# In the United States Court of Federal Claims

**Nos. 06-835C, 06-853C, 06-858C, 07-82C**
**Filed: July 2, 2013**
**Unsealed Opinion Issued for Publication: July 17, 2013**

| | |
|---|---|
| * * * * * * * * * * * * * * * * * | |
| **GULF GROUP GENERAL** | |
| **ENTERPRISES CO. W.L.L.,** | **False Claims Act, 31 U.S.C. § 3729;** |
| | **Special Plea in Fraud, 28 U.S.C.** |
| **Plaintiff,** | **§ 2514; Contract Disputes Act, 41** |
| **v.** | **U.S.C. § 604; Rescission and** |
| | **Disgorgement; Termination; Breach** |
| **UNITED STATES,** | **of Contract; Abuse of Discretion;** |
| | **Demurrage.** |
| **Defendant.** | |
| | |
| * * * * * * * * * * * * * * * * * | |

**Iliaura Hands**, Miller & Williamson LLC, New Orleans, LA, for plaintiff.  With her was **Machale A. Miller**, Miller & Williamson LLC, New Orleans, LA.

**Timothy P. McIlmail**, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Robert C. Bigler**, **Stacey K. Grigsby, Kent C. Kiffner, Lartease M. Tiffith, Russell J. Upton**, Trial Attorneys, **Jeanne E. Davidson**, Director, Commercial Litigation Branch, and **Stuart F. Delery**, Acting Assistant Attorney General, Civil Division.  Of counsel, **Major Daniel Everett**, **Major John Gowel**, and **Captain Dana Collins**, United States Army, Litigation Division.

## O P I N I O N

<u>**HORN, J.**</u>

### FINDINGS OF FACT

This opinion relates to four consolidated cases filed by the same plaintiff, Gulf Group General Enterprises Co. W.L.L. (Gulf Group), in the United States Court of Federal Claims.[1]  The cases arise from four awards to Gulf Group by the United States Army in 2004.  In the lead case, Case No. 06-835C (the camp package BPA case), Gulf

---

[1] The original complaints were filed as follows: Case No. 06-835C, the camp package blanket purchase agreement (BPA) case was filed on December 8, 2006; Case No. 06-858C, the latrine case, was filed on December 15, 2006; Case No. 06-853C, the

Group alleges that the government's termination of its BPA call under a general services contract was arbitrary, capricious, and an abuse of discretion. Gulf Group also alleges that the camp package BPA call termination was made in bad faith.[2] In Case No. 06-858C (the latrine case), Gulf Group alleges that the government's termination of its contract to supply latrines to Camp Arifjan in Kuwait was arbitrary, capricious, and an abuse of discretion. Gulf Group also alleges that the latrine contract termination was made in bad faith. In Case No. 06-853C (the dumpster case), Gulf Group alleges that the government's termination of its contract to supply dumpsters to Camp Arifjan in Kuwait was arbitrary, capricious, and an abuse of discretion. Gulf Group also alleges that the termination of the dumpster contract was made in bad faith. In Case No. 07-82C (the bottled water BPA case), Gulf Group alleges that the government's requirement that it travel in military convoys to deliver bottled water to base camps in Iraq and Kuwait[3] and on return trips resulted in significant delays, as a result of which plaintiff incurred additional costs. Gulf Group contends that the government breached its duty of good faith and fair dealing in delaying plaintiff's delivery of bottled water and that, because of the breach, the government is responsible for demurrage expenses.

dumpster case, was filed on December 19, 2006; Case No. 07-82C, the bottled water BPA case, was filed on February 1, 2007. The cases were consolidated on August 28, 2008. The complaints in each case, however, have been amended multiple times, with the final amendment in the camp package BPA case dated May 6, 2011, the final amendment in the latrine case dated February 25, 2011, the final amendment in the dumpster case dated February 25, 2011, and the final amendment in the bottled water BPA case dated February 25, 2011. Some of the cases were stayed pending decisions of the contracting officer. Subsequently, the second amended complaints in the camp package BPA case, latrine case, and dumpster case raised allegations of abuse of discretion and bad faith on the part of the United States. The cases also were stayed for a considerable period of time at the request of defendant to accommodate ongoing criminal investigations and prosecutions, which are addressed more fully below.

[2] Although plaintiff alleged bad faith in the second amended complaints in the camp package BPA case, the latrine case, and the dumpster case, plaintiff subsequently dropped all allegations concerning bad faith in each of the cases in which it originally was raised. As confirmed in an April 22, 2011 Order issued by this court, "[i]n a conference the court held with the parties on April 8, 2011, plaintiff's counsel advised the court that, upon reflection, counsel does not wish to pursue a bad faith claim on the part of the government, but that plaintiff's counsel intends to proceed with the allegation that government officials acted arbitrarily and capriciously with respect to the cancellation of Gulf Group's contract." Thereafter, in its third amended complaint in Case No. 06-835C (the camp package BPA), filed on May 6, 2011, plaintiff dropped its bad faith claim against the government. Plaintiff reiterated at closing argument, "there is no bad faith claim in any one of these four cases, 06-835, 06-858, 06-853, and 07-082."

[3] The court notes that the bottled water BPA statement of work states that water was to be delivered to camps in Kuwait, whereas the "Special Instructions" in the bottled water BPA, discussed more fully below, indicate that water was to be delivered in Kuwait and Iraq.

The government filed counterclaims and affirmative defenses in each of the four consolidated cases. Regarding the camp package BPA case, Case No. 06-835C, defendant alleges violations of the False Claims Act, 31 U.S.C. § 3729 (2000), amended by Fraud Enforcement & Recovery Act of 2009 (FERA), Pub. L. No. 111–21, 123 Stat. 1617,[4] the Contract Disputes Act, 41 U.S.C. § 604 (2000) (current version at 41 U.S.C. § 7103(c)(2) (Supp. V 2011)), and the Special Plea in Fraud statute, 28 U.S.C. § 2514 (2000).[5] Defendant seeks forfeiture of plaintiff's entire camp package BPA claim under the Special Plea in Fraud statute, damages in the amount of plaintiff's unsupported claim, as well as defendant's cost of reviewing plaintiff's alleged false claim under the Contract Disputes Act, and treble damages and allowable civil penalties under the False Claims Act. Defendant also seeks rescission of the calls issued under the camp package BPA, which the government alleges were obtained by plaintiff through bribery, conflict of interest, and fraud, and defendant seeks disgorgement of all monies the United States paid for calls issued under the camp package BPA, plus costs.

In the latrine case, Case No. 06-858C, defendant alleges violations of the False Claims Act, the Contract Disputes Act, and the Special Plea in Fraud statute. Defendant seeks forfeiture of plaintiff's entire claim under the Special Plea in Fraud statute, damages in the amount of plaintiff's unsupported claim, as well as defendant's cost of reviewing plaintiff's allegedly false claim under the Contract Disputes Act, and allowable civil penalties under the False Claims Act, plus costs. Although defendant argues that the latrine contract also was tainted by bribery, conflict of interest, and fraud, defendant does not seek rescission of the latrine contract.

In the dumpster case, Case No. 06-853C, defendant alleges violations of the False Claims Act, the Contract Disputes Act, and the Special Plea in Fraud statute. As in the latrine case, defendant seeks forfeiture of plaintiff's entire claim under the Special Plea in Fraud statute, damages in the amount of plaintiff's unsupported claim, as well as defendant's cost of reviewing plaintiff's allegedly false claim under the Contract Disputes Act, and allowable civil penalties under the False Claims Act, plus costs. As in the latrine case, although defendant argues that the dumpster contract was tainted by bribery, conflict of interest, and fraud, defendant does not seek rescission of the dumpster contract.

---

[4] The 2009 amendments to the False Claims Act apply retroactively to claims pending on or after June 7, 2008. See United States ex rel. Bennett v. Medtronic, Inc., 747 F. Supp. 2d 745, 762-63 (S.D. Tex. 2010). Although the amended version of the False Claims Act could potentially apply to a submission that plaintiff made in 2011, the court refers to the previous version of the False Claims Act because, as indicated below, plaintiff's conduct in 2011 does not implicate liability under the False Claims Act.

[5] The court notes that some courts refer to the Special Plea in Fraud statute as the "Forfeiture of Fraudulent Claims Act" or "FFCA." See, e.g., Ulysses, Inc. v. United States, 110 Fed. Cl. 618, 648 (2013); Grand Acadian, Inc. v. United States, 105 Fed. Cl. 447, 458, appeal dismissed (Fed. Cir. 2012).

As to the bottled water BPA case, Case No. 07-82C, defendant alleges violations of the False Claims Act, the Contract Disputes Act, and the Special Plea in Fraud statute. As in the camp package BPA case, defendant seeks forfeiture of plaintiff's entire claim under the Special Plea in Fraud statute, damages in the amount of plaintiff's unsupported claim and the cost of reviewing plaintiff's allegedly false claim under the Contract Disputes Act, and treble damages, as well as allowable civil penalties under the False Claims Act. Defendant also seeks rescission of the BPA calls, which defendant alleges were obtained by plaintiff through bribery, conflict of interest, and fraud, and seeks disgorgement of all monies the United States paid for calls issued under the bottled water BPA, plus costs.

Pursuant to the False Claims Act, the government alleges that Gulf Group knowingly submitted false or fraudulent claims to the government on the camp package BPA, the latrine contract, the dumpster contract, and the bottled water BPA. Regarding the camp package BPA, defendant claims that plaintiff violated the False Claims Act in submitting invoices for a call issued under the camp package BPA and in submitting to the government its claims for monies due because the award of the camp package BPA was tainted by bribery, plaintiff inflated the amount of its claims relating to BPA call 0001[6] for services and supplies it had not rendered, and plaintiff supported at least one of its claims with an invoice for services rendered by another government contractor, Green Valley Company (Green Valley).[7] According to defendant, plaintiff also inflated

---

[6] Camp package BPA call 0001 was issued pursuant to the camp package BPA on September 30, 2004, for items covered by the camp package BPA for Camp Buehring.

[7] The parties stipulated that, "[o]n September 28, 2004, Gulf Group and Green Valley entered into a joint venture agreement to perform certain contracts," including for supplies and equipment and other necessary expenses, under which Suresh Pulikkal, a legal consultant for Gulf Telecom, a wholly owned subsidiary of Gulf Group, and other companies in the region, was given power of attorney to act for Green Valley. Saud Al Tawash, the General Manager of Gulf Group, testified that, to the best of his recollection, Gulf Group did not perform any projects with Green Valley under the brief joint venture agreement between the two companies. Saud Al Tawash also testified, however, that Gulf Group had contacted Green Valley in connection with securing equipment to perform under the camp package BPA call for Camp Buehring. Palm Springs General Trading and Contracting Establishment (Palm Springs), a separate company established by Saud Al Tawash, apparently also had a joint venture with Green Valley. Saud Al Tawash testified that, although Palm Springs and Green Valley had worked together on a project, he terminated the joint venture between Palm Springs and Green Valley shortly after a December 2004 meeting about waste management fraud perpetrated by Green Valley employees. Saud Al Tawash testified that government personnel were confused about the relationship between Palm Springs and Green Valley and a contract performed by the two companies was modified in an attempt to clarify the confusion. When asked about the relationship between Palm Springs and Green Valley, Saud Al Tawash offered the following testimony:

4

the amount of its latrine and dumpster contract claims for services and supplies it did not render, inflated the amount due on its claims for demurrage under the bottled water BPA, and obtained the bottled water BPA, and latrine and dumpster contracts through bribery.

Pursuant to the Contracts Disputes Act, defendant alleges that Gulf Group cannot support the monetary claims submitted in the above-captioned cases due to misrepresentation of fact or fraud. In each case, defendant asserts that plaintiff submitted a claim for an amount significantly greater than the contract or BPA call price. As to the camp package BPA, defendant contends that plaintiff claimed $4,544,339.84,[8] although BPA call 0001 was only for $1,447,457.22, the call was only twelve days into performance when it was terminated, and as with the False Claims Act allegations, plaintiff supported its claim with an invoice from Green Valley. Under the latrine contract, defendant alleges that plaintiff claimed $4,558,428.60, although the contract was only for $613,142.86, the contract was terminated after twenty days of performance, and the contract was obtained through bribery. Defendant also alleges that plaintiff certified entitlement to $999,994.67 under the dumpster contract, although the contract was only for $346,998.00, the contract was terminated thirty-two days into the performance period, and the contract was tainted by bribery. Defendant further argues that plaintiff claimed $1,065,711.39 for demurrage under the bottled water BPA, although its documented demurrage charges do not total $1,065,711.39. Defendant also alleges that the bottled water BPA was obtained through bribery. Therefore, defendant contends, plaintiff must pay the government the amount of money it has claimed which is unsupported, plus the government's costs generated in reviewing the claims.

Pursuant to the Special Plea in Fraud statute, asserted in Case No. 06-835C, the camp package BPA case, Case No. 06-858C, the latrine case, Case No. 06-853C, the dumpster case, and Case No. 07-82C, the bottled water BPA case, the government

---

Q: So these [Palm Springs and Green Valley] are two completely separate companies?

A: Yes.

Q: There's no comingling of funds, there's no joint employees, there's nothing that is in common to each other?

A: If Green Valley was my company why would I ask for a modification on this contract?

Q: Why would you even need a joint venture?

A: Why would I need a joint venture, right.

[8] The parties have, by stipulation, generally converted Kuwaiti dinars (KD) into United States dollars (USD) using a 1:3.571 rate throughout their pleadings.

5

alleges that the contracts and BPA calls were awarded in exchange for "money, trips, and other things of value" given by Gulf Group to Carolyn Blake, the sister of John Cockerham, a former Army Major, contract specialist, and contracting officer at Camp Arifjan, Kuwait, who was involved in the award, and terminations, of some of Gulf Group's contracts. Defendant asserts that Gulf Group's actions constitute fraud under the Special Plea in Fraud statute, requiring forfeiture of plaintiff's claims, as Gulf Group's actions created an unlawful conflict of interest and violated 18 U.S.C. § 201(b)(1) (2000), which prohibits the offering or promising of anything of value to a public official with the intent to influence an official act. Defendant further alleges that Gulf Group violated the Special Plea in Fraud statute by submitting false claims under each contract and BPA call to the United States government for an amount of money "to which it knew or knows it was not entitled." Defendant also contends that Gulf Group's camp package and bottled water BPAs were void from the beginning, because they were tainted by bribery, conflict of interest, and fraud, entitling the government to the rescission of the calls and the disgorgement of all amounts paid to Gulf Group under the calls issued for the BPAs.

## Contract Awards

Gulf Group is owned by members of the Al Tawash family, including Saud Al Tawash. Saud Al Tawash, a Kuwaiti citizen, was the General Manager and one of the directors of Gulf Group in 2004 and 2005, the time period pertinent to the contracts and BPAs at issue. Saud Al Tawash also was the Managing Director of Gulf Telecom, which employed Ms. Blake. Saud Al Tawash was the primary point of contact for the United States for both Gulf Group and Gulf Telecom.

On September 30, 2004, Maj. Gloria Davis,[9] who was at the time the chief of Army contracting at Camp Arifjan, awarded the camp package BPA to Gulf Group. The parties stipulated that the camp package BPA, W912D1-04-A-0047, called for "the provision of tent packages, portable latrines, light sets, bulk water, dumpsters, and generators for use in Kuwait." The period of performance on the camp package BPA was September 30, 2004[10] through September 30, 2006, with a BPA master dollar limit of $10,000,000.00, and a BPA call limit of $7,000,000.00. On September 30, 2004, Maj.

---

[9] On December 12, 2006, after speaking with the Army's Criminal Investigation Division (CID) at Camp Victory, Maj. Davis committed suicide. The Wall Street Journal reported that "[o]n December 11, 2006, CID agents met Maj. Davis at Camp Victory in Baghdad's Green Zone to ask about $225,000 found in her offshore accounts. Sometime after midnight, the CID investigators escorted Maj. Davis to her quarters, agreeing to resume debriefing the next morning. Before dawn, she used her own sidearm to commit suicide."

[10] There is a slight discrepancy in the camp package BPA as to the period of performance. In one section, the camp package BPA states the period of performance begins on September 30, 2004, but in another section, the camp package BPA states that the period of performance begins on October 1, 2004.

6

Davis issued call No. 0001 for Camp Buehring pursuant to the master camp package BPA in the amount of $1,447,457.22, with a period of performance from December 15, 2004 through June 15, 2005. Maj. Davis modified the camp package BPA call twice on September 30, 2004, under Modification No. 101 and Modification No. 102.

John Cockerham was on the Contract Review Board that recommended award of the camp package BPA to Gulf Group, but he was not the contract specialist or the contracting officer. The parties stipulated that "Mr. Cockerham was employed by the Department of Defense ('DoD') as a Major in the Army attached to the Army Contracting Activity, Fort Sam Houston Army Post, San Antonio, Texas, from on or about June 2004, until on or about July 2007." The parties also stipulated: "From on or about June 30, 2004, through late December 2005, Mr. Cockerham was deployed to Camp Arifjan, Kuwait, first as a contract specialist and then as a contracting officer upon obtaining a contracting warrant," initially for five million dollars. Mr. Cockerham reported to Col. John Hess, the Director of Contracting at Camp Arifjan in Kuwait. Mr. Cockerham was responsible for soliciting and reviewing bids for Department of Defense contracts in support of Army operations in the Middle East, and was authorized to award contracts after receipt of his contracting warrant in October 2004. Mr. Cockerham has been convicted of conspiracy, bribery, and money laundering in connection with his assignment in Kuwait. Mr. Cockerham is currently serving his prison sentence at a federal facility in Texas. Mr. Cockerham was in federal custody when he testified at trial in the four above-captioned cases.

On September 28, 2004, Maj. Davis awarded Gulf Group a fixed-price contract for the provision of latrines and latrine services at Camp Arifjan. The contract, W912D1-04-P-0932, required four hundred new latrines with daily cleaning services. Mr. Cockerham was the contract specialist assigned to the contract award. Although Mr. Cockerham was not a member of the Contract Review Board that recommended that the latrine contract be awarded to Gulf Group, he signed the Contract Review Board's Contract Review Memorandum as the point of contact for the latrine contract. The base period of the latrine contract was listed as September 28, 2004 through January 21, 2005, with additional option periods totaling twenty-nine months, which could have caused the contract to be extended through early 2007. After a modification, the contract price for the base period of the latrine contract was $613,142.86.[11] The option periods were priced at a combined $4,444,752.28.[12] Thus, the total potential price of the latrine contract was $5,057,895.14.

---

[11] The latrine contract indicates that the base period price of 171,680.000 KD was equivalent to $613,142.86, which is the figure that defendant cites in its briefs. Although an application of the conversion rate to which the parties have stipulated results in a base period price of $613,069.28, the court uses the price that appears on the face of a contract or call, rather than the conversion rate to which the parties have stipulated, when the contract or call provides a USD figure.

[12] The prices for the base and option periods are listed in the original contract in USD, but a modification to the contract listed the prices for the base period in USD and KD, and for the option periods in KD. The KD numbers are calculated into USD in plaintiff's

On September 20, 2004,[13] Maj. Davis awarded a fixed-price contract, W912D1-04-P-0897, to Gulf Group for the provision of dumpsters and dumpster services at Camp Arifjan. Mr. Cockerham testified that he "thought" he was the contract specialist assigned during the award of the dumpster contract. Mr. Cockerham signed a Contract Review Board Memorandum as the point of contact for the dumpster contract, although he was not a member of the Contract Review Board that recommended award of the dumpster contract to Gulf Group. The base period of the dumpster contract was listed as September 25, 2004 through March 24, 2005. There were five additional option periods of six months each following the base period, which were available to extend the contract through September 24, 2007. The price awarded for the base period of the dumpster contract was $346,998.00. The combined price of the option periods was $1,110,621.72. Thus, the total potential price of the dumpster contract was $1,457,619.72.

On September 28, 2004, Maj. Davis awarded the bottled water BPA, W912D1-04-A-0052, to Gulf Group for the provision of bottled water. Although Mr. Cockerham, the contract specialist, was not a warranted contracting officer at the time the BPA was awarded, and he was not a member of the Contract Review Board that reviewed the award of the bottled water BPA, his name appears next to the duty position "Contracting Officer" in the Contract Review Board Memorandum. The base period of performance for the bottled water BPA was September 28, 2004 through September 28, 2006. The contract called for the supply and delivery of bottled water to locations in Kuwait and Iraq. The BPA master dollar limit on the bottled water BPA was $10,000,000.00, and the BPA call limit was $7,000,000.00. The performance period was extended to September 7, 2008 by Modification P00001, which also deleted the original $10,000,000.00 BPA call limit. Modification P00001 was signed by Mr. Cockerham as the contracting officer on December 20, 2005.

A number of separate incidents are relevant to understanding the events related to each of the contracts and BPAs at issue in the above-captioned cases. The parties stipulated that, subsequent to the award of the BPAs and contracts, "COL Patrick

claim. Defendant does not dispute plaintiff's numbers and agrees that the correct base period price is represented by the USD and KD figures listed in the contract modification. Therefore, the total, possible award for the latrine contract appears to have been $5,057,895.14. In his decision on Gulf Group's claim with respect to the latrine contract, which is described below, contracting officer Joseph Libbey, a warranted level-3, maximum level, contracting officer, stated that the price reflected on the contract for the base period was inaccurate. The latrine contract, however, states the price of each line item. The court, therefore, refers to the amounts listed on the face of the modification to the contract.

[13] According to the parties' joint stipulation of facts, the dumpster contract was entered into on September 26, 2004. This appears to be an error, however, as the contract performance period is listed as starting on September 25, 2004, and the signatures on the dumpster contract are both dated September 20, 2004.

Dardis, the 'Camp Buehring Mayor,' sent MAJ Robert McKinzie and MAJ Terry England to conduct a site visit of Gulf Group's yard at Amgarah on or about October 6, 2004." According to Saud Al Tawash and his brother, Megbel Al Tawash, a director of Gulf Group, and Gulf Group's Operations Manager in 2004 and 2005, the visit was conducted to inspect Gulf Group's preparations for the camp package BPA. Saud Al Tawash and Megbel Al Tawash testified that this first site visit was very quick and unannounced, and, although the inspectors "were not happy," they did not explain their concerns to Megbel Al Tawash, who had received them. Nevertheless, the government moved up the period of performance of Gulf Group's camp package BPA call for Camp Buehring from December 15, 2004 to November 15, 2004 due to a surge. A second site visit was conducted on October 13, 2004, by Lt. Theodore Rivera, Capt. William Trimble, Jr., and Capt. Ryan N. Novak, who were assigned to the contracting office at Camp Arifjan. The purpose of the second site visit was to ensure that Gulf Group was prepared to carry out the camp package BPA call. Saud Al Tawash was present during this second site visit, apparently conducted a day after the termination of the camp package BPA call at issue, at which time he first learned that the date of the camp package BPA call was being accelerated due to the surge. Bobby Wilson, Gulf Group's Project Manager in Kuwait, also was present during this second inspection and indicated that the contracting office inspectors were satisfied with their review. Regarding the second site visit, defendant's October 20, 2004 Memorandum for the Record[14] on the subject of "Gulf Group Cancellation" states:

> During the site visit, the government was able to evaluate the Gulf Group's capabilities of meeting the surge. All the equipment (dumpsters, latrines, generators) on site was brand new and Saud [sic] Tawash (General Manager) produced copies of the purchase orders for the fire-retardant tents. Saud informed the CO's [contracting officers] that he currently has a contract at Camp Arifjan supplying dumpsters and latrines. The CO's believed Gulf Group were [sic] able to do the job and do the job well. Gulf Group had the technical and logistical expertise, manpower, material, and equipment, and it was our firm recommendation to allow Gulf Group to continue with this contract.... On 14 Oct 2004, the 3 CO's arranged a meeting with Major Cockerham and Mr. Tijani to meet GG [Gulf Group]. Prior to meeting with GG, the government personnel discussed GG's capabilities.... He blessed their capabilities and informed the CO's he would follow up with Lt. Col Hess.

At trial, Capt. Novak remembered preparing a memorandum on the subject of Gulf Group's readiness to perform the camp package BPA, along with Capt. Trimble

---

[14] The October 20, 2004 Memorandum for Record introduced as an exhibit at trial is unsigned. Additionally, at the end of the unsigned memorandum, there were hand-written notations. At trial, it was not established who wrote the October 20, 2004 Memorandum for Record, or who authored the hand-written notes on the document, with various witnesses disavowing responsibility for the Memorandum for Record and Mr. Cockerham challenging some of the statements attributed to him in the memorandum.

and Lt. Rivera, and Capt. Novak agreed with the impression that Gulf Group could do the job well. Capt. Novak indicated remembering a document similar to the memorandum quoted above. He testified, however, that he did not believe the memorandum quoted above is the exact memorandum he prepared because of the phrase, "blessed their capabilities," which he said "just seems out of place to me." Capt. Novak acknowledged that the memorandum quoted above could have been a draft of the final memorandum he prepared. Capt. Trimble did not remember writing the memorandum quoted above or any similar memorandum, or assisting anyone in writing such a memorandum, but stated that "[w]e left with the impression that they could perform the work." Capt. Trimble also agreed with statements in the memorandum, including, "[t]he CO [contracting officer] believed Gulf Group were [sic] able to do the job and do the job well," and noted that "Gulf Group had the technical and logistical expertise, manpower, material, and equipment and it was our firm recommendation to allow Gulf Group to continue with the contract."

With regard to Gulf Group's performance on the dumpster contract, according to the testimony of M. Sgt. Edward Sivert,[15] a contracting officer's representative who maintained life support systems, including dumpsters, at Camp Arifjan from March 2004 to February 2005, there were issues with Gulf Group not having enough dumpsters to replace Future Services, a rival contractor, when Gulf Group took over performance of dumpster services at Camp Arifjan between mid-September and October 10, 2004. M. Sgt. Sivert testified that, as a result of this dumpster shortage, trash appeared on the ground in different areas of Camp Arifjan over the course of a week or so, although no item of trash necessarily had been on the ground for a full week. According to plaintiff, the government had reduced the number of dumpsters below the number required from previous contractors.[16] Following the termination of Gulf Group's dumpster contract, the government awarded the contract to another contractor, Green Valley, and required two hundred sixty-five dumpsters, which was thirty-two more dumpsters than the government had ordered plaintiff to provide. M. Sgt. Sivert explained that the trash on the ground was not necessarily caused by the alleged reduction in the number of government-requested dumpsters because some of the dumpsters had been located at the ball field, which was closed. When asked, "if there is trash on the ground because there is no [sic] sufficient dumpsters, whose fault is it," M. Sgt. Sivert replied "probably the government's at that time, if there was enough dumpsters to put there." M. Sgt. Sivert further explained that not all of the other dumpster contracts had run out by September 30, 2004, and that both Future Services and Gulf Group had dumpsters on base at the same time. M. Sgt. Sivert noted that he was not present when Gulf Group allegedly had insufficient dumpsters on site. He also testified that he remembered Gulf

---

[15] Edward Sivert was a Sergeant First Class, rather than a Master Sergeant, during the time of the relevant BPAs and contracts.

[16] According to a spreadsheet introduced into the record, which plaintiff asserts was prepared by a Maj. Ken Braddock, there were three hundred fifty-one dumpsters that were expired and renewed between June 2003 and September 2004. The Army contracted with Gulf Group for the provision of two hundred thirty-three dumpsters.

Group's dumpsters being blue and Future Services' dumpsters being "[g]oldish brown." Saud Al Tawash testified, however, that Gulf Group's dumpsters were painted red.

According to Saud Al Tawash, there was an incident with trash on the ground in September 2004, which he attributed to "dirty competitors or dirty practices." Saud Al Tawash testified that other contractors had flipped over their own dumpsters, causing trash to pile up on the ground. Megbel Al Tawash also testified that he believed the trash on the ground on the first day of Gulf Group's performance resulted from other companies tipping over their dumpsters. Mr. Cockerham, who was a contract specialist at Camp Arifjan at the time, testified that he had never heard of any problems with Gulf Group's dumpsters.

According to Joseph Libbey, the contracting officer who issued the final decisions on Gulf Group's latrine and dumpster contracts and camp package BPA claims, a police report that was in the contract files, which he reviewed while considering Gulf Group's claims, indicated that employees of Gulf Group were scavenging through dumpsters at Camp Arifjan. The police report that Mr. Libbey referred to, however, was addressed to another contractor, Gulf Company, as opposed to plaintiff Gulf Group. During testimony at trial, Mr. Libbey indicated that "I took Gulf Company to mean Gulf Group, I mean it's got Gulf and then Co. over here." The parties have stipulated, however, that "Gulf Company is not associated or related in any way with Gulf Group, Gulf Telecom, or any of the Al Tawash family members." The two companies are distinct organizations, and the record does not reflect that the government has ever issued any cure notices to Gulf Group regarding performance under the dumpster contract. Moreover, Saud Al Tawash testified that he received no performance complaints related to the dumpsters under the contract.

Gulf Group's performance of the latrine contract appears to have been contentious since its inception, or even before, as Mr. Cockerham testified at trial that, prior to the initiation of contract performance on the latrine contract, Col. Hess had received a telephone call from Sally Ziedan of the incumbent contractor, Future Services, who was "livid going off about how dare he. How could he let Maj. Cockerham go ahead and award the latrine contract to Gulf Group and how much experience they had, and she was just raving."[17]

Mohammed Al Tawash, Saud Al Tawash's and Megbel Al Tawash's brother, was asked to oversee the servicing of the four hundred Gulf Group latrines. Mohammed Al Tawash also was a shareholder in Gulf Group, although, according to his testimony, he only worked for Gulf Group on one occasion, October 7, 2004, which was his first time at Camp Arifjan. On that day, Mohammed Al Tawash carried a notepad, asked the military escorts for a map, and asked questions about the location of the cafeteria and other buildings where latrines were to be placed. Mohammed Al Tawash testified that he requested the information because Gulf Group did not have a service route for the latrines, and a map could enable Gulf Group to be more efficient and effective in its performance of the latrine contract. The parties stipulated that, "[o]n October 7, 2004,

_____

[17] According to Mr. Cockerham, Future Services' bid had arrived two days late.

four Gulf Group employees, were detained by Military Police and/or Counterintelligence officers at Camp Arifjan. After being questioned, they were released to the Kuwait Ministry of the Interior" and a Military Police Report was generated regarding the incident. The police report stated that Mohammed Al Tawash asked questions regarding locations on base for latrine placement.

According to Mohammed Al Tawash, the military escorts answered his questions and he did not remember the escorts questioning his need for information or the building locations. The military escorts worked in three hour shifts and, after the second shift, Mohammed Al Tawash and the three other Gulf Group employees with him returned to the security station, hoping that a third escort could be arranged.[18] At that time, Mohammed Al Tawash and the other three Gulf Group employees were detained and interviewed by military police, who were not in uniform, but dressed in what Mohammed Al Tawash testified was "evening night out attire." The military police did not search him or the vehicle the Gulf Group employees were driving. Mohammed Al Tawash was not asked to sign any paperwork, nor was he fingerprinted. The notepad he used to draw a service map and to take notes on the latrines that had already been serviced was confiscated and not returned. The military police turned the Gulf Group employees over to the Kuwait Ministry of the Interior, and they were transported to a police station. According to Mohammed Al Tawash, at the police station a detective asked them questions, requested their civil identifications, ran a background check, and cleared them shortly before midnight on the same day, October 7, 2004. Mohammed Al Tawash testified that they were released, no charges were filed against them, and they were not asked to return for a hearing. According to Saud Al Tawash, none of Gulf Group's employees were barred from the United States military camps as a result of this incident or any other incident. Mohammed Al Tawash testified that he was not able to finish cleaning the latrines that day, but believed a vacuum truck returned to finish the job. He was unsure how many latrines remained to be serviced. Mr. Wilson testified that he had heard that Mohammed Al Tawash had been using a GPS on base, and had a cell phone with him at the time he inquired about the latrines, but could not confirm the accuracy of the information. Capt. Novak also reported hearing something about a GPS incident and Gulf Group, but he did not necessarily remember anything about workers asking allegedly suspicious questions. Mr. Wilson indicated that he "grilled him [Mohammed Al Tawash] pretty hard" about the alleged security incident afterward and instructed him, as a precaution, not to ask similar types of questions on base.

According to Col. Laurence Portouw, the Third Army Assistant Chief of Staff who ran the intelligence organization for the staff that supported the General at the Third Army at Camp Arifjan and in Atlanta, Georgia, one of his staff officers told him about the alleged security incident involving Gulf Group personnel and said that the contract was going to be cancelled. Col. Portouw was asked whether he could have the cancellation delayed so that the incident could be examined. Thereafter, Col. Portouw called Col. Brick Miller, Commander of the Area Support Group in Kuwait, stationed at Camp Arifjan, about the incident. During this call, Col. Portouw asked Col. Miller to delay

---

[18] At trial, Mohammed Al Tawash was unclear as to whether he asked questions of both the first and second shifts of escorts, or only of a single shift.

cancellation of Gulf Group's contract so the intelligence organization could look into the incident. Ultimately, a case was not opened on the incident involving Gulf Group because, according to Col. Portouw, "there was no substance to it" and the questions asked by Mohammed Al Tawash were "innocent."

According to Col. Miller, he received a telephone call asking him to delay termination of Gulf Group's contract, but he does not recall who the call was from, although he admitted that "it could very well" have been from Col. Portouw.[19] Col. Miller also indicated that during this telephone call he was informed that the Counter Intelligence Team was looking into whether Gulf Group was involved in detonating improvised explosive devices (IEDs) using cell phones, and he "took that as they [Gulf Group] were aiding and abetting those that detonated IED's with cell phones." According to Col. Miller, he notified Col. Hess of the request to delay cancellation, and it was his understanding that Col. Hess then deferred the termination.[20] Col. Portouw, however, testified that he did not tell Col. Miller that Gulf Group employees were suspected of detonating IEDs with cell phones because he was "not even sure I knew who the company was at the time." According to Capt. Jacquelyn Olsa,[21] the S2[22] intelligence officer at Camp Arifjan in October 2004, who reported to Col. Miller, she did not have any discussions with Col. Miller about IEDs related to Gulf Group. She did believe, however, that she would have discussed the alleged security incident with Col. Miller, although she did not specifically remember doing so.

Col. Portouw indicated that such incident reports were not frequent, but also not uncommon, and that, "invariably we found out that they were curiosity-generated reports and simply required explaining to the employee why they shouldn't do that." Capt. Olsa indicated that similar incidents would typically occur "once a week," although she indicated that she would "recommend a bar for these types of activities." Col. Miller felt the incident was not particularly important. When asked, Col. Hess agreed that the failure to give a contractor a schematic plan of the camp could complicate performance, particularly during startup, and that a layout with the number and locations of latrines would be of considerable use to a new contractor. Like Col. Hess, Maj. Timothy Petty, the support operations officer under the director of logistics at Camp Arifjan who

---

[19] In a July 7, 2010 email to Capt. Lisa Satterfield of the office of the Judge Advocate General, Col. Miller indicated that he had received a phone call from "[t]he CFLCC/3rd AR C2/G2, a COL whose name escapes me," and the officer stated that he had heard the contractor would be terminated for deficiency and asked for a delay of the termination.

[20] As described in greater detail below, Col. Hess testified that he reviewed Gulf Group's contract files and found no documentation linking the Al Tawash family to terrorists, anti-American groups, the Taliban, Saddam Hussein, or any other enemies of America.

[21] At the relevant time, in Kuwait in 2004, Capt. Olsa was known as Capt. Hellmeier.

[22] The S2 refers to an intelligence officer at the coordinating staff level.

oversaw latrine contracts, testified that the provision of a map of where latrines should be located was a good idea.

As a result of the alleged security incident, Col. Miller sent warning letters on October 21, 2004 to Saud Al Tawash, Marcos Sotos, Bobby Wilson, Mohammed Al Tawash,[23] Fizan Abdula, Mohadien Asif, and Munir Ahmed regarding Gulf Group and its employees not following certain unspecified security regulations. According to Saud Al Tawash, only four of the letter recipients (Mohammed Al Tawash, Fizan Abdula, Mohadien Asif, and Munir Ahmed) had been involved in the incident. Although not consistent with other testimony he offered at trial, Col. Miller testified that he first became aware of the alleged security incident concerning Gulf Group when he signed these warning letters. Col. Miller indicated that "[t]housands" of warning letters such as these were sent at that point in time in Kuwait and that this incident had "[n]othing to do with" the termination of Gulf Group's contracts and camp package BPA call.

In addition to testifying about the alleged security incident, Col. Miller also testified about a latrine incident. According to Col. Miller, on a day in September or October 2004, he was summoned by Maj. Gen. Gary Spear[24] to view about twenty latrines in front of headquarters and facing the dining facility, which, according to Col. Miller, were "in a deplorable state of affairs or condition." Col. Miller agreed with plaintiff's counsel's characterization of Maj. Gen. Spear having a "one-sided conversation" with Col. Miller, and which Col. Miller characterized as "a chewing out, basically," about fixing the latrines. Col. Miller testified that liquids were "overflowing out of the toilets," and that it was a "life health safety issue" affecting "all of the latrines that were there, because we opened every door." At the trial, Col. Miller further described the overflowing latrines as follows: "It's coming over. It's on the floor. It's on the seat." According to Col. Miller, either Col. Fugate, Col. Miller's executive officer, or Col. Hess was with him when he viewed the latrines, but he was not sure which officer was with him. Col. Miller testified that either he told Col. Hess to fix the issue or had Col. Fugate tell Col. Hess to get it fixed. According to Col. Miller, there were no subsequent complaints, and Maj. Gen. Spear did not summon him again to view the latrines.

Joseph Libbey wrote in his contracting officer's final decision on Gulf Group's contract and BPA claims that Maj. Gen. Spear not once, but twice, had "summoned Colonel Miller and LTC Hess to, again, observe the deplorable conditions of the latrines." When Col. Hess testified at trial, he did not recall the latrine incident, and testified that he did not recall ever seeing even one latrine overflowing. When questioned about Mr. Libbey's contracting officer's final decision, which found, in part, "[b]arely a week had passed from the first latrine inspection when the General again summoned Colonel Miller and LTC Hess to again observe the deplorable conditions of the latrines," Col. Hess testified that he certainly did not recall a second latrine incident a week after the alleged first incident. Furthermore, contrary to Col. Miller's testimony,

---

[23] The letter to Mohammed Al Tawash was incorrectly directed to "Mohammed Altawash."

[24] Maj. Gen. Spear is sometimes referred to as Maj. Gen. "Spears" in the trial transcript.

Col. Hess testified that no one ever directed him to fix the dirty latrine. According to Mr. Cockerham, the dirty latrine was in front of Maj. Gen. Spear's office, and it was a one-time issue in which one latrine was not cleaned, and was subsequently corrected. Mr. Cockerham testified that he believed the latrine issue was used as an excuse to terminate Gulf Group's latrine contract because Maj. Petty wanted to consolidate two latrine contractors into one, and because Maj. Petty preferred Future Services as the contractor.

According to Maj. Petty, he learned of a latrine problem while he was at a meeting at Camp Doha, through a call from Lt. Col. Platt, who told him that "he had received a phone call, that they were, that they [the latrines] were just really dirty, disgusting, and I needed to get it fixed." Maj. Petty testified that he personally inspected a group of eight to ten Gulf Group latrines in a high-traffic area between the dining facility and headquarters after 5 p.m., which had "feces above the rim." He indicated that "there was one that was extremely bad and then the others were just unkept," but that all but one were usable. He did not recall seeing any debris in the basin of the latrines. After seeing the latrines, Maj. Petty called one of the non-commissioned officers in his office, which may have been M. Sgt. Seibert,[25] who served the role of contracting officer representative for Gulf Group's latrine contract, to make him aware of the situation. Maj. Petty did not recall any specific conversation with Col. Hess about the latrine issue, but did make Col. Miller, who was at the same meeting at Camp Doha, aware of the situation. According to Maj. Petty, Gulf Group was contacted to resolve the issue, which he believes Gulf Group resolved the following day, and there were no further incidents.

Saud Al Tawash testified that he never received a non-conformance report or written complaint about Gulf Group's latrine contract. Saud Al Tawash did, however, receive a call about a single overflowing latrine next to the dining facility, which, according to his on-site superintendent, was filled with empty plastic bottles, even inside the sewage tank "as if somebody was storing plastic bottles." According to Saud Al Tawash, Gulf Group's latrines were unplumbed, such that it was "not possible" for them to overflow. Saud Al Tawash also testified, however, that the single, overflowing latrine was an "isolated event." Saud Al Tawash believed that this incident was due to people storing plastic bottles in the latrine for recycling, or a cultural issue for third country nationals on Camp Arifjan, who were not used to unplumbed latrines.

According to trial testimony from Megbel Al Tawash, Gulf Group's office received a call that one latrine had feces up to the brim, which plaintiff's on-site supervisor cleaned that same day. Megbel Al Tawash indicated that a Gulf Group latrine was "overflowing with bottles of water and feces." Megbel Al Tawash testified that Future Services had about eight to ten latrines in the same area near the mess hall. Mr. Wilson testified that, because the latrines from various companies all looked the same,

---

[25] Maj. Petty testified that "M. Sgt. Seibert" oversaw the latrine contract. It is unclear whether Maj. Petty's testimony refers to M. Sgt. Sivert, who as indicated above, maintained life support systems at Camp Arifjan, including dumpsters.

it was possible that the dirty latrine, or the latrines involved in the incident, belonged to another contractor.

Maj. Petty testified that Future Services still had latrines in place when Jasmine International Trading & Service Company (Jasmine) and Gulf Group first arrived, so that these new contractors would know where to put the latrines, and that, as a result, two sets of latrines may have been in a particular area at the same time. Maj. Petty also testified that, to the best of his recollection, servicing the latrines once a day would have been sufficient. The statement of work for Gulf Group's latrine contract stated, in part:

> 4.2 *Cleaning*. The Contractor will empty and clean each latrine daily by wiping down interior walls and seat with mild disinfectant water or solution (that is nonharmful to the skin and eyes) and will provide steam cleaning reconditioning services once a month. The Contractor will provide all materials, equipment, personnel, chemicals, and cleaning supplies to include using an approved disinfectant. The Contractor will provide a Material Safe Data Sheet to the COR for any chemicals used in this contract. The cleaning services will include the following:
>
> 4.2.1 *Daily*. The Contractor will vacuum sewage from the basin. Debris such as cans, bottles, rags, sticks, etc. will be removed from the waste tank, collected and hauled away for proper disposal. No debris will be allowed to contaminate the outside area around the chemical latrine. The Contractor will be responsible for cleanup of any spills. After all sewage and debris have been removed the Contractor will wash the toilet seat, urinal, and adjacent area around the toilet seat with the approved cleaning solution and remove all built up dirt and waste by scrubbing with a nylon hand brush. The Contractor will fill the empty basin with a mixture of two (2) cups disinfectant solution and ten (10) gallons fresh water. The Contractor will refill toilet paper dispensers and hand sanitation gel dispensers. The Contractor will leave the area in and around the latrines in a sanitary state.

(emphasis in original). Based on his experience, Col. Hess believed that a contract that only required service of latrines once a day in high-traffic areas like the mess hall or headquarters may have set a contractor up for failure because these areas should have been cleaned twice a day. Steven Perry, a former Army Colonel and plaintiff's expert on issues of Army contracting and standard practices and procedures for Army contracting,[26] also testified that, if the government sets a once-per-day cleaning requirement for latrines, but has not anticipated the extent of the usage, the state of uncleanliness of the latrines may not be attributable to the contractor, but rather to faulty

---

[26] Mr. Perry was qualified as an expert in the standard practices and procedures of Army contracting, including the subjects of the solicitation, award, management, administration, closeout, and termination of contracts. Mr. Perry also was qualified as an expert on the interrelationship and interface of those same practices and procedures with basic principles of command and control.

specifications, and that, if the specification underestimates usage, the specifications may need to be altered. Moreover, according to Mr. Perry, if bottles of water were found in a latrine, it would be the fault of the "end-user," not of the contractor.

Mr. Perry further stated that "in a latrine contracting situation, you get all kinds of garbage dumped in the latrines all the time. That happens to be a performance issue. That is why this type of contract is very hard to manage." During his testimony, Col. Miller also indicated that latrines are "a subject that you have to watch," and that he would expect that, if a contracting officer representative had seen the latrine incident, a non-conformance report would have been prepared "[a]t some point." In contrast, Col. Hess testified that "we generally did not have problems with latrine contracts." According to Col. Hess, a contractor missing a group of latrines during servicing was not uncommon and was not considered a serious offense warranting termination for default. Col. Hess further testified that, to his knowledge, his contracting office had no performance problems with Gulf Group and that Gulf Group's latrine contract was not terminated for failure to clean the latrines. Mr. Perry also testified that he does not think latrine contracts are "hard to manage, as long as you set in place what needs to be done."

There is confusion and inconsistency in the record as to the timing of the latrine incident relative to the alleged security incident involving Mohammed Al Tawash. In his July 7, 2010 email to Capt. Satterfield, Col. Miller indicated, almost six years after the event in question, that he believed the latrine incident occurred in the week prior to the alleged security incident. According to Maj. Petty, the support operations officer at Camp Arifjan who oversaw numerous latrine contracts, the alleged security incident occurred before the latrine incident, the latter of which occurred in the "October time frame." Maj. Petty testified that, "[i]nitially before the deposition and we met, I would have said it [the questions incident] was after the dirty latrines. But after reviewing the notes that you [plaintiff's counsel] showed me to refresh my memory, that it was before." According to Mr. Wilson, the latrine incident was before the alleged security incident. Mr. Wilson stated, "you know, first it was this issue in the latrine, and the next thing it's the issue of Mohammed. And the next thing it's the issue of a counterintelligence measure.…"

## Terminations of the Camp Package BPA Call, the Latrine Contract, and the Dumpster Contract

Maj. Davis terminated Gulf Group's camp package BPA call at Camp Buehring on October 12, 2004, through Modification 103. According to the parties' joint stipulation of facts, the camp package BPA call was terminated for the government's convenience, although this is not clearly indicated on Modification 103. The modification stated: "The purpose of this modification is to cancel the BPA call with Gulf Group. Gulf Group has no issues with this cancellation and will accept it at no cost to the government." Despite terminating the camp package BPA call, the government had sufficient funds to pay for, and continued to be in need of, the camp package services. The same day the cancellation was issued, Future Services was awarded two BPA calls

for Camp Buehring for approximately the same amount of goods and services as Gulf Group's cancelled camp package BPA call.

Plaintiff's initial submission to the contracting officer in relation to the camp package BPA call termination indicated that the termination was made in order to award Gulf Group another BPA call. Plaintiff's statement was supported by some of the testimony at trial, which indicated that the termination of the Camp Buehring camp package call was conditioned on the award to Gulf Group of a camp package call for Camp Virginia. During cross-examination at trial, Saud Al Tawash indicated that he may have agreed to the termination of the Camp Buehring camp package call based upon the assurance that he would receive a camp package call for Camp Virginia. Saud Al Tawash testified that he had asked for the paperwork to be sent over for the proposed swap, which he never received. The parties have stipulated that "BPA Call No. 0002 under Master BPA 0047 for general camp package services at Camp Virginia was prepared for Gulf Group but never signed." Saud Al Tawash indicated at trial that he had received an undated hand-written note from Mr. Cockerham, stating:

> Here is a copy of the cancellation to Camp Buehring. This cancellation was made because we were giving you a larger camp call Virginia. Virginia award was verbal with the agreement to cancel Buehring. Virginia was not awarded on paper as a command directive. The original cancellation was sent out 13 Oct 04. But here is another copy as requested. Thank you.

From this note, Saud Al Tawash testified that he understood that the Army would not award Camp Virginia to Gulf Group. Mr. Cockerham testified, however, that he may have sent the note as a "reassurance" and that the note was intended to convey that a call for Camp Virginia had been verbally "awarded," but that Col. Hess had ordered contracting personnel not to award Camp Virginia "on paper" because he may have been considering another contractor for the Camp Virginia call and because Col. Hess "was checking on...some other issues from perhaps a security report." Instead, the camp package call for Camp Virginia was initially awarded to StarCon, Ltd. (StarCon), but the BPA call issued under that BPA was cancelled on October 11, 2004 by Maj. Davis, and ultimately was awarded to Kamal Al Sultan Company (KMS) on October 14, 2004.

On October 18, 2004, Mr. Cockerham issued Modification P00002, which terminated plaintiff's latrine contract pursuant to 48 C.F.R. § 52.212-4. The description of Modification P00002 reads: "This contract is being canceled due to command directive of the ASG [Army Support Group] commander SWA COL Brick Miller 3rd Army Arcent Kuwait. The contract is canceled under the terms of 52.212-1, 52-212-4 [sic], 52.249-4." According to the parties' joint stipulation of facts, the latrine contract was cancelled on October 24, 2004, pursuant to Modification P00003, but the description of Modification P00003 reads: "Modification to this previously canceled contract by order of the ASG Commander Kuwait COL Miller. This mod is to remove money from previously canceled contract that was ordered [sic] to be canceled. Contract was canceled in

18

accordance with FAR Part 52.212-4." Despite terminating Gulf Group's latrine contract, the government had sufficient funds to pay for, and continued to be in need of, the latrine services. The parties stipulated that "[a]ll or part of the service that was initially awarded to Gulf Group under the latrine contract was awarded to Jasmine." Following termination of the latrine contract, the government continued to place orders for latrines with Gulf Group for other locations, including Camp Victory, Camp Crossing, and the Ash Shuaybah Sea Port of Debarkation.

On October 22, 2004, Mr. Cockerham issued Modification P00005 on behalf of the Army, which terminated Gulf Group's dumpster contract for the convenience of the government.[27] Modification P00005 reads: "Contract is cancelled by order of the ASG Commander Kuwait COL Brick Miller. Contract was canceled in accordance with FAR Part 52.212-4 Termination for Convenience of the Government." Despite terminating the dumpster contract, the government had sufficient funds to pay for, and continued to be in need of, the dumpster services. Prior to the termination of Gulf Group's dumpster contract, on October 14, 2004, the government sent a request to Fouad Salem of Abdul Hameed Salem, seeking a quote for dumpster services at Camp Arifjan, to which Fouad Salem responded. Four days later, on October 18, 2004, and before plaintiff's dumpster contract was cancelled, a contract for dumpster services was awarded to Green Valley. After Gulf Group's dumpster contract was terminated, however, the government continued to order dumpsters from Gulf Group for the Ash Shuaybah Sea Port of Debarkation.

Despite the language contained in the modifications terminating the camp package BPA call and the latrine and dumpster contracts, at trial, a number of witnesses offered contradictory testimony as to the reasons for the multiple terminations. Although contradicted by other witnesses, Col. Miller indicated that he did not direct, nor was he involved in, the termination of the camp package BPA call, the latrine contract, or the dumpster contract.[28] Col. Miller stated that contracting was a

_____

[27] The parties' joint stipulation of facts states that Mr. Cockerham issued the termination on October 22, 2004. Although Mr. Cockerham signed the modification terminating the contract on October 21, 2004, October 22, 2004 is shown as the "effective date" of the termination. Gulf Group was faxed the modification on October 28, 2004.

[28] For example, during direct examination, Col. Miller was presented with a copy of Modification P00005 to the dumpster contract, which stated: "Contract is canceled by order of the ASG Commander Kuwait COL Brick Miller. Contract was canceled in accordance with FAR Part 52-212-4 Termination for Convenience of the Government." After the Modification P00005 to the dumpster contract was read into the record, Col. Miller and plaintiff's counsel had the following exchange:

Q: Is that statement true and correct?

A: No, sir.

completely separate command structure from his own command, and that he did not have the authority to terminate or award contracts. Col. Miller also testified, however, that the Gulf Group terminations were not related to the alleged security incident, indicating at least some awareness of the whole situation. In addition, according to Clea Efthimiadis, a United States Army[29] civilian attorney assigned to Camp Arifjan at the time, Col. Miller represented to her that Gulf Group's latrine contract "was terminated because they couldn't do the job," and that the contract was terminated for default based on a "repeated failure to perform to the statement of work." As noted above, however, Gulf Group's contracts and camp package BPA call were terminated for the convenience of the government.[30]

---

Q: Do you have any idea on your -- this is going back to your knowledge and -- mind you -- why Major Cockerham would have said that you ordered this termination?

A: Can you be more specific than, "any idea?" Any idea at that time? Any idea now? Any idea hearsay?

Q: Very good point. In -- you'll notice the effective date of this is October 22, 2004. In 2004, did you have any idea -- did you even know that this contract had been canceled?

A: Sir, I couldn't have told you that this contract even existed in this form. Because I didn't talk to contractors. I didn't --

Q: This is not your command.

A: -- correct. I had no reason to look at these, nor do I have any reason to look at when they cancel them.

[29] Although formerly a civilian attorney for the United States Army, Ms. Efthimiadis was an attorney for the United States Navy when she testified in the above-captioned cases.

[30] The distinction between termination for default or cause and termination for convenience is evident from the termination clauses in the camp package BPA:

Termination for the Government's convenience. The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost

20

Col. Hess, the head of contracting at Camp Arifjan at the relevant time, offered inconsistent and self-serving testimony at trial, but generally testified that he believed Gulf Group's camp package BPA call, latrine contract, and dumpster contract were terminated because of security concerns, and that Col. Miller gave a directive or order to terminate the contracts. According to Col. Hess' testimony, Col. Hess ordered Mr. Cockerham to terminate Gulf Group's latrine and dumpster contracts, and Col. Hess ordered Maj. Davis to terminate Gulf Group's camp package BPA call, because "[w]e were ordered to get Gulf Group off the bases, the camps." Col. Hess indicated that this order to remove Gulf Group from the bases did not come from Col. Mark Neumann, the Principal Assistant Responsible for Contracting at Camp Arifjan in October 2004, to whom Col. Hess reported, or anyone in ARCENT (United States Army Central Command). He also stated that he had reviewed the contract files, and that none of the files included any documentation linking the Al Tawash family to terrorists, anti-American groups, the Taliban, Saddam Hussein, or any other enemies of America. According to Mr. Wilson, however, Col. Hess told him that Gulf Group's contracts were terminated due to "counterintelligence on the Al Tawash family, and they have ties [to] Al Qaeda and Saddam Hussein." Notably, Col. Hess testified that the government terminated Gulf Group for convenience, rather than for default, so that Gulf Group could file claims for reimbursement because the government did not "want to cause any undue hardship" to Gulf Group. Col. Hess further stated that he does not believe that a termination for default is proper even if a contractor is suspected of anti-American ties or sentiments.

According to Col. Portouw, the Gulf Group cancellations "had something to do with performance with latrines," but he did not recall who told him that and did not indicate to which Gulf Group contract he was referring because he never referred specifically to any particular contract during his testimony. According to Maj. Petty's recollection, Gulf Group's contracts were terminated because of the alleged security

principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

Termination for cause. The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance. In the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contract shall be liable to the Government for any and all rights and remedies provided by law. If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

21

incident, as opposed to the dirty latrine incident.[31]  Maj. Petty testified that he had never heard of Gulf Group having any affiliation with the Taliban.

Capt. Novak also testified that a Gulf Group contract was terminated because of a "security incident."  Capt. Novak disagreed with the decision to terminate Gulf Group's camp package BPA call, and although he was at first unable to meet with Col. Hess, Capt. Novak did meet with Col. Neumann[32] to discuss his disagreement with the termination.  Capt. Novak also indicated that he did not feel that he was going outside the chain-of-command or risking his career by doing so.  Eventually, Capt. Novak was able to meet with Col. Hess to voice his disagreement with the decision to terminate Gulf Group's camp package BPA call.  Capt. Novak also met with Tijani Saani, a civilian assigned to the contracting office at Camp Arifjan, who was the deputy to Col. Hess, about the decision.  Capt. Trimble also spoke to Col. Neumann about terminating Gulf Group's camp package BPA call and told Col. Neumann that he believed Gulf Group was capable of performing.  Capt. Trimble indicated that he had heard that Gulf Group's camp package BPA call was going to be terminated because the camp "mayors" preferred to keep their current contractors to avoid interruption of services.

Mr. Cockerham testified that he terminated Gulf Group's latrine and dumpster contracts based on a direct order from Col. Hess, who himself had been ordered to terminate the contracts by Col. Miller.  According to Mr. Cockerham, a termination for convenience in the interest of national security relieves the government of liability for "any losses."[33]  Mr. Cockerham stated, however, the termination has to be or should be heavily documented, which is why he requested a report to document the file, to protect the contracting office and the government.  According to Mr. Cockerham, Col. Hess directed him to cancel Gulf Group's contracts "in the interest of security, national security."  Mr. Cockerham further testified that Col. Hess said that a call for Camp Virginia should not be awarded to Gulf Group because they were a security risk.  According to Mr. Cockerham, he asked Col. Miller and Col. Hess for a security incident report, or even just the incident number, to attach to the latrine and dumpster contract cancellations, but they never gave him one.  Capt. Trimble testified that Mr. Cockerham was upset that he never received a Memorandum of Record from Col. Hess, stating that Col. Hess directed Mr. Cockerham to cancel Gulf Group's contracts.  At trial, Col. Hess

---

[31] Maj. Petty's testimony on this point appears to be related to the termination of three of plaintiff's contracts, the camp package BPA call and the latrine and dumpster contracts, although his testimony is not explicit in this regard.

[32] Although the trial transcript refers to "Col. Newman," other areas of Capt. Novak's testimony refer to Col. Neumann, Col. Hess' superior and the Principal Assistant Responsible for Contracting at Camp Arifjan.

[33] Mr. Cockerham subsequently elaborated that in his mind, "[t]he only time the government can possibly get around reimbursing in the interest of convenience is in the interest of national security."  It is unclear from Mr. Cockerham's testimony whether he believed that a termination for convenience in the interest of national security absolves the government of all liability or only liability relating to "losses."

denied that either Mr. Cockerham or Maj. Davis had asked for a security incident report in order to support the cancellations of the contracts or the camp package BPA call.

The October 20, 2004 Memorandum for Record, which Capt. Novak stated is similar to the one he wrote with Capt. Trimble and Lt. Rivera, provides that, "Major Cockerham informed the CO's to cancel the [camp package] BPA call to Gulf Group due to their inexperience in building tents," and that the contract should be awarded to British Link Kuwait, although its prices were "unreasonably" high. At trial, however, Mr. Cockerham denied having told Capt. Trimble, Capt. Novak, and Lt. Rivera that Gulf Group's camp package BPA call was being terminated due to Gulf Group's inexperience in building tents, or that it was in the government's best interest to award the call to British Link Kuwait. Mr. Cockerham testified he believed that Tijani Saani told Capt. Trimble, Capt. Novak, and Lt. Rivera that the statements were coming from Mr. Cockerham, when they actually came from Col. Hess.

Joseph Libbey stated in his contracting officer's final decisions, and testified at trial, that he believed that the contracts were terminated due to dumpster diving and rummaging through camp dumpsters, perhaps the latrine issue, and security reasons. In Mr. Libbey's final decision for the dumpster contract he stated: "On 9 October 2004, six Gulf Group employees were detained for security violations involving traveling on Camp Arifjan without their required escort, and rummaging through a dumpster. At least four of these individuals were barred from Camp Arifjan by Colonel Miller on 16 and 18 October 2004." The contractor allegedly involved in dumpster diving, however, was Gulf Company, not Gulf Group. At trial, Mr. Libbey testified that he "took Gulf Company to mean Gulf Group." Mr. Libbey's final decision on Gulf Group's dumpster contract also stated:

> The Government originally contemplated terminating Gulf Group's contracts for failure to comply with security regulations; however, due to the global war on terror operational tempo in the area, and a desire to maintain a friendly working relationship with local contractors that often include prominent Kuwaiti families, the Government decided to terminate the contract for the convenience of the Government.[34]

According to Saud Al Tawash and Mr. Wilson, they first learned that Gulf Group's latrine and dumpster contracts and camp package BPA call were being terminated through their competitors. According to Saud Al Tawash, he first heard rumors about the cancellations from an individual working with a competitor, Jasmine, who told him "they're going to cancel all your contracts because they have a report of an intelligence that you guys are related to terrorist groups and you're anti-American." Saud Al Tawash also testified that Mr. Wilson was then told "directly from the contracting office" that

---

[34] Mr. Libbey testified that Mr. Randall Kemplin, a government civilian counsel who worked with Mr. Libbey on the claims, wrote the above quoted paragraph, which was incorporated into Mr. Libbey's contracting officer's final decision. Although Mr. Libbey was not aware of how Mr. Kemplin had obtained the information, Mr. Libbey stated he was "good with it."

there was a "security" and a "counter intelligence concern," and that the contracting office alleged that the alleged security incident was the reason for the cancellations. At trial, Saud Al Tawash also pointed out that the contracting officer, Mr. Libbey, made a final determination that the contracts were terminated due to the alleged security incident. Saud Al Tawash testified that Capt. Trimble, Capt. Novak, Lt. Rivera, and Tijani Saani all told him that the contracts were terminated as a result of a concern for security. Saud Al Tawash also indicated that he had heard that the promised award of Camp Virginia had been put on hold, with the possibility of cancellation, due to the security concerns.

According to testimony offered by Mr. Wilson, on October 17 or 18, 2004, he spoke with Mr. Cockerham, Tijani Saani, and Col. Hess about the Gulf Group cancellations and prepared a report about those discussions. Mr. Wilson testified that Mr. Cockerham told him that the cancellations were coming from above him at "the general level." Mr. Wilson also stated that Col. Hess told him that the cancellations had to do with security and counterintelligence, and that the Army Support Group commander made the decision to cancel. According to Mr. Wilson, Tijani Saani told him that they were cancelling all of Gulf Group's contracts for security reasons, but that "we'll try to get you guys some work." Mr. Wilson also spoke to Col. Hess over the telephone. Mr. Wilson stated Col. Hess did not want to talk to him, and was "really nervous, talking in circles." According to Mr. Wilson, Col. Hess stated during this telephone call that Gulf Group's contracts were terminated due to "counterintelligence on the Al Tawash family, and they have ties [to] Al Qaeda and Saddam Hussein." Mr. Wilson also heard someone comment that Gulf Group was a "bunch of kids" and needed to be "taken out," although he could not remember if he heard this from an Army officer or from one of Gulf Group's competitors.

Col. Khalid Al Salal, a retired intelligence officer for the Kuwait Ministry of Defense, who had left the ministry, but maintained communication with the security and intelligence office, testified as a witness for plaintiff and stated that Gulf Group, Gulf Telecom, and Saud Al Tawash were all cleared by Kuwaiti security and passed background checks. Col. Al Salal further testified that the Al Tawash family is very well-known in Kuwait, and that he had never heard of any links between the Al Tawash family and the Taliban, Saddam Hussein, or other anti-American groups. Maj. Petty similarly testified that he never heard that Gulf Group was suspected of having connections with the Taliban. Mr. Cockerham testified that he heard a number of rumors about Gulf Group's involvement with the Taliban and other similar groups, which he believed were not true.

Ferdinand Peters, the attorney retained by Gulf Group in October 2004, testified that he met separately with Col. Hess, Col. Miller, Mr. Cockerham, and Tijani Saani, and was given "a variety of reasons" by "everyone" for the termination of Gulf Group's latrine and dumpster contracts and camp package BPA call. Mr. Peters testified that "I can only say that there were multiple reasons given." Mr. Peters indicated that he was "told about security problems, and words had come up in various discussions as connections to terrorists, cell phone use, personnel of Gulf Group asking questions and being a

security threat, or whatever. Things like that." Mr. Peters recalled that, in his meeting with Col. Miller, Col. Miller had "mentioned" the latrine incident to Mr. Peters, and may have indicated that Gulf Group was suspected of being allied with anti-American interests. Mr. Peters could not "remember exactly what was stated," but indicated that "[i]t was so serious of what we were being told that efforts were being made by the family to figure out through Congressional action and like that on what was going on here."

After speaking with Mr. Wilson and hearing rumors from his competitors, Saud Al Tawash contacted Congressman Trent Franks, who was "an old family friend," to inquire on Gulf Group's behalf about rumors of Al Tawash family links to anti-American groups because "it was hurting our family reputation." According to Saud Al Tawash, Congressman Franks called Col. Miller, Col. Hess, Tijani Saani, and Mr. Cockerham to "restore my family's reputation" and to "chat with the right people from in the upper channels at the military to find out if this is truth [sic]." In an October 27, 2004 email addressed to Gen. Keith Alexander and Gen. Steven Whitcomb, Congressman Franks stated: "I am respectfully asking the military command to issue a letter stating categorically that the cancellation of the subject contracts was in no way related to any counterintelligence, espionage, or security concern connected to the Al-Tawash family or the Gulf Group." Gen. Whitcomb forwarded the email to Col. Miller, Col. Richard McEvoy, and Col. Louis Yuengert, requesting a status update. Col. McEvoy responded that the letter had been taken care of by the Army. Col. Miller recalled receiving a telephone call from Congressman Franks about the Al Tawash family, followed shortly by a telephone call from Gen. Alexander on the same subject. Col. Hess testified that he did "not remember being called by Congressman Franks." On November 3, 2004, Col. Hess was directed, he assumed by Col. Miller,[35] to write a letter to Mohammed Al

---

[35] Col. Hess' testimony at trial was as follows:

Q: Looking at Exhibit 147, this being a letter from the Department of the Army dated November 3, 2004 to Mohammed Al Tawash, with what purports to be your signature. Is that indeed your signature?

A: Yes, it is.

Q: Did anyone order you to write this letter?

A: I don't remember, but I wrote the letter so I presume I was directed to write the letter.

…

Q: Do you recall receiving a direct order commanding you to write the letter, or did someone simply ask if you might accommodate them by writing the letter?

A: Instead of saying yes or no, can I explain my recollection of the letter?

25

Tawash about the cancellation of Gulf Group's latrine contract, which, according to Saud Al Tawash, was drafted in response to Congressman Franks' inquiries. Saud Al Tawash testified that he did not know why the letter from Col. Hess was addressed to his brother, Mohammed Al Tawash. The letter stated, in pertinent part:

> Please rest assured that the Gulf Group's contract to service portable latrines at Army camps in Kuwait was not terminated because of security reasons. While it is true that some employees of the Gulf Group have been either barred from the installation or warned because they had not followed the rules for contract employees on the installation, these incidents did not cause the termination of the contract.
>
> The contracting officer terminated the contract because circumstances arose that caused the contracting officer to conclude that it was in the best interest of the Army to terminate the contract. Since the contract was terminated for convenience of the government, the Gulf Group should not suffer any repercussions to its reputation or competitive standing. The Gulf Group is fully eligible to compete for other Army contracts in Kuwait. I hope this clarifies this unfortunate misunderstanding.

Col. Hess further testified that "Colonel Miller actually wanted to author a letter to send to the Al Tawash family and I recommended against that, that this was a contractual issue and any such letter ought to be coming from the contracting office." According to Col. Hess, the security and espionage concerns about Gulf Group "turned out to be unfounded," but the statement in the letter that Gulf Group's latrine contract "was not terminated because of security reasons" was "false." In other words, based on Col. Hess' testimony, Gulf Group was terminated for security reasons, but those same security concerns later turned out to be unfounded. Also according to Col. Hess, the

---

Q: Please do. Yes, sir.

A: My recollection of the letter was we went through all the security stuff, all the concerns about espionage in the previous few exhibits we went through, and it turned out to be unfounded. This is my recollection. As such, we still had a viable contractor that we could do business with. The purpose of this letter was to put Gulf Group on notice that we still would like to consider them to do Army contracting, to engage, to bid on Army requirements in the future.

Q: Who directed you to send this letter?

A: I don't recall specifics.

Q: It was Colonel Brick Miller, wasn't it?

A: I'm going to have to make the assumption that it was the ASG, Colonel Miller. He was my primary customer.

26

statement that some Gulf Group employees had been barred was, likewise, untrue and inaccurate based on his recollections, but he had obtained that information to insert into the letter from Col. Miller. Col. Hess indicated that he also had help from the ASG Judge Advocate General's office when composing the November 3, 2004 letter, but did not identify by name any individuals who aided him.

## Bottled Water Delays

Gulf Group's bottled water BPA calls were not cancelled at the time of the October 2004 terminations of the camp package BPA call, the latrine contract, and the dumpster contract, and Gulf Group continued to supply bottled water to the Army under the bottled water BPA in 2005. According to the parties' joint stipulation of facts, between November 1, 2004 and March 31, 2005, United States government contractors supplying bottled water in Iraq were required to travel in military convoys. The convoy requirement was issued to ensure the prompt delivery of bottled water and for the protection of personnel and supplies. During this time period, all of Gulf Group's deliveries of bottled water to camps in Iraq were made by trucks traveling to and from Iraq and Kuwait with military convoys. The trucks were delayed at times for a number of reasons, including IEDs and observance of religious holidays by Iraqi nationals. The parties have jointly stipulated that "[a]dditionally, the delays occasionally were caused by the Government not having sufficient escorts." According to Saud Al Tawash, most Gulf Group trucks going into Iraq around April 2005 were delayed more than a week.

Saud Al Tawash testified that, pursuant to Gulf Group's bottled water BPA, Gulf Group was required to contact certain Army officials to obtain delivery instructions. The bottled water BPA refers to these requirements as "Special Instructions," which state in part:

> Purchased For: US Army Various Locations in Kuwait and Iraq. Surface to some of the locations are unimproved which could cause delays in deliveries. Contractor shall do everything possible to ensure deliveries are made on time. The contractor is liable for all equipment and personnel necessary to deliver to the proper quantities. The US Military is not liable for damages caused to transportation assets or equipment necessary to deliver the items.
>
> Personnel to contact for directions and acess [sic] to various locations are as follows:
>
> MAJ Banks:[36] 968-4819
> CPT Sharp:[37] 970-5952

---

[36] According to the parties' joint stipulation of facts, "Major Banks was the chief of the bottled water branch until October 2004, when she was replaced by LTC Derrick Shoemake," who was the chief of the bottled water branch at Camp Arifjan during April 2005.

Saud Al Tawash further testified that the Army officers gave Gulf Group convoy numbers, which he understood to be a requirement that Gulf Group travel in convoys. According to Mr. Wilson, at a post-award vendor meeting attended by Lt. Col. Derrick L. Shoemake, chief of the bottled water branch at Camp Arifjan, Mr. Cockerham, and Sgt. Diane Brooks, all the bottled water contractors were told that they were required to move in convoys. Also at the post-award vendor meeting, Mr. Wilson was told to follow the instructions to travel with convoys given by Lt. Col. Shoemake and Sgt. Brooks. Mr. Wilson stated that contractors could hire private protection, but that even then they would have had to coordinate transportation with the Army. Mr. Wilson explained that Gulf Group could not have transported the water without the military convoys because there was significant fear over the physical safety of the water and potential biological additives, such that "if you showed up at a front gate of an army base unescorted with truck loads of water, you're probably going to be shot." Mr. Wilson also testified that rules and regulations were posted on a wall at Camp Navistar, a convoy consolidation point in Kuwait, specifying that trucks "must stay in convoy, they must be escorted all times."

Lt Col. Mary O'Connor, a battalion commander and chief of transportation responsible for the movement of control teams at convoy support centers throughout Iraq in 2004 and 2005, testified that all trucks in Iraq were required to move in military convoys, and that she knew this to be the case because she was in charge of this process. Lt. Col. O'Connor identified a specific "fragmentary order" (FRAGO) as the document requiring all vehicles used in support of the military to travel in convoys. The FRAGO provides:

> The purpose of this FRAGO is to enhance and convoy [sic] security measures to protect the force by providing convoy commanders and unit commanders tools to ensure that all measures have been properly taken to safeguard personnel and equipment. Unit/convoy commanders are personally responsible for the conduct and protection of convoy operations. MNF-I units will monitor their convoys, and exercises control measures implemented by unit commanders.
>
> 3.C. (U) Tasks to Subordinate Unites. [sic]
>
> 3.C.1. MNC-I
>
> 3.C.1.A. Continue to produce internet status updates, and maintain the information on the MNCI webpage. Convene emergency status board update when the situation warrants.
>
> 3.D. (U) Coordinating Instructions.

---

[37] Capt. Sharp was Maj. Banks' deputy at the time the "Special Instructions" were issued.

3.D.1.   There will be two vehicles minimum during daylight hours, and three vehicles minimum during the hours of darkness.  There will be at least two soldiers per vehicle and three in the trail vehicle to provide a turret or rear gunner for tactical vehicle movements.

3.D.2.   **Non-tactical vehicle (NTV) movements used to transport military members, DOD civilians, and DOD contractors are cautioned not to move outside secure zones without security as set forth by MSC[38] commanders**.  As far as practical use armored/add on armored commercial vehicles to move off FOBS.  The use and number of NTVS to support movement requirements is delegated to the MS[] commanders.  However, the number of NTVs used should consider current AIF TTPS, emergency cross loading of personnel requirements and safety.  NTVs will posses [sic] communication IAW Para 5.A.2. below, and have communication with the security escort.

3.D.3. Convoy commanders are responsible for the self-protection capability within their convoy.  There will be at least one rifle in each vehicle for all movements.  Tactical vehicle movements must have 360 degree security consisting of an M249 or above from the turret or out the back with the "canvas" removed.  All military personnel will carry personal weapons, wear fragmentation protective vest, ballistic eye protection, and combat helmet.  A minimum of one vehicle will maintain communications contact with coalition forces.  Convoys will not have lights on during daylight operations.  During night operations white lights will be used, and they will have NVDS in each vehicle.

3.D.4. Prior to all movements, convoy commanders will conduct coordination and include communications equipment sufficient to communicate with other MSCS when traveling through their AOR.  Advanced notification to other MSCS will minimize potential fratricide of blue on blue forces.  All vehicles must log out with parent unit and provide ETA to destination.  All vehicles must report at destination to their parent unit.

3.D.5.   Breakdown procedures, convoy commanders are responsible for self-recovery capability within each convoy.  Recovery equipment will be available to each convoy.  Commanders will take all reasonable measures to recover vehicles and will abandon vehicles as last resort only.  They will recover the vehicle to the nearest CSO or LSA if possible.  If not, leave appropriate security personnel and an operational vehicle with it until it can be recovered.

3.D.6.   All MSCS will report deteriorating road conditions to MNCI, upon reporting to convoy support center operations cell(s), convoy commanders

---

[38] It appears that MSC stands for Major Subordinate Command.

will report locations where maintenance is required and where engineer work could mitigate areas of vulnerability.

3.D.7.  In the greater Baghdad area defined by the MND Baghdad area there will cautinue [sic] to be mission critical movements only.  Units will verify route status with 1 CD website or Iraqna or prior to any movement.

3.D.8. There will be a minimum ratio of one tactical security vehicle for every ten military cargo vehicles, and a minimum ratio or [sic] one tactical security vehicle for every 5 KBR cargo vehicles.  There will be no less than two security vehicles for every convoy (Para. 3.D.1.).

...

4.B. (U)  All units will conduct risk assessments using mission, enemy, terrain, troops, time available, and civilian demonstrations (METT-TC) to identify and assess hazards.  Ensure that seatbelts are properly used.  Gunners in turrets and rear facing security will ensure other safety measures are used due to the inability to wear seat belts.  All soldiers operating or riding in tactical and NTV vehicles must wear regulation gear as stated in paragraph 3.D.3. above.

The FRAGO does not specifically refer to government contractors.  Lt. Col. O'Connor testified, albeit inconsistently, that it was understood that, if a contractor was supporting the military, it was "assumed in the order that they would – that we would protect them."  Nevertheless, Lt. Col. O'Connor testified that the language "DOD contractors are cautioned not to move outside secure zones without security as set forth by MSC commanders.  As far as practical use armored/add on armored commercial vehicles to move off FOBS," was a recommendation, rather than an order, until a more stringent order was delivered.  Lt. Col. O'Connor also testified that she had not seen a more stringent order.  She then stated that the existing order was intended to require civilian contractors to travel in military convoys.  Lt. Col. O'Connor also testified that there were no exceptions to this convoy requirement, however, she conceded that some contractors violated the convoy requirement.  She also acknowledged that the Army could not control the travel of all civilians.  Although her testimony regarding the number of days of travel time between Kuwait and Iraq was inconsistent, she did indicate, however, perfect travel conditions were rare in Iraq at the time.

Regarding the cause of the bottled water transportation delays, Saud Al Tawash stated that, having been to the border between Kuwait and Iraq, he had personal knowledge of Gulf Group trucks delayed at the border due to insufficient escorts, which was "the only cause" of delay. He stated, however, that he did not travel with the Gulf Group trucks beyond the border to deliver the water into Iraq.  According to Saud Al Tawash, it was Lt. Col. Shoemake and KBR, another contractor, through whom Saud Al Tawash learned that the truck delays in Iraq were caused by lack of escorts.  Mr. Wilson stated that he had learned from the truck drivers that the delays in the delivery of bottled water were caused by "security and the lack of escorts," as well as convoy priorities.  He

further indicated the delays were also caused by IEDs and accidents. Mr. Wilson also testified that Gulf Group trucks were being delayed at the bases because they also were being used to store water and to haul military equipment on their return trips, despite Gulf Group's contract and arrangement with the trucking company that there only would be one-way hauls. Neither Saud Al Tawash nor Mr. Wilson, personally, were on board the trucks that delivered bottled water for Gulf Group into Iraq.

Megbel Al Tawash testified that he knew from project managers and from coordinating with Expeditors, the company Gulf Group had hired to transport the bottled water, that the lack of escorts "was the main problem" Gulf Group experienced with the delivery of bottled water to Iraq. Megbel Al Tawash further stated that he personally observed Gulf Group trucks used by the military to haul equipment, specifically Humvees, on return trips from Iraq. Lt. Col. O'Connor agreed that it was "quite possible" that bottled water trucks coming back from Iraq into Kuwait were loaded with military equipment. Mr. Cockerham testified that "quite often what they would do is put equipment on the trucks that were designated just for carrying water," and that he believed Gulf Group's bottled water trucks were being used to haul military equipment on the return trips. Mr. Cockerham stated that there was no agreement between the bottled water contractors and the government to use the bottled water trucks for hauling military equipment on return trips. The parties also have stipulated that, "[t]here was no agreement between Gulf Group and the Government to use some or all of Gulf Group's trucks that delivered bottled water to camps in Iraq, to transport military equipment back to Kuwait on their return trips from Iraq." The Army had another contract in place to take equipment out of Iraq, but it apparently was not always used.

Due to the acknowledged delays in the delivery of bottled water, the government offered to increase the amount it was paying to the bottled water contractors to cover demurrage charges. Between November 1, 2004 and March 31, 2005, Gulf Group charged 2.400 KD per case for bottled water. The parties stipulated, "[o]n April 5, 2005, a contracting officer, John Cockerham, submitted a proposal to all contractors supplying bottled water to camps in Iraq to increase the price of the bottled water to 2.578 KD per case, in exchange for the contractors not charging the Government for additional expenses including demurrage incurred in the deliveries." Mr. Cockerham's email stated: "All previous claims prior to APR 05 will continue to be processed." According to the parties' joint stipulation of facts, Gulf Group received, and accepted, the proposal of the higher rate per case in exchange for not making any more claims for demurrage incurred after April 1, 2005.

**Plaintiff's Submissions and Claims**

On December 15, 2005, Gulf Group submitted a claim under the bottled water BPA for 298,435.000 KD in demurrage for delays incurred between November 2004 and March 2005 to Mr. Cockerham, who was the contract specialist for the bottled water BPA in Kuwait.[39] The following day, December 16, 2005, Gulf Group submitted three

---

[39] The KD value later was calculated to be equivalent to $1,035,802.23 in plaintiff's original complaint in the bottled water case, Case No. 07-82C, and $1,065,711.39 in its

31

"Claim & Settlement Offers"[40] to Mr. Cockerham, proposing settlement in the amount of $4,544,339.84 for the termination of the camp package BPA call, in the amount of $4,558,428.60 for the termination of the latrine contract, and in the amount of $999,994.67 for the termination of the dumpster contract.[41] The 2005 Claim and Settlement Offers also asserted that Gulf Group was entitled to $10,000,000.00 for the termination of the camp package BPA call, $5,058,428.59[42] for the termination of the latrine contract, and $1,110,621.72 for the termination of the dumpster contract. Saud Al Tawash signed the cover letter to Gulf Group's four submissions to Mr. Cockerham in 2005, and all four submissions were certified by plaintiff's attorney at the time, Ferdinand Peters.

On October 19, 2006, the Camp Arifjan contracting office files were searched, but there was no record of Gulf Group's December 15 and 16, 2005 submissions. Gulf Group then re-submitted the same Claim and Settlement Offers between October 20, 2006 and October 22, 2006, and the submissions were put on the contracting command log. Mr. Cockerham testified that he had received the 2005 latrine and dumpster Claim and Settlement Offers twice, and that he does not know if Gulf Group's initial submissions were logged, although they would have been placed in a box in the contracting office. Although not clearly referring to plaintiff's 2006 resubmissions, Mr. Cockerham also testified that he made minimal efforts to ensure that Gulf Group's Claim

---

second amended complaint in the bottled water case. In plaintiff's first amended complaint in the bottled water case, plaintiff simply listed the amount as 298,435.000 KD without a USD equivalent.

[40] As indicated below, it is not immediately clear that the 2005 submissions relating to the terminations of the camp package BPA call, the latrine contract, and the dumpster contract, constituted "claims" under the Contract Disputes Act. Defendant's post-trial briefs generically refer to plaintiff's 2005 submissions as "claims," but defendant initially argued that the Claim and Settlement Offers did not constitute claims under the Contract Disputes Act. In discussing plaintiff's submissions with respect to the court's jurisdiction under the Contract Disputes Act, therefore, the court distinguishes between the "Claim and Settlement Offers" that plaintiff submitted in 2005, and the "claims" that plaintiff submitted in 2007 and 2011. The court includes the 2005 Claim and Settlement Offers in general references to "claims" elsewhere in this opinion, however, because the 2005 submissions constitute claims in other contexts, such as under the False Claims Act. See 48 C.F.R. § 49.001 (2005) ("A settlement proposal is included within the generic meaning of the word 'claim' under false claims acts (see 18 U.S.C. 287 and 31 U.S.C. 3729).").

[41] The parties' joint stipulation of facts lists plaintiff's 2005 Claim and Settlement Offer as seeking $5,058,428.59. That is the full amount that plaintiff claimed it was owed, but plaintiff's submission offered to settle for $4,558,428.60.

[42] In calculating plaintiff's claimed entitlement to $5,058,428.59, plaintiff's 2005 Claim and Settlement Offer appears to have used a different conversion rate between KD and USD than the rate stipulated to by the parties.

32

and Settlement Offers were processed, indicating that the "[o]nly thing I really remember doing was just notifying the chief that this was the second time...."

The record is unclear as to whether the government ever reviewed plaintiff's 2005 Claim and Settlement Offers. Mr. Cockerham, however, confirmed at trial that he wrote the notations on the Claim and Settlement Offers that appear in the record relating to the camp package BPA call, the latrine contract, and the dumpster contract, indicating that the Claim and Settlement Offers in the record are the Claim and Settlement Offers that Mr. Cockerham received on December 16, 2005, rather than the copies of the Claim and Settlement Offers that plaintiff re-submitted between October 20, 2006 and October 22, 2006. Although raising more questions than it addressed, Mr. Libbey's contracting officer's final decision for plaintiff's 2007 camp package BPA claim attempted to explain what had happened to the 2005 Claim and Settlement Offers, stating:

> The settlement offer [for the camp package BPA] was one of three termination packages Major Cockerham allegedly received from Mr. Surresh Pulikkal [sic] of Gulf Group[43] in October 2005. Major Cockerham allegedly signed for the three settlement proposals, and handed them off to the Claims Section in the contracting office. These matters are "alleged" as the Government has no evidence to establish these events actually occurred. Major Cockerham and Gloria Davis, the awarding contracting officer, came under investigation for improper and illegal contracting activity after the subject contract was awarded....
>
> Gulf Group representatives returned to the Contracting Command in late November 2005 and again in December 2005 to check on the status of the settlement offer. No record could be found that it had been submitted, so Mr. Surresh Pulikkal [sic] was asked to resubmit the settlement offer. Mr. Pulikkal subsequently gave a settlement offer to Major Cockerham, who signed for it acknowledging receipt....
>
> Gulf Group Representatives Saud Al Tawash and Allen Tadayon met with LTC David Pershing, Commander, United States Army Contracting Command, Southwest Asia-Kuwait (USACC), Major Marcellus Newson, Contracting Officer, and Captain Andrew Gast, Contracting Claims Officer, both of USACC, on or about 19 October 2006 to discuss the following topics.... Concern over an earlier termination for convenience.... Their settlement offers....

---

[43] Although defendant has repeatedly described Suresh Pulikkal as a Gulf Group employee, Saud Al Tawash testified that Suresh Pulikkal was a legal consultant for a number of the companies that Saud Al Tawash managed, describing him as "our legal counsel…a legal consultant." Mr. Cockerham also confirmed that Suresh Pulikkal "worked with several companies."

Mr. Tadayon asked about the settlement offer Gulf Group had submitted, inquiring about its status. Captain Gast was directed by LTC Pershing during the meeting to check his files for its status. Captain Gast checked his file log for disputes and reported there was no record of any settlement offers being filed by Gulf Group....

Captain Gast checked with other members of the Claims Team on 20 October 2006, specifically asking Major Paul Bidinger, Contracting Claims Officer, Third Army, U.S. ARCENT, about the Gulf Group's inquiry. Major Bidinger reported back to Captain Gast the same day that he could not find Gulf Group's name on the disputes lists....

On 22 October 2006, Gulf Group representative Allen Tadayon provided Captain Gast with a copy of the settlement offer by email. Captain Gast reviewed the documents briefly and noted they were missing the required certification....

On 22 October 2006, Mr. Tadayon emailed three "certifications" signed by Gulf Group's counsel to Captain Ghast [sic].

On 15 November 2006, Mr. Tadayon requested an appointment with Captain Gast to discuss the settlement offer. Captain Gast responded on 16 November 2006 that the only appointments he was making was for current disputes and ratifications he was working on....

Mr. Tadayon communicated again with Captain Gast on or about 17 November 2006 concerning the status of the three settlement offers. Captain Gast stated he had not yet begun to work on them. This was the last communication Captain Gast had with Gulf Group concerning its documents.

It appears from Mr. Libbey's summary of the events surrounding the submission of plaintiff's 2005 Claim and Settlement Offers, and from Mr. Cockerham's testimony regarding his receipt of plaintiff's Claim and Settlement Offers, that plaintiff may also have originally submitted the Claim and Settlement Offers to Mr. Cockerham in October 2005, prior to the December 16, 2005 submissions in the record. That plaintiff previously submitted the camp package BPA, latrine contract, and dumpster contract Claim and Settlement Offers is consistent with the October 2005 date that appears on the cover letters to each submission.

Plaintiff interpreted the lack of a response to its 2005 submissions for almost a year to be a deemed denial of its "claims" pursuant to 41 U.S.C. §§ 605(c)(1), (c)(3) (2005) (current versions at 41 U.S.C. § 7103(f)(1), (f)(3) (Supp. V 2011)).[44] Based on

---

[44] In Case No. 06-835C, the camp package BPA case, plaintiff asserts that the sixty days under 41 U.S.C. § 605 began to run on October 10, 2005. In Case No. 06-853C, the dumpster case, plaintiff asserts that the sixty days began to run on October 20,

this perceived denial of its "claims," Gulf Group ultimately filed the four suits which are currently consolidated before this court. The parties stipulated that, "[o]n December 8, 2006, Gulf Group commenced [the camp package BPA case in the United States Court of Federal Claims] seeking $7,000,000.00, plus interest, costs, and attorney fees arising from the contracting officer's deemed denial of its claim" for the cancellation of the camp package BPA call. The parties also stipulated that, "[o]n December 15, 2006, Gulf Group commenced [the latrine case in the United States Court of Federal Claims] seeking $6,000,000, plus interest, costs, and attorney fees arising from the termination" of the latrine contract. The parties further stipulated that, "[o]n December 19, 2006, Gulf Group commenced [the dumpster case in the United States Court of Federal Claims] seeking $1,800,000, plus interest, costs, and attorney fees arising from the cancellation" of the dumpster contract. Finally, the parties stipulated that, "[o]n February 1, 2007, Gulf Group commenced [the bottled water case in the United States Court of Federal Claims] seeking $1,035,802.23, plus interest, costs, and attorney fees arising from calls issued pursuant to" the bottled water BPA.

In the camp package BPA case, the latrine case, the dumpster case, and the bottled water BPA case, defendant requested that the judges initially assigned to each case stay the proceedings in each case because defendant believed, with respect to each Claim and Settlement Offer, "that plaintiff's submission constitute[d] a 'termination settlement offer,'" rather than a "claim" under the Contract Disputes Act, which, according to defendant, deprived this court of jurisdiction over plaintiff's complaints. The judges initially assigned to the camp package BPA case, the latrine case, and the dumpster case, each agreed to stay the cases pending a decision by the contracting officer on each of plaintiff's "claims."[45] On March 26, 2007, Gulf Group presented "revised" claims to the contracting officer, certified by plaintiff's replacement attorney, and current attorney of record, Ms. Iliaura Hands, for $7,000,000.00, $1,800,000.00, and $6,000,000.00, arising from the camp package BPA, the latrine contract, and the dumpster contract, respectively.[46] In addition, Ms. Hands signed the cover letter to all of

2005. In Case No. 06-858C, the latrine case, plaintiff references two dates, October 17, 2005 and December 16, 2005, from which the sixty days could have run. In Case No. 07-82C, the bottled water BPA case, plaintiff asserts that the agency's sixty days began to run on December 15, 2005.

[45] The undersigned judge denied defendant's request to stay the bottled water BPA case. The bottled water BPA case did not involve a termination for convenience. With respect to the 2005 bottled water BPA Claim and Settlement Offer, the language that plaintiff used in requesting a decision, and the context in which plaintiff's submission was made, indicated that plaintiff had asserted a "claim" under the Contract Disputes Act. The undersigned judge, however, subsequently stayed all four of the consolidated cases at the request of the United States Department of Justice because of related ongoing criminal investigations and prosecutions.

[46] In its pleadings to the court, plaintiff submitted a different version of the revised claim for the dumpster contract than the version of the revised claim that was admitted at trial. Although the differences between the versions are minimal, this discrepancy is one of

the revised claims. Each revised claim included a copy of the relevant 2005 Claim and Settlement Offer, which contained a cover letter that was signed by Saud Al Tawash, and which was certified by plaintiff's previous attorney, Ferdinand Peters.

On May 21, 2007, Joseph Libbey reviewed Gulf Group's revised claims and issued final decisions on the revised camp package BPA, latrine contract, and dumpster contract claims. Mr. Libbey awarded Gulf Group $33,053.57, $149,285.71, and $57,833.00, plus interest, for its camp package BPA, latrine contract, and dumpster contract claims, respectively. The parties stipulated that "Mr. Libbey did not interview anyone in preparation of the final decisions." Randall Kemplin, a civilian attorney for the Army, wrote portions of the final decision from information he received from Army attorney Clea Efthimiadis, who, in turn, obtained information on the terminations of Gulf Group's contracts from Col. Brick Miller, Tijani Saani, and Mr. Cockerham.[47]

After Mr. Libbey issued his contracting officer's final decisions, Gulf Group filed amended complaints before this court in each of the three cases he addressed, the camp package BPA and the latrine and dumpster contracts. The original complaint in the bottled water BPA case was also subsequently amended. In its amended complaints, plaintiff altered the amounts sought in each case, except the bottled water BPA case, the only case on which Mr. Libbey did not issue a contracting officer's final decision. In its original complaint in Case No. 06-835C, the camp package BPA case, plaintiff sought $7,000,000.00. In its first amended complaint in the camp package BPA case, plaintiff sought $2,682,160.86.[48] In its second amended complaint in the camp package BPA case, plaintiff sought $3,463,287.57.[49] Subsequently, in its third

---

numerous deficiencies in plaintiff's submissions to the court. Additionally, as discussed below with respect to the dumpster contract, the copy of Saud Al Tawash's signature page from the 2005 Claim and Settlement Offer is dated October 20, 2004.

[47] Ms. Efthimiadis testified that she did not contact Col. Hess regarding plaintiff's claims. When questioned, Ms. Efthimiadis stated:

> I was in the middle of starting the litigation report, I did not complete the litigation report. I did not interview all the witnesses or take even written statements from them as is required in [sic] litigation report. The uptempo in Kuwait was tremendous, the workload was tremendous at that time.

[48] Plaintiff sought $1,447,457.22 in lost profits, $1,234,703.64 in preparatory expenses, legal fees, costs incurred in preparing a settlement of plaintiff's claims, and interest.

[49] Plaintiff sought $3,387,247.64 in lost profits, $69,002.43 in preparatory expenses, $7,037.50 in fees and costs incurred in preparing the settlement for plaintiff's claims, prejudgment interest, cost of litigation, and attorneys' fees.

amended complaint in the camp package BPA case, plaintiff now seeks $922,851.84.[50] In 2011, plaintiff submitted a second revised claim for the camp package BPA to Maj. Daniel Everett,[51] which mirrored the amounts plaintiff claimed in its third amended complaint. In its original complaint in Case No. 06-858C, the latrine case, plaintiff sought $6,000,000.00. In its first amended complaint in the latrine case, plaintiff sought 1,572,967.611 KD.[52] In its second amended complaint in the latrine case, plaintiff now seeks $2,830,662.20.[53] In its original complaint in Case No. 06-853C, the dumpster case, plaintiff sought $1,800,000.00. In its first amended complaint in the dumpster case, plaintiff sought $1,946,721.78.[54] In its second amended complaint in the dumpster case, plaintiff now seeks $780,031.63.[55] In its original complaint in Case No. 07-82C, the bottled water BPA case, plaintiff sought 298,435.000 KD, calculated as $1,035,802.23. In its first amended complaint in the bottled water BPA case, plaintiff sought 298,435.000 KD. In its second amended complaint in the bottled water BPA case, plaintiff now seeks 298,435.000 KD, calculated as $1,065,711.39, for demurrage and related expenses.[56]

The total potential contract prices and the amounts claimed by Gulf Group can be summarized as follows:

---

[50] Plaintiff seeks $846,811.91 in lost profits, $69,002.43 in preparatory expenses, $7,037.50 in fees and other costs, prejudgment interest, costs of litigation and attorneys' fees.

[51] Contrary to plaintiff's assertion that the judge directed plaintiff to submit a revised claim to Maj. Everett, a member of the Army JAG Corps assisting defendant, the court directed plaintiff to file revisions to any of the complaints filed in the four above-captioned cases, if appropriate.

[52] Plaintiff sought 1,416,360.000 KD in lost profits, 156,607.611 KD in preparatory expenses, legal fees, costs incurred in preparing a settlement of plaintiff's claims, and interest. Plaintiff did not convert the amount to USD.

[53] Plaintiff seeks $2,724,795.96 in lost profits, $91,978.74 in preparatory expenses, $13,887.50 in fees and other costs, plus prejudgment interest, costs of litigation and attorneys' fees.

[54] Plaintiff sought $1,457,619.72 in lost profits, $489,102.06 in preparatory expenses, legal fees, costs incurred in preparing the settlement of the claims, and interest.

[55] Plaintiff asserts in its second amended complaint in the dumpster case that it seeks $780,131.63, but the total of the various amounts listed by plaintiff is only $780,031.63. Plaintiff seeks $483,322.42 in lost profits, $282,871.71 for preparatory expenses, $13,837.50 for fees and other costs, prejudgment interest, costs of litigation and attorneys' fees.

[56] It appears that plaintiff's original complaint used a different currency conversion rate than the currency conversion rate stipulated to by the parties.

| BPA/Contract | Maximum Potential Price | 2005 Claim & Settlement Offer | 2007 Claim | 2011 Claim | Original Complaint | Additional Complaints |
|---|---|---|---|---|---|---|
| *Camp Package* | BPA Limit: $10,000,000.00<br><br>Call Limit: $7,000,000.00<br><br>Call 0001 Price: $1,447,457.22 | Claimed Entitlement: $10,000,000.00[57]<br><br>Settlement Offer: $4,544,339.84 | $7,000,000.00 | $922,851.84 | $7,000,000.00 | 1st Amended: $2,682,160.86<br><br>2d Amended: $3,463,287.57<br><br>3d Amended: $922,851.84 |
| *Latrine* | Total: $5,057,895.14<br><br>Base Period: $613,142.86 | Claimed Entitlement: $5,058,428.59<br><br>Settlement Offer: $4,558,428.60 | $6,000,000.00 | N/A | $6,000,000.00 | 1st Amended: 1,572,967.611 KD<br><br>2d Amended: $2,830,662.20 |
| *Dumpster* | Total: $1,457,619.72<br><br>Base Period: $346,998.00 | Claimed Entitlement: $1,110,621.72[58]<br><br>Settlement Offer: $999,994.67 | $1,800,000.00 | N/A | $1,800,000.00 | 1st Amended: $1,946,721.78<br><br>2d Amended: $780,031.63 |
| *Bottled Water* | BPA Limit: $10,000,000.00<br><br>Call Limit: $7,000,000.00 | 298,435 KD | N/A | N/A | 298,435 KD calculated at $1,035,802.23 | 1st Amended: 298,435 KD<br><br>2d Amended: 298,435 KD calculated at $1,065,711.39 |

---

[57] Mr. Peters testified that he did not remember if the 2005 Claim and Settlement Offer for the camp package BPA claimed entitlement to $10,000,000.00, but later testified that the 2005 Claim and Settlement Offer did not claim entitlement to $10,000,000.00, guessing it claimed entitlement to $5,000,000.00. The only number that is referenced in the Claim and Settlement Offer other than the amount of plaintiff's settlement proposal is the $10,000,000.00 figure. In this column, the court refers to the "claimed" amount as the amount to which plaintiff stated it was entitled in the claim, other than the settlement offer.

[58] According to Mr. Peters, only the option periods were added to the dumpster contract Claim and Settlement Offer, without the base period. The dumpster contract Claim and Settlement Offer, however, asserted entitlement to the total contract price. Including the base period, the amount to which plaintiff appeared to assert it was entitled was $1,457,619.72.

The 2005 Claim and Settlement Offers for the camp package BPA and latrine and dumpster contracts included settlement offers lower than the total amount to which Gulf Group believed it was entitled, which, notwithstanding an apparent omission of the base period price in the dumpster Claim and Settlement Offer, the Claim and Settlement Offers included the price of the base period and all option periods for the latrine and dumpster contracts. Gulf Group's camp package BPA, latrine, and dumpster Claim and Settlement Offers described the total potential awards as "contract costs...added to the anticipated contract profit."[59] Saud Al Tawash indicated that he believed Gulf Group would have performed the option periods on the latrine contract because Camp Arifjan was permanent and there would be a need beyond the base period for Gulf Group's services. Saud Al Tawash further testified that Maj. Davis informed Gulf Group that, if they performed well on the latrine contract, they would be completing the full potential period of the contract, including all of the option periods. Saud Al Tawash also explained that he expected to perform the option periods of the latrine contract because the capital expenditures necessary to acquire the materials and equipment needed to perform the contract would not have been covered by the base period alone.[60] According to Saud Al Tawash, he also understood the period of performance on the dumpster contract to be for three years because Maj. Davis told him Camp Arifjan was a permanent camp and that, if Gulf Group performed well, then they would have the contract for the full three-year term, inclusive of the base period and all of the option periods. When asked whether Gulf Group understood it was not guaranteed the option periods, Saud Al Tawash explained on cross examination:

A: No, we didn't understand if we were guaranteed -- to be given guaranteed or not guaranteed? We did not understand that.

Q: What was Gulf Group's understanding with regard to the option period?

A: We had no understanding. We understood that this contract starts from this day and finishes from this day. That was our understanding.

---

[59] At times, plaintiff appears to indicate in its post-trial briefs that it did not separately seek costs in its submissions to the contracting officer. Plaintiff's 2005 Claim and Settlement Offers for the camp package BPA, the latrine contract, and the dumpster contract, however, stated that "[t]his offer includes reimbursement for both costs and lost profits" and that "Gulf Enterprises should also be compensated fully for the costs incurred in furtherance of the contract." In both its 2005 submissions to the contracting officer and the 2006 complaints filed in this court, therefore, plaintiff sought lost profits and costs as a result of defendant's alleged breach of the camp package BPA call, the latrine contract, and the dumpster contract.

[60] As discussed below, plaintiff's lost profits calculation indicates that plaintiff's costs would have exceeded its profits for the base period of the dumpster contract, rather than the latrine contract.

39

Q: When you say start this date and ends this date, you're talking about the base period?

A: Talking about the contract overall period which is from A through Z, the duration of the contract itself.

Q: Are you saying you didn't understand that there were option periods in the contract?

A: I believed that the understanding we had at that time was that the contract is the contract in a normal sense, the base period. We did not understand this options that reflect in like a contract within a contract. We did not understand that. Now we are understanding that this is quite different from our understanding from that time. In Kuwait most waste management contracts are for three years, municipal.  So this contract being two to three years, we thought that this is the time that we have to perform the contract.

An August 20, 2004 Memorandum titled, "Determination and Findings Use of Options," signed by Maj. Davis, stated:

Upon the basis of the following findings and determinations which I hereby make, the Dumpster Service contract requires the use of options as defined by FAR 17.202, Use of Options....  It is in the Government's best interest to include these options.  There is an anticipated need for the service beyond the contract period and the government risks potential costs of disrupted support in re-competing the contract....  There is a reasonable likelihood that the options will be exercised.

The memorandum was not circulated to contractors, including Gulf Group.  At trial, Saud Al Tawash did not remember if he had seen the document before, but stated that it confirmed his understanding of what Maj. Davis had told him at the time of contract award.

Gulf Group's first attorney, Ferdinand Peters, testified that he believed the Army owed Gulf Group for the option periods and included them in the 2005 Claim and Settlement Offers.  Attorney Peters testified that his legal research indicated that plaintiff was entitled to lost profits, and that he believed there was a sound basis for claiming lost profits for both the base periods and the option periods, without deducting expenses for the base period or the option periods.  Attorney Peters further stated that the lost profits were the total contract price.[61]  Terry Carlson, an expert in government contract

---

[61] Under cross-examination, government counsel asked Mr. Peters, "you testified earlier that you got the amount of lost profits by summing up the values that appeared in all option periods; is that right?"  Mr. Peters replied: "Right. It is clearly stated.  We even chose the lines from the government contracts where they came from."

accounting hired by Gulf Group to determine lost profit calculations on Gulf Group's camp package BPA, latrine, and dumpster claims, also included the base period and all options periods when determining lost profits on the camp package BPA call, latrine contract, and dumpster contract. Mr. Carlson testified that his calculations were reasonable, accurate, and correct based on a good faith effort to account for every single item of costs, and that option periods were reasonably included in the 2005 Claim and Settlement Offers.

Although Saud Al Tawash and Attorney Peters testified that the 2005 Claim and Settlement Offers were based on the base period and option periods, included in each Claim and Settlement Offer was an expense table, which Saud Al Tawash and Mr. Peters testified was only incorporated to show that Gulf Group was prepared to perform, and not to claim that Gulf Group had actually incurred all of the expenses listed. Mr. Peters testified that he could not calculate projected costs and, thus, did not include the expense tables to suggest such costs as a basis for the amounts claimed, because there had not been any performance. Attorney Peters also testified that he "didn't put any costs in because I didn't have any cost data.... And I felt that if the government was using bad faith to terminate these agreements, then they should pay everything, and that was a legitimate basis for the claim."

In the 2005 camp package BPA Claim and Settlement Offer, Gulf Group listed in the expense table, in Kuwaiti dinars, 12,200.000 KD for sixty-one dumpsters, 28,000.000 KD for two vacuum tankers, 22,945.000 KD for a tower light system, 241,962.000 KD for tents, 3,490.000 KD for electric generators, 22,120.000 KD for one hundred fifty-eight latrines, and 15,000.000 KD for a potable water truck. The 2005 latrine Claim and Settlement Offer expense table listed as expenses, in Kuwaiti dinars, 14,437.359 KD for one hundred fifty-nine drop tanks, 36,984.985 KD for shipment expenses, 11,478.000 KD for equipment leasing and services, 3,805.000 KD for truck rentals, 31,300.000 KD for agreements for specialized labor and equipment, 19,195.126 KD for installation, management, and consulting, 1,014.500 KD for miscellaneous costs, and 153,900.00 in Euros for six hundred drop tanks.[62] The 2005 dumpster Claim and Settlement Offer's expense table included, in Kuwaiti dinars, 127,740.000 KD for a dumpster container purchase, 72,000.000 KD for subcontracting papers, invoices, and receipts for dumpster service, and 761.200 KD in miscellaneous payments. Also included in each Claim and Settlement Offer was a copy of purchase orders and invoices for some, but not all, of the items listed in each expense table.

Of the items listed in the expense tables, Gulf Group subsequently maintained that it purchased one tower light, one tent, one generator, and fifty dumpsters for the camp package BPA call, which it reflected in a 2011 notice to the court. Regarding the 2005 camp package BPA Claim and Settlement Offer, Saud Al Tawash testified that the Army would have understood Gulf Group was not submitting the expense table as a basis for the amounts listed in the Claim and Settlement Offer because "[t]here was [sic] no receipt vouchers, no checks, no wire transfers for the PO's [Purchase Order's] that

---

[62] The claim lists a total of 171,044.970 KD, which purportedly includes the 153,900.00 Euro expense.

41

have been not purchased." The contract for the latrines required only six hundred latrines, and Saud Al Tawash testified that the seven hundred fifty-nine latrines listed in the 2005 latrine Claim and Settlement Offer's expense table was a mistake made by Gulf Group's accounting department. Gulf Group eventually revised its latrine Claim and Settlement Offer to reflect the purchase of only four hundred latrines. Saud Al Tawash explained that Gulf Group had taken mitigation efforts to sell many of the latrines, reducing its actual costs from the costs shown in the 2005 expense table. When questioned about the latrine Claim and Settlement Offer, Mr. Peters acknowledged that the terminology he had used was "a little bit misleading." Mr. Peters stated that he understood at the time that Gulf Group had obligated itself to buy the items listed in the expense table, not that Gulf Group had actually made the purchases. Mr. Peters stated, however, that he did not intend for the expense tables to be considered a basis for the amount submitted in the latrine Claim and Settlement Offer. Mr. Peters also testified, "I admit this is pretty aggressive in what we are going for here, but I had a bad faith situation, and a bad faith termination. So there was no reason not be aggressive with the military." Mr. Peters indicated that he expected the latrine Claim and Settlement Offer would be a starting point for settlement negotiations with the Army. Gulf Group also revised its claim for the dumpster contract, reducing the contract preparatory expenses to 59,927.871 KD. The 2005 expense table for the dumpster Claim and Settlement Offer showed expenses of 200,501.220 KD.

When asked why the 2005 Claim and Settlement Offers on the camp package BPA and latrine and dumpster contracts were revised in the 2007 revised claims and in the complaints filed in this court, Saud Al Tawash testified that he relied on the advice of both attorneys Gulf Group hired to assist Gulf Group in putting together submissions for the contracting officer and the court. He stated that the complaints were "revised because we saw errors in the first claim, in the initial claim, and we seeked [sic] help from a U.S. CPA [Certified Public Accountant], who helped us determine what would be the best way to -- the best method and the acceptable method by the U.S. government standards to file a revised claim." Saud Al Tawash stated that Gulf Group believed "[w]e are entitled to what we are [sic] deserved," but admitted that Gulf Group had made some mistakes with respect to the various amounts that it claimed.

Although Saud Al Tawash recognized that he had signed the cover pages to the 2005 Claim and Settlement Offers, he indicated that he did not look at the various submissions in detail until his deposition. He stated that he had trusted Attorney Peters to prepare the Claim and Settlement Offers properly, and that he glanced at the cover page of each Claim and Settlement Offer before signing it, but did not understand all of the technical matters therein about the law and accounting. Saud Al Tawash stated that he considered it the responsibility of everyone involved with the various submissions to the contracting officer to ensure that the submissions were accurate. Saud Al Tawash explained that he followed Attorney Peters' recommendations because he had never filed a claim with the United States government before and did not understand the process. Finally, Saud Al Tawash stated that he believed that the amounts claimed were correct at the time they were originally presented. Yet, when questioned at trial, Saud Al Tawash did not know why Gulf Group claimed more than the full price of the

latrine and dumpster contracts in its 2007 revised claims. In 2007, Gulf Group claimed $6,000,000.00 pursuant to the latrine contract, although the latrine contract, including all of the option periods, was worth only $5,057,895.14. Similarly, the dumpster contract, including all the option periods, was worth up to $1,457,619.72, but Gulf Group claimed $1,800,000.00 in 2007.

Regarding Gulf Group's bottled water BPA demurrage claim, Saud Al Tawash testified that the 85.000 KD/day demurrage expenses were the result of various costs, including the fees charged by its trucking company, Expeditors, for each of the 3,511 days of delay, but also other fees related to the delays, such as insurance for the water, temporary storage, loading and unloading, salaries, vehicles, staging area, and local transportation charges. The water had to be stored for climate and security reasons while Gulf Group awaited the next convoy. Saud Al Tawash testified that, although Gulf Group's demurrage claim was denied, he believed that the Army had awarded costs for other contractors' demurrage expenses. The parties stipulated that, "[s]ometime prior to December 24, 2004 another contractor supplying bottled water to the US Government in Iraq, StarCon Ltd., submitted a claim for demurrage expenses incurred from delays of the convoys," which was approved by the issuance of a BPA call on December 24, 2004. According to Mr. Cockerham, the Army also awarded demurrage to a company identified as IAP. Mr. Cockerham testified that there were, on average, two demurrage claims submitted each week around April 2005, and that, in total, hundreds of demurrage claims were submitted. Mr. Cockerham recalled the government policy on demurrage being that the Army would pay if a truck was held seven days past the required time given for delivery, including reimbursement for offloading, storage, reloading, and delays at the government's port.

### Certifications

#### Camp Package BPA

With respect to the camp package BPA, Saud Al Tawash signed the October 10, 2005 cover letter to plaintiff's Claim and Settlement Offer. Mr. Peters certified the Claim and Settlement Offer. Plaintiff included an unsigned copy of Standard Form 1436 in its Claim and Settlement Offer. Standard Form 1436, which is titled "Settlement Proposal (Total Cost Basis)," contains the following statement under the heading "CERTIFICATE:"

> (a) AS TO THE CONTRACTOR'S OWN CHARGES. The proposed settlement (exclusive of charges set forth in Item 14) and supporting schedules and explanations have been prepared from the books of account and records of the Contractor in accordance with recognized commercial accounting practices; they include only those charges allocable to the terminated portion of this contract; they have been prepared with knowledge that they will, or may, be used directly or indirectly as the basis of settlement of a termination settlement proposal or

claim against an agency of the United States; and the charges as stated are fair and reasonable.

48 C.F.R. 53.301–1436 (2005) (emphasis in original). The signature block of the form contains the phrase "BY *(Signature of authorized official).*" Id. (emphasis in original). Both the 2005 camp package BPA Claim and Settlement Offer and the Standard Form 1436 included in the submission sought $4,544,399.84. Ms. Hands signed the cover letter and certification to plaintiff's 2007 revised camp package BPA claim.[63] Plaintiff's 2007 revised claim requested $7,000,000.00. Although plaintiff attached its 2005 Claim and Settlement Offer to its 2007 revised claim, plaintiff inexplicably replaced the unsigned copy of Standard Form 1436 included in its 2005 camp package BPA Claim and Settlement Offer with a signed copy of the Standard Form 1436 included in plaintiff's 2005 dumpster Claim and Settlement Offer. Plaintiff submitted a second revised camp package BPA claim to Maj. Everett on April 12, 2011. Plaintiff's second revised claim sought $922,851.84 and was similarly certified by Ms. Hands.

Latrine Contract

With respect to the latrine contract, Saud Al Tawash signed the October 17, 2005 cover letter to the Claim and Settlement Offer. Attorney Peters certified the 2005 Claim and Settlement Offer. Saud Al Tawash's signature, dated October 17, 2004,[64] appears

---

[63] The language that Ms. Hands used to certify plaintiff's 2007 revised claim deviates from the language set forth in the Contract Disputes Act and the FAR implementing regulations. Ms. Hands' certification states:

> I hereby certify that the claim herein is made in good faith and that the supporting data submitted is accurate and complete to the best of my knowledge and belief, that the amount requested herein accurately reflects the contract adjustment for which the contractor believes the US Government is liable, and that I am duly authorized to certify the claim on behalf of the contractor, Gulf Group General Enterprises, Co. W.L.L. as its attorney in fact.

The Contract Disputes Act and the FAR implementing regulations prescribe the following language:

> I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

See 48 C.F.R. § 33.207 (2005).

[64] Saud Al Tawash appears to have erroneously indicated that he signed the Standard Form included in plaintiff's latrine Claim and Settlement Offer in 2004, rather than 2005.

44

on the Standard Form 1436 included in the Claim and Settlement Offer. Both the Claim and Settlement Offer and the Standard Form 1436 included in the Claim and Settlement Offer seek $4,558,428.60. Ms. Hands signed the cover letter and certification to plaintiff's 2007 revised latrine claim.[65] Plaintiff's 2007 revised claim requests $6,000,000.00. The Standard Form 1436 included with plaintiff's 2007 revised claim is identical to the copy of the Standard Form 1436 included in plaintiff's 2005 Claim and Settlement Offer.

Dumpster Contract

With respect to the dumpster contract, Saud Al Tawash signed the October 20, 2005 cover letter to the Claim and Settlement Offer. Attorney Peters certified the 2005 Claim and Settlement Offer. The stand-alone copies of plaintiff's Claim and Settlement Offer that appear in the record include an unsigned copy of Standard Form 1436. Both the Claim and Settlement Offer and the Standard Form 1436 included in the Claim and Settlement Offer sought $999,994.67. Ms. Hands signed the cover letter and certification to plaintiff's 2007 revised dumpster claim.[66] Plaintiff's 2007 revised claim requested $1,800,000.00. The Standard Form 1436 that plaintiff included in its 2007 revised claim appears to be a copy of the Standard Form 1436 included in plaintiff's 2005 Claim and Settlement Offer, except that the copy included in plaintiff's 2007 revised claim contains Saud Al Tawash's signature, dated October 20, 2004.[67]

Bottled Water BPA

With respect to the bottled water BPA, Saud Al Tawash signed the December 1, 2005 cover letter to the Claim and Settlement Offer. Attorney Peters certified plaintiff's 2005 Claim and Settlement Offer.[68] Saud Al Tawash's signature, dated December 1, 2005, appears on the Standard Form 1436 included in plaintiff's 2005 Claim and Settlement Offer. Both the 2005 Claim and Settlement Offer and the Standard Form 1436 included in the claim seek 298,435.000 KD. Plaintiff did not submit a revised bottled water BPA claim.

---

[65] The language that Ms. Hands used to certify plaintiff's 2007 revised latrine claim similarly deviates from the language prescribed by the Contract Disputes Act and the FAR implementing regulations.

[66] The language that Ms. Hands used to certify plaintiff's 2007 revised dumpster claim similarly deviates from the language prescribed by the Contract Disputes Act and the FAR implementing regulations.

[67] Saud Al Tawash appears to have erroneously indicated that he signed the Standard Form included in plaintiff's dumpster claim in 2004, rather than 2005.

[68] At trial, the parties failed to introduce a signed copy of plaintiff's 2005 bottled water BPA Claim and Settlement Offer and the corresponding Standard Form 1436. Plaintiff included a signed copy of both forms in its original complaint.

**John Cockerham and Carolyn Blake**

John Cockerham and Carolyn Blake each testified in the above-captioned consolidated cases in San Antonio, Texas.[69] When they testified before this court they were both incarcerated and serving federal, criminal prison sentences. The parties stipulated that Mr. Cockerham was a member of the Army procurement team in Kuwait and was introduced to Saud Al Tawash at Saud Al Tawash's home in Kuwait in 2002. Saud Al Tawash testified that he first met Mr. Cockerham in 2002 or 2003 in the "Diwanya"[70] at his house. Mr. Cockerham testified that he believes, however, he was briefly introduced to Saud Al Tawash by a "Mr. Eli or Elias" during one of his earlier tours of Kuwait at the end of 2002 at a Ramadan "social dinner." Mr. Cockerham also testified that he has been to dinner at Saud Al Tawash's house twice. According to Mr. Cockerham's testimony at trial, he thought of, and still thinks of, Saud Al Tawash as a friend. Saud Al Tawash testified that Mr. Cockerham and Mr. Cockerham's wife attended Saud Al Tawash's wedding on February 4, 2006, in New Orleans, Louisiana. Mr. Cockerham also testified that he was the only person from the Army contracting office who attended Saud Al Tawash's wedding. Saud Al Tawash and Joanne Hands, Saud Al Tawash's fiancé at the time, now wife, also visited Mr. Cockerham at his home in San Antonio, Texas, in the spring of 2005 to congratulate Mr. Cockerham on the birth of his daughter, and brought toys for Mr. Cockerham's children. Joanne Hands testified that she remembers Saud Al Tawash saying "a friend or something had a baby," and that she first met Mr. Cockerham at this visit to his house where they had conversations like one would have with a friend.

Saud Al Tawash described Mr. Cockerham as an "older acquaintance" with whom he had a "professional relationship." Saud Al Tawash stated that the only social activity he engaged in with Mr. Cockerham in September or October of 2004 was in the "Diwanya." Saud Al Tawash also testified to hosting a change-over ceremony for Mr. Cockerham at the end of 2005, in which Mr. Cockerham received a small wooden souvenir boat, because Mr. Cockerham was leaving Kuwait. Saud Al Tawash testified that a number of Army contracting officers and Carolyn Blake, Mr. Cockerham's sister, were in attendance. According to Saud Al Tawash, "[i]t's a common practice in Kuwait when a new group -- an old group leaves and a new group comes in that we have these change-over ceremonies." According to Mr. Cockerham, he believes the last time he saw Saud Al Tawash was for "a quick lunch" in Austin, Texas, in March or April of 2006.

---

[69] Throughout the testimony of Mr. Cockerham, and especially Ms. Blake, there were many inconsistencies and numerous memory lapses. Unfortunately, the same was true for some of the government witnesses, such as Col. Miller and Col. Hess. Although there were some inconsistencies in Saud Al Tawash's testimony, he struck the court as sincerely trying accurately to recall the events of 2004 and 2005.

[70] Saud Al Tawash testified that a "Diwanya" (which he spelled out for the court reporter) is an "open door," and "you could receive strangers coming to a Diwanya because usually Diwanya is not inside the house, the main quarters of houses."

In 2004, Saud Al Tawash met Carolyn Blake, Mr. Cockerham's sister, in Kuwait. According to Ms. Blake, she went to Kuwait after she had contacted her sister-in-law, Mr. Cockerham's wife, to ask Mr. Cockerham if they were hiring females in Kuwait. Mr. Cockerham recommended that Ms. Blake visit Kuwait to see if the culture was amenable to her. Ms. Blake's first trip to Kuwait was from August 16, 2004 through August 22, 2004. According to Ms. Blake, Mr. Cockerham picked her up at the airport with Diaa Salem, who was identified as the owner of Jasmine, and Diaa Salem gave her an amount of Kuwaiti dinars, but the testimony is unclear as to whether the amount was 500.000 KD or an amount equal to $500.00. Ms. Blake testified that she was under the impression that Mr. Cockerham and Diaa Salem talked about her working for Saud Al Tawash. Ms. Blake also testified that during this visit, Mr. Cockerham was trying to arrange an interview at Camp Arifjan for a clerical position.

The testimony is not clear as to when Saud Al Tawash met Ms. Blake for the first time and if Saud Al Tawash knew she was Mr. Cockerham's sister at the time, although the parties stipulated that Saud Al Tawash met Ms. Blake for the first time in Kuwait, when Mr. Cockerham introduced her as his sister and mentioned that she was searching for a job. According to Ms. Blake, she believed that when she first arrived in Kuwait, Saud Al Tawash knew that she and Mr. Cockerham "were family." Ms. Blake testified that her first introduction to Saud Al Tawash occurred at the Crowne Plaza hotel where she was staying. Ms. Blake testified that she had never heard of Saud Al Tawash, Gulf Telecom, Gulf Group, or Palm Springs[71] before arriving in Kuwait on August 16, 2004. Mr. Cockerham testified that he was not aware that Saud Al Tawash was interested in hiring expatriates prior to Ms. Blake's move to Kuwait, and that he believes Saud Al Tawash first met Ms. Blake at Camp Doha, Kuwait, when she was given a temporary badge. According to Saud Al Tawash, Mr. Cockerham referred to Ms. Blake as "Sis" when they were first introduced, but Saud Al Tawash indicated he did not realize that Ms. Blake was Mr. Cockerham's sister until she later returned to Kuwait for work.

Ms. Blake testified that she told Saud Al Tawash during her first visit to Kuwait that she wanted to come back to Kuwait to work there. According to Saud Al Tawash, after Ms. Blake returned to the United States, Saud Al Tawash offered her a job as a "marketing consultant" for Gulf Telecom call centers, which Ms. Blake accepted. Ms. Blake testified that when she returned to Kuwait:

> I believe it was Mr. Al Tawash or his brother Michel [sic]. I think they were trying to help me find employment, so John [Cockerham] got them to help me, more or less like, to pay for an apartment or something like that until I could find a job and then after not being able to find a job, then, Saud talked more about well he would just try to hire me and find a position or make a position for me and he would just try to set it up as me being a consultant.

---

[71] According to the parties' joint stipulation of facts, "[i]n July 2005, Mr. [Saud] Al Tawash became the sole owner of Palm Springs General Trading and Contracting Establishment ('Palm Springs')."

According to Saud Al Tawash, the job offer to Ms. Blake was an offer with the same benefits as those given to other Americans working for Gulf Telecom. Saud Al Tawash testified that these benefits included "housing, travel allowance or tickets, tuition and vehicle, phone." Saud Al Tawash gave the following explanation of Ms. Blake's qualifications: "She's an American. She understands the culture very well of the military. She understands the American culture. She knows the holidays. She's somebody who has experience with that environment," and "[s]he's American citizen and clients are Americans. She's ex-military; she has retail experience; she has experience in security as a guard and she has the personality to -- the attitude, for this particular position. She's educated. She has a degree. She has also a -- quite a good knowledge of the different demographics and segments of the military." Immediately prior to accepting Gulf Telecom's job offer, Ms. Blake was employed in the United States as both an assistant school teacher and a shopping mall security guard. Ms. Blake testified that she also had worked as a clerk in a gas station. Mr. Cockerham testified that Saud Al Tawash hired Ms. Blake as an "English speaking liaison" and to do "some office work and research work" and that both Ms. Blake and Saud Al Tawash told him that Ms. Blake was doing administrative paperwork for Saud Al Tawash. Mr. Cockerham also indicated that Ms. Blake had military training and experience, which is listed on the résumé that Ms. Blake prepared in 2006 or 2007, although not on the résumé that appears to have been prepared prior to working for Gulf Telecom.

According to Saud Al Tawash, Ms. Blake's position had been open to others and he had interviewed other individuals for the job, but he did not remember the names of the other candidates. Saud Al Tawash testified that he did not believe it was a conflict of interest to hire Ms. Blake "because she was not working on any contracts then or after." Saud Al Tawash testified that he did not tell Mr. Cockerham that he had hired Ms. Blake, although Ms. Blake testified that Mr. Cockerham knew that the Al Tawash family was trying to help her get a job. Mr. Cockerham testified that Ms. Blake told him that she had worked out temporary employment with Saud Al Tawash, and that Gulf Telecom paid her a salary, but that he was not then aware of Ms. Blake's employment conditions. Mr. Cockerham testified that he did not tell anybody in the Army that Saud Al Tawash had hired his sister.

Ms. Blake testified that after she accepted the job, she was met at the airport in Kuwait on August 27, 2004 by Mr. Cockerham, Maj. Davis, Saud Al Tawash, and Diaa Salem. Subsequently, Megbel Al Tawash helped Ms. Blake locate housing in Kuwait. Megbel Al Tawash cashed a 1,200.000 KD check for her, and paid Ms. Blake that amount in cash every month as her salary, which he delivered to her in envelopes at her apartment. Ms. Blake was paid twice as much in salary as Megbel Al Tawash. She had asked for $4,000.00 or more per month in wages. Saud Al Tawash testified that Ms. Blake was graded higher and, therefore, entitled to a higher wage than the local staff because she knew the American culture and the English language, which presented a barrier for local workers when communicating with the Army. Ms. Blake testified that she believed her salary could have been paid to her in cash or "they can send it to your account." Saud Al Tawash testified that Ms. Blake was paid in cash rather than wire transfers because "[s]he didn't ask it to be wired to the United States, she asked to be

48

paid locally in Kuwait." Saud Al Tawash further explained that Ms. Blake was paid in cash because she could not obtain a local bank account and that cash payments were a common practice in Kuwait. Mr. Wilson testified that he did not have a Kuwaiti bank account when he first arrived in Kuwait so Gulf Group wired his salary to his United States account, but he was not paid in cash. Megbel Al Tawash testified that he did not remember paying cash to any other Gulf Telecom employee, although he believes Shane Mi, a Gulf Telecom employee, also initially was paid in cash. Mr. Cockerham testified that he never received any of Ms. Blake's salary and did not know how much money she earned.

The parties stipulated that, "[w]hile employed in Kuwait, Ms. Blake was given the task of calling members of the Kuwaiti public to ask if they were interested in buying water purification systems by cold-calling from a telephone book," but she testified that she failed to sell a single system. The parties also stipulated that Ms. Blake did not speak Arabic. According to Saud Al Tawash, the call centers at which Ms. Blake was supposed to work were on military bases, and she never went to them because she did not have the requisite paperwork to obtain a civil identification. Saud Al Tawash testified at trial that, although he realized Ms. Blake could not work in the call centers in late fall 2004, he "could not cancel her employment because [he] had a close contract with her." Saud Al Tawash explained that a close contract is "when you enter into a contract with your employer and employee regarding the duration period that you're agreed on." Saud Al Tawash stated that, on such a contract, "I cannot fire her at that time because she had her kids in school and it wasn't the right thing to do. And I was obligated by law because of a fixed contract I had to pay her anyway because of the remainder of her contract." According to Saud Al Tawash, under Kuwaiti labor law, he was obligated to pay Ms. Blake for the full, one-year-term of her contract, including indemnity, salary, and benefits, starting in August 2004, even if he fired her. In response to a question how long did she have use of a company vehicle, Ms. Blake stated, "I think it was December '05, no, December '04 until June '07." It does not appear, however, that there is other testimony regarding Ms. Blake being employed by a Gulf entity until June 2007, and Ms. Blake testified she was no longer in communication with Saud Al Tawash after December 2006. In fact, Ms. Blake offered confused and inconsistent testimony on many issues throughout the course of the trial.

Ms. Blake testified that she thought she was working for Gulf Telecom or Gulf Group, "but I never did work for anyone." The parties stipulated that, "[w]hile in Kuwait in October 2005, Ms. Blake also worked for Mr. Saud Al Tawash's uncle at Jireh Springs [General Trading & Contracting Establishment]," to whom she was referred and recommended by Saud Al Tawash. In a résumé that Ms. Blake prepared at the end of 2006 or early in 2007 and introduced at trial, Ms. Blake listed the following under the "Employment" heading: "Gulf Group Enterprise - Consultant" and "Jireah [sic] Springs - Sales Representative." Upon being asked why she listed Gulf Group, rather than Gulf Telecom as her employer, Ms. Blake testified that she "really didn't know who I was employed by," but that she "thought it was Gulf Telecom" and also thought she was supposed to be working for Jireh Springs in 2005 or 2006. Additionally, Ms. Blake testified that she never did any work for Jireh Springs from 2004 to 2007. According to

49

Saud Al Tawash, Ms. Blake's passport lists Gulf Telecom, in Arabic, on her October 9, 2004 Kuwait residency permit, because Gulf Telecom was her visa sponsor and employer at the time. Mr. Cockerham testified that Saud Al Tawash told him Jireh Springs would sponsor Ms. Blake and that Ms. Blake told Mr. Cockerham that she was in fact sponsored by Jireh Springs. It also appears that Jireh Springs considered Ms. Blake to be an employee in February 2006, based on a letter from Jireh Springs to the Commercial Bank of Kuwait regarding the transfer of salary funds to three Jireh Springs employees, including Carolyn Blake. The letter stated: "They work for the Jireh Springs General Trading and Contracting Establishment."

As one of her employment benefits, Gulf Telecom paid tuition for Ms. Blake's children to attend the American International School in Kuwait, which, according to Ms. Blake, amounted to about $20,000.00 per year. Ms. Blake also testified that Saud Al Tawash provided her with a vehicle while she was in Kuwait. According to Mr. Wilson, Gulf Group purchased similar vehicles for at least four employees. Ms. Blake further testified that Saud Al Tawash paid for travel and a hotel for her and her children for a trip to Dubai and that Saud Al Tawash gave her between $1,500.00 and $2,000.00 in spending money. According to Saud Al Tawash, this trip to Dubai was deducted from Ms. Blake's monthly cash envelopes, and he did not give her spending money for personal trips. According to Ms. Blake, Saud Al Tawash paid for another trip, to Bahrain, including hotel costs, to get a blood test for a visa, with spending money, in the amount of about $1,000.00. Saud Al Tawash testified that the trip to Bahrain, on February 3, 2005, was to further Ms. Blake's application to obtain residency in Kuwait. Ms. Blake additionally stated that she returned to the United States for a vacation in June 2005, but was not asked to retrieve any of the documents required for her to obtain an identification. The parties stipulated that, "[i]n March 2005, Gulf Group wired $9,478 to Ms. Blake for her to pay taxes due upon property she owned in the United States." Saud Al Tawash testified that this payment was "helping her out with payments that she required for tax and credit cards" and that "this amount would have been deducted from her -- it was like an advance payment that was paid from our company." During his rebuttal testimony, Saud Al Tawash testified that this wire payment was to reimburse Ms. Blake for her travel expenses. He explained that "she voiced her concern that taxes are up and she has a lot of credit card bills and the agreement between the company that we reimburse or [sic] staff for airline tickets, so she asked if she could get paid, urgently because she had to meet the first of April deadline." According to Ms. Blake, when she told him she "didn't need that much," he replied, "don't worry about it, just use it if you need it for your other bills."

Regarding Ms. Blake's relationship to the Al Tawash family, Ms. Blake testified "we were like family" and that she "really loved the Al Tawash family." Ms. Blake attended dinners at the Al Tawash home, including when Saud Al Tawash was present. According to Ms. Blake, she was invited, but did not go on the honeymoon of Saud Al Tawash and Joanne Hands. Ms. Blake testified, "[s]o, I spoke to her so I said Joanne, Saud has invited us all to go with you all on your honeymoon to Sharm el Sheikh and so, she said, yes, girl, it will be fine, we will have fun." Joanne Hands, however, testified that nobody but her husband, Saud Al Tawash, accompanied her on their honeymoon in

the Maldives, not Sharm el Sheikh as Ms. Blake testified, and that she did not invite Ms. Blake on her honeymoon. Joanne Hands further testified that the Al Tawash family took a vacation in the summer of 2006 to Sharm el-Sheikh, but neither Ms. Blake nor anyone outside the family was invited or came on that trip.

When questioned about whether he had improperly tried to influence the award of any Army contracts, Saud Al Tawash adamantly denied any such allegations.[72] Saud Al Tawash also pointed out that there were contracts for which he submitted bids to Mr. Cockerham, which were not awarded to Saud Al Tawash's company, although there were several smaller contracts, valued at $100,000.00 or less, that Mr. Cockerham awarded to Gulf Group after the terminations of the camp package BPA call and the latrine and dumpster contracts.[73] Saud Al Tawash forcibly and credibly denied obtaining inside information not otherwise available to the public, influencing anyone in the contracting office, offering to give money, gifts, favors, or property to anyone in the contracting office, paying anyone's debts, or hiring anyone in exchange for favorable treatment as a contractor, including the contracts and BPA call awards at issue in this case. Saud Al Tawash also testified that he never had an agreement with Mr. Cockerham for contracting actions, the purchase of land, or investment in any companies Mr. Cockerham owned. Mr. Cockerham similarly testified that he never had a conversation with Saud Al Tawash about business opportunities. Saud Al Tawash explained that he had, however, heard of other contractors bribing Army officers for favorable consideration.

The parties stipulated that, "[o]n February 4, 2008, Saud Al Tawash met with Mr. Mark Pletcher, Ms. Emily Allen, Mr. Richard Evans, attorneys for the Department of Justice, as well as with Mr. Larry S. Moreland and Mr. Sergio Gamino of the U.S. Army CID." At the trial before this court, Saud Al Tawash testified that he told federal investigators he had heard that Tijani Saani and former Army Maj. James Momon, Jr.[74] were soliciting bribes, and that Green Valley had been debarred for bribing Mr. Momon. During this meeting, which was prior to Mr. Momon pleading guilty to participation in a

---

[72] For example, on direct examination, plaintiff's counsel asked Saud Al Tawash if he had given anything of value to Maj. Cockerham in order to receive the award of "the Internet Café, the UPS [uninterruptable power supply] contract, the light set contract or the wash rack contract?" to which Saud Al Tawash replied: "No ma'am."

[73] Mr. Wilson noted, for example, that after the terminations of the camp package BPA call, the latrine contract, and the dumpster contract, Gulf Group "built a loading ramp at Shuait for the departing troops, that was like an $80,000 small job, then at Kuwait Naval Base we did some construction work on one of the piers that had been hit by a ship and bent...."

[74] According to the parties' joint stipulation of facts, "Mr. Momon was employed by the DoD as a Major with the Army deployed to Camp Arifjan, Kuwait where he served as a contract specialist from about September 21, 2005 through August 10, 2006." According to Saud Al Tawash, Mr. Cockerham introduced Saud Al Tawash to Mr. Momon at the end of 2005.

bribery scheme and involvement in a criminal conspiracy to accept bribes, Saud Al Tawash also told the investigators that Mr. Momon had solicited a bribe from him, and that he, Saud Al Tawash, had rejected the solicitation.

Saud Al Tawash testified that he first learned that Mr. Cockerham and Ms. Blake were involved in bribery allegations related to other contractors from the news media in 2007 or 2008. According to Saud Al Tawash, a number of Gulf Group bottled water competitors, including Jasmine and Allied Arms, were debarred for bribing Mr. Cockerham. In addition, Saud Al Tawash testified that he believed there was a proposed debarment against Jireh Springs, and perhaps against Palm Springs, for bribing Mr. Cockerham, although in response to the questions, "as of today has Palm Springs ever been debarred? Completely debarred?" Saud Al Tawash responded "no."

At trial, Mr. Cockerham was questioned about his undated, hand-written "appreciation payments" list, which was introduced into evidence, and which included abbreviations of names of contractors and numeric values. Mr. Cockerham testified "[i]t was money, a list of either money anticipated receiving or received," on his behalf, by his wife, Carolyn Blake, or Kermit Cruz, who established a business at the direction of Mr. Cockerham. According to Mr. Cockerham, "AA" on the "appreciation payments" list refers to Allied Arms, "Jireh" refers to Jireh Ventures, "Jas" refers to Jasmine International, "Zenith" refers to Ghopal Zenith, "Falah" refers to the owner of Trans Orient, "F.S." refers to Future Services, "KMS" refers to Kamal Sultan, and "Terry" refers to a representative of Freedom Catering Company. "Lee Dynamics" and "Green Valley" both appear on the "appreciation payments" list as well. Mr. Cockerham testified he began receiving payments from contractors on the list in August 2005 to "show some appreciation" for his work in preventing bottled water contracts from being cancelled and getting contractors off of the contracting office blacklist. Mr. Cockerham also stated that these "appreciation payments" were for a church that he was in the process of starting and for displaced women with whom Ms. Blake was working. Mr. Cockerham noted that "I was just thinking, you know, be able to help a lot of people and definitely wouldn't have to ever worry about taking up a collection.…" Mr. Cockerham testified that, of the fourteen contractors that he saved from cancellation, five of them were bottled water contractors that appear on the "appreciation payments" list: Allied Arms, Jasmine, Trans Orient, Zenith, and Freedom Catering Company. According to Mr. Cockerham, although Gulf Group was one of the fourteen bottled water contractors that he saved from cancellation, Gulf Group did not give any "appreciation payments" to him, his sister, his wife, or Kermit Cruz. Moreover, as noted above, Mr. Cockerham also signed the cancellations of Gulf Group's latrine and dumpster contracts. According to Saud Al Tawash, Mr. Cockerham did ask him to donate to a "fictional church," which "[t]o me, that was a big no no because to me that is a bribe." Saud Al Tawash testified that he never had any agreement with Mr. Cockerham to do business of any kind.

Allied Arms is included on the "appreciation payments" list as giving two million dollars to Ms. Blake, which Mr. Cockerham testified was given to Ms. Blake on his behalf and at his direction. According to Mr. Cockerham, he "told [Ms. Blake] to just put it in a safe deposit box" "for what we were wanting to do with the church, the mission,

the school, the daycare, the boys' center and on and on." Mr. Cockerham testified that Ms. Blake understood that this money was for the church, as opposed to personal spending, but that she could keep ten percent of whatever money she received from the bottled water contractors on Mr. Cockerham's behalf.

Lee Dynamics also is referenced on the "appreciation payments" list, and Mr. Cockerham testified at trial that he had gotten them off of the contracting office blacklist. According to Mr. Cockerham, they were under the mistaken impression that he was influencing a contract award to them, and they had, in return, "expressed like $300,000 or whatever" so he told them, "if you want to give something to somebody, I said give it to Maj. Davis' daughter for dental school." Mr. Cockerham further testified that the representative from Lee Dynamics "was persisting and by this time I was thinking about the church and all of this stuff, and so I was like, well, if you want to give something, you can, but I say, you know, understand this, you don't have to." Similarly, Green Valley[75] is referenced on the "appreciation payments" list, and Mr. Cockerham testified that the amount listed from Green Valley also was "showing me appreciation." Mr. Cockerham testified, however, that Green Valley did not pay him any "appreciation payments" until the summer of 2005. Mr. Cockerham clarified that he did not receive any "appreciation payments" or indicate that he would be willing to accept any "appreciation payments" during the time period in which Gulf Group's camp package BPA call for Camp Buehring, latrine contract, and dumpster contract were awarded and terminated. Mr. Cockerham also testified that one of the names blacked out on the "appreciation payments" list is Mr. Ishmal, an employee of Green Valley, who, Mr. Cockerham speculated, "worked with a couple of other different companies." Mr. Cockerham stated that he told Mr. Ishmal to give money to a church in Israel, but that Mr. Ishmal was unable to so. According to Mr. Cockerham, while Mr. Cockerham was on leave in the Spring or Summer of 2005, Mr. Ishmal, the Green Valley employee, visited San Antonio, Texas, and left an ATM card with $250,000.00 on it for Mr. Cockerham in the backseat of a van, which Mr. Cockerham never used and ended up shredding. Mr. Cockerham testified that the money from Green Valley did not come from Saud Al Tawash.

According to Mr. Cockerham, another contractor on the list, "Jireh" was Jireh Ventures, a company that Mr. Cockerham directed Mr. Cruz to establish in San Antonio for "providing supplies and so forth for vendors overseas that needed things from the states." Mr. Cockerham testified that neither Saud Al Tawash nor Jamal Al Dahma, Saud Al Tawash's uncle, had any involvement with Jireh Ventures. Mr. Cockerham testified at trial before this court that, in a January 2007 meeting with investigators, he explained to Ann Brickley and Mark Pletcher of the Department of Justice that "Jireh" on the appreciation list was a Kuwaiti company. Mr. Cockerham's testimony on Jireh Ventures, however, was contradictory and disjointed. Mr. Cockerham also stated shortly thereafter: "No, I don't think -- I don't think I told them it was a Kuwait company." Mr. Cockerham also testified that, although he was aware that Mr. Al Dahma was related to Saud Al Tawash, he could not recall if he knew Mr. Al Dahma was Saud Al Tawash's uncle. Mr. Cockerham also testified that Mr. Al Dahma did not pay him any

---

[75] As noted above, Saud Al Tawash testified he had no financial interest in Green Valley.

money. According to Mr. Cockerham, his 2007 statements to Department of Justice investigators, that he had asked Mr. Cruz to start Jireh Ventures so that Mr. Al Dahma could transfer money to it and that he had held up a large BPA call to Jireh Springs because Mr. Al Dahma did not want to pay him, were "not true," and he was pressured into making them. In a BPA call for bottled water in Kuwait issued by Mr. Cockerham to Jireh Springs, however, Mr. Cockerham listed Ms. Blake as the point of contact for the Army and Nathan Blake, Ms. Blake's teenage son, as the point of contact for the contractor. In total, Mr. Cockerham testified that he received "close to seven" million dollars from the contractors on the "appreciation payments" list.[76]

In addition, after being questioned by the federal investigators and after the investigators searched Mr. Cockerham's house, Mr. Cockerham testified that he drafted, but never sent, the note, reproduced below, to Ms. Blake telling her, among other things, to "Get Rid of Everything." The full text of the hand-written note, as introduced into evidence at trial, reads:

> 1. <u>Carolyn</u> Get Rid of Everything
> 2. Do not talk to them at All
> 3. Make sure no excess money is lying around. Put it all in the bank.
> 4. Make sure no keys are laying around.
> 5. Tell Saud if ask to don't confess to anything. Tell them they can talk to his lawyer that he never ~~called Fernand Peters~~ [sic] gave me a penny for a contract. We will do business later in trading.
> 6. Tell Carolyn start business in Dubai.
> 7. It's perfect legal for Carolyn to work for him doing admin paperwork as long as he and I didn't have an agreement. She never work on nor prepared any contracts or worked in that Department. She got the job on her own.

(emphasis, capitalization, and strike-through in original).

According to Mr. Cockerham's testimony at trial, "[e]verything" in the first line of the note referred to "appreciation payments" by bottled water contractors, as well as Ms. Blake's employment relationship with Saud Al Tawash. Mr. Cockerham further testified that "them" in the second entry of the note refers to federal investigators. The note stated, "[d]o not talk to them at All," and "[t]ell Saud if ask to don't confess to anything." Mr. Cockerham explained that when he wrote, regarding Saud Al Tawash, "[w]e will do business later in trading," he "thought there might be perhaps an opportunity in the future," despite the fact that he had not had any business with Saud Al Tawash prior to writing this note. In another hand-written note, written during the same time period, but also never sent, Mr. Cockerham wrote to Ms. Blake:

---

[76] Information in the indictments against Mr. Cockerham, Ms. Blake, and Mr. Cockerham's wife suggests that Mr. Cockerham accepted as much as $9.6 million in bribes.

0. Identify anyone other than me, Dia, Saud, you don't know them.
1. Kids → []ist of Phone # Safe Deposit Box
2. Keys/D&J Get rid of it    Talk is Bad
3. Tony: American Business / Just say he only knows
4. Don't talk to them, you have no money except your business.   (1.)
   $ Melissa Business Loan
5. Put the 1 Key inside the other box.  (2.)
6. Get rid of all the keys / turn them in
7. They will show you a list / that was made reference Shirly Robinson other names, Do not answer.  They are not your friends.  They have nothing on you.  They will use anything and twist it against you.  Sade[]→Gopal → Disa→
8. He just a friend/ Tony
9. Marriage Kuwaiti Only / Non American
10. Sponsor Aunt/ Legal/ work / no exchange for...for Jireah Ad[] Mission work, Christian counselor

(all punctuation in original). According to Mr. Cockerham, these notes were "just brainstorming," and there were "about 70 pages of these notes, just -- I'm just on a mental rampage, just everything I can -- that was coming to mind...."

Besides meeting with Mr. Cockerham, federal investigators called Ms. Blake in February 2007 and requested to meet with her.  According to Ms. Blake, before meeting with the investigators, she called Megbel Al Tawash, and he suggested that she meet with them at a restaurant, rather than her apartment "[b]ecause the apartment was not my apartment."  According to Ms. Blake, she did not tell Mr. Cockerham that the investigators wanted to meet with her.  Ms. Blake testified that she met with the federal investigators a few weeks later and they asked her about money she had received from certain people whose names she had written in a list.

On a list Ms. Blake prepared of people who gave her money, contractors were assigned "some type of American name because I didn't know how to spell their names."  According to Ms. Blake's testimony, "Felicia Hamilton" refers to Mr. Falah, "Julie Landsheen" refers to Justin Lee, "Destiny Carter" refers to Diaa Salem, and "Sharon Miller" perhaps refers to Mr. Shawak.  Ms. Blake testified that the people named on the list gave her $3,135,120.00, which she eventually gave back, "except for the amount for the tuition and for the amount to pay for a plane ticket for the kids to come home."  According to Ms. Blake, none of the names on the list refer to Saud Al Tawash, Megbel Al Tawash, or Suresh Pulikkal, a legal consultant for Gulf Group, and she never considered any of the money she received from Gulf Telecom or the Al Tawash family to be a bribe toward obtaining army contracts through Mr. Cockerham.

A few months prior to meeting with the investigators, in December 2006, Ms. Blake claims that the Al Tawash family "just wouldn't talk to me no more" and would not return her phone calls about paying her children's tuition.  Mr. Cockerham testified that he told Ms. Blake to talk to Saud Al Tawash about paying the tuition and that he also

"mentioned it to him one time that she was concerned about the tuition in time for the kids so that they wouldn't be put out of school...." Around this same time period, according to Ms. Blake, Mr. Cockerham sent Ms. Blake's niece, to "just give the money back, back to the contractors because the Feds had been asking questions about it." According to Ms. Blake, she gave money back to the contractors on January 3, 2007.

According to Ms. Blake, although members of the Al Tawash family were not returning her calls in December 2006, after Ms. Blake met with the federal investigators in early 2007, Saud Al Tawash called and said he wanted to meet with her at the college where his wife worked. Ms. Blake stated that she met with Saud Al Tawash at the college for about ten or fifteen minutes and he "wanted to know why the Feds wanted to meet with me or something like that and that he said something else about if John gets ousted or something...." According to Saud Al Tawash, he never used the word "ousted" in his conversations with Ms. Blake and he does not "even know what it means." Ms. Blake testified that she told Mr. Cockerham around April 2007 that the Al Tawash family had stopped communicating with her.

Eventually, Mr. Cockerham was indicted and convicted, and he entered a plea agreement as a result of bribery in connection with the "appreciation payments." Ms. Blake also was indicted and convicted, and she entered a plea agreement, confessing that she had received bribe payments from government contractors on Mr. Cockerham's behalf. According to the joint stipulation of facts in the above-captioned cases, "none of the contractors from whom Blake received bribe money included Mr. Saud Al Tawash, Gulf Group, Gulf Telecom, Palm Springs, Mr. Jamal Al Dahma or Jireh Springs." The parties also stipulated that, "[t]he Indictment obtained against Cockerham does not mention any of the contracts that are the subject of this litigation or any contract ever issued to Gulf Group, Gulf Telecom, or Saud Al Tawash." In addition, the parties stipulated that "[t]he Indictment obtained against Cockerham also does not mention any contracts awarded to Jireh Springs." The plea agreements signed by Mr. Cockerham and Ms. Blake also do not mention any members of the Al Tawash family, Gulf Group, Gulf Telecom, Palm Springs, Mr. Al Dahma, or Jireh Springs. In fact, the plea agreements do not mention any contractor by name. According to Mr. Cockerham, he was arrested in late July 2007, and he had not exchanged any communications with Saud Al Tawash, including phone calls or emails, since his arrest, until his testimony during the trial before this court.

## DISCUSSION

Gulf Group's complaints allege abuse of discretion and arbitrary and capricious action by the Army concerning the terminations, and, therefore, breaches of the camp package BPA call, the latrine contract, and the dumpster contract. Plaintiff also claims what appear to be expectancy damages and preparation costs for breaches of the camp package BPA, the latrine contract, and the dumpster contract. Plaintiff further asserts that the United States violated its duty of good faith and fair dealing by causing delays for the delivery of plaintiff's bottled water pursuant to the bottled water BPA, for which plaintiff seeks demurrage compensation.

56

Defendant responds to plaintiff's complaints by asserting various affirmative defenses and counterclaims. For Case No. 06-835C, the camp package BPA, defendant alleges that plaintiff's claim is "barred by illegality as a result of submitting a false claim," "barred by fraud in the inducement of the contract," and "[p]laintiff's agreement is unenforceable because of conflict-of-interest taint." Defendant states:

> As to Count I, under the Special Plea in Fraud, 28 U.S.C. § 2514, against plaintiff, for forfeiture of Gulf Group's entire claim; As to Count II, under the Contract Disputes Act, 28 [sic] U.S.C. § 7103(c)(2),[77] against plaintiff, for damages in the amount of Gulf Group's unsupported claim, plus the Government's cost of reviewing plaintiff's false claim; As to Count III, under the False Claims Act, 31 U.S.C. § 3729, against plaintiff, for treble the damages sustained by the United States, plus civil penalties as are allowable by law in the amount of $5,500 to $11,000 per violation, post-judgment interest, and costs; As to Count IV, rescission and disgorgement, for rescission of the contracts obtained by plaintiff through bribery, conflict of interest, and fraud, and for disgorgement of all monies the United States paid under calls under BPA [W912D1-04-A-]0047. For the dismissal of Gulf Group's third amended complaint; and For such other and further relief as the Court may deem appropriate.

(capitalization in original).

Regarding Case No. 06-858C, the latrine contract, defendant alleges that plaintiff's claim is "barred by illegality as a result of submitting a false claim," "barred by fraud in the inducement of the contract," and "[p]laintiff's agreement is unenforceable because of conflict-of-interest taint." Defendant states:

> As to Count I, under the Special Plea in Fraud, 28 U.S.C. § 2514, against plaintiff, for forfeiture of Gulf Group's entire claim; As to Count II, under the Contract Disputes Act, 28 [sic] U.S.C. § 7103(c)(2), against plaintiff, for damages in the amount of Gulf Group's unsupported claim, plus the Government's cost of reviewing plaintiff's false claim; As to Count III, under the False Claims Act, 31 U.S.C. § 3729, against plaintiff, for civil penalties as are allowable by law in the amount of $5,500 to $11,000 per violation, post-judgment interest, and costs; For the dismissal of Gulf Group's second amended complaint; and For such other and further relief as the Court may deem appropriate.

(capitalization in original).

---

[77] Defendant incorrectly cites to the amended provisions of the Contract Disputes Act. See 41 U.S.C. § 7103. The court refers to the provisions of the Contract Disputes Act in effect during the time period relevant to this dispute unless quoting from defendant's briefs. See 41 U.S.C. § 604.

Regarding Case No. 06-853C, the dumpster contract, defendant alleges that plaintiff's claim is "barred by illegality as a result of submitting a false claim," "barred by fraud in the inducement of the contract," and "[p]laintiff's agreement is unenforceable because of conflict-of-interest taint." Defendant states:

> As to Count I, under the Special Plea in Fraud, 28 U.S.C. § 2514, against plaintiff, for forfeiture of Gulf Group's entire claim; As to Count II, under the Contract Disputes Act, 28 [sic] U.S.C. § 7103(c)(2), against plaintiff, for damages in the amount of Gulf Group's unsupported claim, plus the Government's cost of reviewing plaintiff's false claim; As to Count III, under the False Claims Act, 31 U.S.C. § 3729, against plaintiff, for civil penalties as are allowable by law in the amount of $5,500 to $11,000 per violation, post-judgment interest, and costs; For the dismissal of Gulf Group's second amended complaint; and For such other and further relief as the Court may deem appropriate.

(capitalization in original).

Regarding Case No. 07-82C, the bottled water BPA, defendant alleges that plaintiff's claim is "barred by illegality as a result of submitting a false claim," "barred by fraud in the inducement of the contract," and "[p]laintiff's agreement is unenforceable because of conflict-of-interest taint." Defendant states:

> As to Count I, under the Special Plea in Fraud, 28 U.S.C. § 2514, against plaintiff, for forfeiture of Gulf Group's entire claim; As to Count II, under the Contract Disputes Act, 28 [sic] U.S.C. § 7103(c)(2), against plaintiff, for damages in the amount of Gulf Group's unsupported claim, plus the Government's cost of reviewing plaintiff's false claim; As to Count III, under the False Claims Act, 31 U.S.C. § 3729, against plaintiff, for treble the damages sustained by the United States, plus civil penalties as are allowable by law in the amount of $5,500 to $11,000 per violation, post-judgment interest, and costs; As to Count IV, rescission and disgorgement, for rescission of the contracts obtained by plaintiff through bribery, conflict of interest, and fraud, and for disgorgement of all monies the United States paid under calls under BPA [W912D1-04-A-]0052. For the dismissal of Gulf Group's second amended complaint; and For such other and further relief as the Court may deem appropriate.

(capitalization in original).

## I.     The False Claims Act and the Contract Disputes Act

Defendant alleges that plaintiff violated the False Claims Act in the submission of its claims to the government under the camp package BPA and the bottled water BPA, as well as under the latrine contract and the dumpster contract. Defendant also asserts that plaintiff submitted claims for the camp package BPA call and bottled water BPA

calls, as well as for the latrine contract and dumpster contract, for an amount significantly greater than what was owed, and that, under the antifraud provision of the Contract Disputes Act, plaintiff must pay the government the money it has claimed which is not supported, plus the government's costs in reviewing the claims.

On December 15, 2005, Gulf Group submitted a Claim and Settlement Offer to Mr. Cockerham under the bottled water BPA for 298,435.000 KD in demurrage for delays incurred between November 2004 and March 2005. Saud Al Tawash signed the cover letter to the bottled water BPA Claim and Settlement Offer and the Claim and Settlement Offer was signed and certified by plaintiff's attorney at the time, Ferdinand Peters. On December 16, 2005, Gulf Group submitted a Claim and Settlement Offer to Mr. Cockerham for $4,544,339.84 for the camp package BPA. Mr. Peters and Saud Al Tawash disagreed at trial as to who chose the settlement amount, with each testifying that the other chose it. Within the settlement offer, plaintiff asserted that it was entitled to the master BPA limit of $10,000,000.00.

On December 16, 2005, Gulf Group also submitted Claim and Settlement Offers to Mr. Cockerham in the amount of $4,558,428.60 for the latrine contract and $999,994.67 for the dumpster contract.[78] Saud Al Tawash signed the cover letter to the 2005 Claim and Settlement Offers relating to the latrine contract and the dumpster contract, and the Claim and Settlement Offers were certified by plaintiff's attorney at the time, Ferdinand Peters. On March 26, 2007, Gulf Group presented revised claims to Joseph Libbey, the contracting officer, certified by plaintiff's replacement attorney and current attorney of record, Iliaura Hands, for $7,000,000.00 for the camp package BPA, $6,000,000.00 for the latrine contract, and $1,800,000.00 for the dumpster contract. On May 21, 2007, Mr. Libbey issued separate final decisions on the camp package BPA, the latrine contract, and the dumpster contract termination claims.

The total price of the camp package BPA call No. 0001 was $1,447,457.22. In its original complaint in Case No. 06-835C, the camp package BPA case, plaintiff sought $7,000,000.00. In its first amended complaint in the camp package BPA case, plaintiff sought $2,682,160.86. In its second amended complaint in the camp package BPA case, plaintiff sought $3,463,297.57. In its third amended complaint in the camp package BPA case, plaintiff now seeks $922,851.84. The total price of the base period of the latrine contract was $613,142.86. In its original complaint in Case No. 06-858C, the latrine case, plaintiff sought $6,000,000.00. In its first amended complaint in the latrine case, plaintiff sought 1,572,967.611 KD. In its second amended complaint in the latrine case, plaintiff now seeks $2,830,662.20. The total price of the base period of the dumpster contract was $346,998.00. In its original complaint in Case No. 06-853C, the dumpster case, plaintiff sought $1,800,000.00. In its first amended complaint in the dumpster case, plaintiff sought $1,946,721.78. In its second amended complaint in the dumpster case, plaintiff now seeks $780,031.63. In its original complaint in Case No.

---

[78] As indicated above, on October 19, 2006, the Camp Arifjan contracting office files were searched, but there was no record of claim submissions from Gulf Group on December 15 and 16, 2005. Gulf Group, therefore, re-submitted its Claim and Settlement Offers and, this time, the claims were put on the contracting command log.

07-82C, the bottled water BPA case, plaintiff sought 298,435.000 KD, calculated as $1,035,802.23. In its first amended complaint in the bottled water BPA case, plaintiff sought 298,435.000 KD. In its second amended complaint in the bottled water BPA case, plaintiff now seeks 298,435.000 KD, calculated as $1,065,711.39, for demurrage and related expenses. For each of the amended complaints in the camp package BPA, the latrine case, and the dumpster case, plaintiff altered the amount of money sought.

As noted above, with respect to the camp package BPA, Saud Al Tawash signed the October 10, 2005 cover letter to plaintiff's Claim and Settlement Offer and Attorney Peters certified plaintiff's 2005 Claim and Settlement Offer. Plaintiff included an unsigned copy of Standard Form 1436 (Rev. 5/04) in its 2005 Claim and Settlement Offer. Standard Form 1436, which is titled "Settlement Proposal (Total Cost Basis)," contains the following statement under the heading "CERTIFICATE:"

> (a) AS TO THE CONTRACTOR'S OWN CHARGES. The proposed settlement (exclusive of charges set forth in Item 14) and supporting schedules and explanations have been prepared from the books of account and records of the Contractor in accordance with recognized commercial accounting practices; they include only those charges allocable to the terminated portion of this contract; they have been prepared with knowledge that they will, or may, be used directly or indirectly as the basis of settlement of a termination settlement proposal or claim against an agency of the United States; and the charges as stated are fair and reasonable.

48 C.F.R. 53.301–1436 (emphasis in original). The signature block of the form contains the phrase "BY *(Signature of authorized official)*." Id. (emphasis in original). Both the 2005 camp package BPA Claim and Settlement Offer and the Standard Form 1436 included in the Claim and Settlement Offer sought $4,544,399.84. Ms. Hands signed the cover letter and certification to plaintiff's 2007 revised camp package BPA claim.[79]

---

[79] The language that Ms. Hands used to certify plaintiff's 2007 revised claim deviates from the language set forth in the Contract Disputes Act and the FAR implementing regulations. Ms. Hands' certification states:

> I hereby certify that the claim herein is made in good faith and that the supporting data submitted is accurate and complete to the best of my knowledge and belief, that the amount requested herein accurately reflects the contract adjustment for which the contractor believes the US Government is liable, and that I am duly authorized to certify the claim on behalf of the contractor, Gulf Group General Enterprises, Co. W.L.L. as its attorney in fact.

The Contract Disputes Act and FAR implementing regulations prescribe the following language:

Plaintiff's 2007 revised claim requested $7,000,000.00. Although plaintiff attached its 2005 Claim and Settlement Offer to its 2007 revised claim, plaintiff inexplicably replaced the unsigned copy of Standard Form 1436 included in its 2005 Claim and Settlement Offer with a signed copy of the Standard Form 1436 relating to plaintiff's dumpster claim. Plaintiff submitted a second revised camp package BPA claim to Maj. Daniel Everett on April 12, 2011. Plaintiff's second revised claim sought $922,851.84 and was similarly certified by Ms. Hands.

With respect to the latrine contract claim, Saud Al Tawash signed the October 17, 2005 cover letter to plaintiff's Claim and Settlement Offer and Attorney Peters certified plaintiff's 2005 Claim and Settlement Offer. Saud Al Tawash's signature, dated October 17, 2004,[80] appears on the Standard Form 1436 included in plaintiff's 2005 Claim and Settlement Offer. Both the 2005 Claim and Settlement Offer and the Standard Form 1436 included in the Claim and Settlement Offer sought $4,558,428.60. Ms. Hands signed the cover letter and certification to plaintiff's 2007 revised latrine claim,[81] which requested $6,000,000.00. The Standard Form 1436 included with plaintiff's 2007 revised claim is identical to the copy of the Standard Form 1436 included in plaintiff's 2005 Claim and Settlement Offer.

With respect to the dumpster contract claim, Saud Al Tawash signed the October 20, 2005 cover letter to plaintiff's Claim and Settlement Offer and Attorney Peters certified plaintiff's 2005 Claim and Settlement Offer. The stand-alone copies of plaintiff's 2005 Claim and Settlement Offer that appear in the record include an unsigned copy of Standard Form 1436. Both the 2005 Claim and Settlement Offer and the Standard Form 1436 included in the Claim and Settlement Offer sought $999,994.67. Ms. Hands signed the cover letter and certification to plaintiff's 2007 revised dumpster claim,[82] which requested $1,800,000.00. The Standard Form 1436 that plaintiff included in its 2007 revised claim appears to be a copy of the Standard Form 1436 included in

---

> I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

See 48 C.F.R. § 33.207.

[80] Saud Al Tawash appears erroneously to have indicated that he signed the Standard Form included in plaintiff's latrine Claim and Settlement Offer in 2004, rather than 2005.

[81] The language that Ms. Hands used to certify plaintiff's 2007 revised latrine claim similarly deviates from the language prescribed by the Contract Disputes Act and the FAR implementing regulations.

[82] The language that Ms. Hands used to certify plaintiff's 2007 revised dumpster claim similarly deviates from the language prescribed by the Contract Disputes Act and the FAR implementing regulations.

plaintiff's 2005 Claim and Settlement Offer, except that the copy included in plaintiff's 2007 revised claim contains Saud Al Tawash's signature, dated October 20, 2004.[83]

With respect to the bottled water BPA claim, Saud Al Tawash signed the December 1, 2005 cover letter to plaintiff's Claim and Settlement Offer. Attorney Peters certified plaintiff's 2005 Claim and Settlement Offer. Saud Al Tawash's signature, dated December 1, 2005, appears on the Standard Form 1436 included in plaintiff's 2005 Claim and Settlement Offer. Both the 2005 Claim and Settlement Offer and the Standard Form 1436 included in the Claim and Settlement Offer sought 298,435.000 KD.

It is not clear from the face of the 2005 Claim and Settlement Offers that plaintiff submitted to Mr. Cockerham for the termination of camp package BPA call, the latrine contract, and the dumpster contract whether the Claim and Settlement Offers constituted "claims" under the Contract Disputes Act.[84] The United States Court of Appeals for the Federal Circuit has indicated that a submission to a contracting officer constitutes a claim if it is "(1) a written demand, (2) seeking, as a matter of right, (3) the payment of money in a sum certain." See Northrop Grumman Computing Sys., Inc. v. United States, 709 F.3d 1107, 1112 (Fed. Cir. 2013) (citing Reflectone, Inc. v. Dalton, 60 F.3d 1572, 1575-76 (Fed. Cir.), reh'g denied (Fed. Cir. 1995)). An "explicit request for a final decision" is not required, however, "'as long as what the contractor desires by its submissions is a final decision....'" See James M. Ellett Constr. Co. v. United States, 93 F.3d 1537, 1543 (Fed. Cir. 1996) (quoting Transamerica Ins. Corp. v. United States, 973 F.2d 1572, 1576 (Fed. Cir. 1992), overruled on other grounds by Reflectone, Inc. v. Dalton, 60 F.3d 1572). Whether a submission requests a final decision, therefore, "'can be implied from the context of the submission.'" James M. Ellett Constr. Co. v. United States, 93 F.3d at 1543 (quoting Heyl & Patterson, Inc. v. O'Keefe, 986 F.2d 480, 483 (Fed. Cir. 1993), overruled on other grounds by Reflectone, Inc. v. Dalton, 60 F.3d 1572).

The Contract Disputes Act requires that a contractor certify with respect to a claim valued at more than $100,000.00, "that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor." 41 U.S.C. § 605(a)(1) (2005) (subsequently codified with minor alterations at 41 U.S.C. § 7103(b)). A contractor is required to submit a settlement proposal to a contracting officer when seeking the

---

[83] Saud Al Tawash appears to have erroneously indicated that he signed the Standard Form included in plaintiff's dumpster Claim and Settlement Offer in 2004, rather than 2005.

[84] Plaintiff also submitted a Claim and Settlement Offer under the bottled water BPA in 2005. Although plaintiff included a settlement form in its 2005 submission for the bottled water BPA, plaintiff did not propose a settlement amount and appeared to request a final decision on the amount of its claim.

payment of money in connection with the termination for convenience of a fixed-price contract.  See 48 C.F.R. § 49.502(b) (2005) (directing that "the clause at 52.249–2" be inserted in fixed-price contracts that exceed the simplified acquisition threshold); see also 48 C.F.R. § 52.249–2(e) (2005) ("After termination, the Contractor shall submit a final termination settlement proposal to the Contracting Officer in the form and with the certification prescribed by the Contracting Officer.").

Before the 1992 amendments to the Contract Disputes Act, a number of courts found the certification on Standard Form 1436 to be insufficient to confer jurisdiction on this court under the Contract Disputes Act.  See Technassociates, Inc. v. United States, 14 Cl. Ct. 200, 211 (1988) (noting that the certification on Standard Form 1436 "does not state that the claim is made in good faith[,]...does not state that the data are accurate and complete to the best of the contractor's knowledge[,]…[and] does not state that it accurately reflects the contract adjustment for which the contractor believes the Government to be liable"); cf. Gardner Mach. Corp. v. United States, 14 Cl. Ct. 286, 292 (1988) (concluding that the submission of a settlement proposal on Standard Form 1436 did not qualify as a claim under the Contract Disputes Act).  "Following the 1992 amendments, however, this court and other tribunals have determined that the certification language found in...SF [Standard Form] 1436…is sufficiently similar to the CDA [Contract Disputes Act]  certification to permit jurisdiction."  See Scan-Tech Sec., L.P. v. United States, 46 Fed. Cl. 326, 336 (2000) (citing James M. Ellett Constr. Co. v. United States, 93 F.3d at 1544–45) (noting that the government "does not argue that the substance of the preprinted certification contained on the SF 1436 was in any way deficient...[and] concedes that the 'certification Ellett submitted with its settlement proposal contained similar language' to that of the CDA."  (comparing 48 C.F.R. § 53.301–1436 to 41 U.S.C. § 605(c)(1))); Medina Constr., Ltd. v. United States, 43 Fed. Cl. 537, 547–48 (1999) ("The certification executed by Medina, pre-printed on the TSP [termination settlement proposal] form SF 1436, contains similar language to that required for a CDA certification....  Medina's refusal to provide a new certification does not preclude the previously executed and certified TSP from ripening into a CDA claim within this Court's jurisdiction."); Appeal of Metric Constructors, Inc., ASBCA No. 50,843, 98–2 BCA ¶ 30,088 ("The only certification submitted by appellant was the standard certification included in the SF 1436.  That certification language differs from the certification required by the CDA.  In fact, this Board has previously determined that those differences are such as to render the SF 1436 certification one which could not be corrected to meet the CDA certification requirements....  However, the Court of Appeals for the Federal Circuit has since given us reason to hold differently than we did....").  The certification included in Standard Form 1436 is, therefore, considered to be a certification under the Contract Disputes Act, albeit defective.  See 48 C.F.R. § 33.201 (2005) ("Defective certification means a certificate which alters or otherwise deviates from the language in 33.207(c)...."); see also Appeal of Green Dream Grp., ASBCA No. 57,413, 11–1 BCA ¶ 34,739; Appeal of  W. Plains Disposal, ASBCA No. 56,986, 11–1 BCA ¶ 34,617.

"[T]hat the contractor may express a desire to settle or negotiate the dispute...will not necessarily prevent a finding that the contractor's submissions requested a final

decision."  See Kanag'Iq Constr. Co. v. United States, 51 Fed. Cl. 38, 44 (2001) (citations omitted); see also Reflectone, Inc. v. Dalton, 60 F.3d at 1583.  However, "settlement proposals submitted under the termination for convenience clause of the FAR generally are not CDA claims."  See Sys. Dev. Corp. v. McHugh, 658 F.3d 1341, 1346–47 (Fed. Cir. 2011); see also Gardner Mach. Corp. v. United States, 14 Cl. Ct. at 292–93.  A settlement proposal is, by its nature, submitted to a contracting officer "for the purpose of negotiation, not for a contracting officer's decision."  See James M. Ellett Constr. Co. v. United States, 93 F.3d at 1543–44 ("A settlement proposal is just that: a proposal."  (citing 48 C.F.R. § 49.001 (1995))); see also Rex Sys., Inc. v. Cohen, 224 F.3d 1367, 1371 (Fed. Cir.) ("Settlement proposals submitted under the termination for convenience clause of the FAR are by their very nature merely negotiating tools and not claims."), reh'g and reh'g en banc denied (Fed. Cir. 2000).  A settlement proposal, however, may ripen into a claim once negotiations reach an impasse.  See James M. Ellett Constr. Co. v. United States, 93 F.3d at 1544; see also Scan-Tech Sec., L.P. v. United States, 46 Fed. Cl. at 337 (noting that the FAR contemplates that the submission of Standard Form 1436 "will ripen automatically into a CDA claim if the parties reach an impasse in their negotiations").

In each of its 2005 Claim and Settlement Offers submitted to the contracting officer, for the camp package BPA, the latrine contract, and the dumpster contract, Gulf Group appeared to seek a final decision from the contracting officer, in addition to making a settlement offer.  Although Gulf Group referred to each submission as "an offer for settlement," included Standard Form 1436, "Settlement Proposal (Total Cost Basis)," and cited provisions of the FAR relating to settlement, the cover letter to each 2005 Claim and Settlement Offer, each of which was signed by Saud Al Tawash, stated that "[w]e hereby submitting [sic] our claim," requested "approval for our claim," and indicated that Gulf Group had attached supporting documentation in support of its "claim."  Moreover, each 2005 Claim and Settlement Offer included the certification required by the Contract Disputes Act for claims seeking more than $100,000.00.  Furthermore, in each of Gulf Group's 2007 submissions to the contracting officer with respect to the camp package BPA and latrine and dumpster contracts,[85] Iliaura Hands, plaintiff's replacement attorney, referred to the previous submission as the "initially submitted certified claim," designated the corresponding cover letter as "Mr. Al Tawash's claim letter," and stated that "a Settlement Proposal in the Standard Form 1436 and a Claim & Settlement Offer letter" was "[i]ncluded in Gulf Group's claim."  The 2007 submissions purported to withdraw each initial "settlement offer," but also

---

[85] Prior to the above-captioned cases being consolidated before the undersigned judge, Gulf Group submitted its 2007 revised claim to the contracting officer with respect to the camp package BPA claim, as well as the latrine and dumpster contract claims, after defendant requested the then-presiding judges, to whom each of the cases individually had been assigned, to issue a stay in each case pursuant to 41 U.S.C. § 605(c)(5), "so that the contracting officer can issue a decision regarding plaintiff's 'claim and settlement offer.'"  The bottled water BPA case was not stayed at that time.  Subsequent stay requests were granted by the undersigned judge in each of the consolidated cases to accommodate related ongoing criminal investigations.

64

indicated that Gulf Group "hereby re-submit[s] a claim under the Contract Dispute [sic] Act."

At least one decision issued by the United States Court of Appeals for the Federal Circuit has indicated, however, that a contracting officer's failure to respond to a settlement proposal may not be sufficient to demonstrate a breakdown in the settlement process, precluding the "deemed denial" of a settlement proposal from allowing the settlement proposal to ripen into a claim. Specifically, in Walsky Construction Co. v. United States, the contractor submitted "a termination for convenience settlement proposal to the contracting officer, which also contained what purported to be a certification submitted pursuant to the Contract Disputes Act...." See Walsky Constr. Co. v. United States, No. 98–5112, 178 F.3d 1312, 1999 WL 13376, at *2 (Fed. Cir. 1999) (unpublished table decision). The Federal Circuit concluded, however, that the "deemed denial" of the settlement proposal did not cause the settlement proposal to ripen into a claim, even though the contractor waited almost a year after transmitting its settlement proposal before bringing suit in the United States Court of Federal Claims. The Federal Circuit reasoned that the "deemed denial" of the settlement proposal did not constitute an impasse in negotiations between the parties. See id. at *2–3.

The court recognizes the similarity between the submissions at issue in Walsky Construction Co. v. United States and the submissions at issue in the camp package BPA, latrine, and dumpster cases. The context in which the settlement proposals were submitted, however, is different. After submitting the termination settlement proposal, the contractor in Walsky Construction Co. v. United States requested that the government "'set a negotiations date,'" the government indicated that settlement was "'a definite priority,'" and the government updated the contractor as to the status of its review of the settlement proposal. See id. at *3. In contrast, the record before this court does not reflect that the settlement proposals that Gulf Group submitted for the termination of the camp package BPA call, the latrine contract, and the dumpster contract were subject to further discussions between the parties. Instead, the record reflects that government personnel may have lost the initial submission of the Claim and Settlement Offers in October 2005, that government personnel could not contemporaneously locate a copy of the Claim and Settlement Offers that plaintiff submitted on December 16, 2005, which now inexplicably appear in the record before the court, and that government personnel refused to meet with plaintiff's representatives in November 2006, approximately a year after plaintiff had made its submissions. Mr. Libbey, the contracting officer who issued the final decisions on the camp package BPA call, and latrine and dumpster contracts, testified, apparently with respect to plaintiff's 2005 submissions, that "the government didn't answer the claim," that he could not even remember whether plaintiff had submitted a termination for convenience settlement, and that the "government was in error" with regard to "the delay in processing." Although "[o]bjective evidence that negotiations had been abandoned by the parties is necessary before the negotiations can be found to have reached an impasse," see Rex Sys., Inc. v. Cohen, 224 F.3d at 1372–73, at least one authority has recognized that, when a settlement proposal, which also is styled as a claim under the Contract Disputes Act, is not subject to any form of negotiation, an impasse in negotiations may result, allowing

the settlement proposal to ripen into a claim under the Contract Disputes Act. See ePlus Tech., Inc. v. FEC, CBCA No. 2,573, 12–2 BCA ¶ 35114 ("In looking at the circumstances presented here, we see a settlement proposal as well as a certified claim being presented to the contracting officer. No attempt was made by the contracting officer to contact the appellant to discuss either the settlement proposal or the certified claim. After more than six months had passed, the contractor got fed up, filed the appeal, and refused to negotiate on the settlement proposal or certified claim."). Notwithstanding the potentially broad holding of the unpublished table decision in Walsky Construction Co. v. United States, therefore, the court determines that the parties had reached an impasse with regard to plaintiff's Claim and Settlement Offers and that the settlement proposals included in the Claim and Settlement Offer submissions with respect to the camp package BPA and the latrine and dumpster contracts had ripened into claims under the Contract Disputes Act when the plaintiff filed the complaints in the above-captioned cases based on a deemed denial of plaintiff's claims.

Accordingly, because the 2005 Claim and Settlement Offers had ripened into claims under the Contract Disputes Act, and because settlement proposals constitute claims under the False Claims Act, see 48 C.F.R. § 49.001 ("A settlement proposal is included within the generic meaning of the word 'claim' under false claims acts (see 18 U.S.C. 287 and 31 U.S.C. 3729)."), the court examines plaintiff's liability under the False Claims Act and the Contract Disputes Act for its 2005, 2007, and 2011 submissions for the camp package BPA, and its 2005 and 2007 submissions for the latrine and dumpster contracts.

The False Claims Act, 31 U.S.C. § 3729, provides that any person who –

> **(1)** knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> **(2)** knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
>
> **(3)** conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;
>
> **(4)** has possession, custody, or control of property or money used, or to be used, by the Government and, intending to defraud the Government or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt;

**(5)** authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

**(6)** knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge the property; or

**(7)** knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000[86] plus 3 times the amount of damages which the Government sustains because of the act of that person....

---

[86] "The Department of Justice, by regulation, has increased the penalties for FCA [False Claims Act] violations to a minimum of $5,500.00 and a maximum of $11,000.00." Alcatec, LLC v. United States, 100 Fed. Cl. 502, 526 n.13 (2011) (citing 28 C.F.R. § 85.3(a)(9)), aff'd, 471 F. App'x 899 (2012); see also Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, 104 Stat. 890; Civil Monetary Penalties Inflation Adjustment, 64 Fed. Reg. 47,099–01, 47,104 (Aug. 30, 1999). The regulation at 28 C.F.R. § 85.3 states:

The civil monetary penalties provided by law within the jurisdiction of the respective components of the Department, as set forth in paragraphs (a) through (d) of this section, are adjusted in accordance with the inflation adjustment procedures prescribed in section 5 of the Federal Civil Monetary Penalties Inflation Adjustment Act of 1990, Pub. L. 101–410, effective on or after September 29, 1999, as follows:

(a) Civil Division.

…

(9) 31 U.S.C. 3729(a), False Claims Act, violations: minimum from $5,000 to $5,500; maximum from $10,000 to $11,000.

28 C.F.R. § 85.3 (2005). In its counterclaims in Case No. 06-835C, the camp package BPA, and Case No. 07-82C, the bottled water BPA, defendant requests treble damages, but in its post-trial briefing defendant addresses only statutory penalties. Neither plaintiff nor defendant address the number of claims at issue in the alleged False Claims Act violation(s) pursuant to 31 U.S.C. § 3729. Plaintiff's position appears to be that, even if the court finds violation(s) of the False Claims Act, defendant should

31 U.S.C. § 3729(a) (emphasis in original).  The term "claim" is defined in the False Claims Act as:

> Includ[ing] any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(c). The False Claims Act also states:

> the terms "knowing" and "knowingly" mean that a person, with respect to information –
>
> **(1)** has actual knowledge of the information;
>
> **(2)** acts in deliberate ignorance of the truth or falsity of the information; or
>
> **(3)** acts in reckless disregard of the truth or falsity of the information,
>
> and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b).

Congress rejected requiring a specific intent to defraud under the False Claims Act.  See 31 U.S.C. § 3729(b).  Instead, Congress adopted a knowing standard, defined as "actual knowledge of the falsity," acting in "deliberate ignorance of the truth or falsity," or "acting in reckless disregard of the truth or falsity."  Id.  The standard was designed to address "the problem of the 'ostrich-like' refusal to learn of information which an individual, in the exercise of prudent judgment, had reason to know."  See S. Rep. No. 99-345, at 21 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5286.  Thus, the False Claims Act covers not just those who set out to defraud the government, but also those who ignore obvious deficiencies in a claim.

Therefore, the critical issue before the court is whether plaintiff had "knowledge," as defined by the False Claims Act to include reckless disregard, that the claims plaintiff submitted to the government were false or fraudulent.  To prove a violation of the False

---

not recover because it has not proven damages.  As discussed below, however, under the False Claims Act, the wrongdoer still may be held liable for the statutory penalty, even if the government is not injured by the conduct.  The court has the discretion to impose penalties within the statutory range.  See Morse Diesel Int'l, Inc. v. United States, 79 Fed. Cl. 116, 125 (2007), recons. denied, 81 Fed. Cl. 311 (2008).

Claims Act, the government can, but need not, prove that a party intended to deceive the government.  See United States v. TDC Mgmt. Corp., 24 F.3d 292, 298 (D.C. Cir. 1994); see also Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d 1332, 1340 (Fed. Cir.) ("no proof of specific intent to defraud is required." (quoting 31 U.S.C. § 3729(b))), reh'g and reh'g en banc denied (Fed. Cir.), cert. denied, 558 U.S. 990 (2009).  The False Claims Act requires only that the government prove that a party knowingly, as defined under the Act, submitted a claim with reckless disregard to the truth or falsity of the information.  See 31 U.S.C. § 3729(b); United States v. TDC Mgmt. Corp., 24 F.3d at 298; Wang ex rel. United States v. FMC Corp., 975 F.2d 1412, 1420 (9th Cir. 1992); see also Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662, 672 n.2 (2008) ("Section 3729(b) provides that the terms 'knowing' and 'knowingly' 'mean that a person, with respect to information—(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.'"), superseded in unrelated part by statute, FERA, Pub. L. No. 111–21, § 4, 123 Stat. 1617, 1621.  The United States Court of Appeals for the Federal Circuit has noted that, "[f]or purposes of the FCA [False Claims Act], a contractor is deemed to have known that a claim it submitted was false if it had actual knowledge of the falsity of the claim or if it acted in deliberate ignorance or reckless disregard of the truth or falsity of the claim." Comm. Contractors, Inc. v. United States, 154 F.3d 1357, 1362 (Fed. Cir.), reh'g denied (Fed. Cir. 1998).

Reckless disregard has been characterized as "'an extreme version of ordinary negligence,'" United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency, 530 F.3d 980, 983 (D.C. Cir.) (quoting United States v. Krizek, 111 F.3d 934, 942 (D.C. Cir. 1997)), reh'g en banc denied (D.C. Cir. 2008), or "aggravated gross negligence" such as when the party "deliberately avoided learning the truth." United States v. Sci. Applications Int'l Corp., 626 F.3d 1257, 1274-75 (D.C. Cir. 2010); see also United States ex rel. Burlbaw v. Orenduff, 548 F.3d 931, 945 n.12 (10th Cir. 2008); Trafalgar House Constr., Inc. v. United States, 77 Fed. Cl. 48, 53 (2007) ("'Reckless disregard' has been defined as an '"aggravated form of gross negligence."'  (quoting UMC Elecs. Co. v. United States, 43 Fed. Cl. 776, 792 n.15 (1999) (quoting United States ex rel. Aakhus v. Dyncorp, Inc., 136 F.3d 676, 682 (10th Cir. 1998)), aff'd, 249 F.3d 1337 (Fed. Cir. 2001))), aff'd, 274 F. App'x 898 (Fed. Cir. 2008); Riley Constr. Co. v. United States, 65 Fed. Cl. 264, 270 (2005) ("The legal standard that may apply is 'reckless disregard.'  This has been defined in the case law as something more than gross negligence, or 'gross negligence plus.'").[87]

---

[87] Black's Law Dictionary defines gross negligence as:

A lack of slight diligence or care.  A conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences to another party, who may typically recover exemplary damages. — Also termed *reckless negligence; wanton negligence; willful negligence; willful and wanton negligence; hazardous negligence; magna neglegentia*....  "Negligence is gross if the precautions to be taken against harm are very simple, such as persons who are but poorly endowed with physical and

A failure to make a minimal examination of records can constitute deliberate ignorance or reckless disregard, and a contractor that deliberately ignores false information submitted as part of a claim can be found liable under the False Claims Act. See United States v. TDC Mgmt. Corp., 24 F.3d at 298; see also Miller v. United States, 213 Ct. Cl. 59, 70, 550 F.2d 17, 23 (1977) (An applicant who submitted estimates of the quantities of the materials billed to the government prepared by his workmen, but substantially overbilled due to misrepresentation, resulted in a finding of "extreme negligence" for which he was found liable under the False Claims Act.). The court in Miller v. United States noted that a contractor cannot be saved by relying on local government officials in preparing its claims. See Miller v. United States, 213 Ct. Cl. at 70, 550 F.2d at 23. The applicant in Miller had the responsibility to ensure the claims were accurate, and the contractor had in fact signed the claims, "evidencing his agreement to the figures it contained." Id.; see also Riley Constr. Co. v. United States, 65 Fed. Cl. at 268-69 (noting that Senate committee Report on the False Claims Act states that "'those doing business with the Government have an obligation to make a limited inquiry to ensure that the claims they submit are accurate.'" (citation omitted)). When the claims are prepared in a "sloppy or unsupervised fashion" and it results in overcharging the government, there is reckless disregard. See 132 Cong. Rec. H9,382-03 (1986) (statement of Rep. Berman, as sponsor of the 1986 amendment to the False Claims Act). Although a person must make at least a minimal examination of the records, the examination need be only "reasonable and prudent under the circumstances." United States v. Bourseau, 531 F.3d 1159, 1168 (9th Cir. 2008) (quoting S. Rep. No. 99-345, at 21), cert. denied, 555 U.S. 1212 (2009). Courts have found reckless disregard when a plaintiff failed to review claims that either he or another person prepared before submitting them. See Miller v. United States, 213 Ct. Cl. at 70, 550 F.2d at 23; United States v. Krizek, 111 F.3d at 942. In Krizek, the United States Court of Appeals for the D.C. Circuit upheld the district court's conclusion that plaintiff acted with reckless disregard in failing "utterly" to review the false submissions made on his behalf in violation of the False Claims Act when, inter alia, plaintiff doctor let his wife complete the submission of claims to the local Medicare carrier; the wife did not attempt to establish how much time was actually spent with each patient; and the doctor did not review the submission. United States v. Krizek, 111 F.3d at 942. Indeed, a person generally cannot escape liability by claiming to have relied on others in preparing the claim. Id.; see also Miller v. United States, 213 Ct. Cl. at 70, 550 F.2d at 23. But see United States v. Chen, 402 F. App'x 185, 188 (9th Cir. 2010); Riley Constr. Co. v. United States, 65 Fed. Cl. at 270 ("Mr. Riley would have had reason to rely on Douglas, the former Navy ROIC, as an expert in submitting claims. Such reliance, if it exists, may be relevant in considering the various counterclaims.").

---

mental capacities can easily take.... As it originally appeared, this was very great negligence, or the want of even slight or scant care. It has been described as a failure to exercise even that care which a careless person would use."

Black's Law Dictionary 1134 (9th ed. 2009) (emphasis in original) (citations omitted).

An innocent mistake or mere negligence, such as a math error or flawed reasoning, may be excused.  See Wang ex rel. United States v. FMC Corp., 975 F.2d at 1420-21; see also United States v. Sci. Applications Int'l Corp., 626 F.3d at 1274 (citing S. Rep. No. 99-345, at 7); United States ex rel. Fowler v. Caremark RX, L.L.C., 496 F.3d 730, 742 (7th Cir.) (citations omitted), reh'g and suggestion for reh'g en banc denied (7th Cir. 2007), cert. denied, 552 U.S. 1183 (2008), overruled on other grounds by Glaser v. Wound Care Consultants, Inc., 570 F.3d 907 (7th Cir. 2009); Riley Constr. Co. v. United States, 65 Fed. Cl. at 269 (noting that the False Claims Act was not intended to punish honest mistakes and mere negligence (citing S. Rep. No. 99-345 at 7 (1986))); see also United States ex rel. Lamers v. City of Green Bay, 168 F.3d 1013, 1018 (7th Cir. 1999) (summarizing innocent mistake cases).

Thus, under the False Claims Act, there must be a showing of more than an innocent mistake or mere negligence.  See Wang ex rel. United States v. FMC Corp., 975 F.2d at 1420; see also Riley Constr. Co. v. United States, 65 Fed. Cl. at 269.  The government is required to show the knowing presentation by the contractor of information known to be "false or fraudulent."  Wang ex rel. United States v. FMC Corp., 975 F.2d at 1420; see also Young-Montenay, Inc. v. United States, 15 F.3d 1040, 1043 (Fed. Cir. 1994).  The government has "the burden to allege and prove that the statements were false under any reasonable interpretation."  United States v. Adler, 623 F.2d 1287, 1289 (8th Cir. 1980).  The burden of proof on the government in this regard is by a preponderance of the evidence.  See Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d. at 1340 (citing 31 U.S.C. § 3731(c); Comm. Contractors, Inc. v. United States, 154 F.3d at 1362).

"To bring [a] FCA claim, the Government is not tasked to show that it incurred damages, although a showing of damages as a result of the fraudulent claim is required if the Government seeks to recover damages."  Veridyne Corp. v. United States, 105 Fed. Cl. 769, 808, modified by 107 Fed. Cl. 762 (2012); see also Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1341 ("The Court of Federal Claims did not err in concluding that Daewoo violated the False Claims Act.  Because the court did not find that the government incurred damages from Daewoo's false claim, the court properly assessed only the statutory penalty."); see also Comm. Contractors, Inc. v. United States, 154 F.3d at 1371-72 ("[A] contractor can be held liable for submitting a false claim even if the goods it delivered are of the same quality as the goods specified in the contract, provided that the contractor acted with the requisite knowledge that the corresponding claim was false.  But while the contractor may be liable in that situation, it is liable only for FCA penalties, not damages....  In order to recover FCA damages, the government must prove that it sustained an actual loss as a result of the contractor's false or fraudulent claim." (citations omitted)); Alcatec, LLC v. United States, 100 Fed. Cl. at 526 ("To bring an FCA claim, the Government does not have to show that it incurred damages, although a showing of damages as a result of the fraudulent claim is required if the Government seeks to recover damages." (citing Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1341; Young–Montenay, Inc. v. United States, 15 F.3d at 1043 (absent proof of harm, the government can recover penalties, but not damages))).  In Daewoo, the Federal Circuit rejected the plaintiff's argument that a

claim can only be fraudulent it if rests upon false facts, not if it rests upon a baseless calculation, stating: "It is well established that a baseless certified claim is a fraudulent claim." Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1349.

In Rex Trailer Co. v. United States, the United States Supreme Court stated, "there is no requirement, statutory or judicial, that specific damages be shown, and this was recognized by the Court in Marcus." Rex Trailer Co. v. United States, 350 U.S. 148, 152-53 (1956). In Rex Trailer, the United States Supreme Court summarized United States ex. rel. Marcus v. Hess, 41 F. Supp. 197, 218 (W.D. Pa. 1941), rev'd on other grounds, 127 F.2d 233 (3d Cir.), cert. granted, 317 U.S. 613 (1942), and rev'd on other grounds, 317 U.S. 537, and reh'g denied, 318 U.S. 799 (1943), superseded by statute on other grounds as recognized in Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 559 U.S. 280, reh'g denied, 130 S. Ct. 3351 (2010), by noting that, in the 1940s, the United States District Court for the Western District of Pennsylvania concluded that plaintiff was liable for the statutory penalty for submission of a false claim, but not damages, as damages were not proven. See Rex Trailer Co. v. United States, 350 U.S. at 152-53. Although the Supreme Court's discussion in Rex Trailer focused on the Surplus Property Act, the Supreme Court referred to Marcus, which involved the False Claims Act, in determining that proof of damages was not necessarily required in the assessment of a civil remedy or statutory penalty. See id. at 153 n.5 ("On several of the projects involved in the Marcus case, fraud was discovered by the Government in time for payments to be withheld. At trial [on the False Claims Act] in the District Court defendants urged that there could be no recovery of a penalty or forfeiture in these instances in which no actual damages could be shown. The District Court held that failure to show actual damages in these instances would not preclude recovery under the statute. United States ex rel. Marcus v. Hess, 41 F. Supp. 197, 218. The judgment of the District Court [in Marcus] was affirmed here. See United States v. Rohleder, 157 F.2d 126, 129 [(3d Cir. 1946)].").

The anti-fraud provision of the Contract Disputes Act, 41 U.S.C. § 604 (now 41 U.S.C. § 7103(c)(2)) provides:

> If a contractor is unable to support any part of his claim and it is determined that such inability is attributable to misrepresentation of fact or fraud on the part of the contractor, he shall be liable to the Government for an amount equal to such unsupported part of the claim in addition to all costs to the Government attributable to the cost of reviewing said part of his claim.

41 U.S.C. § 604.[88] A misrepresentation of fact is defined as "'a false statement of substantive fact, or any conduct which leads to a belief of a substantive fact material to

---

[88] The language of the anti-fraud provision of the Contract Disputes Act was slightly altered when it was recodified in 2011 at 41 U.S.C. § 7103(c)(2). The current language of the provision now states:

proper understanding of the matter in hand, made with intent to deceive or mislead.'" Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1335 (quoting 41 U.S.C. § 601(9) (now 41 U.S.C. § 7101(9) (Supp. V 2011))). "The government must prove a violation of the Contract Disputes Act and False Claims Act by a preponderance of the evidence." UMC Elecs. Co. v. United States, 249 F.3d 1337, 1338 (Fed. Cir. 2001) (citing Comm. Contractors, Inc. v. United States, 154 F.3d at 1362).[89] "To recover under the CDA, the government is required to establish that the contractor made false or fraudulent statements in its submitted claim with an intent to deceive or mislead the government." Comm. Contractors, Inc. v. United States, 154 F.3d at 1362 (citing 41 U.S.C. § 601(7) (now 41 U.S.C. § 7101(7) (Supp. V 2011))); see also Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. 547, 584 (2006), aff'd, 557 F.3d 1332 (Fed. Cir.), and reh'g and reh'g denied (Fed. Cir.), cert. denied, 558 U.S. 990 (2009); Chemray Coatings Corp. v. United States, 29 Fed. Cl. 278, 285 (1993) ("In order to obtain reimbursement for a paid claim, defendant must prove that a part of plaintiff's claim is unsupported and that this lack of support is due to fraud or misrepresentation intended by plaintiff to deceive the government." (citing Tyger Constr. Co. v. United States, 28 Fed. Cl. 35, 58 (1993))).

When a contractor files a complaint in the United States Court of Federal Claims that incorporates claims previously submitted to a contracting officer, and the government contends that those claims violate the False Claims Act, a question arises as to whether the act of filing the complaint constitutes the making of an additional claim under the False Claims Act. See 31 U.S.C. § 3729. Judges of the Court of Federal Claims appear to have come to varying conclusions as to whether the act of filing a complaint is equivalent to the making of a claim for the purpose of determining a contractor's liability under the False Claims Act. Compare Ab-Tech Constr., Inc. v. United States, 31 Fed. Cl. 429, 435 (1994) (assessing the False Claims Act's statutory penalty for "21 payment vouchers that were submitted by Ab-tech during the course of

> If a contractor is unable to support any part of the contractor's claim and it is determined that the inability is attributable to a misrepresentation of fact or fraud by the contractor, then the contractor is liable to the Federal Government for an amount equal to the unsupported part of the claim plus all of the Federal Government's costs attributable to reviewing the unsupported part of the claim.

41 U.S.C. § 7103(c)(2). Although the minor differences in the revisions to the current versions do not change the court's analysis, the court refers to the anti-fraud provision of the Contract Disputes Act in effect at the time of the events in the above-captioned cases.

[89] The preponderance of the evidence standard applied to proof under the Contract Disputes Act and the False Claims Act is a less rigorous standard than the clear and convincing standard of proof applied under the Special Plea in Fraud statute. See UMC Elecs. Co. v. United States, 249 F.3d at 1338-39 ("Under the Special Plea in Fraud, the government must prove its allegations by clear and convincing evidence." (citing Comm. Contractors, Inc. v. United States, 154 F.3d at 1362)).

contract performance and also for the claim that was later brought in this court," resulting in a total assessment of "$220,000 in penalties" at a rate of $10,000 per claim (emphasis added)), aff'd, 57 F.3d 1084 (Fed. Cir. 1995) (unpublished table decision), with Ry. Logistics Int'l v. United States, 103 Fed. Cl. 252, 260 (2012) (assessing the False Claims Act's statutory penalty for a claim "submitted to a contracting officer," but failing to assess an additional penalty for the plaintiff's decision to sue the government "for millions of dollars on a specious claim").

In interpreting the False Claims Act's definition of a claim, the United States Supreme Court has stated: "A correct application of the statutory language requires...that the focus in each case be upon the specific conduct of the person from whom the Government seeks to collect the statutory forfeitures." See United States v. Bornstein, 423 U.S. 303, 312 (1976).[90] The Supreme Court's guidance in United States v. Bornstein has been interpreted to require the court to ask: "'With what act did the defendant submit his [or her] demand or request and how many such acts were there?'" United States v. Krizek, 111 F.3d at 939. When a fraudulent claim consists of multiple components, the submission of an aggregate claim, rather than its individual components, is the act that creates liability under the False Claims Act. See Miller v. United States, 213 Ct. Cl. at 71–72, 550 F.2d at 23–24 (rejecting an argument that a contractor had asserted sixteen false claims under an earlier version of the False Claims Act, "eleven based on invoices used in calculating the monthly billings plus five, one for each of the monthly consolidated billings," because "the invoices are like tally sheets used in calculating a final figure to present to the Government; they are not the claim itself"); see also United States v. Woodbury, 359 F.2d 370, 378 (9th Cir. 1966) (rejecting the argument that a penalty could be assessed under an earlier version of the False Claims Act for each document that was attached to fraudulent applications for payment).

When Gulf Group submitted a certified claim to the contracting officer relating to each of the above-captioned cases, it made a single "request or demand...for money." See 31 U.S.C. § 3729. Although a complaint that incorporates claims that have already been submitted to a contracting officer can similarly be characterized as a "demand...for money," a complaint, unlike a certified claim, is not "present[ed]...to an officer or employee of the United States Government...for payment or approval." See id.; cf. United States ex rel. Bennett v. Medtronic, Inc., 747 F. Supp. 2d 745, 763 (S.D. Tex. 2010) (indicating while discussing amendments to the False Claims Act that apply retroactively to pending claims, that the definition of a claim in the False Claims Act does not refer to "*cases* or *causes of action*" (emphasis in original)); United States ex rel. Bender v. N. Am. Telecomms., Inc., 686 F. Supp. 2d 46, 49 n.4 (D.D.C. 2010) (same). When a contractor's complaint incorporates the claims that it had submitted to a contracting officer, and the government contends that those claims violate the False Claims Act, the submission of a claim to the contracting officer may create liability under

---

[90] United States v. Bornstein analyzed an earlier version of the False Claims Act, but the guidance of the United State Supreme Court remains relevant to the court's interpretation of amended versions of the False Claims Act. See United States v. Krizek, 111 F.3d at 939 n.1.

the False Claims Act, but the filing of a complaint in the United States Court of Federal Claims does not.

In addition, the filing of a complaint in this court does not constitute the making of a claim under the Contract Disputes Act. The Contract Disputes Act permits a contractor to "bring an action directly on the claim in the United States Court of Federal Claims" only after submitting a "claim" to a contracting officer. See 41 U.S.C. § 609. The FAR also indicates that a "written demand or written assertion by the Contractor seeking the payment of money exceeding $100,000 is not a claim under the Act [the Contract Disputes Act] until certified." See 48 C.F.R. § 52.233–1 (2005). A complaint, therefore, cannot serve as the basis for liability under the Contract Disputes Act because it is not submitted to a contracting officer. See SITCO Gen. Trading & Contracting Co. v. United States, 87 Fed. Cl. 506, 509 (2009) ("A complaint filed in this court does not seek a decision from the contracting officer or meet the other CDA requirements of a 'claim.'").[91]

The circumstances of the above-captioned cases present a further question as to whether the submission of additional certified claims to a contracting officer while litigation is pending can serve as the basis for additional liability under the Contract Disputes Act or the False Claims Act. A line of cases dealing with the jurisdiction of the Court of Federal Claims over a modification to a claim that already has been submitted to a contracting officer suggests that, in particular circumstances, a contractor may modify the amount of its claim as long as it does not "raise *new* claims not presented and certified to the contracting officer." See, e.g., Santa Fe Eng'rs, Inc. v. United States, 818 F.2d 856, 858 (Fed. Cir. 1987) (emphasis in original) (citations omitted). Although the cases that discuss the effect of a modification on the court's jurisdiction over a modified claim generally involve amendments to a contractor's complaint during litigation, these cases indicate that the submission of a revised claim to a contracting officer after litigation has commenced may not constitute a new claim under the Contract Disputes Act because the amendment of a complaint during litigation, which effectively modifies the amount of an existing claim submitted to a contracting officer, does not transform the existing claim into a new claim for the purpose of the court's jurisdiction under the Contract Disputes Act. See Kunz Constr. Co. v. United States, 12 Cl. Ct. 74, 79 (1987) ("[T]he Claims Court does not have jurisdiction under the Contract Disputes Act over claims which a contractor has failed to present to the agency's contracting officer." (citations omitted)). The Federal Circuit has indicated that "[a]n action brought before the Court of Federal Claims under the CDA must be 'based on the

---

[91] In contrast to the False Claims Act and the Contract Disputes Act, the Special Plea in Fraud statute contemplates that the filing of a complaint constitutes a "claim." The Special Plea in Fraud statute is located in Title 28 of the United States Code, which relates to the judiciary and judicial procedure, and the statute specifically directs the Court of Federal Claims to "find such fraud or attempt and render judgment of forfeiture" in relation to a fraudulent "claim against the United States." See 28 U.S.C. § 2514; see also DeRochemont v. United States, 23 Cl. Ct. 87, 90 (1991) ("DeRochemont has filed a claim—the pending complaint—for a tax refund relative to tax year 1979, and he has attempted to practice fraud in the statement of that claim.").

same claim previously presented to and denied by the contracting officer.'" See Scott Timber Co. v. United States, 333 F.3d 1358, 1365 (Fed. Cir.) (quoting Cerbonics, Inc. v. United States, 13 Cl. Ct. 415, 418 (1987)), reh'g denied (Fed. Cir. 2003). In order for a revised claim to be the "'same claim previously presented to and denied by the contracting officer,'" Scott Timber Co. v. United States, 333 F.3d at 1365, the revised claim must be based on "the same operatives facts," and request "essentially the same relief" as the claim originally submitted to the contracting officer, and, if applicable, "merely assert differing legal theories for that recovery," which satisfies the requirement that the contracting officer be given "'adequate notice of the basis and amount of the claim.'" Id. (quoting Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987)); see also Modeer v. United States, 68 Fed. Cl. 131, 137 (2005) (requiring that the revised claim be based on "the same operative facts as the original claim and claims the same categories of relief" (citing Cerbonics, Inc. v. United States, 13 Cl. Ct. at 418)), aff'd, 183 F. App'x 975 (Fed. Cir. 2006). When a contractor submits a revised claim to a contracting officer during litigation, therefore, that revised claim is not treated as a new claim under the Contract Disputes Act for jurisdictional purposes, which indicates that the revised claim also should not be considered a new claim for the purpose of assessing liability under the Contract Disputes Act.[92]

That the revised claims Gulf Group submitted to the contracting officer in 2007, and that the submission addressed to Maj. Everett in 2011 with respect to the camp

_____

[92] Generally, "[o]nce a claim is in litigation, the Department of Justice gains exclusive authority to act in the pending litigation.... The exclusive authority divests the contracting officer of his authority to issue a final decision on the claim." See Sharman Co. v. United States, 2 F.3d 1564, 1571 (Fed. Cir. 1993) (citations omitted), overruled on other grounds by Reflectone, Inc. v. Dalton, 60 F.3d 1572. This is because, "[e]xcept as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General." See 28 U.S.C. § 516 (2000). The Contract Disputes Act, however, explicitly grants a reviewing court the authority to "retrocede authority to the contracting officer" when the court "possess[es] jurisdiction over a claim based on a deemed denial." See United Partition Sys., Inc. v. United States, 59 Fed. Cl. 627, 643 (2004); see also 41 U.S.C. § 605(c)(5) ("[I]n the event an appeal or suit is...commenced in the absence of a prior decision by the contracting officer, the tribunal concerned may, at its option, stay the proceedings to obtain a decision on the claim by the contracting officer."). The judges previously assigned to the camp package BPA, latrine, and dumpster cases, therefore, stayed proceedings pending the issuance of a final decision by the contracting officer. Although Gulf Group's revised claims submitted to the contracting officer in 2007 did not each constitute a new claim under the Contract Disputes Act, the contracting officer was not deprived of jurisdiction to render a final decision during the litigation of the above-captioned cases as would typically be the case after a contractor files a complaint in the Court of Federal Claims because the judges previously assigned to the camp package BPA, latrine, and dumpster cases exercised their authority to "stay the proceedings to obtain a decision on the claim by the contracting officer." See 41 U.S.C. § 605(c)(5).

76

package BPA, did not constitute new claims under the Contract Disputes Act, however, does not indicate whether the revised claims constituted additional claims under the False Claims Act. Similar to the contractor in Daewoo Engineering & Construction Co., Gulf Group repeatedly has modified the amount that it seeks in the camp package BPA case and in the latrine and dumpster cases. See Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. at 560 n.19. Unlike the contractor in Daewoo Engineering & Construction Co., in which the plaintiff was assessed a single penalty under the False Claims Act after revising its single claim to the contracting officer during litigation, Gulf Group submitted its revised, certified claims to the contracting officer for "a final decision...awarding Gulf Group full compensation for its damages...." See id. at 560 n.19, 573 (indicating that the revised claim amount that was discussed at trial in Daewoo was never certified and submitted to a contracting officer). In its revised 2007 claims, Gulf Group even requested that the contracting officer disregard its initial claims. The court concludes, therefore, that Gulf Group's submission of revised claims in 2007 and potentially the submission of its second revised claim for the camp package BPA in 2011,[93] in the specific circumstances presented by the facts of this case, constituted a "request or demand...for money," which was "present[ed]...to an officer or employee of the United States Government...for payment or approval," thereby creating the potential for additional liability under the False Claims Act. See 31 U.S.C. § 3729; see also Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 785 (4th Cir. 1999) (describing a claim under the False Claims Act as "a call upon the government fisc").

A.      The Camp Package BPA Claims under the False Claims Act and the Contract Disputes Act

The camp package BPA call for Camp Buehring was awarded to plaintiff on September 30, 2004 and terminated on October 12, 2004. Gulf Group submitted a claim to the government on the camp package BPA call, first to the Army, and then incorporated those claims in the original complaint filed in this court as Case No. 06-835C. The original complaint filed in this court in the camp package BPA case was amended three times. Additionally, plaintiff resubmitted its camp package BPA claim to the contracting officer in 2007 and again in 2011.[94] In each instance, plaintiff alleged it was owed monies based on its contractual relationship with the government, which the Army had refused to pay. In its third amended complaint filed in this court regarding the camp package BPA, plaintiff alleges:

---

[93] A number of differences between the 2007 and 2011 submissions, including that the Army lacked authority to issue a decision on plaintiff's 2011 submission, give the court pause in concluding that the 2011 submission constitutes a claim under the False Claims Act. Regardless of whether the 2011 submission constitutes a claim under the False Claims Act, Gulf Group's 2011 submission does not implicate liability under the False Claims Act.

[94] Gulf Group's 2011 claim was submitted to a contracting officer "in the care of" Maj. Everett.

77

Gulf Group was fully prepared to perform under the...BPA Call and was ready to continue to fully perform for the complete duration of the BPA Call any subsequent BPA Call Modifications or additional separate BPA Calls, including other future extensions of the Master BPA.

On or about October 12, 2004, after Gulf Group had commenced preparations to perform its contractual duties and had incurred substantial preparatory costs to perform under the Master BPA, the U.S. Army Contracting Command SWA-Kuwait (ARCENT) Contracting Officer, Gloria D. Davis, issued BPA Call Modification Number 000103 which cancelled and terminated the BPA Call without warning or valid justification and without any benefit ensuring [sic] to the Government.

(internal citation omitted).

In its third amended answer to plaintiff's complaint in the camp package BPA case, No. 06-835C, defendant responds by alleging that:

Gulf Group is unable to support its claim,[95] as alleged above, due to a misrepresentation of fact or fraud. Gulf Group knowingly and deliberately certified entitlement to $4,544,339.84[96] for Call 0001, despite that: (a) the total contract award was $1,447,457; (b) the contract was terminated 12 days into the performance period; and (c) Gulf Group submitted an invoice from Green Valley generated by a Gulf Group employee[97] to support its

---

[95] Defendant's answers to plaintiff's complaints in the camp package BPA case and the latrine and dumpster cases interchangeably refer to plaintiff's "certified claim" and plaintiff's "claims" when discussing the False Claims Act. Defendant's answers, however, seek "civil penalties as are allowable by law…per violation." As indicated above, plaintiff's submissions in 2005 and 2007 create the potential for liability under the False Claims Act.

[96] Defendant's third amended answer interprets plaintiff's settlement offer as the amount to which plaintiff claimed entitlement in its 2005 camp package BPA claim. As indicated above, plaintiff asserted entitlement to more than the amount of its settlement offer in its 2005 claim.

[97] In its third amended answer, defendant argued that the Green Valley invoice was included in the camp package BPA claim to evidence the purchase of one hundred fifty-eight latrines and one potable water tanker, and highlighted that the invoice had the mobile telephone number of Suresh Pulikkal, who defendant described as a "Gulf Group employee." As noted above, Suresh Pulikkal appears to have been a legal consultant for a number of different companies. Saud Al Tawash explained that Suresh Pulikkal was "the project coordinator" for Gulf Group and Green Valley's joint venture. The joint venture agreement between Gulf Group and Green Valley indicated that Suresh Pulikkal had authority to act on the behalf of Green Valley. In addition, plaintiff asserted that the invoice from Green Valley was not included in the claim calculation, but was

claim. Accordingly, Gulf Group is liable to the United States pursuant to the Contract Disputes Act, 41 U.S.C. § 7103(c)(2), for the unsupported claim, plus the Government's costs attributable to reviewing the claim.

Defendant continues:

Gulf Group knowingly presented and caused to be presented, to officers and employees of the United States Government, and to members of the Armed Forces of the United States, false or fraudulent claims for payment or approval, in submitting invoices for all calls under BPA 0047 and in submitting its certified claim to the contracting officer(s). The claims for payment were false or fraudulent because: (a) Gulf Group inflated the amount of its claim for Call 0001 for supplies and services it did not render; (b) Gulf Group submitted an invoice from Green Valley generated by a Gulf Group employee to support its claim for Call 0001; and (c) the award of BPA 0047 contract was tainted by bribery.[98]

In a post-trial brief, defendant contends that plaintiff violated the False Claims Act because the amounts it claimed, when plaintiff submitted its claims in 2005 and 2007 on the camp package BPA claim, were without basis and inflated, and because plaintiff sought payment for expenses it never had incurred. Defendant also argues that plaintiff is liable to the United States in the amount of $6,674,502.13, pursuant to the antifraud provision of the Contract Disputes Act, for the amounts it claimed when plaintiff submitted its claims in 2007. Defendant identifies $5,545,505.28 as the unsupported amount of plaintiff's 2007 claim, which asserted entitlement to the BPA call limit, $7,000,000.00, and attorneys' fees, which were later identified as amounting to $7,037.50, even though the price of the call was $1,447,457.22.[99] In addition, defendant argues that plaintiff asserted entitlement to $1,128,996.85 in unsupported costs in its 2005 and 2007 submissions. Defendant not only contends that plaintiff

included with the claim documents to show that plaintiff was ready to perform and that it had a good faith belief that the government would award other calls under the camp package BPA to Gulf Group or extend the call already awarded.

[98] As is discussed more fully below regarding defendant's allegations of bribery, Saud Al Tawash testified forcefully that he did not obtain inside information from Mr. Cockerham, Maj. Davis, or anyone else in the contracting office, and that he and his company did not offer money, gifts, or favors to Mr. Cockerham, Maj. Davis, or any other official in the contract office in order to receive any inside information or award of any of the contracts, BPAs, or BPA calls. The court had considerable opportunity to observe Saud Al Tawash in the courtroom, including during his lengthy direct testimony, cross-examination, and rebuttal, to reach its conclusion that Saud Al Tawash offered sincere and credible testimony.

[99] Defendant does not address the fact that plaintiff's claim to attorneys' fees arises out of Attorney Peters' preparation of plaintiff's 2005 Claim and Settlement Offer, rather than plaintiff's 2007 claim.

sought costs it had not incurred, but also that the claimed amount was merely a negotiating ploy.

Plaintiff argues in response that it "sought full contract value including the base period and all options that Gulf Group believed would have performed if the contracts were not improperly terminated, which is also the total amount the Government would have spent to obtain the services." Plaintiff contends that it sought payment for the full contract price, including the option periods, based on case law, which plaintiff asserts established that a contractor may recover for unexercised option periods if the government made an arbitrary and capricious or bad faith[100] decision not to exercise the options.

The United States Court of Appeals for the Federal Circuit stated in White v. Delta Construction International, Inc.:

> The primary objective of damages for breach of contract is to place the non-breaching party "in as good a position pecuniarily as he would have been by performance of the contract." Miller v. Robertson, 266 U.S. 243, 257 (1924). As this court has stated, "[t]he general rule is that damages for breach of contract shall place the wronged party in as good a position as it would have been in, had the breaching party fully performed its obligation." Mass. Bay Transp. Auth. v. United States, 129 F.3d 1226, 1232 (Fed. Cir. 1997) (citing prior cases of this court and its predecessor, the Court of Claims). Commentators and the Restatement of Contracts also have consistently recognized this principle. Arthur Linton Corbin, *Corbin on Contracts* § 992, at 5 (1964); E. Allan Farnsworth, *Farnsworth on Contracts* § 12.3, at 157 (2d ed. 1998); Charles T. McCormick, *Damages* § 137, at 561 (1935); Restatement (Second) of Contracts § 344 cmt. a (1979).
>
> A corollary of that principle is that the non-breaching party is "not entitled to be put in a better position by the recovery than if the [other party] had

---

[100] In the second amended complaints submitted to this court, plaintiff alleged bad faith terminations in Case No. 06-835C (the camp package BPA), Case No. 06-858C (the latrine contract), and Case No. 06-853C (the dumpster contract). Plaintiff subsequently dropped all allegations concerning bad faith in each case. As confirmed in an April 22, 2011 Order issued by this court, "[i]n a conference the court held with the parties on April 8, 2011, plaintiff's counsel advised the court that, upon reflection, counsel does not wish to pursue a bad faith claim on the part of the government, but that plaintiff's counsel intends to proceed with the allegation that government officials acted arbitrarily and capriciously with respect to the cancellation of Gulf Group's contract." Thereafter, in its third amended complaint in Case No. 06-835C (the camp package BPA), filed on May 6, 2011, plaintiff dropped its bad faith claim against the government. At closing argument, in response to the question from the court, "there is no bad faith claim in any one of these four cases, 06-835, 06-858, 06-853, and 07-082, is that correct?" plaintiff's counsel responded, "[t]hat is correct."

fully performed the contract." Miller, 266 U.S. at 260, 45 S. Ct. 73. As the First Circuit stated the rule, the non-breaching party "should on no account get more than would have accrued if the contract had been performed." DPJ Co. v. FDIC, 30 F.3d 247, 250 (1st Cir. 1994).

White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002); see also Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (stating that breach of contract damages are meant to place the wronged party in as good a position as he or she would have been in but for the breach, not in a better position); San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1562–63 (Fed. Cir.) (stating that breach of contract damages put the wronged party in as good a position as he would have been in if the breaching party had performed in full), reh'g denied (Fed. Cir.), and corrected on limited grant of reh'g (Fed. Cir. 1997). In Glendale Federal Bank, FSB v. United States, 239 F.3d 1374 (Fed. Cir. 2001), the Federal Circuit addressed "expectancy damages," which are often equated with "lost profits." The court wrote:

> One way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred. *See Restatement (Second) of Contracts* § 344(a) (1981). The benefits that were expected from the contract, "expectancy damages," are often equated with lost profits, although they can include other damage elements as well. *See Restatement (Second) of Contracts* § 347. The problems of proof attendant on the burden placed on the non-breaching party of establishing lost profits—on establishing what might have been— are well recognized. Even with a generous standard of proof applied in such cases, *see, e.g., San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1563 (Fed. Cir. 1997); *Neely v. United States*, 152 Ct. Cl. 137, 285 F.2d 438, 443 (1961), the proof problems can in some situations prove to be insurmountable.

Glendale Fed. Bank, FSB v. United States, 239 F.3d at 1380.

Plaintiff admits that the claims it submitted relevant to the camp package BPA in 2005 and 2007 were incorrect. Plaintiff argues, however, that the mistakes made in submitting the camp package BPA claims in 2005 and 2007 were innocent mistakes and, thus, should not be actionable under the False Claims Act or the Contract Disputes Act. Plaintiff further argues that the expense table that was included in the 2005 camp package BPA claim was not attached to show expenses actually incurred, or as a basis for the amount claimed, but rather to show that plaintiff was prepared to perform. At closing argument, plaintiff's current attorney of record, Ms. Hands, who prepared, signed, and certified plaintiff's revised camp package BPA claim in 2007, stated: "I made a mistake. I misunderstood the claims. I thought that we could collect full contract value, plus the expenses. I misunderstood the expenses to be the full amount on those expense tables," and "I read those expense tables as including all of the expenses." Plaintiff also responds to defendant's counterclaims by arguing that it had a legal and factual basis for claiming the full amount of the camp package BPA call 0001,

stating: "Gulf Group had a good faith basis for claiming the full $7,000,000 call limit and Gulf Group did not submit a claim for costs as the Government interpreted or maintained that it had actually paid $1,183,838.72 in costs."

According to plaintiff, Maj. Davis, on behalf of the Army, had informed Saud Al Tawash that Gulf Group would receive multiple calls under the camp package BPA if it performed well.[101]  Moreover, even after camp package BPA call 0001 was terminated, Gulf Group received other calls for latrines and dumpster services under the camp package BPA.  Plaintiff states that "Mr. Al Tawash thus had every expectation that the Army would either amend BPA Call 001 [sic] to issue additional requests for camp packages or individual items listed on the BPA Call up to the maximum Call limit of $7,000,000, and even up to the full Master BPA aggregate of $10,000,000."

During cross-examination, Attorney Peters, plaintiff's prior attorney, revealed his views regarding his decision to seek the entire amount of the camp package BPA, and his misunderstanding of what had occurred:

Q: So the future work under this call, or the future work under the entire BPA?

A: The entire BPA.

Q: And when you put whatever number, the $5 million, in the claim, you put it in because you believed the termination for the BPA call was based on the Army's bad faith and abuse of discretion; isn't that right?

A: Yes, but I might have been -- I might have made a mistake on this one. I might have misunderstood and thought that the entire BPA was being canceled, or was being withdrawn, because I was going by what I had been told by Hess and everyone else that they were canceling everything that my clients had with them.

Q: Did you ask anyone at Gulf Group whether Gulf Group received further calls under this BPA?

A: I probably didn't because I thought that everything had been canceled.

The extent to which Attorney Peters did a disservice to his client and opened up the possibility of a False Claims Act counterclaim and a Contract Disputes Act counterclaim regarding his client's claims, as a result of advice that he gave to his client, is further illustrated by this exchange on direct examination of Mr. Peters at trial:

---

[101] Maj. Davis both awarded and terminated plaintiff's camp package BPA call.  Unlike the other contracts, Mr. Cockerham had more limited involvement with the camp package BPA call.  He was not the contract specialist or contracting officer on the camp package BPA, but was listed on the Contract Review Board that recommended award of the camp package BPA to Gulf Group.

Q: And when you submitted this claim did you intend to submit a fraudulent claim?

A: Never.

Q: And when you submitted these claims did you knowingly submit a false claim?

A: No, I would never submit anything fraudulently at all for a variety of reasons. One, having to do with my oath as an officer, and as an attorney who values his license, and ability to practice law, and I will not compromise myself for any client ever.

Q: Did Gulf Group ask you to submit a claim that was inflated?

A: No.

Q: Did Gulf Group ask you to submit a claim that was false?

A: No, they relied on me to know what the American law was, and I felt that what I submitted was correct. If I had submitted anything less, then I would be guilty of malpractice for not submitting the full amount that under the circumstances would be correct in a court of law based on my review of case law, et cetera, and the rules that guide us in this endeavor.

Plaintiff insists that it did not include a claim for the expenses listed on the expense table for the camp package BPA.  Plaintiff also asserts that the invoice from Green Valley was included with the camp package BPA claim documents only to show that plaintiff was ready to perform and that it had a good faith belief that the government would award other calls under the camp package BPA or extend the call awarded.  According to plaintiff, the Green Valley invoice was not included in the claim calculation.

In 2005, plaintiff submitted its Claim and Settlement Offer to the Army for the camp package BPA, certified by Attorney Peters, with a cover letter and settlement offer in the amount of $4,544,339.84, both signed by Saud Al Tawash.  Neither Attorney Peters nor Saud Al Tawash offered any specific basis for the settlement amount included, other than Attorney Peters testifying that he generally instructed his clients to offer "something less" than the total claim amount.  The camp package BPA call No. 0001 was in the amount of $1,447,457.22.  In its 2007 revised claim submitted to the Army, which was prepared, signed, and certified by plaintiff's second attorney, and current attorney of record, Iliaura Hands, as well as in its original complaint filed in this court, also submitted by Ms. Hands as attorney of record in the above-captioned cases, plaintiff claimed $7,000,000.00, the price of the camp package BPA call limit.  In its first amended complaint in the camp package BPA case, plaintiff sought $3,463,297.57, in its second amended complaint plaintiff sought $3,463,287.57, and in its third amended

83

complaint plaintiff now seeks $922,851.34. Each of the three amended complaints was submitted by Ms. Hands as plaintiff's attorney of record.

The amounts plaintiff claimed in its successive claims and complaints were inconsistent and submitted without reasonable explanation of the original submission to the contracting officer, and without reasons and justifications for the amendments to the complaints or claims. Plaintiff sought amounts that would have placed plaintiff in a better position than if camp package BPA call 0001 had been fully performed. Had the maximum value of the calls been issued under the camp package BPA, plaintiff would have incurred expenses, which would have reduced its gross profits under any given camp package BPA call. In its 2007 claim, plaintiff sought the entire call limit of $7,000,00.00, an amount that far exceeded any potential profit on the $1,447,457.22 BPA call 0001. Although plaintiff's 2005 Claim and Settlement Offer, which was incorporated into plaintiff's 2007 claim, acknowledged that the law directs that contract damages place the wronged party in as good a position as it would have been but for the breach, the claims plaintiff submitted in 2005 and 2007 would have put plaintiff in a far better position. Unfortunately for plaintiff, which has indicated it acted on its attorneys' advice, Gulf Group is bound by its attorneys' mistakes and errors. See Link v. Wabash R.R., 370 U.S. 626, 633-34 ("Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'" (quoting Smith v. Ayer, 101 U.S. 320 (1879))), reh'g denied, 371 U.S. 873 (1962).[102] Moreover, although the initial claims submitted to the Army were certified by Ferdinand Peters, and the revised claims were signed and certified by Iliaura Hands, successively, Saud Al Tawash also signed the cover letters and settlement forms included in the claims earlier submitted to the Army and was responsible for the actions of Gulf Group as the head of the organization.

Furthermore, the case law plaintiff cites as providing a basis for seeking lost profits on option periods, for which plaintiff sought the maximum value of all calls the government could have issued under a BPA in its 2005 Claim and Settlement Offer, refers to situations in which the contractor can prove that the government chose, in bad faith, not to exercise the option periods, see Hi-Shear Tech. Corp. v. United States, 356

---

[102] The cases and law journal article plaintiff cites in support of its position that plaintiff should not be held responsible for its attorneys' actions are inapposite. See United States ex rel. Hefner v. Hackensack Univ. Med. Ctr., 495 F.3d 103 (3d Cir. 2007); United States ex rel. Bidani v. Lewis, 2001 WL 32868 (N.D. Ill. Jan. 12, 2001), vacated on recons. by 2001 WL 747524 (N.D. Ill. Jun. 29, 2001); The Government's Increasing Use of the False Claims Act Against the Health Care Industry, 24 J. Legal Med. 457 (2003). The case United States ex rel. Hefner v. Hackensack University Medical Center is a non-precedential decision and was ultimately decided based on a lack of evidence of reckless disregard. The case United States ex rel. Bidani v. Lewis is an unreported, non-precedential decision, and the Journal of Legal Medicine creates no binding precedent.

F.3d 1372, 1374, 1375, 1380 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2004); Blackstone Consulting, Inc. v. Gen. Servs. Admin., CBCA 718, 08-1 BCA ¶ 33,770; Greenlee Constr., Inc. v. Gen. Servs. Admin., CBCA 416, 07-1 BCA ¶ 33,514. These cases do not cover situations in which the government chooses to terminate a contract during a base period without ever reaching or making a decision as to the option periods. In the camp package BPA case, there is no evidence that, had the BPA call not been terminated, the government would have issued additional calls under the BPA or modified the value of Gulf Group's call, or would have not issued additional calls in bad faith. Nor is the government generally obligated to exercise an option. See Gov't Sys. Advisors, Inc. v. United States, 847 F.2d 811, 813 (Fed. Cir. 1988) ("An option is normally an option, and nothing in [the provision at issue], or in any other contract clause, limited the circumstances under which the government could decline to exercise that bargained-for right in this case."); see also Sundowner 102, LLC v. United States, 108 Fed. Cl. 737, 741 (2013).

With regard to the expense table submitted with the camp package BPA claim, Attorney Peters testified that he did not intend the 2005 Claim and Settlement Offer to include the table as support for its claims, but, rather, that the expense table was attached to the claim to show that Gulf Group was prepared to perform. Attorney Hands stated at closing arguments that she did not know that some of the expenses listed had actually not been incurred. Although Attorney Peters may wish he had made clear that the tables were submitted for the limited purpose to which he testified at trial, and Attorney Hands may have been ignorant of whether all the expenses were incurred or not, post-action explanations do not assist plaintiff. The 2005 and 2007 claims to the Army, and the original complaint in this case, all list the full potential value of the camp package BPA call as the sum to which plaintiff believed it was entitled, not the expenses listed in the expense table, which was submitted with the certified claim, and which amounted to 345,717.000 KD.

At the time that Gulf Group submitted its 2005 camp package BPA Claim and Settlement Offer, it knew which items in the expense table it had already purchased and which items no longer would be needed because the camp package BPA call for Camp Buehring had been terminated. Yet, it was not until Gulf Group submitted its second revised claim to Maj. Everett in 2011 that Gulf Group adjusted the expense table to reflect that some items had been purchased and other items had not. Indeed, Gulf Group actually purchased only 19,255.000 KD worth of equipment, not 345,717.000 KD worth of equipment, as reflected in the submitted expense table. The assertion of entitlement to the full potential value of all calls issued under the camp package BPA and the incorrect expense table, to which both attorneys contributed, and which Saud Al Tawash, as plaintiff's principal, failed to oversee, resulted in submission of conflicting, incorrect, and reckless claims to the United States by plaintiff.

Moreover, the invoices and purchase orders submitted muddle the issues. The documentary support submitted for the 2005 Claim and Settlement Offer for the camp package BPA is little more than a perplexing disarray of documents, which serves only to complicate an amount sought that is without legal or logical basis. Despite plaintiff's

after the fact argument to the contrary, it does not appear from the claim as filed that the expense table was included to prove the preparedness to perform. Rather, the cover page to the 2005 Claim and Settlement Offer states: "we request your kind attention and approval for our claim and [sic] submitting this claim with [sic] following documents for reimbursement of both costs and profits....:"

1) Form 1438 Settlement proposal
2) Claim and Settlement Offer
3) Appendix: 1. Contract
4) Appendix: 2. Cancellation Documents
5) Appendix: 3. **Expense Table**
6) Appendix: 4. Expense Documents
7) Appendix: 5. Pictures of dumpsters and vehicles.

(emphasis added). The 2005 Claim and Settlement Offer certified by Attorney Peters states, "[t]his offer includes reimbursement for both costs and lost profits.... The contract costs, when added to the anticipated contract profit, total $10,000,000.00 the full contract price." This puzzling statement appears to assert that Gulf Group is entitled to be paid either for the costs it already incurred, thus the inclusion of the expense table and expense documents for items which, as now established, were not all purchased, or for the costs plaintiff would have incurred had the contract been performed with all potential calls exercised, a notion that is similarly unsupportable, as the costs of performing the contract are the responsibility of the contractor and are deducted from potential net profit in breach-damage computations. See Bluebonnet Sav. Bank, FSB v. United States, 339 F.3d at 1345.

Additionally, although the 2005 Claim and Settlement Offer offered to settle for $4,544,339.84, less than the BPA master dollar limit of $10,000,000.00, plaintiff appears to believe that, had the camp package BPA call not been terminated, the government would have issued calls to plaintiff up to the full master dollar limit of $10,000,000.00, although plaintiff offers no reasonable explanation or evidence in the record for this belief. The camp package BPA was not a guaranteed set of calls worth $10,000,000.00, rather, $10,000,000.00 was the maximum value of all calls which could be issued under the camp package BPA. Furthermore, only camp package BPA call 0001, worth $1,447,457.22, was terminated, and the limit of that camp package BPA call was only $7,000,000.00. Indeed, there were other calls issued under the camp package BPA to Gulf Group from 2004 to 2005, for which plaintiff was paid a total of $3,112,498.24. At trial, Attorney Peters testified that he may have been mistaken in thinking that the entire camp package BPA had been cancelled, rather than call 0001 with its $7,000,00.00 limit. Regardless, the camp package BPA call 0001 at issue was only worth $1,447,457.22, and was terminated only twelve days after it was awarded.

Finally, the fact that Saud Al Tawash testified that he and Gulf Group did not know how to compile a claim to be submitted to the United States government does not obviate Gulf Group's responsibilities, or Saud Al Tawash's responsibilities as the General Manager of Gulf Group, nor does plaintiff's and Saud Al Tawash's reliance on the attorneys absolve the plaintiff of its responsibilities for submitting inflated and

86

deficient claims. See Link v. Wabash R.R., 370 U.S. at 633-34. Saud Al Tawash signed the cover letter for the 2005 camp package BPA claim, as well the settlement offer form. He testified at trial, however, that he did not look at the claim in detail until his deposition, despite acknowledging that it was the responsibility of everyone involved with the claims to make sure they were accurate. Plaintiff is bound by the actions of its attorneys and its General Manager, Saud Al Tawash. Plaintiff chose to rely on its attorneys to prepare and submit its claims. By giving its attorneys the authority to certify the claims on Gulf Group's behalf, and failing to review the submissions, plaintiff cannot now hide behind the mistakes of its attorneys to avoid liability under the False Claims Act. It appears from the record that plaintiff, in the personages of Attorney Peters, Attorney Hands, and Saud Al Tawash, did not conduct even a minimal inquiry into the accuracy of the claims submitted. Had they done so, they would have seen the inconsistency of the claims and the expense table. They also should have seen the lack of foundation for the information included in the table. Moreover, had any one of them carefully reviewed the various claims, they should have noticed that the claims were for more than the BPA call amount. In addition, the attorneys should have been more conversant with government contract law, including the legal status of options, BPAs, and calls. According to his testimony, Saud Al Tawash was a business major and graduate of Tulane University, who has multiple business holdings and experience running companies, including performance of other United States government contracts. It is hard for this court to imagine that, had Saud Al Tawash appropriately reviewed the 2005 Claim and Settlement Offer, he would not have realized that plaintiff stood to recoup more money from its 2005 Claim and Settlement Offer than it would have made, even had the master dollar limit of the BPA been reached and had BPA call 0001 not been terminated. Plaintiff cannot escape the fact that it sought the BPA call dollar limit of $7,000,000.00 in its 2007 claim on a terminated call that was worth only $1,447,457.22.

As noted above, a failure to make a minimal examination of records can constitute deliberate ignorance or reckless disregard, for which a contractor may be found liable under the False Claims Act. See Miller v. United States, 213 Ct. Cl. at 70, 550 F.2d at 23; United States v. TDC Mgmt. Corp., 24 F.3d at 298. The submissions were prepared by Gulf Group in such a "sloppy or unsupervised fashion" that the government was overbilled. See 132 Cong. Rec. H9,382-03. Plaintiff, as the claim applicant, is responsible for the accuracy of the claims presented to the government, regardless of who prepared them and how they were prepared. Plaintiff's submissions contain far more than mere math errors, innocent mistakes, or flawed reasoning. See Wang ex rel. United States v. FMC Corp., 975 F.2d at 1420-21. The claims were false on their face and lacked a reasonable basis. The facts as established in testimony at trial and in the trial exhibits, including plaintiff's written submissions to the Army, lead the court to conclude that plaintiff's varied, ill-considered, and jumbled camp package BPA claims in 2005 and 2007 were submitted with reckless disregard as to their truth or falsity, and, therefore, under the statutory definition, constitute "false claims," pursuant to 31 U.S.C. § 3729. Plaintiff's 2011 submission addressed many of the deficiencies in the previous claims and, therefore, even if considered a claim, does not serve as the basis for additional liability under the False Claims Act.

Despite the established liability under the False Claims Act, based on reckless disregard, and defendant's correct assertion that Gulf Group submitted a claim for the camp package BPA claim in excess of the amount of the camp package BPA call 0001, defendant has not proven that the claims were made with intent to deceive the government on the part of Gulf Group and Saud Al Tawash. At trial, Saud Al Tawash testified that he believed the claim was correct when it was submitted. The court finds the testimony of Saud Al Tawash to be sincere and credible, although he was far too trusting of his attorneys. Plaintiff Gulf Group, through Saud Al Tawash, was relying on the experience of Attorney Peters and of Attorney Hands in American law and government contracts law when the claims were submitted to the United States government.

Attorney Peters confirmed at trial that Gulf Group did not ask for an inflated or false claim to be submitted. Attorney Peters stated that it was his experience, as a former military commander, that the Army would "not change horses in midstream" and would continue the calls on BPAs. Attorney Peters also testified that the expense table was included to show that Gulf Group was prepared to perform, not that Gulf Group was claiming costs it had not incurred. Similarly, Attorney Hands appears to have honestly mistaken what costs plaintiff had incurred and to have had an honest belief in plaintiff's flawed reasoning presented in the early claims and complaints.

At trial Saud Al Tawash readily admitted that Gulf Group had made mistakes in submitting the camp package BPA claims to the government. Saud Al Tawash pointed to his unfamiliarity with how to submit claims to the United States government and lack of understanding of the American claims process, as well as his status as a foreign national, as having played a large role in what occurred. Saud Al Tawash conceded:

> Yes, we did have mistakes in our claims because we don't have experience. But here we have contract in office from the leading military in the world that we have high respect for and look very high up at which are well-trained and well looked at and, you know, what we've been taught in school was the opposite of what's been actually in reality. We were taught in school that there's arbitration. There's, you know, courts in Paris, courts in locally with the Chamber of Commerce. None of that happened. I mean, in Kuwait, we will never, never get to a court. They'll try to resolve it even at the police station, imagine, before it even goes up to -- because it takes a lot of resources from both sides. I mean, this case has been very expensive for us and I'm sure for the government. And had we sat down in 2004 -- in 2005 and tried to resolve these issues, we would not be here, sir.

In Daewoo, the Court of Federal Claims noted that Daewoo submitted an inflated claim to get the government to "pay attention." Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. at 585. The Court of Federal Claims stated:

88

The Project Manager testified at one point that Daewoo filed at least $50 million of the claim to indicate "the seriousness of the situation" and to get the Government to "pay attention" so it would agree to a cheaper method of constructing embankments. If so, this is further evidence of bad faith. It means that Daewoo submitted a certified claim as a negotiating ploy; that is, for a reason other than an attempt to recover money for which Daewoo believed the Government is liable.

Id. (citations and footnote omitted). As noted by the Federal Circuit in affirming the trial court's decision in Daewoo, "[i]It is well established that a baseless certified claim is a fraudulent claim." Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1339.

Attorney Peters testified he expected the 2005 camp package BPA Claim and Settlement Offer would be a starting point for settlement negotiations. At a minimum, counsel for plaintiff, if not Saud Al Tawash, as plaintiff's representative, should have known that to submit a claim that could not be substantiated as amounting to the actual value of the claim resulted in the making of a false claim. Although Gulf Group may now understand that some of its claims were incorrect, and this court concludes that the 2005 and 2007 camp package BPA claims were submitted with reckless disregard in violation of the False Claims Act, there is insufficient evidence in the record to find that Gulf Group intended to deceive or mislead the government, as required under the Contract Disputes Act, when it submitted its camp package BPA claims.[103]

B.    The Latrine Contract Claims under the False Claims Act and the Contract Disputes Act

In response to plaintiff's various complaints in the latrine case, defendant alleges that plaintiff violated the False Claims Act by submitting claims for services and supplies under the latrine contract, which were not provided. Defendant asserts that the claimed expenses plaintiff had not incurred included expenses for all of the potential option periods for the latrine contract. According to defendant, the amount in plaintiff's 2007 claim and original complaint exceeds the total possible contract price. Defendant also alleges that "Gulf Group is liable to the United States pursuant to the Contract Disputes Act, 41 U.S.C. § 7103(c)(2), for the unsupported claim, plus the Government's costs attributable to reviewing the claim," because "Gulf Group knowingly and deliberately certified entitlement to $4,558,428.60 for Contract 0932 [the latrine contract], despite that: (a) the total contract award was $613,142.86; (b) the contract was terminated 25 days [sic] into the performance period; and (c) this contract was obtained through

---

[103] Because the court finds that plaintiff is not liable for the amount of its unsubstantiated camp package BPA claims under the Contract Disputes Act, the court does not further address defendant's position that the amount of plaintiff's settlement offer constitutes the amount of its 2005 certified claim, rather than the amount for which plaintiff asserted entitlement.

bribery."[104]  Defendant identifies $5,373,469.64 as the unsupported amount of plaintiff's 2007 claim, which asserted entitlement to more than the total potential contract price, $6,000,000.00, and attorneys' fees, which, according to defendant, were later identified as $13,387.50,[105] even though the base period price of the latrine contract was $613,142.86.  In addition, defendant argues that plaintiff asserted entitlement to $266,335.04[106] in unsupported costs in its 2005 and 2007 submissions.  Defendant asserts that the claimed amount, including the costs not incurred, was merely a negotiating ploy.  Defendant argues, with respect to plaintiff's 2007 latrine claim presented to the Army for $6,000,000.00, that "the only reasonable explanation of the latrine claim amount is that it was a negotiating ploy, and not an amount to which Gulf Group could have honestly believed it was entitled."

Plaintiff argues that it sought the full contract price for the base period and the option periods for the latrine contract because it believed that but for the terminations, it would have performed the full potential term of the contract, and that this amount was the sum that the government would have paid for its services.  Plaintiff contends that it sought payment for the full contract price, including all the option periods, based on case law, which plaintiff asserts establishes that a contractor may recover for unexercised option periods if the government made an arbitrary, capricious, or bad faith decision not to exercise the option periods.  Plaintiff also asserts that the government, through Maj. Davis, expressly told the bidders submitting proposals on the latrine contract to include option periods because Maj. Davis believed there was a reasonable likelihood the option periods would be exercised.  Furthermore, plaintiff argues the option periods were in fact exercised with respect to other contractors who received contracts for the same latrine services Gulf Group had been awarded.  According to plaintiff, Maj. Davis told Saud Al Tawash that the contracts were "long-term" and for permanent camps, and that the Army required Gulf Group to supply brand new latrines

---

[104] As with the camp package BPA, defendant's second amended answer interprets plaintiff's settlement offer as the amount to which plaintiff claimed entitlement in its 2005 latrine contract claim.  As indicated above, plaintiff asserted entitlement to more than the amount of its settlement offer in its 2005 claim.  The allegation regarding bribery is discussed below.

[105] Defendant inaccurately alleges that plaintiff claimed entitlement to $13,387.50 in legal fees.  A "notice of filing revised claim" that plaintiff filed in the latrine case in 2011 claimed entitlement to a total of $13,837.50, although the individual entries corresponding to the legal fees plaintiff claims amount to $13,887.50.  In addition, although defendant includes legal fees, which should be not recoverable given the inflated amount submitted by plaintiff with respect to the camp package BPA claim, defendant inexplicably treats the legal fees that plaintiff incurred as recoverable with respect to the latrine contract claim.

[106] As indicated below, in the court's discussion of plaintiff's claims, defendant inexplicably indicated that plaintiff had validly incurred 68,289.630 KD of costs that plaintiff did not claim in its 2011 notice for the latrine contract, potentially confusing plaintiff's identification of 68,910.000 KD of costs plaintiff claimed to have avoided.

90

on the contract, although the base period of the contract was only for four months. Plaintiff also indicates that Attorney Peters informed plaintiff it was the Army's policy not to interrupt service, based on his own personal experience in Bosnia.

As with the camp package BPA claims, plaintiff contends that the expense table, attached as an appendix to the 2005 latrine contract Claim and Settlement Offer, was included merely to show that plaintiff was prepared to perform, and was not to be considered part of its claim. Moreover, plaintiff states that it was reasonable to submit a claim in excess of the total potential contract price because an additional amount for interest and attorneys' fees normally would be granted.

Moreover, as with the 2005 camp package BPA Claim and Settlement Offer, plaintiff's 2005 latrine Claim and Settlement Offer was prepared and certified by Attorney Peters, and the cover letter were signed by Saud Al Tawash. In the 2005 latrine Claim and Settlement Offer, plaintiff offered settlement in the amount of $4,558,428.60, an amount less than that to which plaintiff believed it was entitled, which plaintiff calculated to be $5,058,428.59 for the full potential contract price, including the base period and all option periods. The 2005 latrine Claim and Settlement Offer stated that Gulf Group "should be allowed full profit," and "should also be compensated fully for the costs incurred in furtherance of the contract. The contract costs, when added to the anticipated contract profit, total $5,058,428.59, the full contract price." Nevertheless, Gulf Group indicated it was "willing at this time to accept $4,558,428.60 as full and final settlement." Neither Saud Al Tawash nor Attorney Peters gave an explanation of the basis for the proposed settlement amount. Attorney Peters did state at trial, however, "I admit this is pretty aggressive in what we are going for here, but I had a bad faith situation, and a bad faith termination. So there was no reason not to be aggressive with the military." As noted above, plaintiff dropped any possible claims of bad faith in any of the four above-captioned cases. Attorney Peters also indicated that the final settlement amount was approximately five to ten percent lower than the claimed amount.

In its 2007 claim submitted to the Army for the latrine contract, plaintiff increased the amount sought to a sum larger than the total potential contract price, $6,000,000.00. The 2007 claim did not deduct any costs that Gulf Group would have incurred had the contract been fully performed. As with the initial camp package BPA claim, Gulf Group would have been better off receiving the claimed amount than had it performed and had the government awarded every option period of the latrine contract, a result which the law does not allow. See White v. Delta Constr. Int'l, Inc., 285 F.3d at 1043 ("[T]he non-breaching party is 'not entitled to be put in a better position by the recovery than if the [other party] had fully performed the contract.'" (second bracket in original) (quoting Miller v. Robertson, 266 U.S. at 260)).

Saud Al Tawash testified that he did not know why the 2005 latrine Claim and Settlement Offer was submitted for more than the entire contract price. In a post-trial brief, however, plaintiff argued that it sought more than the potential contract price in

order to include interest and attorneys' fees.[107] The 2007 claim submitted to the contracting officer states that it seeks preparatory expenses, unpaid services rendered, lost profits, legal fees, and interest, despite the fact that in the 2006 original complaint for the latrine case, Case No. 06-858C, which claimed $6,000,000.00, plaintiff asked for that sum, "together with interest, costs and attorney fees." In its first amended complaint in the latrine case, Case No. 06-858C, plaintiff sought 1,572,967.611 KD, which is more than the full latrine contract price, including the base and option periods, as calculated by plaintiff in its 2005 claim. In its second amended complaint, plaintiff now seeks $2,830.662.20 on the latrine contract.

As with plaintiff's 2005 camp package BPA Claim and Settlement Offer, Gulf Group included with its latrine 2005 Claim and Settlement Offer an expense table, listing cost items it would never incur, nor could incur, given the cancellation of the contract twenty days after contract award. The expense table shows a total under the "Expense" column of 171,044.970 KD. The expense table also shows an expenditure for seven hundred fifty-six latrines. Saud Al Tawash testified the number of latrines on the expense table was a mistake made by Gulf Group's accounting department, given that the latrine contract only called for four hundred latrines. The record reflects that Gulf Group purchased six hundred latrines, of which only four hundred were intended for the latrine contract at issue before this court. Attorney Peters and Saud Al Tawash gave the same explanation in their trial testimony for including the expense table in the 2005 latrine Claim and Settlement Offer as had been offered regarding the 2005 camp package BPA Claim and Settlement Offer, namely that it was only offered for proof that plaintiff was prepared to perform. At trial, Attorney Peters acknowledged that the terminology he used in the latrine Claim and Settlement Offer was "a little bit misleading." Mr. Peters also alleged that the Claim and Settlement Offers were to be a starting point for settlement negotiations with the Army.

Despite plaintiff's assertions that plaintiff had case law support for including the option periods in their contract claims, plaintiff ultimately conceded at closing argument that no such case law exists in direct support of its position. Instead, plaintiff argued that the principle of the law should be analogized, such that a finding of a bad faith termination on a primary contract also would permit damages on unexercised option periods. The case law plaintiff cites as providing a basis for seeking lost profits on option periods refers to situations in which the wronged contractor can prove that the government chose, in bad faith, not to exercise the option periods, see Hi-Shear Tech. Corp. v. United States, 356 F.3d at 1374, 1375, 1380; Blackstone Consulting, Inc. v. Gen. Servs. Admin., CBCA 718, 08-1 BCA ¶ 33,770; Greenlee Constr., Inc. v. Gen. Servs. Admin., CBCA 416, 07-1 BCA ¶ 33,514, and not to situations in which the government chose to terminate a contract during a base period without ever reaching or even making a decision as to the option periods. In the latrine case currently before the court, there is no evidence that, had the contract not been terminated, the government

---

[107] For much of its argument in its post-trial briefing, plaintiff combines the discussion of the latrine and dumpster claims. It appears that when plaintiff stated that it claimed more than the contract price because it included interest and attorneys' fees, plaintiff was applying the statement to both the latrine and dumpster claims.

would have exercised the option periods, or would have not exercised option periods in bad faith. Nor is the government generally obligated to exercise an option. See Gov't Sys. Advisors, Inc. v. United States, 847 F.2d at 813 ("An option is normally an option, and nothing in [the provision at issue], or in any other contract clause, limited the circumstances under which the government could decline to exercise that bargained-for right in this case."); see also Sundowner 102, LLC v. United States, 108 Fed. Cl. at 741.

As with plaintiff's 2005 camp package BPA Claim and Settlement Offer submitted to the Army, Saud Al Tawash admitted having failed to review the 2005 latrine Claim and Settlement Offer before it was submitted, despite signing the cover page. Saud Al Tawash cannot hide behind the mistakes of plaintiff's attorneys for a claim he also signed, and which he did not investigate before he approved it. At trial, Saud Al Tawash testified that Mr. Peters "didn't give me a justification [for the 2005 latrines claim amount] but he did tell me that what is the amount of the contract." In response to the question, "Did you ask Mr. Peters for a justification for this claim amount?" Saud Al Tawash responded, "No, but I think that there is a, I think he put here this number...." When asked "[w]hat was the purpose of submitting a claim for $5 million along with a settlement amount of $4.5 million?" Saud Al Tawash testified that "you'd have to ask Mr. Peters."

In sum, the submission of both the 2005 and 2007 latrine claims, like the camp package BPA claims, were made in reckless disregard for the truth or falsity of the information contained therein. Plaintiff did not conduct even a minimal inquiry into the basis for the claims, see Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1340; see also United States v. TDC Mgmt. Corp., 24 F.3d at 298, and prepared them in such a "sloppy or unsupervised fashion" that the government was overbilled. See 132 Cong. Rec. H9,382-03. Plaintiff is responsible as the applicant for the claimed amounts and for the accuracy of the claims, regardless of who prepared them. See Miller v. United States, 213 Ct. Cl. at 70, 550 F.2d at 23; see also Comm. Contractors, Inc. v. United States, 154 F.3d at 1362. The numbers included in the submissions contained more than mere math errors or flawed reasoning. See Wang ex rel. United States v. FMC Corp., 975 F.2d at 1420-21. Had Saud Al Tawash reviewed the latrine claims, as he should have, he would have realized they were in error. As a businessman, Saud Al Tawash should have understood that claiming more than the value of a contract is improper and not to undertake even a basic level of due diligence is unacceptable. The errors were particularly egregious in that the 2007 claim was for nearly one million dollars more than the entire contract price, even if plaintiff had not been in error in claiming option periods. The 2005 and 2007 latrine claims were submitted with reckless disregard as to their truth or falsity, and, therefore, under the statutory definition, were "false claims," pursuant to 31 U.S.C. § 3729.

As with the camp package BPA claims, despite finding a violation of the False Claims Act, and defendant's correct assertion that Gulf Group submitted claims in excess of the amount of the terminated latrine contract, defendant has not proven that the claims were made with the intent to deceive the government, as required for liability under the Contract Disputes Act. As quoted above, at trial, Saud Al Tawash admitted to

having made mistakes and testified that he honestly believed the 2005 latrine claim was correct when it was submitted. The court had considerable opportunity to judge Saud Al Tawash's credibility during the course of his testimony and finds him sincere and credible. Moreover, plaintiff was relying on Attorneys Peters' and Hands' experience in American law and their supposed understanding of how to submit contract claims to the United States government. Plaintiff appears to have misunderstood, and was given improper legal advice as to how to calculate and submit a government contract claim, as well as how to calculate the amount to which plaintiff could be entitled. Plaintiff's new attorney of record similarly adopted the flawed reasoning. Although the latrine claims were submitted with a reckless disregard for their accuracy, reckless disregard does not prove an intent to deceive under the Contract Disputes Act. Plaintiff should not be held liable under the Contract Disputes Act for the latrine contract claims because defendant has not proven an intent to deceive on the part of Saud Al Tawash and Gulf Group.[108]

C.     The Dumpster Contract Claims under the False Claims Act and the Contract Disputes Act

In response to plaintiff's complaint in the dumpster case, Case No. 06-853C, defendant alleges that plaintiff violated the False Claims Act in its submission of the 2005 and 2007 dumpster claims because plaintiff inflated its claims to include services and supplies plaintiff never provided. Defendant states that plaintiff had no legal basis for claiming the option periods in its dumpster claim; sought payment for expenses it did not incur; and asked for a sum greater than the entire contract price, including all of the option periods. Defendant also claims that Gulf Group "is unable to support its [dumpster] claim, as alleged above, due to a misrepresentation of fact or fraud," and that "Gulf Group knowingly and deliberately certified entitlement to $999,994.67[109] for Contract 0897, despite the fact that: (a) the total contract award was for $346,998.00; (b) the contract was terminated 33 days [sic] into the performance period; and (c) the contract is tainted by bribery." According to the defendant, "Gulf Group is liable to the United States pursuant to the Contract Disputes Act, 41 U.S.C. § 7103(c)(2), for the unsupported claim, plus the Government's costs attributable to reviewing the claim." Defendant identifies $1,439,614.50 as the unsupported amount of plaintiff's 2007 claim, which asserted entitlement to more than the total potential contract price, $1,800,000.00, and attorneys' fees, which, according to defendant, later were identified

---

[108] As with the camp package BPA claims, because the court finds that plaintiff is not liable for the amount of its unsubstantiated latrine contract claims under the Contract Disputes Act, the court does not further address defendant's position that the amount of plaintiff's settlement offer constitutes the amount of its 2005 certified claim for the latrine contract.

[109] As with the camp package BPA and latrine contract claims, defendant's answer interprets plaintiff's settlement offer as the amount to which plaintiff claimed entitlement in its 2005 dumpster contract claim. As indicated above, plaintiff asserted entitlement to more than the amount of its settlement offer in its 2005 claim.

94

as $13,387.50,[110] even though the base period price of the dumpster contract was $346,998.00. In addition, defendant argues that plaintiff asserted entitlement to $415,195.29[111] in unsupported costs in its 2005 and 2007 submissions. Defendant also contends that plaintiff sought costs it had not incurred and that the claimed amount was merely a negotiating ploy.

Plaintiff offered the same arguments regarding the dumpster claims as it did with respect to the camp package BPA claims and the latrine claims, namely that the law provides for lost profits on option periods when the decision not to exercise the options was made in bad faith or as a result of an abuse of discretion. As noted above, however, plaintiff ultimately conceded to the court at closing argument that no such case law exists in direct support of its position, and argued the principle of the law should be analogized, such that a finding of a bad faith termination during the base period of a contract also would permit damages on unexercised option periods. As noted above, the case law plaintiff cites as providing a basis for seeking lost profits on option periods refers to situations in which the wronged contractor can prove that the government chose, in bad faith, not to exercise the option periods, see Hi-Shear Tech. Corp. v. United States, 356 F.3d at 1374, 1375, 1380; Blackstone Consulting, Inc. v. Gen. Servs. Admin., CBCA 718, 08-1 BCA ¶ 33,770; Greenlee Constr., Inc. v. Gen. Servs. Admin., CBCA 416, 07-1 BCA ¶ 33,514, and not to situations in which the government chose to terminate a contract during the base period without ever reaching or even making a decision as to the option periods.

Plaintiff also argued, as it did with respect to the camp package BPA and the latrine claims, that the expense table in the dumpster claims was included merely to demonstrate readiness to perform the contract, that plaintiff claimed more than the contract price because it was including interest and attorneys' fees, and that the Army signaled to plaintiff that the option periods were likely to be exercised. Plaintiff contends that by requiring plaintiff to supply dumpsters with lids, which plaintiff had to special order, the government must have intended to exercise the option periods. For the reasons discussed above with respect to the camp package BPA claims and latrine claims, the court finds that plaintiff also acted with reckless disregard when submitting its dumpster claims.

---

[110] Similar to the latrine claim, defendant inaccurately alleges that plaintiff claimed entitlement to $13,387.50 in legal fees with respect to the dumpster claim. Plaintiff's 2011 notice for the dumpster contract claimed entitlement to a total of $13,837.50. The individual entries corresponding to legal fees plaintiff claims in the 2011 notice for the dumpster contract, however, amount to $13,887.50. Also similar to the latrine contract claim submitted by plaintiff, although defendant includes legal fees, which should be not recoverable given the inflated amount submitted by plaintiff with respect to the camp package BPA claim, defendant inexplicably treats the legal fees that plaintiff incurred as recoverable with respect to the dumpster contract claim.

[111] As indicated below, defendant inexplicably indicated that plaintiff had validly incurred 20,540.000 KD of costs that plaintiff actually claimed to have avoided in its 2011 notice for the dumpster contract.

95

The price for the base period of the dumpster contract was $346,998.00 and the sum of the all the option periods was $1,110,621.72. Therefore, the total potential price of the dumpster contract, including the base period and option periods, was $1,457,619.72.[112] In its 2007 dumpster claim submitted to the Army, plaintiff nearly doubled the amount sought, even from its 2005 settlement offer of $999,994.67 to $1,800,000.00, although this amount exceeded the total potential contract price by approximately $350,000.00. The $1,800,000.00 figure was the amount of damages claimed in plaintiff's December 19, 2006 original complaint in this court in Case No. 06-853C, the dumpster case.[113] In plaintiff's first amended complaint, plaintiff increased its claim for damages to $1,946,721.78, which is nearly $500,000.00 more than the total contract price, including all option periods. In its second amended complaint, plaintiff drastically reduced the amount it is claiming to $780,031.63, which is still $400,000.00 more than the entire base period value of $346,998.00. As with plaintiff's other claims, regarding its dumpster claim, plaintiff also argues that a wronged party is to be put in as good a position as it would have been but for the breach. By claiming the amounts plaintiff claimed, however, plaintiff has asked to be put in a better position than it was in before the alleged breach. Moreover, plaintiff's inflated numbers were substantially higher than the full value of the contract, despite the fact that plaintiff's dumpster contract was terminated less than a month after it was awarded.

At trial, Saud Al Tawash testified he did not know why Gulf Group had claimed more than the full contract price for the dumpster contract. Saud Al Tawash and plaintiff's original attorney, Mr. Peters, offered the same explanations as he had offered with respect to the camp package BPA claims and the latrine claims, testifying that the expense table was included merely to show that Gulf Group was prepared to perform. Plaintiff's expense table for the dumpster claim shows a total under the expense column of 200,501.200 KD, although Gulf Group later revealed it had spent only 59,927.871 KD. Although Attorney Peters testified at trial that the expense table was not included as support for the claim, that fact was entirely unclear in the claim as submitted, particularly given that the claim states in one section, "[t]his offer includes reimbursement of both costs and lost profits," which could indicate costs incurred, while in another section, the claim suggests that costs and profits total $1,110,621.72, which appears to encompass the unincurred costs. Furthermore, regarding the 2005

---

[112] At trial, it appeared from Saud Al Tawash's testimony that he believed the base period and the option periods for the dumpster contract together totaled $1,110,621.72. This view is reflected in the 2005 claim to the Army, which stated, "it [Gulf Group] plaintiff should be allowed full profit. Gulf Enterprises also should be compensated fully for the costs incurred in furtherance of the contract. The contract costs, when added to the anticipated contract profit, total $1,110,621.72."

[113] Plaintiff alleged that "[a]s a result of the Government's cancellation of the Contract solely for the convenience of the Government, Gulf Group incurred damages in the form of preparatory expenses, unpaid services actually rendered, lost profits, and legal fees in the amount presently estimated to be $1,800,000."

dumpster Claim and Settlement Offer, Saud Al Tawash similarly admitted that he signed the cover page of the dumpster claim without reviewing the details of the claim.

Plaintiff's actions with regard to the submission of the dumpster claims were in reckless disregard for the truth or falsity of the claims. As with the camp package BPA claims and the latrine contract claims, plaintiff did not conduct even a minimal inquiry into the claims, see Miller v. United States, 213 Ct. Cl. at 70, 550 F.2d at 23; see also United States v. Krizek, 111 F.3d at 942; United States v. TDC Mgmt. Corp., 24 F.3d at 298, and the dumpster claims were prepared in such a "sloppy or unsupervised fashion" that the government was overbilled. See 132 Cong. Rec. H9,382-03. Plaintiff is responsible as the applicant for the accuracy of the claims, regardless of who prepared them. See Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1340; see also Comm. Contractors, Inc. v. United States, 154 F.3d at 1362. The submissions were the result of more than mere math errors or flawed reasoning. See Wang ex rel. United States v. FMC Corp., 975 F.2d at 1420-21. Had Saud Al Tawash reviewed the claims submitted under the dumpster contract, the court finds it difficult to believe that he would not have realized that the claims were significantly inflated, particularly considering that the 2007 claim was for a far greater amount than the total potential contract price. The 2005 and 2007 dumpster claims were submitted with reckless disregard as to their truth or falsity, and, therefore, under the statutory definition of "false claims" pursuant to 31 U.S.C. § 3729, violated the False Claims Act.

For the same reasons articulated above with respect to the camp package BPA claims and the latrine contract claims, although plaintiff is liable under the False Claims Act for submitting claims in reckless disregard of their truth or falsity, that failure does not automatically result in a finding of plaintiff's intent to deceive when submitting the dumpster contract claims under the Contract Disputes Act. As noted above, the court had considerable opportunity to observe Saud Al Tawash in the courtroom as plaintiff's principal representative, including during lengthy testimony, cross-examination, and rebuttal, to reach its conclusion that, although Saud Al Tawash admitted to having made mistakes when submitting the dumpster contract claims, Saud Al Tawash offered sincere and credible testimony that revealed no intent to deceive. Defendant has not proven an intent to deceive on the part of plaintiff regarding the dumpster contract claims and, therefore, has not proven liability under the Contract Disputes Act.[114]

D.   The Bottled Water BPA Demurrage Claim under the False Claims Act and the Contract Disputes Act

In its second amended answer to plaintiff's complaint under the bottled water BPA, Case No. 07-82C, defendant asserts that plaintiff's demurrage claim arising under the bottled water BPA was inflated because it sought reimbursement for demurrage

---

[114] Because the court finds that plaintiff is not liable for the amount of its unsubstantiated dumpster contract claims under the Contract Disputes Act, the court does not further address defendant's position that the amount of plaintiff's settlement offer constitutes the amount to which plaintiff would be liable when its 2005 Claim and Settlement Offer ripened into a claim.

expenses that were not incurred. In its briefing to this court, defendant argues that plaintiff submitted an 85.000 KD/day claim for demurrage for charges from its trucking company, Expeditors, although Expeditors charged only between 50.000 and 60.000 KD/day. Defendant also contends that plaintiff's claim was fraudulent because it did not consider whether any of the delays were caused by entities other than the Army (citing Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1338).

In response, plaintiff states that the amount it claimed for demurrage has consistently been 298,435.000 KD, and that the 85.000 KD/day rate included not only the charges from Expeditors, but also charges for cargo insurance, administrative and logistical expenses, staging area and warehouse rentals to store the water, local transportation, labor, and equipment handling. Plaintiff admits, however, that its claim was not complete when submitted, and failed to include all the documents necessary to fully support the charges it had incurred in addition to those from Expeditors.

Unlike plaintiff's claims under the camp package BPA, the latrine contract, and the dumpster contract, Gulf Group's bottled water BPA demurrage claim remained constant throughout the period between when the claim was filed with the Army and when the complaint and amended complaints were filed in this court in Case No. 07-82C. Also unlike plaintiff's other three claims, plaintiff did not submit a revised bottled water demurrage claim to the Army. In 2005, Gulf Group submitted a claim to the contracting officer for 298,435.000 KD. In its first complaint filed in the United States Court of Federal Claims, plaintiff again sought 298,435.000 KD. In its first amended complaint, it requested the same amount, and in its second amended complaint, plaintiff again sought 298,435.000 KD. Thus, in stark contrast to its camp package BPA, latrine contract, and dumpster contract claims, plaintiff has presented a consistent request for the demurrage damages it alleges it incurred performing under the bottled water BPA.

Attorney Peters prepared plaintiff's 2005 bottled water BPA demurrage claim and presented it to the Army on behalf of plaintiff, as he had done for the 2005 camp package BPA, latrine, and dumpster Claim and Settlement Offers. In the case of the bottled water demurrage claims, however, Attorney Peters buttressed the claim with more documentation, attempting to show the basis for the dinars charged. Although the 2005 bottled water demurrage claim was incomplete, because the 2005 claim included only documentation showing the charges from Expeditors, the company Gulf Group hired to transport the water, plaintiff subsequently provided the court with a chart breaking down each demurrage expense incurred. The chart lists detailed expenditures, often by date and name, for insurance, staff salaries, vehicles, warehousing, staging area rent, local transportation, and loading and unloading, and it provides a brief description of the nature of the charges. Plaintiff has admitted that its 2005 bottled water demurrage claim was incomplete. The demurrage chart and the additional documentation attached to the demurrage chart was not included in the 2005 bottled water claim. In this instance, the court finds that plaintiff's error was an "honest mistake." See Riley Constr. Corp. v. United States, 65 Fed. Cl. at 269; see also United States v. Sci. Applications Int'l Corp., 626 F.3d at 1274-75. There is no indication that plaintiff's failure to include the demurrage chart and the additional documentation

attached to the demurrage chart was done with a reckless disregard for the truth or falsity of the claim. The chart submitted to the court shows the dinars claimed, which appear to be a specific replication of the expenditures plaintiff claims it incurred as a result of bottled water delays.

Reviewing the invoices from Expeditors in the 2005 bottled water demurrage claim, it is apparent that Expeditors was not charging 85.000 KD/day. For example, Expeditors charged 720.000 KD for one truck's delay of twelve days, a total of 60.000 KD/day, not 85.000 KD. Although this fact may have been confusing to the contracting officer, Mr. Libbey, nowhere in the 2005 bottled water demurrage claim does plaintiff state that its expenses arose solely from Expeditors. Rather, plaintiff's claim states that it is for "demurrage charges for delays," and that Gulf Group "incurred delay (demurrage) and damages." Plaintiff initially should have included the invoices from the other sources of the demurrage charges, but this absence does not indicate a reckless disregard for the accuracy of the charges or that plaintiff's claim was false. Plaintiff's claim for the bottled water BPA demurrage was far more straightforward and transparent than plaintiff's camp package BPA, latrine contract, and dumpster contract claims. Although somewhat incomplete, the presentation of the demurrage claim does not meet the reckless disregard standard regarding liability under the False Claims Act. In the case of the demurrage claim, Saud Al Tawash and Mr. Peters presented claims with substantiation attached, albeit, as it turned out, incomplete information. The court cannot condone Saud Al Tawash, as the General Manager and representative of Gulf Group, for his minimal role in preparing the demurrage certified claim, nor the apparent blind faith he placed in his advisors to accurately present plaintiff's claim. The testimony Saud Al Tawash offered throughout the trial to the court, however, was sincere and offered without reservation. With respect to the bottled water demurrage claim, there was an attempt to document the claim and the claim numbers remained consistent, for which reason the requisite intent under the False Claims Act is found not to have been present regarding the bottled water demurrage claims. Although Saud Al Tawash appears not to have reviewed this claim to any greater extent than he did the other claims at issue in these cases, he was a fortunate beneficiary of a claim submission which met the most minimum standards and requirements for presenting a claim. As defendant has not proven a knowing presentation of a false claim under the False Claims Act, defendant is likewise unable to prove an intent to deceive the government under the Contract Disputes Act regarding the bottled water BPA demurrage claim.

## II.    Special Plea in Fraud

Defendant also argues that all plaintiff's claims should be forfeited under the Special Plea in Fraud statute, 28 U.S.C. § 2514, due to bribery in violation of 28 U.S.C. § 2514, conflict of interest in violation of 18 U.S.C. § 208(a) (2000), and the submission of false claims. The Special Plea in Fraud statute provides:

> A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud

99

against the United States in the proof, statement, establishment, or allowance thereof.

In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514; see also Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1341.

Previous decisions by Judges of the United States Court of Federal Claims have indicated that "[t]he statutory forfeiture contemplated by 28 U.S.C. § 2514 is broad. The Court of Claims has held that, upon a finding that claims are based on 'a contract under which [a contractor] practiced fraud against the Government,' as defined by this statute, 'all of his claims under that contract will be forfeited pursuant to 28 U.S.C. § 2514.' Little v. United States, 138 Ct. Cl. 773, [778,] 152 F. Supp. 84, 88 (1957)." Veridyne Corp. v. United States, 83 Fed. Cl. 575, 586 (2008); see also Kellogg Brown & Root Servs., Inc. v. United States, 99 Fed. Cl. 488, 496 (2011). In American Heritage Bancorp, the court noted that: "The use of the word 'shall' [in 28 U.S.C. § 2514] makes the judgment of forfeiture obligatory on the court; the court has no discretion to turn a blind eye to an attempt, whether successful or not, to commit fraud in the statement of a claim against the United States." Am. Heritage Bancorp v. United States, 61 Fed. Cl. 376, 385 (2004). Similarly, a Judge of the Court of Federal Claims indicated that, "Section 2514 amounts to a 'silver bullet' which, in the present case, would require that [plaintiff's] claim be forfeited if it is shown by clear and convincing evidence that [plaintiff] acted or made false or misleading statements with the 'intent to deceive the Government.'" Farkas v. United States, 57 Fed. Cl. 134, 146 (2003) (quoting Miller v. United States, 213 Ct. Cl. at 68, 550 F.2d at 22), aff'd, 95 F. App'x 355 (Fed. Cir. 2004). In Glendale Federal Bank, FSB v. United States, the United States Court of Appeals for the Federal Circuit "explained that '[t]o prevail under [28 U.S.C. § 2514] the government is required to establish by clear and convincing evidence[115] that the contractor knew that its submitted claims were false, and that it intended to defraud the government by submitting those claims.'" Glendale Fed. Bank, FSB v. United States, 239 F.3d at 1379 (brackets in original) (quoting Comm. Contractors, Inc. v. United States, 154 F.3d at 1362);[116] see also Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1341 ("To

---

[115] The "clear and convincing" standard applies to proof under the Special Plea in Fraud statute, 28 U.S.C. § 2514, as opposed to the preponderance of the evidence standard applicable to the False Claims Act, 31 U.S.C. § 3729, and the Contract Disputes Act, 41 U.S.C. § 604. See UMC Elecs. Co. v. United States, 249 F.3d at 1338-39 ("The government must prove a violation of the Contract Disputes Act and False Claims Act by a preponderance of the evidence. Under the Special Plea in Fraud, the government must prove its allegations by clear and convincing evidence." (citing Comm. Contractors, Inc. v. United States, 154 F.3d at 1362)).

[116] A Judge of the Court of Federal Claims also has indicated that, regarding 28 U.S.C. § 2514, "[a] predicate for forfeiture under this statute is the establishment of fraud,

prevail under § 2514, the government must 'establish by clear and convincing evidence that the contractor knew that its submitted claims were false, and that it intended to defraud the government by submitting those claims.'" (quoting Comm. Contractors, Inc. v. United States, 154 F.3d at 1362)); Young-Montenay, Inc. v. United States, 15 F.3d at 1042 ("Under 28 U.S.C. § 2514, the government bears the burden of proving that the claimant (1) knew the claim was false and (2) intended to deceive the government by submitting it." (citing McCarthy v. United States, 670 F.2d 996, 1004 (Ct. Cl. 1982), abrogated on other grounds by Slattery v. United States, 635 F.3d 1298 (Fed. Cir. 2011))); Veridyne Corp. v. United States, 105 Fed. Cl. at 808; Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. at 584 ("The contractor must knowingly present the false claim with the intention of being paid for it."); O'Brien Gear & Mach. Co. v. United States, 219 Ct. Cl. 187, 199, 591 F.2d 666, 672 (1979); Miller v. United States, 213 Ct. Cl. at 68, 550 F.2d at 22; Kamen Soap Prods. Co. v. United States, 129 Ct. Cl. 619, 641, 124 F. Supp. 608, 620 (1954).

Mere negligence, inconsistency, or discrepancies are not actionable under the Special Plea in Fraud statute. See Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. at 584; Veridyne Corp. v. United States, 105 Fed. Cl. at 801; Grand Acadian, Inc. v. United States, 105 Fed. Cl. at 457-58 ("'Proof of negligence or ineptitude does not meet the standard of clear and convincing evidence; rather, "[a]n intent to deceive the Government must be proved."'" (bracket in original) (quoting Alcatec, LLC v. United States, 100 Fed. Cl. at 517 (quoting Miller v. United States, 213 Ct. Cl. at 68, 550 F.2d at 22))). "The court may, however, consider circumstantial evidence in making its determination." Alcatec, LLC v. United States, 100 Fed. Cl. at 517 (citing Kamen Soap Prods. Co. v. United States, 129 Ct. Cl. at 642, 124 F. Supp. at 620).

As articulated by a Judge of the United States Court of Federal Claims:

In order to satisfy § 2514, however, the fraud alleged must be related to the contract at issue. Little v. United States, 138 Ct. Cl. 773, 152 F. Supp. 84, 87-88 (1957). Fraud in an unrelated transaction will not lead to forfeiture under this statute. However, when fraud is committed in regard to the very contract upon which the suit is brought, the court will not divide the contract and allow recovery on part of it. Id.; UMC Electronics v. United States, 43 Fed. Cl. 776, 791 (1999), aff'd, 249 F.3d at 1340 ([Fed. Cir.] 2001).

In order to prevail in its defense of fraud under 28 U.S.C. § 2514, the "burden is on the government to establish by clear and convincing evidence that the claimant has committed the fraud alleged." Glendale, 239 F.3d at 1379; UMC Electronics, 43 Fed. Cl. at 791 (internal citation omitted). This requirement has more specifically been rendered in the following way: "in order that a misrepresentation be fraudulent...it must be both consciously false and intended to mislead." E. Allan Farnsworth,

_____

although the statute itself does not articulate the elements of fraud." Veridyne Corp. v. United States, 105 Fed. Cl. at 801.

101

Farnsworth on Contracts, § 4.12 (2d Ed.1998). Thus, for the purposes of § 2514, the government must show: 1) that the plaintiff made a false statement to the government knowing that it was false; and 2) that this statement was intended to deceive the government. <u>Glendale</u>, 239 F.3d at 1379.

<u>Am. Heritage Bancorp v. United States</u>, 61 Fed. Cl. at 385-86.

In <u>Brown Construction Trades, Inc. v. United States</u>, 23 Cl. Ct. 214 (1991), the court explained the breadth of the statutory intent in 28 U.S.C. § 2514:

This statute has been held to require the forfeiture of any claim affected by fraud, whether intrinsic to the claim or in the presentment of the claim. <u>Kamen Soap Prods. Co. v. United States</u>, 129 Ct. Cl. 619, 641, 124 F. Supp. 608, 620 (1954) ("this statute goes further than merely banning fraudulent claims. It provides for a forfeiture of the claim if any fraud is practiced or attempted to be practiced in proving, establishing or allowing a claim.").

The Court of Claims has ruled that where fraud is committed in the course of a contract to which the suit pertains, it may not isolate the affected part and allow suit to proceed on the remainder. The practice of a fraud on part of a contract condemns the whole. The rule is set out in <u>Little v. United States</u>, 138 Ct. Cl. 773, 778, 152 F. Supp. 84, 87-88 (1957):

It is true that the forfeiture statute [28 U.S.C. § 2514] was not intended to forfeit an otherwise valid claim of a claimant merely because, in some other unrelated transaction, he had defrauded the Government. But where, as in the present case, fraud was committed in regard to the very contract upon which the suit is brought, this court does not have the right to divide the contract and allow recovery on part of it. Since plaintiff's claims are based entirely upon contract V3020V-241, a contract under which he practiced fraud against the Government, all of his claims under that contract will be forfeited pursuant to 28 U.S.C. § 2514.

Thus, 28 U.S.C. § 2514 requires the forfeiture of all claims arising under a contract tainted by fraud against the Government. <u>See</u> <u>also</u> <u>New York Mkt. Gardeners' Ass'n v. United States</u>, 43 Ct. Cl. 114, 136, 1907 WL 832 (1908).

<u>Brown Constr. Trades, Inc. v. United States</u>, 23 Cl. Ct. 214, 216 (1991); <u>see also</u> <u>Ab-Tech Constr., Inc. v. United States</u>, 31 Fed. Cl. at 435-36.[117] <u>But see</u> <u>Ulysses, Inc. v.</u>

---

[117] This court recognizes that its prior decision in <u>Supermex, Inc. v. United States</u> indicated that bribery in and of itself was sufficient to invoke liability under 28 U.S.C.

<u>United States</u>, 110 Fed. Cl. at 649 ("[S]uch an expansive reading of the FFCA [Forfeiture of Fraudulent Claims Act] is not warranted by the language of the statute.").

"The forfeiture counterclaim carries no monetary penalties other than the forfeiture itself." <u>Daewoo Eng'g & Constr. Co. v. United States</u>, 73 Fed. Cl. at 584; <u>see also</u> <u>Barren Island Marina, Inc. v. United States</u>, 44 Fed. Cl. 252, 257 (1999) ("The plain meaning of the statute [28 U.S.C. § 2514] is that the value of the forfeiture is not restricted or even linked to the value of the loss sustained by the government. For this reason, the forfeiture is not, strictly speaking, a remedy. Additionally, because forfeiture under § 2514 requires demonstration of fraud-intentional conduct-the forfeiture is more akin to punishment."), <u>appeal</u> <u>dismissed</u>, 54 F. App'x 329 (Fed. Cir.), <u>vacated</u> <u>by</u> 57 F. App'x 427 (Fed. Cir.), <u>and</u> <u>appeal</u> <u>dismissed</u>, 66 F. App'x 878 (Fed. Cir. 2003).

With regard to the Special Plea in Fraud, asserted in Case No. 06-835C (the camp package BPA), Case No. 06-858C (the latrine contract), Case No. 06-853C (the dumpster contract), and Case No. 07-82C (the bottled water BPA), the government alleges that the contracts and BPA calls were awarded in exchange for "money, trips, and other things of value" given by Gulf Group to Carolyn Blake, the sister of John Cockerham, a former Army Major, contract specialist, and contracting officer at Camp Arifjan, Kuwait. Defendant asserts that Gulf Group's actions constituted fraud under the Special Plea in Fraud statute, 28 U.S.C. § 2514, requiring forfeiture of plaintiff's claims, as Gulf Group's actions created an unlawful conflict of interest and violated 18 U.S.C. § 201(b)(1), which prohibits the offering or promising of anything of value to a public official with the intent to influence an official act. Defendant further alleges that Gulf Group violated the Special Plea in Fraud statute by submitting false claims under each contract and BPA to the United States government for an amount of money "to which it knew or knows it was not entitled."

According to defendant:

In approximately September 2004, plaintiff, Gulf Group General Enterprises, Co., W.L.L. ("Gulf Group"), began paying money to the sister of John Cockerham, a United States Army contracting official. In return, Mr. Cockerham performed contracting actions favorable to Gulf Group. Those favorable contracting actions taint contracts that the Army awarded

---

§ 2514. <u>See</u> <u>Supermex, Inc. v. United States</u>, 35 Fed. Cl. 29, 42 (1996) ("This court believes that in the instant case, 28 U.S.C. § 2514 can be invoked without the need to prove either justifiable reliance by the sovereign or specific evidences of injury to the sovereign. The injury and the damages to the sovereign are presumed in the breach of the bond of public trust. In <u>Versaggi Shrimp Corp. v. United States</u>, 28 Fed. Cl. 20 (1993), the court found that subversion of public officers, through acts such as bribery, is never without harm to the state. <u>Id.</u> at 25."). In <u>Supermex</u>, however, the president of the company pled guilty to bribing an official during contract performance, making it easily distinguishable from the facts presented in the record in the above-captioned cases, with respect to the actions of Gulf Group and its General Manager, Saud Al Tawash.

to Gulf Group in late 2004, and in 2005, entitling the United States to a refund of the money paid to Gulf Group pursuant to those contracts,[118] and warranting forfeiture of all its claims in these actions. In December 2005, Gulf Group presented to Mr. Cockerham contract claims that were inflated and contained misrepresentations regarding expenses that Gulf Group claimed to have incurred on the contracts. In 2007, Gulf Group resubmitted those claims, further inflating those claims, and repeating those misrepresentations. Those claims are fraudulent, warranting forfeiture to the United States of Gulf Group's claims in these actions, an award to the United States of the unsupported amounts of those claims, and civil penalties. In total, the Court should award to the United States $18,759,164.97. [sic] because the Court should order that Gulf Group's claims are forfeited, the Court need not address the merits of those claims.

Defendant appears to argue that plaintiff's alleged commission of common law fraud supports a finding that plaintiff violated the Special Plea in Fraud statute, and requires rescission of the contracts and that plaintiff disgorge any amounts previously paid to plaintiff. "Proof of federal common law fraud requires the Government to show: (1) misrepresentation of a material fact; (2) intent to deceive; (3) justifiable reliance on the misrepresentation by the deceived party; and (4) injury to the party deceived." Veridyne Corp. v. United States, 105 Fed. Cl. at 795 (citing Kellogg Brown & Root Servs., Inc. v. United States, 99 Fed. Cl. at 514–16); see also Kellogg Brown & Root Servs., Inc. v. United States, 99 Fed. Cl. at 514 (citing Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1244 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 555 U.S. 812 (2008)); First Fed. Sav. Bank of Hegewisch v. United States, 52 Fed. Cl. 774, 791 (2002) ("[T]he court concludes that the circumstances of the existing case require defendant to prove all four elements of common law fraud to assert its special plea in fraud claim.").

"'[A] Government contract tainted by fraud or wrongdoing is void *ab initio*.'" Long Island Sav. Bank, FSB v. United States, 503 F.3d at 1245 (quoting Godley v. United States, 5 F.3d 1473, 1476 (Fed. Cir. 1993)); see also Veridyne Corp. v. United States, 105 Fed. Cl. at 795. "[F]or a government contract to be tainted by fraud or wrong doing and thus void ab initio, the record must show some causal link between the fraud and the contract." Long Island Sav. Bank, FSB v. United States, 503 F.3d at 1250 (citing Godley v. United States, 5 F.3d at 1476). "[A] conflict of interest at the formation of the contract operates like a fraud and warrants nonenforcement." Kellogg Brown & Root Servs, Inc. v. United States, 99 Fed. Cl. at 514 (citing Long Island Sav. Bank, FSB v. United States, 503 F.3d at 1250); see also J.E.T.S., Inc. v. United States, 838 F.2d 1196, 1200 (Fed. Cir.) ("A government contract thus tainted from its inception by fraud is void ab initio, like the government contracts held void because similarly tainted by a prohibited conflict of interest in United States v. Mississippi Valley Generating Co., 364

---

[118] Defendant's post-trial brief generally refers to disgorgement with respect to all of the contracts and BPAs at issue, but defendant's answers only seek disgorgement with respect to the camp package BPA and the bottled water BPA.

U.S. 520 (1961), and K & R Engineering Co. v. United States, 616 F.2d 469, 222 Ct. Cl. 340 (1980)."), cert. denied, 486 U.S. 1057 (1988). But see United States ex. Rel. Siewick v. Jamieson Sci. & Eng'g, Inc., 214 F.3d 1372, 1377 (D.C. Cir. 2000) (disagreeing with the Federal Circuit).

In support of its argument that plaintiff should also disgorge money it received under the contracts and BPAs, defendant cites to K & R Engineering Co. v. United States, 222 Ct. Cl. 340, 616 F.2d 469 (1980), United States v. Mississippi Valley Generating Co., 364 U.S. 520, reh'g denied, 365 U.S. 855 (1961), Haggerty v. Red Bank Borough Zoning Board of Adjustment, 897 A.2d 1094, 1100-01 (N.J. Super. Ct. App. Div. 2006), and 63C American Jurisprudence 2d Public Officers and Employees § 246 (2011), for the notion that there need be only the appearance of impropriety, or the potential for impropriety, for a demonstration of a conflict of interest.

In response to defendant's allegations, plaintiff asserts that the conflict of interest allegations are untrue and unfounded and denies all allegations of bribery. Plaintiff maintains that Ms. Blake was not financially dependent on Mr. Cockerham, pursued jobs in Kuwait of her own volition, and learned of certain jobs in Kuwait without her brother's input, including sending résumés to companies in Kuwait without her brother's aid. Plaintiff cites Mr. Cockerham's testimony that he did not receive anything of value from Saud Al Tawash or Gulf Group. Also, according to plaintiff, it was not Mr. Cockerham's decision to award the camp package BPA, nor did he make the decision to award the camp package BPA call at issue before the court. In fact, Maj. Davis awarded all the contracts at issue in this case. Plaintiff also argues that Mr. Cockerham could have tried to stop the camp package termination and to defy the order to him to terminate plaintiff's latrine and dumpster contracts, but did not, indicating that he felt he was under no obligation to plaintiff. Moreover, plaintiff notes that Mr. Cockerham awarded some contracts on which plaintiff had submitted bids to other contractors, which, according to plaintiff and according to Mr. Cockerham's later convictions, appear to have bribed Mr. Cockerham. Plaintiff also argues that Gulf Group had both a factual and legal basis for claiming the option periods, and that the expense tables, which the government interprets as claiming unincurred costs, were included with the claims only to show that Gulf Group was prepared to perform.

Section 201(b)(1) of Title 18 of the United States Code, "Bribery of Public Officials and Witnesses," provides:

**(b)** Whoever—

**(1)** directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of value to any other person or entity, with intent--

105

**(A)** to influence any official act; or

**(B)** to influence such public official or person who has been selected to be a public official to commit or aid in committing, or collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or

**(C)** to induce such public official or such person who has been selected to be a public official to do or omit to do any act in violation of the lawful duty of such official or person….

shall be fined under this title or not more than three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States.

18 U.S.C. § 201(b)(1) (emphasis in original).

The conflict of interest statute, 18 U.S.C. § 208(a), provides:

Except as permitted by subsection (b) hereof, whoever, being an officer or employee of the executive branch of the United States Government, or of any independent agency of the United States, a Federal Reserve bank director, officer, or employee, or an officer or employee of the District of Columbia, including a special Government employee, participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which, to his knowledge, he, his spouse, minor child, general partner, organization in which he is serving as officer, director, trustee, general partner or employee, or any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest--

Shall be subject to the penalties set forth in section 216 of this title.[119]

---

[119] 18 U.S.C. § 216 provides:

**(a)** The punishment for an offense under section 203, 204, 205, 207, 208, or 209 of this title is the following:

18 U.S.C. § 208(a).  The statute at 18 U.S.C. § 208(a) explicitly includes the wrongdoer and "his or her spouse and minor child" as members of the family unit, which indicates that the statute does not facially apply to relationships between siblings, such as exists between Mr. Cockerham and Ms. Blake.  See Slattery v. United States, 635 F.3d at 1324 ("[T]he express mention of one thing excludes all others.").

48 C.F.R. § 3.101-1 states:

Government business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none.  Transactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct. The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships.  While many Federal laws and regulations place restrictions on the actions of Government personnel, their official conduct must, in addition, be such that they would have no reluctance to make a full public disclosure of their actions.

48 C.F.R. § 3.101-1 (2005).  Regarding conflicts of interest generally, there need not have been any actual profit from the conflict of interest; the mere temptation of dishonor is enough to prevent the contracting agent from acting in the government's best interests.  See United States v. Miss. Valley Generating Co., 364 U.S. at 549-50.

---

**(1)** Whoever engages in the conduct constituting the offense shall be imprisoned for not more than one year or fined in the amount set forth in this title, or both.

**(2)** Whoever willfully engages in the conduct constituting the offense shall be imprisoned for not more than five years or fined in the amount set forth in this title, or both.

**(b)** The Attorney General may bring a civil action in the appropriate United States district court against any person who engages in conduct constituting an offense under section 203, 204, 205, 207, 208, or 209 of this title and, upon proof of such conduct by a preponderance of the evidence, such person shall be subject to a civil penalty of not more than $50,000 for each violation or the amount of compensation which the person received or offered for the prohibited conduct, whichever amount is greater. The imposition of a civil penalty under this subsection does not preclude any other criminal or civil statutory, common law, or administrative remedy, which is available by law to the United States or any other person.

18 U.S.C. § 216 (2000) (emphasis in original).

Although there is disparate testimony in the record as to how and when John Cockerham met Saud Al Tawash, Saud Al Tawash testified that he first met Mr. Cockerham in 2002 or 2003 in the "Diwanya" at his house. Mr. Cockerham testified that he believed, however, he was briefly introduced to Saud Al Tawash by a "Mr. Eli or Elias" during one of his earlier tours of Kuwait at the end of 2002 at a Ramadan "social dinner." John Cockerham testified that he arrived in Kuwait for the tour of duty most relevant to the above-captioned cases on June 30, 2004, and was "acting as a contract specialist for the first few months." Mr. Cockerham testified he "was a contract specialist until about the end of October, of which [sic] I was promoted to Major and then received a warrant for a very short time until December of '04. I was acting as the assistant Chief of Contracting during that time from October to December. At that point then my warrant was relinquished and I went back to being an assistant contract specialist until December of '05." According to his testimony, he and other Army officers were responsible for soliciting and receiving bids for Department of Defense contracts in support of Army operations in the Middle East.

Some of the contacts between John Cockerham and members of the Al Tawash family were clearly social. Some of the contacts involved Ms. Blake's employment. Still other contacts between Mr. Cockerham and Saud Al Tawash were with regard to the contracts plaintiff had been awarded by the United States government. Mr. Cockerham made a trip to visit Saud Al Tawash and his then-fiancé, now-wife, at their home in the United States and Mr. Cockerham attended their wedding. Mr. Cockerham stated at trial that he introduced Carolyn Blake to Saud Al Tawash as his sister, and indicated that she was looking for a job in Kuwait.[120] Ms. Blake was offered and accepted a job in August 2004 with Gulf Telecom, a wholly owned subsidiary of Gulf Group, of which Saud Al Tawash was the Managing Director. Ms. Blake's job in Kuwait apparently involved cold-calling members of the Kuwaiti public from a telephone book to sell water purification systems, despite the fact that Ms. Blake did not speak Arabic. According to the joint stipulation of facts submitted by the parties, Ms. Blake did not sell a single system. While in Kuwait, she also worked for Saud Al Tawash's uncle at Jireh Springs upon the recommendation of Saud Al Tawash. When she arrived in Kuwait to begin her employment, she was met at the airport by Mr. Cockerham, Maj. Davis, Saud Al Tawash, and Diaa Salem. Saud Al Tawash's brother, Megbel Al Tawash, helped Ms. Blake find an apartment. Her monthly salary of 1,200.000 KD was delivered to her at her apartment in cash every month. Saud Al Tawash testified that Ms. Blake was paid in cash because she could not obtain a local bank account under the law in Kuwait, and that cash payments were a common practice in Kuwait. In March 2005, Ms. Blake was wired $9,478.00 to help her pay taxes on property she owned in the United States.

---

[120] The testimony as to when Saud Al Tawash knew Ms. Blake was Mr. Cockerham's sister, however, is inconsistent. While Mr. Cockerham and Ms. Blake testified that Saud Al Tawash knew she was Mr. Cockerham's sister during her first visit to Kuwait, and Ms. Blake testified that her brother knew the Al Tawash family was trying to help her get a job, Saud Al Tawash stated that he did not realize that Ms. Blake was Mr. Cockerham's sister until after he had hired her.

Mr. Cockerham is serving a sentence for conviction of conspiracy, bribery, and money laundering in connection with his participation in bribery schemes while working as an Army Major and staff member of the contracts office at Camp Arifjan, and for a time as a contracting officer. Mr. Cockerham testified that he received "close to seven" million dollars from the contractors on the "appreciation payments" list.[121] Ms. Blake is serving a sentence for conviction of money laundering, and accepting more than $3,000,000.00 on Mr. Cockerham's behalf. Although Mr. Cockerham listed Ms. Blake and her then-minor son, his nephew, as contractor contacts on some bottled water contracts Mr. Cockerham managed, he did not list them on the bottled water BPA awarded to and performed by Gulf Group. Likewise, neither Ms. Blake nor her son was listed on the camp package BPA, latrine or dumpster contracts awarded to Gulf Group. The criminal convictions of both Mr. Cockerham and Ms. Blake for bribery are matters of public record. The public record, and the record before this court, however, do not indicate that Gulf Group, Saud Al Tawash, or members of his family were involved in the bribery schemes that led to Mr. Cockerham's and Ms. Blake's convictions. At trial, Saud Al Tawash stated that he did not give anything to anyone or hire anyone, including Ms. Blake, in exchange for the award of any contract or BPA. Saud Al Tawash consistently denied any intent to defraud the government. Mr. Cockerham also consistently denied having received or having been offered money, gifts or favors from Gulf Group or Saud Al Tawash in exchange for favors or inside information on government contracts.

For a period of time during the history of the four above-captioned cases, this court, at the request of the Department of Justice, stayed all four of the cases, pending conclusion of Mr. Cockerham's and Ms. Blake's criminal proceedings in United States District Court for the Western District of Texas. Although both Mr. Cockerham and Ms. Blake pled guilty to bribery, conspiracy, and money laundering in the United States District Court for the Western District of Texas, the issue before this court is whether Gulf Group, Saud Al Tawash, or Al Tawash family members engaged in activities which would trigger liability under the Special Plea in Fraud Statute or common law fraud with respect to the relevant BPAs and contracts. Although the court concludes that false claims were submitted to the government for work performed and/or not performed, the submission of false claims does not establish that plaintiff or any members of the Al Tawash family were engaged in bribery, conspiracy, money laundering, or that Gulf Group submitted claims with the intent to defraud the government.

The government suggests the following scenario for consideration:

At about the same time as the payments to Ms. Blake began, Mr. Cockerham became involved in the process of the Army's award to Gulf Group of contracts for dumpsters and latrines. He signed a memorandum for record memorializing that the Army would award a latrine contract to Gulf Group, prepared the contract folder for review by the Army's contract review board, and served as the point of contact for the board's contract

---

[121] As indicated above, information in the indictments against Mr. Cockerham, Ms. Blake, and Mr. Cockerham's wife suggests that Mr. Cockerham accepted as much as $9.6 million in bribes.

award action. Indeed, in September 2004, the Army awarded to Gulf Group Contract No. W912D1-04-P-0932, a firm, fixed-priced contract for the provision and servicing of latrines.

Mr. Cockerham also signed a memorandum for record stating that Gulf Group "is recommended for award of [a dumpster] contract"; in September 2004, the Army awarded to Gulf Group Contract No. W912D1-04-P-0897, a firm, fixed-priced contract for the provision and servicing of dumpsters.

Later, in December 2004, Mr. Cockerham issued two calls to Gulf Group for bottled water, pursuant to Blanket Purchase Agreement ("BPA") No. W912D1-04-A-0052, a BPA between the Army and Gulf Group. The Army would pay Gulf Group over 492,000 Kuwaiti dinar ("KD") (over $1.6 million) for that bottled water. In addition, from December 2004 through December 2005, Mr. Cockerham issued several "camp set" calls to Gulf Group, pursuant to BPA No. W912D1-04-A-0047, another BPA between Gulf Group and the Army. The Army would pay Gulf Group over $2.6 million for those camp sets.

While he was working on Gulf Group contracts, Mr. Cockerham understood that Gulf Group was paying Ms. Blake. However, Mr. Cockerham never informed the Army of that understanding. Saud Al Tawash, for his part, never informed Mr. Cockerham's superiors or colleagues in the contracting office of his arrangement with Mr. Cockerham's sister.

(internal citations omitted; footnote omitted). Defendant also asserts that "the Army paid Gulf Group $2,545,273.21 pursuant to camp set calls issued by Mr. Cockerham pursuant to the camp set BPA," and that the payments to Ms. Blake "were in exchange for contracting actions favorable to Gulf Group."

Saud Al Tawash's decision to employ Carolyn Blake concurrent with the time Gulf Group sought, was awarded, and performed on United States government contracts and BPA calls in Kuwait and Iraq, which were awarded by the office in which Mr. Cockerham worked, require scrutiny. As discussed above, however, the record before the court does not establish any payments from plaintiff, Saud Al Tawash, any other Gulf Group employee, or member of the Al Tawash family to Mr. Cockerham, although Mr. Cockerham received payments from contractors other than Gulf Group, resulting in Mr. Cockerham's and Ms. Blake's convictions. Both Mr. Cockerham and Ms. Blake pled guilty at their criminal proceedings, as a result of which, no transcripts of trials with details of what occurred are available, nor do the plea transcripts offer much factual detail. From the record before this court, it appears that Ms. Blake was hired to work for Gulf Telecom, not Gulf Group. Mr. Cockerham also testified at trial that Ms. Blake told him that she had worked out temporary employment with Saud Al Tawash and that Gulf Telecom paid her a salary, but that Mr. Cockerham was not aware at the time of Ms. Blake's employment conditions.

110

The exhibits before this court include a note, which is addressed to no one and appears never to have been sent, drafted by Mr. Cockerham after being questioned by federal investigators in 2007. Based on the trial testimony, the note is a stream of consciousness written to himself, similar to other such rambling notes in the record. The note reads:

1. <u>Carolyn</u> Get Rid of Everything
2. Do not talk to them at All
3. Make sure no excess money is lying around. Put it all in the bank.
4. Make sure no keys are laying around.
5. Tell Saud if ask to don't confess to anything. Tell them they can talk to his lawyer that he never ~~called Fernand Peters~~ [sic] gave me a penny for a contract. We will do business later in trading.
6. Tell Carolyn start business in Dubai.
7. It's perfect legal for Carolyn to work for him doing admin paperwork as long as he and I didn't have an agreement. She never work on nor prepared any contracts or worked in that Department. She got the job on her own.

(emphasis and strike-through in original).

Mr. Cockerham testified at trial that he drafted, but never sent, the note to Ms. Blake or anyone else. This disjointed note is consistent with other disjointed writings in the record authored by Mr. Cockerham, also addressed to no one, and consistent with his sometimes contradictory and rambling testimony offered at trial. Taken together with his testimony, Mr. Cockerham's notes appear to be stream-of-consciousness notes to himself. At trial, Mr. Cockerham stated that these notes were "just brainstorming," and there were "about 70 pages of these notes, just -- I'm just on a mental rampage, just everything I can -- that was coming to mind…." For example, another handwritten note in the record discussed by Mr. Cockerham at trial, perhaps drafted with Ms. Blake in mind, but also never sent, states:

0. Identify anyone other than me, Dia, Saud, you don't know them.
1. Kids → []ist of Phone # Safe Deposit Box
2. Keys/D&J Get rid of it    Talk is Bad
3. Tony: American Business / Just say he only knows
4. Don't talk to them, you have no money except your business.  (1.)
   $ Melissa Business Loan
5. Put the 1 Key inside the other box.  (2.)
6. Get rid of all the keys / turn them in
7. They will show you a list / that was made reference Shirly Robinson other names, Do not answer. They are not your friends. They have nothing on you. They will use anything and twist it against you. Sade[]→Gopal → Disa→
8. He just a friend/ Tony

111

9.  Marriage Kuwaiti Only / Non American
10. Sponsor Aunt/ Legal/ work / no exchange for...for Jireah Ad[] Mission work, Christian counselor

(all punctuation in original).

Defendant argued in a post-trial brief that

> the instructions contain falsehoods that demonstrate that Mr. Cockerham and Saud Al Tawash were engaged in bribery.  The instructions state that Ms. Blake "got the job on her own" even though she obtained her situation with Saud Al Tawash only after Mr. Cockerham introduced her to Mr. Al Tawash as his sister and mentioned to him that she was looking for work in Kuwait.  The instructions also state that Ms. Blake did "admin paperwork" for Saud Al Tawash, even though Ms. Blake never worked for anyone in Kuwait.  The falsity of those statements demonstrates that, contrary to what Mr. Cockerham wrote, he and Saud Al Tawash had an agreement.  That agreement was that Gulf Group would give Mr. Cockerham something of value; that is, money to a sister with whom he was close, in exchange for favorable contracting actions toward Gulf Group. Indeed, if Mr. Cockerham did not have such an agreement with Saud Al Tawash, there would have been no need for Mr. Cockerham to write down the instruction that his sister inform Saud Al Tawash of the absence of such an agreement, or that she "get rid of everything."

(internal citation omitted).

At trial, Saud Al Tawash and Megbel Al Tawash each adamantly, and specifically, denied involvement in any fraudulent activity, including any involvement in trading favors, money, or jobs for favorable contract treatment.  Saud Al Tawash testified at length during the trial.  Despite exhibiting poor and overly trusting judgment, poor choice of friends and advisors, and failure to conduct careful review of the claims submitted by plaintiff to the government, Saud Al Tawash's testimony seemed straightforward and did not appear fallacious to the trial judge.  Moreover, Saud Al Tawash's testimony stood up during aggressive cross-examination.  Although perhaps naïve about how to interact with the Army while seeking and performing government contracts, and how his hospitality would be interpreted, Saud Al Tawash impressed the court during three weeks of trial as credible, sincere, and cooperative, as well as eager to refute any charges or implications of illicit or anti-American activity, which he adamantly denied.  There is insufficient evidence in the record to indicate that plaintiff or any member of the Al Tawash family paid money in exchange for favors.  Saud Al Tawash also appeared to the court to be an individual who believed he could offer good service to support the war and who was supportive of United States efforts in the region, while at the same time operating successful businesses.

Saud Al Tawash testified that he hired Ms. Blake because of her English skills.[122] Saud Al Tawash also explained that he hired Ms. Blake because he was looking for an American employee to work with Gulf Telecom's American clients. Saud Al Tawash testified:

> She's an American. She understands the culture very well of the military. She understands the American culture. She knows the holidays. She's somebody who has experience with that environment…. She's American citizen and clients are Americans. She's ex-military; she has retail experience; she has experience in security as a guard and she has the personality to -- the attitude, for this particular position. She's educated. She has a degree. She has also a -- quite a good knowledge of the different demographics and segments of the military.

According to Saud Al Tawash, Ms. Blake was offered the same benefits that were offered to other Americans working for Gulf Telecom. According to Ms. Blake, Saud Al Tawash supplied her with materials to set up a small home office in her apartment, and while Ms. Blake was supposed to work in call centers, a lack of paperwork made it impossible for her to do so. In addition, a stand-off with AT & T prevented Gulf Telecom from opening several of the call centers that were planned. Despite Ms. Blake's inability to perform the job she was hired to do, and her testimony, "I never did work for anyone," Gulf Telecom continued paying Ms. Blake for the remainder of the year, pursuant to the requirements of Kuwaiti labor laws. The evidence in the record of the pay and benefits Ms. Blake received may be troubling from an American perspective, but alone is not sufficient to establish that plaintiff or Saud Al Tawash engaged in bribery or attempted to gain influence with Mr. Cockerham through Ms. Blake's employment. Rather Kuwaiti labor law obligations and Saud Al Tawash's Kuwaiti sense of hospitality to foreigners, which also was testified to during the trial, suggest a difference in culture, but not necessarily criminal, or civilly actionable, behavior on the part of plaintiff or members of the Al Tawash family. Saud Al Tawash also testified that he did not understand that hiring Ms. Blake would be a conflict of interest. Saud Al Tawash stated: "As long as she doesn't work on contracts that are -- no, I did not think of it as a conflict of interest because she was not working on any contracts then or after." The record does not establish that the hiring of Ms. Blake by Saud Al Tawash was intended as a bribe or as a way to influence Mr. Cockerham in his capacity as a member of the contract office in Kuwait. Moreover, defendant has not provided the court with any regulation or law which would have required plaintiff to inform the Army of the employment of Mr. Cockerham's sibling, Ms. Blake, by Gulf Telecom. The subsequent convictions of Mr. Cockerham and Ms. Blake, without establishing a link to plaintiff Gulf Group, or Saud Al Tawash, also do not support that plaintiff or Saud Al Tawash were guilty of any acts of bribery or intent to influence government contract activity.

---

[122] Mr. Cockerham also testified, regarding Gulf Telecom's hiring of his sister, "as I mentioned earlier, one of the things that, the reason for hiring her was, one, for English speaking liaison."

Although not the most coherent or credible witnesses at trial, neither Mr. Cockerham nor Ms. Blake implicated Gulf Group, Saud Al Tawash, or other members of the Al Tawash family in improper or illicit activities of any kind. John Cockerham and Carolyn Blake, although convicted of bribery with respect to other contractors, both affirmatively and repeatedly denied any involvement by the plaintiff or the Al Tawash family in any bribery scheme or trading Ms. Blake's employment for government favors. Mr. Cockerham's scribbled, apparently free-association notes that are in the record suggest he had a relationship with Saud Al Tawash. The Al Tawash name, however, does not appear on the list of individuals identified as having made payments to Mr. Cockerham, nor does Gulf Group, or Gulf Telecom, appear on the list of corporations named, which lists "AA," an abbreviation for Allied Arms, "Jireh,"[123] a reference to Jireh Ventures, "Jas," a reference to Jasmine International, "Zenith," a reference to Ghopal Zenith, "Lee Dynamics," "Green Valley,"[124] "Falah," a reference to the owner of Trans Orient, "FS," a reference to Future Services, "KMS," a reference to Kamal Sultan, and "Terry," a reference to Terry Hall from Freedom Catering Company. The exhibits in the record, including the hand-written notes authored by Mr. Cockerham, do not connect plaintiff, Saud Al Tawash, or any member of the Al Tawash family with any illicit contract activity involving Mr. Cockerham or any other public official in the United States Army. Observing both Ms. Blake and Mr. Cockerham on the witness stand, when asked about their relationships with plaintiff and Saud Al Tawash, their repeated denials of fraudulent activity involving plaintiff or members of the Al Tawash family seemed plausible, acknowledging, of course, their suspect credibility as convicted felons. Moreover, Mr. Cockerham was the individual who terminated Gulf Group's latrine and dumpster contracts within weeks of their having been awarded to plaintiff.

---

[123] Mr. Cockerham stated that "Jireh" in his list of bribes referred to Jireh Ventures, not Jireh Springs, the latter a Kuwaiti company apparently run by Jamal Al Dahma, an uncle of Saud Al Tawash. At trial, Mr. Cockerham stated that Jamal Al Dahma was not involved in Jireh Ventures. Mr. Cockerham also testified that he asked Mr. Cruz to start a business in San Antonio, Texas, which was called Jireh Ventures, for the purpose of providing supplies to entities in Kuwait from the United States. When he met with Ann Brickley and Mark Pletcher of the Department of Justice, Mr. Cockerham told them, however, that Jireh Ventures was a Kuwaiti company. At trial, Mr. Cockerham stated that "the final report that was actually written up was their [the Department of Justice's] report. It was not really from the briefings. And so I was basically toward the end told what I would say."

[124] Mr. Cockerham explained that one of Green Valley's translators falsely told his employers that he had landed a contract for Green Valley through Mr. Cockerham, and that Green Valley had to pay both Mr. Cockerham and the translator. Mr. Cockerham testified that the money he received from Green Valley, a company with which Gulf Group had a joint venture for a short period of time in 2004, was not from Saud Al Tawash and that he had received payments from Green Valley in the summer of 2005, after the critical dates at issue in the above-captioned cases in 2004. There is insufficient evidence in the record that, if bribe money came from Green Valley, any money flowed through, or was in anyway associated with, plaintiff or Saud Al Tawash.

Defendant also asserts that Saud Al Tawash's reaction when he heard that representatives of the federal investigation had contacted Mr. Cockerham and Ms. Blake "demonstrate that Saud Al Tawash and Mr. Cockerham were engaged in bribery." Defendant points out that Saud Al Tawash contacted Ms. Blake and asked her what the investigators wanted, raising Mr. Cockerham by name. This reaction, without more, however, does not establish that Saud Al Tawash had engaged in acts of bribery and defendant's allegations to the contrary are merely speculation. Saud Al Tawash's actions just as well could have been generated by curiosity regarding several individuals he knew and considered friends, and with whom he had been in contact in Kuwait. Saud Al Tawash and Mr. Cockerham indeed appear to have become social friends. According to the testimony, Mr. Cockerham developed a number of social friendships with local citizens in Kuwait during his time in Kuwait.

Moreover, none of the many government witnesses who served in Kuwait with Mr. Cockerham, civilian or military, including those who worked in the contracting office, even intimated that there was an improper relationship based on bribery between Gulf Group or Saud Al Tawash and any employees of the United States. In fact, Gulf Group was not treated with special handling, quite the contrary, with the latrine and dumpster contracts terminated shortly after they were awarded by Mr. Cockerham.

Significantly, from the record before the court, it is not clear that Mr. Cockerham had sufficient authority to have influenced the award or management of contracts within the structure of the Army contracting office at Camp Arifjan. Although he held a warrant for a short period of time, many contracting decisions seem to have been directed by officials above his pay grade. Maj. Davis awarded each of the contracts and BPAs at issue. At the time the contracts were awarded to plaintiff, Mr. Cockerham was not a contracting officer, but rather a contract specialist. Mr. Cockerham testified that he "was a contract specialist until about the end of October" 2004, after the award of the BPAs and contracts at issue in September 2004. Maj. Trimble testified that he did not believe that a contract specialist has the ability to influence the award of a contract, although a contract specialist could make a recommendation. Mr. Cockerham also testified that a contract specialist cannot influence the award of a contract and that the contract specialist merely passed on the recommendation from the Office of the Chief of Contracting. Col. Hess, the head of contracting at Camp Arifjan, also noted that the contract specialist assembles a package for the Contract Review Board with a recommendation of who should receive the contract. It is clear contract specialists, without a warrant, cannot sign awards of contracts. See Stout Road Assocs., Inc. v. United States, 80 Fed. Cl. 754, 756 (2008) ("Only government officials who possess a Contracting Officer's warrant are authorized to bind the United States to a contract." (citing 48 C.F.R. § 1.602-1)).

In sum, defendant has not adequately connected the dots between Mr. Cockerham and Gulf Group or Saud Al Tawash to support defendant's allegations of bribery with an intent to influence the award of government contracts. Regarding the camp package BPA, the award was made by Maj. Davis on September 30, 2004. Mr. Cockerham was on the Contract Review Board that recommended award of the camp

package BPA to Gulf Group, but defendant has not demonstrated that Mr. Cockerham was bribed by plaintiff or that Mr. Cockerham significantly, or improperly, influenced or caused the award of the BPA to plaintiff. For example, there is no evidence in the record from others on the Contract Review Board that Mr. Cockerham was particularly insistent that the camp package BPA be awarded to plaintiff. The latrine contract was awarded by Maj. Davis on September 28, 2004, and Mr. Cockerham was the contract specialist assigned to the contract. The dumpster contract was awarded by Maj. Davis on September 20, 2004. Mr. Cockerham served as the contract specialist for the latrine and dumpster contracts. With respect to the dumpster contract, oddly, Mr. Cockerham signed the Contract Review Board Memorandum, even though he was not a member of the Contract Review Board that recommended the award of the dumpster contract. Defendant, however, has not demonstrated that Mr. Cockerham used his influence to unfairly cause awards or other favorable action on the latrine or dumpster contracts to Gulf Group. Finally, for the bottled water BPA, the award was made by Maj. Davis on September 28, 2004, with Mr. Cockerham as the contract specialist. Like the dumpster contract, Mr. Cockerham signed a Contract Review Board Memorandum, but indicated that his duty position was that of a "Contracting Officer" even though he was not a member of the Contract Review Board for the bottled water BPA. Mr. Cockerham, however, did terminate the latrine and dumpster contracts, shortly after the awards were made, actions obviously unfavorable to plaintiff.

Although there may have been numerous irregularities in how the Army proceeded to award and manage the BPA calls and contracts at Camp Arifjan, including incidents of bribery involving Mr. Cockerham with other contractors, defendant has not demonstrated that plaintiff or members of the Al Tawash family were involved in any acts of bribery. Ms. Blake was employed by Gulf Telecom at a time when Gulf Group was awarded contracts and while Mr. Cockerham was working in the contracting office. There is no evidence, however, that, but for the hiring of Ms. Blake, Gulf Group, a contractor which had been awarded and held other United States contracts in support of the activities in the Iraq war theatre, independently would not have won the contracts. Significantly, Mr. Cockerham was the Army official who terminated the latrine and dumpster contracts, and, as reflected in the October 20, 2004 Memorandum for Record, purportedly recommended terminating the camp package BPA call for Camp Buehring. The government has offered no explanation as to why Mr. Cockerham would terminate the latrine and dumpster contracts and recommend terminating the camp package BPA call for Camp Buehring, if he were involved in a scheme to award contracts to plaintiff and assist Gulf Group to gain advantages in the contracting process. In fact, the record suggests Mr. Cockerham did not take very good care of his friend, Saud Al Tawash, or of Gulf Group.

Although the defendant has not demonstrated an intent to defraud the government under the Special Plea in Fraud statute, an additional question remains as to whether Ms. Blake's employment created a conflict of interest which allows for rescission or disgorgement. The court finds that the evidence in the record is insufficient to conclude that Ms. Blake's employment relationship with Gulf Telecom and her relationship to Mr. Cockerham tainted the award of the BPAs and contracts at issue.

116

The court recognizes that Mr. Cockerham violated statutes and regulations with respect to contractors other than plaintiff, for which he is currently serving a federal prison sentence, but defendant has not presented the court with evidence indicating that Mr. Cockerham's potential violations had an impact on the award of the contracts or BPAs to plaintiff which are at issue in the above-captioned cases, or that Gulf Telecom's employment of Ms. Blake created a conflict of interest. Although Mr. Cockerham should not necessarily be considered the most reliable of witnesses, he continued to insist throughout the proceedings before this court that he did not receive any payments from or give special favors to Saud Al Tawash or Gulf Group. Mr. Cockerham repeatedly insisted that Saud Al Tawash was a friend.

That Gulf Telecom was identified as a wholly owned subsidiary of Gulf Group that employed Ms. Blake while Mr. Cockerham was involved in discussions preceding the award of Gulf Group's contracts and was involved in contract management, certainly might be considered less than wise under American standards. The court notes, however, that 18 U.S.C § 208 does not appear to apply to conflicts of interest arising out of the employment of a government employee's sibling. In addition, other potentially applicable regulations, such as 5 C.F.R. § 2635.502, which prohibits a government employee from participating in a matter that "is likely to have a direct and predictable effect on the financial interest of a member of his household, or knows that a person with whom he has a covered relationship is or represents a party to such matter," do not clearly apply to the employment Ms. Blake, Mr. Cockerham's sister, entered into with Gulf Telecom. See Letter to a Designated Agency Ethics Official, OGE Informal Advisory Letter 85 X 14, 1985 WL 57313, at *3 (Sept. 23, 1985) (indicating that "no criminal conflict of interest statutes" applied to a government employee's work on a matter that may have affected the financial interest of his sibling, but recommending that the employee "might wish to recuse himself...because of the degree of appearance of potential partiality"). Defendant has not demonstrated that Mr. Cockerham was placed in a position that ordinarily would lead a court to assume that his judgment was impaired in his official capacity with respect to Gulf Group, when compared to the authorities on which defendant relies. See, e.g., United States v. Miss. Valley Generating Co., 364 U.S. at 556 (concluding that a government advisor's position as an officer who shared in a company's profits "at the very least" created an indirect financial interest in a government contract when there was a substantial likelihood that a financing agreement related to the contract would be awarded to the company); K & R Eng'g Co. v. United States, 222 Ct. Cl. at 344, 616 F.2d at 470 (concluding that a government employee's administration of contracts in which he received a percentage of the profits realized created a conflict of interest).

The record before the court does not indicate that Gulf Group's contracts were tainted by an impermissible conflict of interest. Gulf Group appears to have been an "innocent contractor" that entered legitimately into a government contract, despite Mr. Cockerham's improper and illegal conduct in other regards. See Godley v. United States, 5 F.3d at 1475 ("Illegal acts by a Government contracting agent do not alone taint a contract and invoke the void *ab initio* rule. Rather, the record must show some causal link between the illegality and the contract provisions."). Although the decisions

leading to Ms. Blake's employment by Saud Al Tawash and Gulf Telecom may have been naïve by American standards, the record before the court does not establish that plaintiff received special treatment from Mr. Cockerham or that Saud Al Tawash's relationship with Ms. Blake was such that the court can conclude that any impropriety took place, or that Saud Al Tawash or Gulf Group engaged in actions which evidence an intent to bribe or defraud the United States.

A.      The Camp Package BPA Claims Under the Special Plea in Fraud Statute

In its third amended answer to plaintiff's complaint, defendant alleges that plaintiff's claims must be forfeited under the Special Plea in Fraud statute and that the calls issued under plaintiff's camp package BPA and, as addressed below, bottled water BPA, must be rescinded due to bribery, conflict of interest, and fraud. Defendant asserts that Gulf Group artificially inflated its camp package BPA claim, and that, without a plausible basis for the amount sought, the claim was fraudulent. Defendant did not directly raise claims of rescission and disgorgement for the dumpster or latrine contracts. Defendant contends with respect to the camp package BPA that plaintiff sought payment for expenses it had not incurred. According to defendant, Gulf Group represented in its 2005 claim that it had spent 345,717.000 KD, when it had spent only 19,323.000 KD. Additionally, defendant insists that the camp package BPA claims were fraudulent because, at trial, Saud Al Tawash and Mr. Peters disagreed as to the amount of the 2005 claim, and neither admitted devising the settlement offer amount. Finally, defendant states, "Gulf Group fraudulently viewed the pre-2011 version of the camp set claim [sic] an opening gambit in the negotiation of a settlement amount, rather than the amount to which it was entitled." (citing Daewoo Eng'g and Constr. Co. v. United States, 73 Fed. Cl. at 596). Defendant, therefore, claims that plaintiff must disgorge the amounts the government paid to plaintiff under the camp package BPA, and, as discussed below, the bottled water BPA.

Defendant argues that Ms. Blake was hired in exchange for Mr. Cockerham taking favorable contracting actions toward plaintiff, which defendant asserts demonstrates both a conflict of interest and bribery. According to defendant, Ms. Blake was hired and began receiving payments shortly before plaintiff was awarded the BPA calls and other contracts, and Ms. Blake never did any work for the payments she received. The statutes to which defendant points in its counterclaims, violations of which defendant claims demonstrate fraud, are 18 U.S.C. § 201(b)(1) and 18 U.S.C. § 208(a), both of which are criminal statutes. As noted above, although both Mr. Cockerham and Ms. Blake have been criminally convicted of conspiracy, bribery, and money laundering, their convictions were based on transactions involving contractors other than plaintiff Gulf Group or members of the Al Tawash family. Defendant argues that "[p]rotection of the integrity of the Federal procurement process from the fraudulent activities of unscrupulous Government contractors and dishonest Government agents requires a refund to the Government of sums already paid to such a contractor pursuant to the contract. A contractor must disgorge the amounts received under a contract tainted by conflict-of-interest." (citing K & R Eng'g Co. v. United States, 222 Ct. Cl. at 354, 616 F.2d at 476). Defendant also claims that payments to Ms. Blake constituted a

violation of 18 U.S.C. § 201(b)(1), and that these payments also created a common law conflict of interest. Plaintiff responds that the government has not cited to any legal basis for its rescission and disgorgement claims, and that the federal Conflict of Interest statute, 18 U.S.C. § 208(a), is not applicable.

The court finds it difficult to understand how plaintiff's two attorneys, Attorney Peters and Attorney Hands, could have thought Gulf Group was entitled to the master BPA limit of the camp package BPA or the limit of camp package BPA call 0001 when call 0001 was worth only $1,447,457.22, despite testimony from Attorney Peters that he believed the claim was correct at the time it was submitted. Although the attorneys were legally incorrect and reckless in preparing the claims, and Saud Al Tawash failed to properly review the claims, which resulted in a violation of the False Claims Act, the court concludes that plaintiff and Saud Al Tawash do not appear to have had the specific intent necessary to prove fraud under the Special Plea in Fraud statute. See Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. at 584 (noting that, under the Special Plea in Fraud statute, 18 U.S.C. § 2514, "[m]ere negligence is not sufficient"); see also Miller v. United States, 213 Ct. Cl. at 69, 550 F.2d at 22 ("[F]raud, resulting in forfeiture, can be found only on the basis of clear and convincing evidence. An intent to deceive the Government must be proved.") (citations omitted). Saud Al Tawash should not have blindly trusted his advisors before signing the documents, but the record before the court does not demonstrate that there were intentional, corrupt, or fraudulent practices engaged in by plaintiff or Saud Al Tawash during the course of the award or performance under the camp package BPA.

In addition, as discussed above, defendant has not convinced the court that there is sufficient evidence in the record of a conflict of interest or bribery linked to the award or management of the camp package BPA or of an intent to defraud, warranting rescission or disgorgement. The record contains no evidence that Gulf Group had the intent to deceive the government in obtaining its camp package BPA or camp package BPA calls. Defendant offered, as part of its evidence, that plaintiff failed to inform the Army of Gulf Telecom's hiring of Ms. Blake. As noted above, however, defendant has cited no regulation or law which would have required plaintiff to inform the Army of Ms. Blake's employment by Gulf Telecom and the record does not establish that the relationship between Saud Al Tawash and Ms. Blake was such that the court must assume an impropriety had taken place. Moreover, Mr. Cockerham's other illegal activities have not been linked to a taint in Gulf Group's contracts. Defendant, therefore, has failed to demonstrate entitlement to forfeiture under the Special Plea in Fraud or rescission and disgorgement under common law fraud with regard to the camp package BPA.

B.      The Latrine and Dumpster Claims Under the Special Plea in Fraud Statute

With respect to the Special Plea in Fraud statute, defendant makes identical arguments with regard to forfeiture of plaintiff's claims under both the latrine and dumpster contracts. In its filing, plaintiff also combines its responses to the latrine and dumpster contract counterclaims. The court, therefore, addresses the Special Plea in

Fraud issues raised by these two contracts together.[125] Defendant provides the same arguments as it does with regard to the camp package BPA, including that plaintiff violated the Special Plea in Fraud statute by bribing Mr. Cockerham under 18 U.S.C. § 201(b)(1), which also created a conflict of interest, and by submitting claims for amounts to which it knew it was not entitled. According to defendant, Saud Al Tawash and Mr. Cockerham entered into an arrangement whereby Ms. Blake would be employed and Mr. Cockerham would award contracts to Gulf Group. Defendant alleges by way of example for the dumpster contract:

> Mr. Cockerham's sister began receiving monthly payments from Gulf Group's operations manager, at the behest of Gulf Group's general manager, both of whom were directors of Gulf Group. Mr. Cockerham was aware of those payments, and understood them to be from Gulf Group. In September 2004, Mr. Cockerham signed a memorandum for record stating that Gulf Group "is recommended for award of [a dumpster] contract." The Army awarded the dumpster contract, Contract No. W912D1-04-P-0897, to Gulf Group in September 2004. The dumpster contract was not terminated until October 22, 2004. Both Gulf Group and Mr. Cockerham understood the nature of the arrangement.

As described above, defendant alleges that neither Mr. Cockerham nor Saud Al Tawash told the Army about Ms. Blake's employment, that Saud Al Tawash questioned Ms. Blake about her meeting with the federal investigators, and that Mr. Cockerham wrote a note indicating that Saud Al Tawash should not "confess to anything." Defendant further alleges that plaintiff submitted inflated claims to the government that were unsupported and fraudulent. Finally, defendant contends that the inflated amounts claimed were merely a negotiating ploy, as indicated by Mr. Peters' testimony, and that plaintiff submitted the claims to Mr. Cockerham with reason to believe he would act favorably on them.

Plaintiff responds using many of the same arguments that it asserted with regard to the False Claims Act, including that it had a legal basis for claiming lost profits on unexercised option years and that the Army indicated to plaintiff there was a reasonable likelihood the options would be exercised. Plaintiff further argues that the expense tables submitted were not part of the latrine and dumpster claims, but "were included simply to demonstrate that Gulf Group was prepared to perform under the contract if it had been given a fair opportunity to do so." Plaintiff also denies that the claim amounts sought were a negotiating ploy. As to defendant's bribery and conflict of interest allegations, plaintiff contends that Mr. Cockerham had no authority to make the award of the contracts, and that Saud Al Tawash asked Ms. Blake about her meeting with the federal investigators as "a conscientious individual who takes very seriously any federal investigation involving someone with whom he had been involved." Plaintiff further urges that Mr. Cockerham's hand-written notes do not prove that Gulf Group or Saud Al Tawash were involved in bribing Mr. Cockerham. Finally, plaintiff points out that,

---

[125] As noted above, defendant did not directly raise claims of rescission and disgorgement for the latrine contract and dumpster contract.

120

considering all the contractors Ms. Blake and Mr. Cockerham listed and admitted had bribed them, neither Ms. Blake nor Mr. Cockerham ever implicated plaintiff or any members of the Al Tawash family.

The government must prove by clear and convincing evidence that plaintiff intended to defraud the government for the court to conclude that forfeiture is warranted under the Special Plea in Fraud statute. See Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1341. As discussed above in the discussion of the False Claims and Contract Disputes Acts, the evidence offered as to Jireh Springs and Green Valley does not conclusively implicate Gulf Group, Saud Al Tawash, or any other member of the Al Tawash family. Regarding defendant's allegations of fraudulent false claims with respect to the latrine and dumpster contracts, despite the fact that much of plaintiff's reasoning with regard to the availability of lost profits was erroneous for option years and unissued calls, the court finds Saud Al Tawash to have been a sincere and credible witness. Saud Al Tawash testified that Maj. Davis told him that Camp Arifjan would be permanent, and that if Gulf Group performed well it would have the dumpster and latrine contracts for the full term, including all option periods. Saud Al Tawash also explained that he expected to perform the option periods of the latrine contract, for example because the price of the base period alone would not cover the capital expenditures necessary to perform the latrine contract.[126] Saud Al Tawash's testimony is, in part, corroborated by an Army memorandum of August 20, 2004, signed by Maj. Davis, which states that the Army anticipated needing the option periods of the dumpster contract and that there was a likelihood that the options would be exercised. The determination of the memorandum concluded: "Based on the above information, in accordance with FAR 17.202, I hereby determine that the Dumpster Service Contract does require the use of options."[127] Moreover, following the terminations of the latrine and dumpster contracts, the necessary services were carried on by other contractors, including Green Valley and Jasmine, respectively, indicating that defendant was still in need of, and had the ability to pay for, the latrine and dumpster services. Additionally, both Attorney Peters and Mr. Carlson, plaintiff's expert, stated that they believed the option periods were recoverable.

Defendant's arguments implicating the Special Plea in Fraud violations regarding the latrine and dumpster claims are substantially the same as the arguments it made on the same issue with regard to the camp package BPA claim. With respect to all three claims, the camp package BPA, the latrine contract, and the dumpster contract, the court finds that defendant has failed to prove with clear and convincing evidence that plaintiff presented a false claim with the intent to defraud the government, or that the dumpster or latrine contracts, as a whole, were tainted by bribery or a conflict of interest. Moreover, the fact is that Mr. Cockerham terminated both the latrine and

---

[126] Plaintiff's lost profits calculation indicates that plaintiff's costs would have exceeded its profits for the base period of the dumpster contract, rather than the latrine contract.

[127] FAR 17.202 indicates when a contracting officer "may include options" in a contract, but does not indicate that the government must exercise an option. See 48 C.F.R. § 17.202 (2005).

dumpster contracts shortly after they were awarded to plaintiff. If the award of contracts was the result of bribery, conflict of interest, and fraud involving Mr. Cockerham, it gives the court pause that Mr. Cockerham also was the official who terminated the same contracts. Because defendant has failed to prove an intent to defraud the government with respect to its latrine and dumpster claims, forfeiture of plaintiff's claims is inappropriate.

C.    The Bottled Water BPA Demurrage Claim Under the Special Plea in Fraud Statute

With respect to the bottled water BPA, defendant asserts that plaintiff's claims should be forfeited under the Special Plea in Fraud statute as a result of plaintiff's bribery of Mr. Cockerham in violation of 18 U.S.C. § 201(b)(1), which also created a conflict of interest, and because plaintiff submitted the 2005 Claim and Settlement Offer for amounts to which it knew it was not entitled. Defendant also alleges that calls issued under plaintiff's bottled water BPA must be rescinded due to bribery, conflict of interest, and fraud. In its post-trial brief, defendant claims that plaintiff's 2005 bottled water BPA demurrage claim indicates it was seeking excess payment for charges made by Expeditors, Gulf Group's trucking company, because the claim provided that Gulf Group was "submitting this claim with the following documents for reimbursement of our demurrage payments." (emphasis added). Yet, defendant contends that Expeditors did not charge the 85.000 KD/day as requested in the claim; rather, Expeditors charged 50.000 to 60.000 KD/day. Defendant asserts that by claiming more than Expeditors charged, plaintiff intended to deceive the government. Additionally, defendant argues that plaintiff fraudulently assigned all of the delays encountered to the government.

Defendant provided the same rationale regarding the bottled water BPA as it did for the camp package BPA regarding its request for rescission and disgorgement. By way of example, defendant claims that Ms. Blake was paid, but never worked, that the payments were made to her in exchange for the award of contracts to plaintiff by Mr. Cockerham, and that Saud Al Tawash asked Ms. Blake about her conversation with federal investigators. Defendant also relies on Mr. Cockerham's note in the record, albeit apparently undelivered, referring to "Saud" and instructing Ms. Blake to get rid of everything. Defendant believes that the note contained falsehoods (i.e., that Ms. Blake got her job on her own and Ms. Blake did paperwork for Saud Al Tawash). Defendant claims the following with respect to the note:

the instructions contain falsehoods that demonstrate that Mr. Cockerham and Saud Al Tawash were engaged in bribery. The instructions state that Ms. Blake 'got the job on her own' even though she obtained her situation with Saud Al Tawash only after Mr. Cockerham introduced her to Mr. Al Tawash as his sister and mentioned to him that she was looking for work in Kuwait. The instructions also state that Ms. Blake did "admin paperwork" for Saud Al Tawash, even though Ms. Blake never worked for anyone in Kuwait.

122

(internal citations omitted). Finally, defendant notes that neither Mr. Cockerham nor Saud Al Tawash told the Army about Ms. Blake's job with Gulf Telecom, but defendant has not identified a statute or regulation requiring Mr. Cockerham to do so. Defendant asserts that the calls issued under plaintiff's bottled water BPA must be rescinded due to bribery, conflict of interest, and fraud. Defendant also claims that plaintiff must disgorge the amounts the government paid to plaintiff under the bottled water BPA claims.

Plaintiff argues that Mr. Cockerham and Saud Al Tawash testified that Mr. Cockerham did not help Saud Al Tawash obtain the bottled water BPA and that Saud Al Tawash did not offer him anything in exchange for or to prompt the award of the bottled water BPA. According to plaintiff, Gulf Telecom had a legitimate need for Ms. Blake's services and had been seeking an American employee before discovering that Ms. Blake was inquiring about work in Kuwait. Plaintiff argues that Ms. Blake sought a job in Kuwait independent of her brother's influence, that she was unable to work in the end due to issues beyond her control, that Gulf Telecom was required to pay her regardless of her failure to provide actual services pursuant to Kuwaiti law, and that her salary and benefits were commensurate with other local companies. Plaintiff also notes that the amount of Gulf Group's bottled water BPA claim has remained consistent since the 2005 claim. Plaintiff points to a chart in the record evidencing the expenses included in the bottled water claim. Furthermore, Saud Al Tawash testified that the 85.000 KD/day amount included expenses in addition to those charged by Expeditors.

The court does not find clear and convincing evidence of fraudulent claims or bribery under the bottled water BPA and, therefore, defendant has failed to prove its Special Plea in Fraud counterclaim or that the calls issued under the bottled water BPA should be rescinded. The government has not proven that plaintiff knowingly submitted the bottled water BPA claim with the intent to defraud the government or that plaintiff's bottled water BPA was tainted by bribery. Unlike the camp package BPA, latrine, and dumpster claims, defendant did not prove a violation of the False Claims Act with respect to the bottled water BPA claim, which has a lower threshold of proof and intent than the Special Plea in Fraud statute. The amount plaintiff seeks in connection with the bottled water BPA claim has remained consistent from when the claim was first submitted. Gulf Group initially attempted to document the expenses incurred, although, in addition to the information plaintiff included with its bottled water BPA claim, plaintiff also should have included information which demonstrated expenses charged other than by Expeditors. The failure to include such information, which was produced later, does not evidence fraud. At most, the failure to attach the documentation for expenses other than for Expeditors demonstrates negligence and ineptitude, which do not implicate forfeiture under the Special Plea in Fraud statute. See Miller v. United States, 213 Ct. Cl. at 69, 550 F.2d at 22; Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. at 584. Despite defendant's argument that plaintiff's claim implies that it is seeking only reimbursement for charges made by Expeditors, nowhere in the claim does plaintiff actually make such a statement. Rather, the bottled water BPA demurrage claim states that it is for "demurrage charges for delays," and that Gulf Group "incurred delay (demurrage) and damages." The language of the 2005 bottled water BPA demurrage

claim can be read to encompass all damages arising from delays, including charges asserted by entities other than Expeditors. The bottled water BPA claim states, "in furtherance of the contract we shipped the bottled water to Iraq. But we have incurred delay (demurrage) and damages for delivering bottled water to Iraq. Even though we have had [sic] taken all the necessary requirements to perform its obligations both anticipated and ultimate as per the scope of work and were doing the services." The bottled water BPA claim continues: "Gulf Group followed Arcent requirements for shipment which resulted in delays (by the US military) that resulted in extra costs to Gulf Enterprises, and such delays resulted in the demurrage charges as provided in a summary table and detailed line item listing at Appendix 3." Although the only expense documents originally included in the claim were from Expeditors and Gulf Group, the court does not conclude from its statement that the claim was for "demurrage damages for delay" that plaintiff only sought reimbursement for charges made by Expeditors.

Also, as discussed above, defendant has not demonstrated a conflict of interest involving Mr. Cockerham, with regard to Gulf Group or any member of the Al Tawash family or that the relationship between Saud Al Tawash and Ms. Blake was such that the court must assume that there was an impropriety which took place related to the contract at issue. Defendant also has not proven that the hiring of, and payments to, Ms. Blake were linked to contract awards to plaintiff or favorable contracting actions by Mr. Cockerham. Based on the record before the court, the defendant has not met its burden to prove a violation of the Special Plea in Fraud provisions regarding the bottled water BPA by clear and convincing evidence, by showing that plaintiff knowingly presented a false claim with the intent to defraud the government, or that the bottled water BPA was tainted by bribery. Defendant also has not demonstrated the existence of a conflict of interest or proven its counterclaim for common law fraud, including rescission and disgorgement.

In sum, the defendant has failed to prove that forfeiture is warranted under the Special Plea in Fraud statute or that the commission of common law fraud related to any of the four above-captioned cases warrants rescission and disgorgement. A finding of False Claims Act liability without a finding of Special Plea in Fraud is not logically inconsistent.[128] As a Judge of the Court of Federal Claims has noted, "the

---

[128] The court in Liquidating Trustee Ester DuVal of KI Liquidation, Inc. v. United States, noted that:

> The evidence that would negate the level of intent under the FCA, as opposed to the forfeiture statute, involves different findings of fact. The application of these facts should not be conflated, as the legal requirements of the statutes differ significantly: first, § 2514 requires an elevated burden of proof, i.e., clear and convincing evidence, Daewoo Eng'g, 557 F.3d at 1341, not a preponderance of the evidence standard as required by the FCA, see id. at 1340; second, § 2514 requires proof of the intent to deceive, whereas the FCA requires knowledge, a general-intent standard, and explicitly stipulates that proof of specific intent is not required.

consequences of each—forfeiture of plaintiff's entire claim versus comparatively minimal penalties under the FCA—exemplify the perceived gravitas of the fraud under each statute." Liquidating Trustee Ester DuVal of KI Liquidation, Inc. v. United States, 89 Fed. Cl. at 41-42. Although plaintiff was found to have violated the False Claims Act for the camp package BPA claims, latrine claims, and dumpster claims, defendant has failed to demonstrate liability under the Contract Disputes Act or that forfeiture is warranted under the Special Plea in Fraud statute in all four cases, and has failed to prove the common law fraud counterclaim for rescission and disgorgement for the camp package and bottled water BPAs. The court, therefore, turns to plaintiff's claims.

## III.  Contract Terminations and Abuse of Discretion

Plaintiff's camp package BPA call, latrine contract, and dumpster contract each were terminated by the government for convenience in October 2004.[129] Plaintiff claims that the government decisions to terminate its camp package BPA call and latrine and dumpster contracts were abuses of discretion.[130] Plaintiff asserts that the terminations for convenience by the government were not properly based on convenience[131]

---

Liquidating Trustee Ester DuVal of KI Liquidation, Inc. v. United States, 89 Fed. Cl. 29, 41-42 (2009)

[129] None of the calls issued under Gulf Group's bottled water BPA were cancelled in October 2004.  Gulf Group continued to supply bottled water to the Army in 2005.

[130] As noted above, plaintiff had alleged bad faith on the part of the government in the terminations of the camp package BPA call and the dumpster and latrine contracts. Plaintiff subsequently dropped all allegations concerning bad faith in each case, and confirmed at closing arguments, "there is no bad faith claim in any one of these four cases, 06-835, 06-858, 06-853, and 07-082."

[131] The standard termination for convenience clause, 38 C.F.R. § 52.212-4 (2003), was incorporated by reference into plaintiff's contracts.  The clause states:

> Termination for the Government's convenience.  The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be

125

because the government continued to require the camp package, latrine, and dumpster services, and contracted with other contractors to provide the same services after terminating plaintiff. According to plaintiff, the terminations could not have been properly based on default because plaintiff had not committed any error justifying default terminations under the camp package BPA or the latrine and dumpster contracts.

Defendant argues that the camp package BPA call for Camp Buehring was terminated for convenience in order to award a call for a larger camp, Camp Virginia, to Gulf Group because the Army had determined that Gulf Group was better suited to the larger camp. Although plaintiff's 2005 Claim and Settlement Offer references the planned award of a call for Camp Virginia and there is evidence in the record that informal discussions about offering a call for Camp Virginia to plaintiff had occurred, the Camp Virginia call never was awarded to plaintiff. As for the latrine and dumpster contracts, defendant argues the contracts were terminated for convenience in response to security concerns arising from the alleged security incident involving Mohammed Al Tawash when he sought to map the dumpster locations in order to initiate contract performance. Defendant concedes that the security concerns later were determined to be unfounded, but maintains that the concerns were legitimate at the time of the terminations.

The camp package BPA call for Camp Buehring was awarded on September 30, 2004 by Maj. Davis, but was terminated twelve days later on October 12, 2004, when Maj. Davis issued Modification 103 on behalf of the Army. The Modification stated: "The purpose of this modification is to cancel the BPA Call with Gulf Group. Gulf Group has no issues with this cancellation and will accept it at no cost to the government." Despite terminating the camp package BPA call, the government had sufficient funds to pay for, continued to be in need of, and contracted for the camp package services. The contracting officer's May 21, 2007 final decision on the camp package BPA claim, signed by Joseph Libbey,[132] stated:

> paid for any work performed or costs incurred which reasonably could have been avoided.

38 C.F.R. § 52.212-4.

[132] Mr. Libbey was not an ideal witness for the government. He often was defensive and struggled to explain his final decisions, which were confusing and unsupported. At one point during trial, he stated:

> I am not buying that there is a conspiracy to wrongfully have terminated Gulf Group. Makes no sense to me. You've certainly pointed out some factual errors in the letter, you're a full time professional attorney, you know, you've done that, you certainly have made me look a fool on some things today. But nonetheless, no, under the context these letters were written under, you know, I stand by them. There are some factual errors that the Judge will have to take in. This idea about a conspiracy in terms

126

Gulf Group erroneously treats the BPA W912D1-04-A-0047 as a contract. They demand the maximum ordering limit for a BPA call as termination costs. They also fail to reduce the maximum call order amount demanded by any of the orders placed against the BPA and for which they received payment. Gulf Group alleges the contract/BPA was terminated, yet only one call was in fact terminated, not the entire BPA as alleged.

The latrine contract was awarded on September 28, 2004 by Maj. Davis, but was terminated pursuant to 48 C.F.R. § 52.212-4 twenty days later on October 18, 2004, when Mr. Cockerham issued Modification P00002 on behalf of the Army. Modification P00002 stated: "This contract is being canceled due to command directive of the ASG commander SWA COL Brick Miller 3rd Army Arcent Kuwait. The contract is canceled under the terms of 52.212-1, 52-212-4 [sic], 52.249-4." The parties stipulated that: "The Government did not terminate Gulf Group for default under Contract W912D1-04-P-0932," and, "[a]t the time Contract W912D1-04-P-0932 was terminated, the Government had not issued any Cure Notices to Gulf Group regarding Gulf Group's performance of its contractual obligations under that contract, and none was ever issued at any time thereafter." Despite terminating Gulf Group's latrine contract, the government had sufficient funds to pay for, continued to be in need of, and continued to contract for the latrine services.

Sixteen days after the October 18, 2004 termination of the latrine contract, Col. Hess, the head of contracting at Camp Arifjan, sent a letter to Mohammed Al Tawash. The November 3, 2004 letter stated:

Recently, a contracting officer in my office terminated a service contract [the latrine contract] held by Gulf Group General Enterprises, a company operated by the Al-Tawash family. There has been some concern expressed that the incident unfairly tarnished the good name of the Al-Tawash family, which is a highly respected, prominent Kuwaiti family.

Please rest assured that the Gulf Group's contract to service portable latrines at Army camps in Kuwait was not terminated because of security reasons. While it is true that some employees of the Gulf Group have been either barred from the installation or warned because they had not followed the rules for contract employees on the installation, these incidents did not cause the termination of the contract.

The contracting officer terminated the contract because circumstances arose that caused the contracting officer to conclude that it was in the best interest of the Army to terminate the contract. Since the contract was terminated for convenience of the government, the Gulf Group should not

---

of the wrongful termination and all that, I'm going to have leave that in the Judge's hands. All I can offer is I don't believe it.

127

suffer any repercussions to its reputation or competitive standing. The Gulf Group is fully eligible to compete for other Army contracts in Kuwait. I hope this clarifies this unfortunate misunderstanding.

On May 21, 2007, Joseph Libbey issued his contracting officer's final decision on the latrine contract claim, which stated that "the performance failures and security factors prompting the termination to show the decision that termination was in the best interests of the Government was a valid decision and not an abuse of discretion and not done in bad faith." The same decision noted, however, "[o]n 3 November 2004, LTC Hess sent a letter to Mohammed Abdulaziz Al Tawash responding to the apparent Gulf Group inquiry as to whether or not the security violations had prompted the termination [of the latrine contract]. LTC Hess stated the latrine contract services were not terminated because of security concerns." At trial, Col. Hess testified that he directly ordered Mr. Cockerham to terminate Gulf Group's latrine and dumpster contracts, and ordered Maj. Davis to terminate Gulf Group's camp package BPA call, likely at the behest of Col. Miller, because "[w]e were ordered to get Gulf Group off the bases, the camps." At trial, Col. Miller testified that the terminations were not related to the alleged security incident. Col. Miller also testified that, due to a separation in command, he could not give Col. Hess orders relating to contracting and that, due to the nature of his position, had he ordered a contracting officer to terminate a contract, he would have been issuing an "illegal command."

The dumpster contract, which was awarded on September 20, 2004 by Maj. Davis, was terminated thirty-two days later on October 22, 2004, when Mr. Cockerham executed Modification P00005 on behalf of the Army, terminating the dumpster contract for the convenience of the government. Despite what Col. Miller testified, Modification 0005 stated: "Contract is cancelled by order of the ASG Commander Kuwait COL Brick Miller. Contract was canceled in accordance with FAR Part 52.212-4 Termination for Convenience of the Government."

The parties stipulated that: "The Government did not terminate Gulf Group for default under Contract W912D1-04-P-0897," the dumpster contract, and "[a]t the time Contract W912D1-04-P-0897 was terminated, the Government had not issued any Cure Notices to Gulf Group regarding Gulf Group's performance of its contractual obligations under that contract, and none was ever issued at any time thereafter." Despite the termination of Gulf Group's dumpster contract, the government had sufficient funds to pay for, continued to be in need of, and contracted for the dumpster services. In fact, after terminating plaintiff's latrine contract and dumpster contract, the government continued to place orders for dumpsters from Gulf Group for other locations.

Joseph Libbey's May 21, 2007 contracting officer's decision on the dumpster contract claim stated:

On 7 October 2004, four Gulf Group employees were being escorted when one began asking suspicious questions about base personnel housing and base security arrangements. The four were detained and

128

released to the Kuwait Ministry of Interior. On 21 October 2004, the individual asking about base security was barred from Camp Arifjan by Col. Brick T. Miller, ASG Commander.[133] The remaining individuals were issued letters of warning regarding compliance with base security.

Mr. Libbey's contracting officer's decision on the dumpster claim continued:

On 18 October 2004, another Gulf Group employee was barred from Camp Arifjan by Colonel Miller for traveling on base without his required escort. Colonel Miller wrote to Mr. [Saud] Al Tawash of Gulf Group on 21 October 2004 expressing deep concern over Gulf Group and its employees not following and enforcing security regulations. Colonel Miller warned Mr. [Saud Al] Tawash that further violations might result in Mr. Tawash and Gulf Group being barred from all ASG Kuwait installations.

Mr. Libbey's contracting officer's decision on the dumpster contract claim further stated: "On 9 October 2004, six Gulf Group employees were detained for security violations involving traveling on Camp Arifjan without their required escort, and rummaging through a dumpster. At least four of these individuals were barred from Camp Arifjan by Colonel Miller on 16 and 18 October 2004."[134]

The contracting officer's decision on the dumpster contract claim also stated:

The Government originally contemplated terminating Gulf Group's contract for failure to comply with security regulations; however, due to the global war on terror operational tempo in this area, and a desire to maintain a friendly working relationship with local contractors that often include prominent Kuwaiti families, the Government decided to terminate the contract for the convenience of the Government. The Government is not attempting to change the basis for contract termination; but simply notes that because of repeated security violations it was in the best interest of the Government and not an abuse of discretion or bad faith to terminate the [dumpster] contract for convenience.

An unsigned letter, purportedly written by Col. Miller on October 29, 2004 to Mohammed Al Tawash, appears to contradict Mr. Libbey's retrospective explanation:

Dear Mr. Al-Tawash:

Recently I directed that a contract between the United States Army and Gulf Group General Enterprises be terminated for the convenience of the United States Government. Based upon the terms of the contract and

---

[133] This statement in not accurate, as the individuals were not barred from Camp Arifjan.

[134] As noted above, Mr. Libbey, the contracting officer, incorrectly identified Gulf Company employees as Gulf Group employees.

lack of sufficient equipment and personnel for Gulf Group to perform the services, I directed the termination of the contract. My concern for the health of my Soldiers caused me to conclude that it was in the best interest of the Army to terminate the contract. Because I terminated the contract for the convenience of the Army, there are no repercussions upon the Gulf Group for failing to perform under the contract. Gulf Group is not barred from competing for other Army contracts and is fully eligible to compete for other Army contracts in Kuwait. I apologize for any misunderstanding and the Army looks forward to Gulf Group competing for future contracts.

Respectfully,

Brick T. Miller
Colonel, U.S. Army
Commanding

It is unclear, however, as to which contract Col. Miller's letter refers. The reference to lack of sufficient equipment and concern for the health of his soldiers could refer to any of the contracts. Moreover, the letter in the record is unsigned. Upon being shown the letter quoted immediately above at trial, Col. Hess, the head of contracting at Camp Arifjan, stated, "I don't recall seeing this letter before."

As noted by the United States Court of Appeals for the Federal Circuit, agency personnel are presumed to act in good faith, and a claimant must present significant proof of bad faith to overcome that presumption. See T & M Distribs., Inc. v. United States, 185 F.3d 1279, 1285 (Fed. Cir. 1999); see also Sickels v. Shinseki, 643 F.3d 1362, 1366 (Fed. Cir.) (""The presumption of regularity provides that, in the absence of clear evidence to the contrary, the court will presume that public officers have properly discharged their official duties."" (internal quotation marks omitted) (quoting Rizzo v. Shinseki, 580 F.3d 1288, 1292 (Fed. Cir. 2009) (quoting Miley v. Principi, 366 F.3d 1343, 1347 (Fed. Cir. 2004)))), reh'g and reh'g en banc denied (Fed. Cir. 2011). In addition, because of the broad discretion vested in the contracting officer, plaintiff has a high burden of proof to show that a determination was an abuse of discretion. See Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d 1578, 1581 (Fed. Cir. 1995); Salsbury Indus. v. United States, 905 F.2d 1518, 1521 (Fed. Cir.), reh'g denied (Fed. Cir.), and suggestion for reh'g in banc denied (Fed. Cir. 1990), cert. denied, 498 U.S. 1024 (1991); Cont'l Bus. Enters., Inc. v. United States, 196 Ct. Cl. 627, 637, 452 F.2d 1016, 1021 (1971).

A Judge of the United States Court of Federal Claims summarized the standard as follows:

The United States Court of Appeals for the Federal Circuit has held that a termination for convenience will be upheld unless the contractor can establish bad faith or clear abuse of discretion. See T & M Distribs., Inc. v.

<u>United States</u>, 185 F.3d 1279, 1283 (Fed. Cir. 1999) ("In the absence of bad faith or clear abuse of discretion, the contracting officer's election to terminate for the government's convenience is conclusive."); <u>see</u> <u>also</u> <u>Krygoski Constr. Co., Inc. v. United States</u>, 94 F.3d 1537, 1541 (Fed. Cir. 1996) ("When tainted by bad faith or an abuse of contracting discretion, a termination for convenience causes a contract breach.")[, <u>cert.</u> <u>denied</u> 520 U.S. 1210 (1997)].  In <u>Am–Pro Protective Agency, Inc. v. United States</u>, 281 F.3d 1234 (Fed. Cir. 2002), the United States Court of Appeals for the Federal Circuit held that the presumption that Government officials act in good faith may only be overcome by clear and convincing evidence.  <u>Id.</u> at 1239 ("[W]e believe that clear and convincing most appropriately describes the burden of proof applicable to the presumption of the governments good faith.").  In addition, the plaintiff must show "specific intent to injure" the plaintiff.  <u>Id.</u> at 1241.

<u>NCLN20, Inc. v. United States</u>, 99 Fed. Cl. 734, 758-59 (2011), <u>appeal</u> <u>dismissed</u>, 462 F. App'x 966 (Fed. Cir.), <u>and</u> <u>aff'd</u>, 495 F. App'x 94 (Fed. Cir. 2012); <u>see</u> <u>also</u> <u>Custom Printing Co. v. United States</u>, 51 Fed. Cl. 729, 733-34 (2002) ("This Court employs a highly deferential standard when reviewing the Government's decision to terminate for convenience.  While the Government's right to terminate a contract for convenience is not unlimited, the case law clearly provides that the Government is entitled to considerable latitude in making such a decision to terminate." (citations omitted)).  Moreover, it has been observed that: "'if the contract contains a termination for convenience clause and the contracting officer could have invoked the clause instead of terminating, rescinding or repudiating the contract on some other invalid basis, the court will constructively invoke the clause to retroactively justify the government's actions, avoid breach, and limit liability.'"  <u>Praecomm, Inc. v. United States</u>, 78 Fed. Cl. 5, 11 (2007) (quoting <u>Best Foam Fabricators, Inc. v. United States</u>, 38 Fed. Cl. 627, 638 (1997)), <u>aff'd</u>, 296 F. App'x 929 (Fed. Cir. 2008).

The considerable latitude the government is entitled to in terminating for convenience, however, is not unlimited.  <u>See</u> <u>IMS Engineers-Architects, P.C. v. United States</u>, 92 Fed. Cl. 52, 72 (2010) (citing <u>Torncello v. United States</u>, 231 Ct. Cl. 20, 47, 681 F.2d 756, 772 (1982); <u>Nat'l Factors, Inc. v. United States</u>, 204 Ct. Cl. 98, 103, 492 F.2d 1383, 1385 (1974)) (noting the <u>Torncello</u> court rejected, "in context of requirements contract, unfettered use of termination for convenience and stating that the 'government may not use the standard termination for convenience clause to dishonor, with impunity, its contractual obligations'"), <u>aff'd</u>, 418 F. App'x 920 (Fed. Cir.), <u>and</u> <u>reh'g</u> <u>and</u> <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Fed. Cir. 2011).

Proof that a termination for convenience was an abuse of discretion renders a contract breached.  <u>See</u> <u>Krygoski Constr. Co. v. United States</u>, 94 F.3d at 1541 (citations omitted); <u>see</u> <u>also</u> <u>NCLN20, Inc. v. United States</u>, 99 Fed. Cl. at 758.  To prove an abuse of discretion, plaintiff must show that the contracting officer's decision to terminate was arbitrary and capricious.  <u>See</u> <u>U.S. Fid. & Guar. Co. v. United States</u>, 230 Ct. Cl. 355, 368, 676 F.2d 622, 630 (1982).  The applicable burden of proof under the

abuse of discretion standard is a clear and convincing evidence standard or "clear abuse of discretion."  See, e.g., NCLN20, Inc. v. United States, 99 Fed. Cl. at 758 ("The United States Court of Appeals for the Federal Circuit has held that a termination for convenience will be upheld unless the contractor can establish bad faith or clear abuse of discretion."  (citing T & M Distribs., Inc. v. United States, 185 F.3d at 1283 ("In the absence of bad faith or clear abuse of discretion, the contracting officer's election to terminate for the government's convenience is conclusive."))); see also Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d at 1581 ("We have stated that '[i]t is not the province of the courts to decide *de novo* whether termination was the best course. In the absence of bad faith or clear abuse of discretion the contracting officer's election to terminate is conclusive.'"  (bracket in original) (quoting Salsbury Indus. v. United States, 905 F.2d at 1521 (quoting John Reiner & Co. v. United States, 163 Ct. Cl. 381, 390, 325 F.2d 438, 442 (1963))))).

Pursuant to 48 C.F.R. § 12.403(b), the contracting officer can terminate contracts under the following guidance:

> Policy. The contracting officer should exercise the Government's right to terminate a contract for commercial items either for convenience or for cause only when such a termination would be in the best interests of the Government. The contracting officer should consult with counsel prior to terminating for cause.

48 C.F.R. § 12.403(b) (2005).  The FAR requires only that a termination for convenience be in the best interests of the government.  See 48 C.F.R. § 49.101 (2005).  Plaintiff argues that the terminations of the camp package BPA call, latrine contract, and dumpster contract were not in the Army's best interests, given its continuing needs for each of those services.  Plaintiff also argues that the terminations were made in violation of 48 C.F.R. § 12.403(b).  The termination for convenience clause "'gives the Government the broad right to terminate without cause and limits the contractor's recovery to costs incurred, profit on work done, and costs of preparing the termination settlement proposal.'"  Enron Fed. Solutions, Inc. v. United States, 80 Fed. Cl. 382, 406 n.21 (2008) (quoting John Cibinic, Jr. and Ralph C. Nash, Jr., Administration of Government Contracts 1073 (3d ed. 1995)).

A contracting officer, however, may not terminate a contract "simply to acquire a better bargain from another source."  Krygoski Constr. Co. v. United States, 94 F.3d at 1541 (citing Torncello v. United States, 231 Ct. Cl. at 48, 681 F.2d at 772).  Similarly, the government is not permitted to enter into a contract without any intention of upholding it.  See Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d at 1582.  However, "[t]he mere fact that a contracting officer awards a contract to another company after terminating the plaintiff's contract is insufficient to show bad faith."  Kalvar Corp. v. United States, 211 Ct. Cl. 192, 199, 543 F.2d 1298, 1302 (1976), cert. denied, 434 U.S. 830 (1977).

Regarding the termination of the camp package BPA call for Camp Buehring, the government indicates that plaintiff agreed with the termination.  Regarding the latrine

and dumpster contracts, the phrase, "Termination for Convenience of the Government" was used, the termination for convenience clause was specifically invoked, and a command directive was invoked. Additionally, Col. Hess' November 3, 2004 letter to Mohammed Al Tawash affirmatively stated the latrine contract was "terminated for convenience of the government." The government also tried to hide behind security concerns to justify not awarding the Camp Virginia call to plaintiff after terminating the Camp Buehring call and for terminating the latrine contract and dumpster contract. The alleged security incident involving Mohammed Al Tawash occurred on October 7, 2004 in close proximity to the contract terminations, which all occurred in close proximity to one another. As noted above, the camp package BPA call was terminated on October 12, 2004, the latrine contract was terminated on October 18, 2004, and the dumpster contract was terminated on October 22, 2004. At the time of the terminations, however, the October 7, 2004 alleged security incident had not been verified as a security threat. There are also numerous inconsistencies as to reasons for the terminations of the Gulf Group contracts offered by Army personnel at the time and more recently.

The alleged security incident occurred on Mohammed Al Tawash's first and only day working for Gulf Group. He appears to have been in college at the time and was eager to make a good impression in his family's business. He testified that he asked for a map "[b]ecause we never really had a plan or say a service route or Gulf Group to identify where their latrines were.... To make our job a lot more easier; a lot more efficient and to be more effective with how Gulf Group performs with this company." Having had an opportunity to observe Mohammed Al Tawash at trial, the court found him to be a sincere and credible witness. Although the court understands how Mohammed Al Tawash's questions could have sparked suspicion at the time, on a military base in a war zone, the court finds the questions to have been innocent and well-motivated, geared to benefiting contract performance. Apparently, the Army also found the questions to have been innocent because the government opened no investigation or case file, allowed Gulf Group and its employees continued access to the base, and even wrote a letter of explanation on November 3, 2004, within a month of the incident and within days of the terminations of the latrine and dumpster contracts. The explanation letter, quoted above, from Col. Hess addressed to Mohammed Al Tawash, made clear that the contract was not terminated for security reasons, although it incorrectly indicated that certain Gulf Group employees had been barred from Camp Arifjan, while, at the same time, indicating that Gulf Group should not suffer any repercussions as a result of the incident.

The government had a duty to substantiate its security concerns before using them as a basis for termination for any of Gulf Group's contracts. Terminating any of Gulf Group BPAs or contracts based on security reasons, without finding a need to even open a case or begin a formal investigation, in a situation in which the questions asked by Mohammed Al Tawash could have been, and turned out to be, appropriate and germane to improving contract performance, is not reasonable or best practices, and is arbitrary and capricious. See Darwin Constr. Co. v. United States, 811 F.2d 593, 598 (Fed. Cir. 1987) (noting that the issuance of a termination without making a "'judgment as to the merits of the case'" is an "'abdication of responsibility,'" which a court will not

133

sanction "'where there is administrative discretion under a contract.'" (quoting Schlesinger v. United States, 390 F.2d 702, 709, 182 Ct. Cl. 571, 584 (1968))). That Col. Hess was able to state, within days of the latrine contract termination, that the security concerns were not an issue also indicates that an investigation into the incident would have been relatively simple to conduct.

According to Mr. Wilson, Gulf Group's Project Manager in Kuwait, Col. Hess stated to him that "counterintelligence on the Al Tawash family," indicated they have ties to "Al Qaeda and Saddam Hussein," a charge which is not substantiated anywhere in the record and seems to have appeared from nowhere at the time of the alleged security incident, just at the time of the terminations, and was quickly dismissed and disavowed. The record contains no evidence whatsoever linking Gulf Group, Saud Al Tawash, or any other member of the Al Tawash family to terrorists or to any anti-American group. Plaintiff also offered the testimony of Col. Al Salal, who at the time of the trial was a retired Kuwaiti Colonel and, after his retirement from the military was a Defense Attaché at the Kuwait Embassy in Saudi Arabia. Col. Al Salal testified that Gulf Group, Gulf Telecom, and Saud Al Tawash were all cleared by Kuwaiti security, that the Al Tawash family is well-known in Kuwait, and that he had never heard of any ties between the Al Tawash family and the Taliban, Saddam Hussein, or other anti-American groups. Moreover, none of the members of the Al Tawash family who testified at trial demonstrated any traces of anti-American sentiment. To the contrary, each member of the Al Tawash family who testified at the trial, and especially Saud Al Tawash, seemed to be eager to properly perform well on the contracts at issue in the above-captioned cases, and perform properly on other contracts Gulf Group held at the time. Moreover, Gulf Group continued to perform for the United States government in support of the United States mission in the region, even following the terminations of the camp package BPA call and the latrine and dumpster contracts.

A.    The Camp Package BPA Call Termination

As noted above, the camp package BPA call 0001 was terminated on October 12, 2004 when Maj. Davis issued Modification 103 on behalf of the Army, which stated: "The purpose of this modification is to cancel the BPA Call with Gulf Group. Gulf Group has no issues with this cancellation and will accept it at no cost to the government." Plaintiff insists that Maj. Davis did not exercise her own discretion in terminating the camp call 0001, but was acting at the direction of Col. Hess.[135] The termination clauses in the camp package BPA state:

> (l) Termination for the Government's convenience. The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall

---

[135] Col. Hess indicated during his testimony at trial that he may have ordered Maj. Davis to terminate the camp package BPA call, but also indicated that he may have issued an order to terminate the camp package BPA call at Col. Miller's direction. Col. Hess generally appeared eager at trial to shift the focus of the testimony from his role in any of the contracts at issue, despite his role as head of contracting activity at Camp Arifjan.

134

immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

(m) Termination for cause. The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance. In the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contract shall be liable to the Government for any and all rights and remedies provided by law. If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

As indicated in plaintiff's third amended complaint, regarding the claim associated with the termination of the camp package BPA call:

This claim was initially submitted for a final decision as required under 41 U.S.C. §§ [sic] 605 to the then acting contracting officer Major John Cockerham on October 10, 2005, and again on December 16, 2005 in the form of a termination settlement proposal and claim. Gulf Group never received from the Army a response to the claim or a decision to the initial claim. The claim then was re-submitted to other Contracting Officers on October 22, 2006 and again by court order on March 26, 2007, with the most recent submission on April 12, 2011 as ordered by this honorable court[136] clarifying Gulf Group's claim and to expressly state that the termination of BPA Call No. 0001 was arbitration [sic] and capricious.

Plaintiff's third amended complaint for the camp package BPA case also alleges:

The Government's termination of the contract was not properly based on convenience inasmuch as the Government needed the services, had the requisite funding to fully pay for them at the contract price and indeed contracted with another contractor to provide the same services at the

---

[136] As discussed above, the court did not direct plaintiff to submit a new, certified claim to defendant, but rather indicated that plaintiff could, if appropriate, revise its complaint.

same level of demand and for the same period of performance. Moreover, the termination was of no benefit to the Army.

Plaintiff also alleges in the third amended complaint in Case No. 06-835, the camp package BPA case:

> The Government's termination of this contract was wrongful and a breach of contract emanating from arbitrary and capricious conduct as well as an abuse of discretion inasmuch as the Government broke its promise to award [the contract for Camp] Virginia and the purported basis for termination was a supposed security risk presented by Gulf Group that did not in fact exist and was not documented prior to, at the time of or any time subsequent to termination.

Plaintiff argues that, to the extent defendant based the termination of its camp package BPA call on security reasons, the termination was an abuse of discretion because the Army rapidly was able to determine that Gulf Group was not a security risk. Similarly, plaintiff argues that defendant's assertion that the camp package BPA call for Camp Buehring was cancelled in order to award Gulf Group a call for Camp Virginia does not make the termination reasonable. Although plaintiff's 2005 camp package BPA Claim and Settlement Offer refers to the award of Camp Virginia and there is some indication in the record that discussions were held about awarding the larger Camp Virginia camp package BPA call to plaintiff, the award did not occur. Plaintiff now terms the discussions a "bait and switch." The government, in terminating the camp package BPA call, wrote, "Gulf Group has no issues with this cancellation and will accept it at no cost to the government." According to Gulf Group, however, no one on behalf of Gulf Group agreed to the termination. Although the record is not clear as to whether an agreement to exchange Camp Buehring for Camp Virginia was reached, none was ever signed. Saud Al Tawash's testimony at trial indicated that there were discussions, that he requested that any proposed exchange of camps to Gulf Group be put in writing, but none ever was, and that Gulf Group's alleged oral agreement to a termination may have been contingent in his mind upon an award of Camp Virginia.

Defendant argues that because of the proposed future camp package BPA call for Camp Virginia, plaintiff "does not claim" that the termination of the camp package BPA for Camp Buehring was unreasonable. Defendant interprets plaintiff's argument to be that the government breached the camp package BPA call "by deciding, after having terminated the camp package BPA [call], not to issue to Gulf Group a call for Camp Virginia." Defendant asserts that plaintiff's argument fails because once the camp package BPA call for Camp Buehring was terminated, there was no contract remaining to be breached even when the Army decided not to award the Camp Virginia call to plaintiff. Defendant states, "[b]ecause the decision not to award a Camp Virginia call did not breach Call 0001, the Court should reject any claim that the termination of Call 0001 breached that contract," and there was no formal contractual agreement to award a call for Camp Virginia.

136

At trial, the testimony from numerous witnesses was inconsistent as to the reason why the camp package BPA call for Camp Buehring was terminated. Saud Al Tawash and Mr. Cockerham both testified that they had been informed by the Army that Gulf Group's camp package BPA call for Camp Buehring was going to be terminated in order to award Gulf Group a larger camp, Camp Virginia. According to Saud Al Tawash, "Major Gloria [Davis] has called us and told us that Camp Buehring was going to be -- they were going to give us a larger camp, which was Camp Virginia, in lieu of Camp Buehring.... They will cancel Buehring, in order to give us Camp Virginia, which is a larger camp." When asked, "[a]nd do you remember when she called?" Saud Al Tawash answered: "Somewhere around that time frame, the second week of October." Mr. Cockerham testified that he knew of the cancellation "because of the office talk, and my desk was like three spaces over from CPT Trimble. Just the talk between he and MAJ Davis was that it was going to be cancelled because they were planning on giving a larger camp to them [Gulf Group]." Mr. Cockerham also offered a rough time frame for the cancellation discussions, stating that the decision to give Camp Virginia to Gulf Group had been made before he became interim Chief of Contracting, which he had previously stated occurred in late October 2004. Mr. Cockerham's testimony also indicated that the Army may have decided to place a hold on the award to plaintiff of the Camp Virginia call as a result of the alleged security incident.

The chronology of events is uncertain regarding the termination of camp package BPA call. The camp package BPA call for Camp Buehring was awarded on September 30, 2004. The alleged security incident occurred on October 7, 2004. The camp package BPA call for Camp Buehring was terminated on October 12, 2004. Oddly, the Army's second site visit to determine plaintiff's readiness to perform the camp package BPA and to discuss moving up the start date was conducted by Capt. Trimble, Capt. Novak, and Lt. Rivera on October 13, 2004, the day after the camp package BPA call for Camp Buehring was terminated. Saud Al Tawash testified that he learned in the second week of October that the camp package BPA call for Camp Buehring would be terminated in exchange for Camp Virginia. There is nothing in the record to clarify whether Saud Al Tawash was informed of the Army's decision to terminate the Camp Buehring call before or after the alleged security incident. Mr. Cockerham's testimony at trial is equally unhelpful, suggesting only that the decision to terminate was made before the end of October. Despite terminating three of plaintiff's contracts, defendant did not move to bar plaintiff from future contracts in the war zone and, in fact, continued to work with plaintiff on other contracts plaintiff had been awarded, including the bottled water BPA, also at issue in the above-captioned, consolidated cases.

Mr. Cockerham's testimony also was not wholly consistent. An unsigned October 20, 2004 Memorandum for Record,[137] similar to a separate memorandum

---

[137] As discussed above, there was no agreement as to who authored the unsigned October 20, 2004 Memorandum for Record. At trial, Capt. Novak remembered preparing a memorandum on this subject in a combined effort between himself, Capt. Trimble, and Lt. Rivera. Capt. Novak remembered a document similar to the memorandum quoted above. He testified, however, he did not believe the memorandum in the record is the exact memorandum that he prepared because of the

137

written by Capt. Trimble, Capt. Novak, and Lt. Rivera, stated that Mr. Cockerham informed them that the termination of the camp package BPA call was due to Gulf Group's inexperience. The Memorandum for Record begins: "This memorandum consists of a list of events that describes the background behind the Contracting Officer's decision and the direct order that was given to cancel all of Gulf Group's Contracts." The Memorandum for Record also states, "Major Cockerham informed the CO's [Capt. Trimble, Capt. Novak, and Lt. Rivera] to cancel the BPA call to Gulf Group due to their inexperience in building tents. Furthermore, Major Cockerham stated that it was in the government's best interest to place a call to British Link Kuwait, although their prices were unreasonably high." At trial, however, Mr. Cockerham denied having ever made such statements. According to Mr. Cockerham, it was Tijani Saani who gave Capt. Trimble, Capt. Novak, and Lt. Rivera the information for the October 20, 2004 Memorandum for Record. Mr. Cockerham testified he believed Tijani Saani had indicated that the information was from Mr. Cockerham, but Mr. Cockerham believed that the information actually was from Col. Hess.

Additional witnesses at trial offered other reasons for the termination of the camp package BPA call. For example, Mr. Wilson, Gulf Group's Project Manager in Kuwait, testified that Col. Hess told him the Camp Package BPA call and the latrine and dumpster contracts were terminated because of terrorist links. Capt. Trimble testified that he knew nothing about the Camp Buehring call being cancelled for a Camp Virginia call but that the camp mayors preferred to continue with their old contractors, while the unsigned Memorandum for Record asserted that it "was in the government's best interest to place a call to British Link Kuwait." Mr. Libbey indicated in his contracting officer's final decisions that the contracts were terminated for dumpster diving.[138] At trial, Mr. Libbey stated:

Q: So the lawyers didn't tell you about that, the reasons for terminating the contract?

A: No, no, I believe it was due to the going into the dumpster. I do not know anything about, what was it you implied?

Q: A security risk, a security concern that the family of the company represented to the Army, to the government, to the United States.

---

phrase in the memorandum, "blessed their capabilities," which he said "just seems out of place to me." Capt. Novak acknowledged, however, that this memorandum could have been a draft of the final memorandum he prepared. Capt. Trimble did not remember writing this memorandum or a similar memorandum, or assisting anyone in writing such a memorandum.

[138] At trial, the testimony of Mr. Libbey addressed the camp package BPA, the latrine contract, and the dumpster contract collectively, as he spoke generally about the "contracts" and the "final decisions" for much of his testimony. As noted above, Mr. Libbey's testimony at trial was defensive and not clear as to the reasons for the terminations or the basis for his final decisions.

A: Going through the dumpsters, that act in and of itself by the workers is a security risk.

At trial Saud Al Tawash denied the government's characterization and statements regarding the termination of the camp package BPA call for Camp Buehring, and in particular that Gulf Group had no issue with the termination and would accept the termination at no cost to the government. Saud Al Tawash stated: "No, I asked for the paperwork [regarding the Camp swap for Camp Virginia] to be sent over." He also testified that the Camp Virginia papers were never sent to him. The following exchange between plaintiff's attorney and Saud Al Tawash indicates that Saud Al Tawash may have spoken to Army personnel about swapping camps:

Q: And if you read the statement in that item, it says, "the purpose of this notification is to cancel the BPA call with Gulf Group. Gulf Group has no issue in the cancellation and will accept it at no cost to the government." Did you have any issues as to the cancellation of Camp Buehring at no cost to the government?

A: Yes, because what was told to me was they're going to give me -- give our company, Gulf Group General Enterprises, the BPA call for Camp Virginia in lieu of, in exchange of Camp Buehring.

Q: So, your agreement was conditioned upon them giving you Virginia; is that correct?

A: Yes.

...

Q: By the time the officers came to your yard, you had no idea of this agreement or did you, to switch Virginia for Buehring?

A: At the time, I don't think so. It happened right around that time, though, a day after, two days after, yeah.

Saud Al Tawash testified that he had attempted to discuss the cancellations of the Camp Buehring call with Col. Hess, but that "[h]e wouldn't meet with me. I tried to meet with him in the office. I came to Arifjan. He wouldn't meet with me." The modification that terminated the camp package BPA call for Camp Buehring does not mention any exchange of Camp Buehring for Camp Virginia, or any other camp package BPA call. Moreover, it is odd that the camp package BPA call was terminated just twelve days after it was awarded, especially because the parties have stipulated the Army still required the Camp Buehring services and had funding available.

Plaintiff relies on Col. Hess' testimony for the assertion that Maj. Davis did not exercise her own discretion in the termination of the Camp Buehring call, but, rather,

139

followed an order from a superior. During his testimony to the court, Col. Hess confirmed that he was the person who had ordered Maj. Davis to terminate the camp package BPA call:

Q: When Gloria Davis terminated the BPA Call for the camp package on Camp Buehring, was she exercising her discretion?

A: No.

Q: Was she following a direct order?

A: Yes.

…

Q: When you ordered Gloria Davis to terminate the BPA camp package for Camp Buehring, did she ask you for a security report or some type of document to back up and document the file?

A: No.

When she terminated the Camp Buehring call, BPA call 0001, Maj. Davis may have been acting at the direction of Col. Hess, who, although he was not the assigned contracting officer on the Camp Buehring camp package BPA call, was the Director of Contracting at Camp Arifjan. Maj. Davis, a warranted contracting officer, was directly below Col. Hess in the chain of command within the contracting office. Col. Hess did not explicitly testify that Col. Miller directed him to have the BPA call terminated, but he did state "that we were told, directed either directly by Colonel Miller or through his staff sections, to get that contractor [Gulf Group] off the installation." At trial, Col. Miller denied having given such a direction.

Maj. Davis, however, was unavailable to testify, having committed suicide after being questioned by Army CID about funds in offshore accounts. Neither Col. Miller nor Col. Hess offered explanations for the termination of the Camp Buehring call, although Col. Hess indicated he had ordered the termination, possibly at the behest of Col. Miller. The most coherent explanation of the decision to terminate the Camp Buehring call and the decision not to award Camp Virginia to Gulf Group may come from Mr. Cockerham's testimony at trial.

As indicated above, Mr. Cockerham sent the following note to Saud Al Tawash regarding the termination of the Camp Buehring call:

Here is a copy of the cancellation to Camp Buehring. This cancellation was made because we were giving you a larger camp call Virginia. Virginia award was verbal with the agreement to cancel Buehring. Virginia was not awarded on paper as a command directive. The original

140

cancellation was sent out 13 Oct 04. But here is another copy as requested. Thank you.

Although Saud Al Tawash testified that he interpreted Mr. Cockerham's note to be a notice that Gulf Group would not receive the award of a Camp Virginia call, Mr. Cockerham testified that the note may have served as a "reassurance" to Gulf Group, explaining that he intended to convey that, although Army personnel had verbally indicated that Gulf Group would receive the award of a Camp Virginia call, the formal award had been placed on hold at the direction of Col. Hess. Mr. Cockerham stated that Col. Hess may have been considering another contractor for the Camp Virginia call and that Col. Hess "was checking on…some other issues from perhaps a security report." Mr. Cockerham estimated that the direction not to award a Camp Virginia call to Gulf Group and the cancellation of Gulf Group's latrine contract and dumpster contract occurred "within a week period of that whole time." From Mr. Cockerham's testimony, therefore, it appears that Army personnel may have been directed to place the award of the Camp Virginia call on hold as a result of what appears to be the same alleged security incident that led to the terminations of the latrine contract and dumpster contract.

"'In the absence of bad faith or a clear abuse of discretion the contracting officer's election to terminate is conclusive.'" See Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d at 1581 (quoting Salsbury Indus. v. United States, 905 F.2d at 1521). Plaintiff must present clear and convincing evidence to rebut the presumption that government agents act in good faith. See Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1239–40. Plaintiff argues that "[t]he Government's termination of the contract was not properly based on convenience inasmuch as the Government needed the services, had the requisite funding to fully pay for them at the contract price and indeed contracted with another contractor to provide the same services at the same level of demand and for the same period of performance." A demonstration that the government entered into a contract with no intention of honoring it may be sufficient to show bad faith or an abuse of discretion. See TigerSwan, Inc. v. United States, 110 Fed. Cl. 336, 345 (2013) (citing Krygoski Constr. Co. v. United States, 94 F.3d at 1543–44). However, "[t]he mere fact that a contracting officer awards a contract to another company after terminating the plaintiff's contract is insufficient to show bad faith." See Kalvar Corp. v. United States, 211 Ct. Cl. at 199, 543 F.2d at 1302. At least one judge of the Court of Federal Claims has indicated that an offer of additional work that is never delivered may be evidence of a pretextual termination. See IMS Engineers-Architects, P.C. v. United States, 87 Fed. Cl. 541, 553 (2009).

The record before the court does not conclusively demonstrate that defendant abused its discretion by intending to benefit another contractor. The record, however, also does not support a performance-based reason to have terminated plaintiff's camp package BPA call.[139] Defendant has consistently maintained that the Army terminated

---

[139] The unsigned October 20, 2004 Memorandum for Record and the October 29, 2004 letter purportedly written by Col. Miller refer to performance-related issues, but the unsigned Memorandum for Record was renounced by various witnesses at trial and the

141

the Camp Buehring call in order to award Gulf Group a call for Camp Virginia. Defendant alleges that the security concerns only factored into the Army's decision not to award Gulf Group a call for Camp Virginia. Plaintiff's counsel argued, however, that the decision to terminate the Camp Buehring call and the subsequent decision not to award a Camp Virginia call cannot be considered separately because they were part of a "single but two-prong transaction." Although Saud Al Tawash was not able to identify the exact date on which Maj. Davis had proposed swapping Camp Buehring for Camp Virginia, it appears from the record that Saud Al Tawash had indicated he was amenable to the swap, and that he may even have agreed to the termination of the Camp Buehring call on the condition that Gulf Group be awarded a Camp Virginia call. Consistent with this understanding, the Army appears to have prepared a call for Camp Virginia, although it never issued the call to Gulf Group.

The timeline of events indicates that the alleged security incident may have factored into the Army's decision not to award a Camp Virginia call to Gulf Group, but does not necessarily demonstrate that the alleged security incident motivated the Army's decision to terminate the Camp Buehring call. The alleged security incident occurred on Thursday, October 7, 2004, and the Camp Buehring call was terminated on Tuesday, October 12, 2004. The latrine and dumpster contracts were not terminated until Monday, October 18, 2004 and Friday, October 22, 2004, respectively. Although the alleged security incident occurred before the termination of the camp package call for Camp Buehring, Mr. Cockerham's testimony regarding the hand-written note that he sent to Saud Al Tawash indicates that the termination of the Camp Buehring call also may have resulted from discussions that preceded the October 7, 2004 alleged security incident, even though, at one point during his testimony, Saud Al Tawash indicated that an actual agreement to swap camps may have been formed after October 7, 2004. According to Mr. Cockerham, the alleged security incident did not impact Gulf Group's performance under the camp package BPA until Col. Hess put the formal award of a Camp Virginia call on hold pending a review of a "security report." Mr. Cockerham's explanation that the Camp Buehring call was terminated by agreement also is consistent with the different language used in the camp package BPA call termination, versus the latrine contract and dumpster contract terminations. The termination of the camp package BPA call for Camp Buehring indicated that Gulf Group was aware of, and had even agreed to the termination, while the latrine and dumpster contract terminations indicated that they were issued "by order of the ASG Commander Kuwait COL Brick Miller" and cited provisions of the FAR relating to terminations for convenience.

Moreover, numerous Army personnel testified that defendant believed that Gulf Group was fully capable of performing under the camp package BPA, despite the October 29, 2004 unsigned letter purportedly from Col. Miller. The Army continued to issue calls to Gulf Group under the camp package BPA after the alleged security incident was resolved. Approximately two months after the termination of the Camp Buehring call, for example, Army personnel awarded Gulf Group a call for Camp Victory

---

unsigned letter purportedly written by Col. Miller was contradictory to the conclusions of the officers who conducted the second site visit.

and a call for a naval base in Kuwait, as well as for the Ash Shuaybah Sea Port of Debarkation. In fact, the Army continued to issue camp package BPA calls to Gulf Group through 2005 and 2006.

Although the timeline of events is far from clear, the record reflects a sufficient and possible good faith explanation for the termination of the Camp Buehring call. Plaintiff recognizes in its post-trial briefing, Maj. Davis' death makes the details of the termination of the Camp Buehring call "less apparent" than the details of the latrine contract and dumpster contract terminations. Although Maj. Davis was unavailable to testify as to her reasons for terminating the Camp Buehring call, both Saud Al Tawash and Mr. Cockerham confirmed that, at some point, the Army had decided to cancel the Camp Buehring call in order to award a Camp Virginia call to Gulf Group. Although the alleged security incident may have caused Col. Hess not to implement the decision to award Camp Virginia to plaintiff, the record suggests that Col. Hess may have countermanded the decision to award Gulf Group a Camp Virginia call after the termination of the Camp Buehring call, and after the alleged security incident had occurred. Given the timing of events and the testimony of Saud Al Tawash and Mr. Cockerham, the court does not agree with plaintiff that the termination of the Camp Buehring call and the decision not to award a Camp Virginia call to Gulf Group are necessarily part of the same transaction. Although the court recognizes that the record reflects unanswered questions with regard to the termination of the Camp Buehring call, plaintiff has failed to present the court with clear and convincing evidence to rebut the presumption that Army personnel terminated the Camp Buehring call in order to award a Camp Virginia call in good faith. See Am–Pro Protective Agency, Inc. v. United States, 281 F.3d at 1240–41. Although the government officials may have indicated a willingness to award a Camp Virginia call to plaintiff in exchange for the Camp Buehring call, there was no contractual obligation on the part of the government to award the Camp Virginia call to Gulf Group. Considering the high burden that plaintiff must overcome to show that Maj. Davis abused her discretion when she terminated the Camp Buehring call, there is insufficient evidence to conclude that defendant abused its discretion in terminating plaintiff's Camp Buehring call for the convenience of the government.

Although proof that a termination for convenience was an abuse of discretion renders the terminated contract breached, Krygoski Constr. Co. v. United States, 94 F.3d at 1541, "[i]n the absence of bad faith or clear abuse of discretion, the contracting officer's election to terminate for the government's convenience is conclusive." T & M Distribs., Inc. v. United States, 185 F.3d at 1283. The termination for convenience of the camp package BPA was within the contracting officer's discretion and, therefore, the termination of the camp package BPA call was not a breach of contract. The plaintiff's third amended complaint in Case No. 06-835C, the camp package BPA claim, alleges that:

> The Government, by virtue of its arbitrary decision to cancel the contract
> without just cause, diverted business away from Gulf Group and thereby
> caused Gulf Group to sustain substantial damages. The Government is

required to fully compensate Gulf Group for those damages and to put Gulf Group in as good a position as it would have been had the Government not cancelled the contract, including fair compensation for the preparatory expenses incurred in furtherance of the contract and in pursuing the claim submitted to the Contracting Officers, as well as profits Gulf Group would have generated under the BPA Call and Master BPA upon which Gulf Group fully relied, interest, legal fees and costs of litigation.

As a result of the Government's arbitrary and wrongful termination of the contract, Gulf Group is entitled to damages in the form of preparatory expenses of KWD 19,323.000 equivalent to **U.S. $69,002.43** calculated at the exchange rate of 1 KWD @ U.S. $3.571; fees and costs incurred in the preparation and presentation of a termination claim and settlement proposal that was presented to the Contracting Officers in Kuwait in the sum of **U.S. $7,037.50**; in addition to lost profits of KWD 237,135.791 equivalent to **U.S. $846,811.91** calculated at the exchange rate of 1 KWD @ 3.571 representing the lost profits for the entire 6 months duration of the BPA Call that was awarded. Gulf Group also is entitled to prejudgment interest under the Contract Dispute [sic] Act, the specific sum of which will be proven at the time of trial.

(internal citations omitted; emphasis in original). As there was no "arbitrary and wrongful termination of the contract" with respect to the camp package BPA call, plaintiff cannot recover on the camp package BPA call on the basis of a breach. Moreover, as noted above, plaintiff's argument by analogy that lost profits could be included for other calls issued under the BPA relies on situations in which the wronged contractor can prove that the government chose, in bad faith, not to exercise the option periods.[140] See, e.g., Hi-Shear Tech. Corp. v. United States, 356 F.3d at 1374, 1375, 1380; Blackstone Consulting, Inc. v. Gen. Servs. Admin., CBCA 718, 08-1 BCA ¶ 33,770; Greenlee Constr., Inc. v. Gen. Servs. Admin., CBCA 416, 07-1 BCA ¶ 33,514. As the court also determined above, there is no evidence that, had the camp package BPA call not been terminated, the government would have continued placing orders under the camp package BPA or would have abused its discretion in not placing orders under the BPA. The government is not obligated to issue orders under a BPA or exercise an option that is not otherwise restricted. See, e.g., Gov't Sys. Advisors, Inc. v. United States, 847 F.2d at 813 ("An option is normally an option, and nothing in [the provision at issue], or in any other contract clause, limited the circumstances under which the government could decline to exercise that bargained-for right in this case."). Furthermore, anticipatory profits are generally not an available remedy when the government terminates a contract for convenience. See AR Sales Co., Inc. v. United States, 49 Fed. Cl. 621, 630 (2001); Mega Constr. Co. v. United States, 29 Fed. Cl. 396, 473 (1993); Dairy Sales Corp. v. United States, 219 Ct. Cl. 431, 436–37, 593 F.2d

---

[140] As noted above, plaintiff specifically dropped any earlier allegations of bad faith against the government in its third amended complaint in Case No. 06-835C, the camp package BPA case.

1002, 1005 (1979); William Green Constr. v. United States, 201 Ct. Cl. 616, 626–27, 477 F.2d 930, 936-37 (1973), cert. denied, 417 U.S. 909 (1974).

In addition to its breach claims, however, plaintiff also alleges in its third amended complaint:

> On May 21, 2007 the Contracting Officer Joe L. Libbey of the U.S. Army Contracting Agency for Southwest Asia - Kuwait, issued a final decision on the camp package BPA granting in part and denying in part Gulf Group's claim for damages, awarding compensation in the amount of $33,053.57 plus interest. Gulf Group seeks additional compensation be awarded by this Court for its damages that were denied all as it will be shown at the time of trial.

(internal citation omitted). The majority of the testimony at trial addressed the award of the contracts and BPAs, the alleged security incident and the government's reaction to the incident, the hiring of Ms. Blake, Saud Al Tawash's relationship with Mr. Cockerham, and the inflated claims. Little testimony at trial specifically addressed the denied elements of Gulf Group's 2007 claim on the camp package BPA before Mr. Libbey.

The task before the court to determine if plaintiff is entitled to additional compensation under the existing termination for convenience of the camp package BPA call also is made more difficult by the numerous and different claim amounts submitted to Mr. Libbey in the form of certified claims, and to this court in the form of complaints and amended complaints. Plaintiff has sought various amounts for recovery on the camp package BPA claim, including $10,000,000.00 in its 2005 Claim and Settlement Offer to Mr. Cockerham, which also proposed a $4,544,339.84 "settlement offer," and $7,000,000.00 in its 2007 claim to Mr. Libbey. In its original complaint in Case No. 06-835C, the camp package BPA case, plaintiff sought $7,000,000.00. In its first amended complaint in the camp package BPA case, plaintiff sought $2,682,160.86.[141] In its second amended complaint in the camp package BPA case, plaintiff sought $3,463,287.57.[142] Subsequently, in its third amended complaint in the camp package case, plaintiff now seeks $922,851.84.[143]

Few exhibits introduced at trial offer any support for plaintiff's specific claims after the contracting officer's final decision. The most specific information may come from

---

[141] Plaintiff sought $1,447,457.22 in lost profits, $1,234,703.64 in preparatory expenses, legal fees, costs incurred in preparing a settlement of plaintiff's claims, and interest.

[142] Plaintiff sought $3,387,247.64 in lost profits, $69,002.43 in preparatory expenses, $7,037.50 in fees and costs incurred in preparing the settlement for plaintiff's claims, prejudgment interest, cost of litigation, and attorneys' fees.

[143] Plaintiff now seeks $846,811.91 in lost profits, $69,002.43 in preparatory expenses, $7,037.50 in fees and other costs, prejudgment interest, costs of litigation, and attorneys' fees.

the 2011 "notice of filing revised claim," in which plaintiff indicated: "Group General Enterprises, Co. W.L.L. (hereinafter 'Gulf Group'), hereby submits its revised claim together with supporting documents and an explanation of the reasons for the revisions." The 2011 notice for the camp package BPA, included as a joint exhibit at trial, contained a chart which set forth the claims in Kuwaiti dinars:

| ITEM | INITIAL CLAIM | REVISED CLAIM | REASON FOR REVISION |
|---|---|---|---|
| 13 - Tower Lights | 22,945.000 | 1,765.000 | **REDUCED** to claim for only one tower light actually purchased from Kuwait Leaders. Gulf Group is still in possession of tower lights, however upon further investigation Gulf Group believes that the purchase order for the remaining lights requested under this contract was cancelled in mitigation efforts after the contract was terminated. |
| 39 9x32 Fest | 241,962.000 | 4,000.000 | **REDUCED** to claim for only on 9x32 tent actually purchased from Mr. Sayed Ejaz Ali Shah Saye Sultan. Gulf Group is still in possession of tents, however upon further investigation Gulf Group believes that the purchase order for the remaining tents requested under this contract was cancelled in mitigation efforts after the contract was terminated |
| 7 Diesel Generator | 24,430.000 | 3,490.000 | **REDUCED** to claim for only on generator actually purchased from Mohamed Abdulrahman Al-Bahar Gulf Group is still in possession of generators, however upon further investigation Gulf Group believes that the purchase order for the remaining generators requested under this contract was cancelled in mitigation efforts after the contract was terminated |

| 61 Dumpsters (6cm) | 12,200.000 | 10,000.000 | **REDUCED** to remove charges for 11 dumpsters that were not delivered by the factory and therefore no expense was incurred for that concept. Therefore, claim is for 50 dumpsters, each at a cost of KWD 200. |
|---|---|---|---|
| 158 Latrines | 22,120.000 | | **REMOVED**. The purchase order for these latrines was cancelled in mitigation efforts after the contract was terminated. |
| 1 Portable [sic] Water Tanker | 15,000.000 | | **REMOVED**. The purchase order for the potable water tanker was cancelled in mitigation efforts after the contract was terminated. |
| Compensation for services by Mr. Biju Mathew - accountant | | 68.000 | **ADDED** to account for job duties performed in connection with this contract. Job duties were split between 5 services: (1) dumpsters contract, (2) latrines contract, (3) Camp Package, (4) bottled water contract, and (5) other general company matters. Therefore, charge is for 1/5 of the total monthly salary of KWD 340. |

(emphasis in original) (footnote omitted).

At trial, Saud Al Tawash used this 2011 filing and the attachments to the notice to explain why the reductions were made. For example, Saud Al Tawash tried to explain the reduction in the number of tower lights as follows:

Q: And did you, in fact, obtain or purchase from Kuwait Leaders 13 magnum tower lights?

A: We only purchased one from them.

Q: Why?

A: They had one that was available to us. The rest was not available. And so, we purchased what they have, so we can bring it in, into the yard and spec it out.

147

Q: Show it to the Army, is that –

A: We had -- we brought it into our yard, yeah, and our project manager at that time, Mr. Bobby Wilson, he wanted to see the equipment and make sure that this is the right specs to the Army. So, they had one delivered to us prior to ordering the rest of the 13, because they're expensive.

Plaintiff included in its 2011 notice and 2011 submission to Maj. Everett the identical forms, purchase orders, checks, and hand-written notes included in the original 2005 Claim and Settlement Offer to Mr. Cockerham. Plaintiff did not, however, identify the differences in its costs in the 2011 notice and the third amended complaint from the amounts awarded by Mr. Libbey in his May 21, 2007 contracting officer's final decision on the camp package BPA claim. In his final decision, Mr. Libbey wrote:

I determine Gulf Group is entitled to KD 1,765 for lights, KD 4,000 for tents, and KD 3,490 for generators. This represents the percentage of contract performance of the contract performed before contract termination for which Gulf Group has not been compensated. Gulf Group has not shown they incurred costs for water, and the only loss Gulf Group incurred for dumpsters and latrines is anticipatory profit, which is not allowable in this case. Gulf Group has failed to provide information regarding settlement proposal preparation costs, and has failed to provide information regarding legal costs incurred from perusing this matter before the Court of Federal Claims. Therefore, no costs have been established for submittal and pursuit of the termination settlement proposal. Gulf Group is entitled to $33,053.57, plus interest. I believe this [sic] a fair and reasonable settlement.

Notably, Mr. Libbey determined that Gulf Group was entitled to the same amount for the tower lights, tents, and generators as plaintiff claims in its revised settlement. No support was given at trial for the added claim of Mr. Biju Mathew, and the testimony by Saud Al Tawash in support of the fifty dumpsters was confused and unsupported. At trial, Saud Al Tawash provided the following testimony:

Q: What is the document at page 263?

A: This is a PO [Purchase Order] to Malika factory for steel works. They're the steel fabricator for the dumpsters.

Q: And are these the dumpsters that were required under BPA call number one, Mr. Al Tawash?

A: Yeah, 61 pieces.

Q: And the size of the dumpsters, is that the correct size that was required under the BPA?

A: This is the right size, six cubic feet

Q: So is this -- what is this?

A: This is dumpsters and it was ordered by Gulf Group.

Q: So is this for the 61 dumpsters that you had placed the purchase order for with the Malika factory?

A: Yeah.

Q: And I see quantity 50, not 61.  Do you know why?

A: As I said earlier, we may have had the inventory for the product, so whatever the balance that we're not having in the inventory, we would go out on the market and purchase it, to have -- be prepared and readiness for the contract.

The balance of the testimony did not clarify the discrepancies between the number of dumpsters, nor was there a demonstration that Gulf Group had actually paid for the balance of the fifty dumpsters.  Plaintiff only submitted an invoice for the dumpsters in its 2011 notice for the camp package BPA, without explaining whether the purchase of the dumpsters was attributable to Gulf Group's performance of the camp package BPA.  In addition, plaintiff did not substantiate that it incurred additional costs for the services of an accountant.[144]

Notwithstanding plaintiff's minimal effort to demonstrate that it should be compensated for the costs attributable to the purchase of dumpsters and Mr. Mathew's accounting services, defendant has conceded that these costs were incurred in plaintiff's performance of the contract.  The parties stipulated that "Gulf Group ordered 61 (6cm) dumpsters for use in the performance of BPA Call 0001 pursuant to BPA W912D1-04-A-0047, only [sic] 50 were delivered at a cost of 10,000 kd."  Defendant also conceded in its post-trial brief that Gulf Group "actually spent only 19,323 KD…preparing to perform Call 0001," citing to the amount claimed in plaintiff's 2011 notice.  Defendant did not argue that costs associated with the dumpsters and Mr. Mathew's services could have been mitigated or avoided, or are otherwise not recoverable.  Instead, defendant treated the costs as validly incurred in plaintiff's preparation to perform the Camp Buehring call.  The court concludes, therefore, that defendant has conceded that plaintiff incurred costs, both in purchasing the fifty

---

[144] The amount that plaintiff claims that it incurred for accounting services appears to be consistent with the amount that plaintiff attributes to accounting services in its lost profit calculations with respect to the camp package BPA, the latrine contract, and the dumpster contract.

dumpsters and in utilizing Mr. Mathew's services, in preparation of performing the camp package BPA call. Plaintiff is entitled to 19,323.000 KD, plus interest, which is the full amount of costs claimed in plaintiff's 2011 notice, less attorneys' fees.

In plaintiff's 2011 notice for the camp package BPA, plaintiff also seeks "legal expenses incurred in preparation of the claim" as a result of Ferdinand Peters' work on plaintiff's 2005 Claim and Settlement Offer. The FAR provides that settlement expenses, including "[a]ccounting, legal, clerical, and similar costs reasonably necessary for...[t]he preparation and presentation, including supporting data, of settlement claims to the contracting officer," may be recoverable in the event of a contract termination. See 48 C.F.R. § 31.205–42 (2005). Attorney Peters provided, at best, incorrect information during the preparation of the 2005 camp package BPA Claim and Settlement Offer. Attorney Peters, in part, is why defendant has alleged that Gulf Group submitted false claims relating to the termination of the camp package BPA call. Attorneys' fees incurred in the submission of a "meritless" settlement proposal, which results in a "legally insufficient and factually unsupportable" claim, are not recoverable. See OK's Cascade Co. v. United States, 97 Fed. Cl. 635, 649–50 (2011), aff'd, 467 F. App'x 888 (Fed. Cir. 2012); see also Sensorcom, Inc. v. Scitor, Inc., No. JFM–09–3143, 2011 WL 1897521, at *2–3 (D. Md. May 18, 2011). In its 2005 camp package BPA Claim and Settlement Offer, Gulf Group followed required procedures in proposing a settlement to the contracting officer following a termination for convenience. See 48 C.F.R. § 49.602–1(b) ("Standard Form 1436, Settlement Proposal (Total Cost Basis), shall be used to submit settlement proposals resulting from the termination of fixed-price contracts...."). Gulf Group, however, did not engage in typical settlement negotiations as it asserted entitlement to a fixed amount in addition to making a settlement proposal. As indicated above, Gulf Group's 2005 camp package BPA Claim and Settlement Offer was unsupported and without a legal or factual basis. Although Gulf Group's 2011 submission to Maj. Everett may have included some additional factual information and tried to correct legal errors in its 2005 Claim and Settlement Offer, Gulf Group cannot recover attorneys' fees for claims submitted to the contracting officer after litigation has commenced. See OK's Cascade Co. v. United States, 97 Fed. Cl. at 649 ("[T]o the extent settlement proposal costs were incurred after the commencement of this litigation, the costs are improper because the FAR provides for settlement costs submitted to the contracting officer as a result of the termination."). Moreover, costs incurred in submitting a claim to a contracting officer are not otherwise generally recoverable. See Scott Timber Co. v. United States, 97 Fed. Cl. 685, 707 (2011), rev'd on other grounds, 692 F.3d 1365 (Fed. Cir. 2012), reh'g and reh'g en banc denied, 499 F. App'x 973 (Fed. Cir. 2013); see also Envtl. Tectonics Corp. v. United States, 72 Fed. Cl. 290, 298 (2006) (quoting 48 C.F.R. § 31.205–47(f) ("'Costs not covered elsewhere in this subsection are *unallowable* if incurred in connection with...prosecution of claims or appeals against the Federal Government....'") (emphasis in original)); cf. Levernier Constr., Inc. v. United States, 947 F.2d 497, 500 (Fed. Cir. 1991) ("[A]t its earliest, EAJA [Equal Access to Justice Act] coverage may begin after the decision of and in pursuit of an appeal from the decision of a contracting officer."). The court, therefore, denies plaintiff's request for additional compensation arising from Attorney Peters' services in

the preparation of plaintiff's 2005 Claim and Settlement Offer for the camp package BPA.

In sum, the court finds that camp package BPA call No. 0001 was not breached by the government's termination on October 12, 2004. Because defendant conceded that plaintiff is entitled to costs incurred in preparing to perform the contract, the court awards plaintiff 19,323.000 KD, plus interest, under the camp package BPA.

B.     The Latrine and Dumpster Contract Terminations

In plaintiff's second amended complaints in both Case No. 06-858C, the latrine case, and Case No. 06-853C, the dumpster case, plaintiff alleges "[t]he Government's termination of the contract was not properly based on convenience inasmuch as the Government needed the services, had the requisite funding to fully pay for them at the contract price and contracted with one or more other contractors to provide the same services at the same level of demand." Plaintiff further claims that Gulf Group had done nothing to merit terminations for default for either the latrine or dumpster contracts, using the exact same language in each of the second amended complaints: "Gulf Group had not committed any default or breach justifying termination nor done or failed to do anything that would be a justifiable cause for termination." Defendant similarly provided the same responses in its answers to plaintiff's second amended complaints in the latrine and dumpster cases, denying plaintiff's allegations. Because the language of plaintiff's allegations and defendant's responses, are virtually identical in both cases, the court analyzes the terminations of the latrine and dumpster contracts together.

The latrine contract, W912D1-04-P-0932, was terminated pursuant to 48 C.F.R. § 52.212-4, on October 18, 2004, when Mr. Cockerham issued Modification P00002 on behalf of the Army. Modification P00002 stated: "This contract is being canceled due to command directive of the ASG commander SWA COL Brick Miller 3rd Army Arcent Kuwait. The contract is canceled under the terms of 52.212-1, 52-212-4 [sic], 52.249-4." The parties stipulated that: "The Government did not terminate Gulf Group for default under Contract W912D1-04-P-0932 [the latrine contract]. At the time Contract W912D1-04-P-0932 was terminated, the Government had not issued any cure notices to Gulf Group regarding Gulf Group's performance of its contractual obligations under that contract, and none was ever issued at any time thereafter." Despite terminating Gulf Group's latrine contract, the government had sufficient funds to pay for, and continued to be in need of, the latrine services.

The dumpster contract, W912D1-04-P-0897, was terminated pursuant to 48 C.F.R. § 52.212-4, on October 22, 2004, when Mr. Cockerham issued Modification P00005 on behalf of the Army, which terminated the dumpster contract for the convenience of the government. Like the latrine contract termination, the modification issued to cancel the dumpster contract stated: "Contract is canceled by order of the ASG Commander Kuwait COL Brick Miller. Contract was canceled in accordance with FAR Part 52-212-4 Termination for Convenience of the Government," which, as with the latrine contract, was incorporated by reference into the dumpster contract. The parties

151

stipulated that: "The Government did not terminate Gulf Group for default under Contract W912D1-04-P-0897," and "[a]t the time Contract W912D1-04-P-0897 was terminated, the Government had not issued any Cure Notices to Gulf Group regarding Gulf Group's performance of its contractual obligations under that contract, and none was ever issued at any time thereafter." Despite the termination of Gulf Group's dumpster contract, the government had sufficient funds to pay for, and continued to be in need of, the dumpster services.

The latrine and dumpster contracts incorporated by reference the standard termination for convenience and the termination for cause clauses, identical to the clauses in the camp package BPA quoted above. The latrine contract also incorporated by reference 48 C.F.R. § 52.249–1 (1984), Termination for Convenience of the Government (Fixed–Price) (Short Form), which states: "The Contracting Officer, by written notice, may terminate this contract, in whole or in part, when it is in the Government's interest. If this contract is terminated, the rights, duties, and obligations of the parties, including compensation to the Contractor, shall be in accordance with Part 49 of the Federal Acquisition Regulation in effect on the date of this contract." In addition, the latrine contract incorporated by reference 48 C.F.R § 52.249–4 (1984), Termination for Convenience of the Government (Services) (Short Form), which states: "The Contracting Officer, by written notice, may terminate this contract, in whole or in part, when it is in the Government's interest. If this contract is terminated, the Government shall be liable only for payment under the payment provisions of this contract for services rendered before the effective date of termination."[145]

In defendant's second post-trial brief, defendant states that "Mr. Cockerham issued a contract modification terminating the latrine contract for the convenience of the Government, effective October 18, 2004," and "Mr. Cockerham issued a contract modification terminating the dumpster contract for the convenience of the Government, effective October 22, 2004." Defendant asserts that either Mr. Cockerham exercised his own discretion by agreeing with the directions from Col. Miller to terminate the contracts, or implemented the terminations at the direction of Col. Hess, Director of Contracting at Camp Arifjan. At trial, it remained unclear as to who was responsible for the order to terminate the latrine contract and the dumpster contract, with conflicting testimony offered, including from Col. Hess and Col. Miller. Col. Hess testified that Col. Miller ordered that Gulf Group's latrine and dumpster contracts be terminated, and Col. Miller denied that he had ordered the terminations.

In the same post-trial brief, however, defendant insists that the latrine contract was terminated for the convenience of the government due to force protection and

---

[145] The preamble to the 48 C.F.R. § 52.249–4 states: "As prescribed in 49.502(c), insert the following clause in solicitations and contracts for services, regardless of value, when a fixed-price contract is contemplated and the Contracting Officer determines that because of the kind of services required, the successful offeror will not incur substantial charges in preparation for and in carrying out the contract, and would, if terminated for the convenience of the Government, limit termination settlement charges to services rendered before the date of termination." See 48 C.F.R. § 52.249–4.

security issues, and that the Army did not breach the contracts. Defendant argues that "the latrine contract was terminated for the convenience of the Government for security reasons." In the same brief regarding the dumpster contract, defendant also asserts, "[d]espite what Col. Miller and Col. Hess may believe, the October 7, 2004 security incident is almost certainly what set in motion the termination of the dumpster contract." (internal citation omitted). Mr. Cockerham testified that he requested a meeting to document the security issues before terminating the latrine and dumpster contracts, but could not get one with Col. Hess. In the answer to the third amended complaint in the camp package BPA case, Case No. 06-835C, and in the answer to the second amended complaint in both the latrine case, Case No. 06-858C, and the dumpster case, Case No. 06-853C, defendant admitted "that Lieutentant [sic] Colonel Hess did not provide former Major Cockerham with a security report."

Defendant argues that the alleged security incident, in which Mohammed Al Tawash was detained after asking questions, taking notes, and making drawings of locations of buildings on the military base in order to assist in determining placement locations for dumpsters under the plaintiff's contract with the government, including the locations for where the general officer lived and whether the water and communications towers were the highest points on base, was initially reported as a potential criminal or terrorist incident. At trial, during direct examination of Col. Hess, plaintiff's counsel read back Col. Hess' deposition testimony to him, in which he stated

> there was concern raised by the security and intel community on [Camp] Arifjan that the company or owners of the company were involved, and I don't recall even with whom, but they were involved with people of interest, be it, I'm not sure if it was Taliban, I'm not sure if it was Saddam Hussein's outfit, any of that, but they were concerned about the involvement of the owners of this company being involved with enemies of America.

Although defendant continued to assert that at the time of the terminations the Army believed there were security concerns, on November 3, 2004, just sixteen days after plaintiff's latrine contract was terminated, and just twelve days after plaintiff's dumpster contract was terminated, defendant wrote the apology letter signed by Col. Hess, indicating that the Army had determined that Gulf Group, in fact, did not pose a security threat. Defendant, however, adds a curious aside in its second post-trial brief: "Although the contract had been terminated because of security concerns, the contracting command acceded to the congressman's specific request, and wrote that the latrine contract 'was not terminated because of security reasons.'" Presumably, if the security concerns were real, the senior officers responsible would have investigated the relevant facts before quickly issuing a letter denying any official security concerns. As noted above, courts assume government officials act in good faith. The Army acting on or acceding to the request of a United States Congressman, if a real security threat existed, would undermine that assumption.

153

The government did not even open a case or launch an investigation into the alleged security incident before terminating the latrine or dumpster contracts, suggesting that terminations may already have been part of the government's plan prior to the alleged security incident. For example, the parties have stipulated that "[a]ll or part of the service that was initially awarded to Gulf Group under the latrine contract was awarded to Jasmine." Col. Hess testified at trial, after reviewing the joint exhibits, that Jasmine was awarded a latrine contract on October 18, 2004, the same day Gulf Group's latrine contract was cancelled. At trial, Saud Al Tawash testified that "Jasmine picked up where I left. Jasmine is a competitor, and they absorbed -- when we were canceled, Jasmine took over our portion of the contract from Camp Arifjan." In addition, before the Army terminated Gulf Group's dumpster contract, it sent out a request to another contractor, Fouad Salem of Abdul Hameed Salem, seeking a quote for dumpster services at Camp Arifjan. The request was sent out on October 14, 2004, but the cancellation of Gulf Group's dumpster contract was not signed until October 21, 2004. Also, before the Army terminated the dumpster contract, it awarded a dumpster contract to another contractor, Green Valley, on October 18, 2004. The government continued to require, and had available funds to pay for the dumpster services.

The record, including the trial testimony, reveals varied and inconsistent explanations by defendant's witnesses concerning the reasons for the terminations of Gulf Group's contracts. On November 3, 2004, Col. Hess sent the letter to Mohammed Al Tawash regarding cancellation of Gulf Group's latrine contract, which stated in part:

> Please rest assured that the Gulf Group's contract to service portable latrines at Army camps in Kuwait was not terminated because of security reasons. While it is true that some employees of the Gulf Group have been either barred from the installation or warned because they had not followed the rules for contract employees on the installation, these incidents did not cause the termination of the contract.

> The contracting officer terminated the contract because circumstances arose that caused the contracting officer to conclude that it was in the best interest of the Army to terminate the contract. Since the contract was terminated for convenience of the government, the Gulf Group should not suffer any repercussions to its reputation or competitive standing. The Gulf Group is fully eligible to compete for other Army contracts in Kuwait. I hope this clarifies this unfortunate misunderstanding.[146]

---

[146] At trial, among other evasive and contradictory statements he made, Col. Hess attempted to distance himself from the November 3, 2004 apology letter, when he testified:

Q: The first sentence in the third paragraph [of the November 3, 2004, apology letter, quoted above,] recites, and I quote, "the contracting officer terminated the contract because circumstances arose that caused the contracting officer to conclude that it was in the best interest of the Army to terminate the contract." In the previous paragraph we said that security

154

According to Col. Hess' recollection at trial regarding the November 3, 2004 letter to Mohammed Al Tawash, the security and espionage concerns about Gulf Group "turned out to be unfounded," and the statement that some Gulf Group employees had been barred was, likewise, untrue and inaccurate. Col. Hess indicated he had obtained that information to insert into the letter from Col. Miller. At trial, Col. Hess elaborated:

> My recollection of the letter was we went through all the security stuff, all the concerns about espionage in the previous few exhibits we went through, and it turned out to be unfounded. This is my recollection. As such, we still had a viable contractor that we could do business with. The purpose of this letter was to put Gulf Group on notice that we still would like to consider them to do Army contracting, to engage, to bid on Army requirements in the future.

Col. Hess further indicated at trial that the contracts were terminated for convenience, rather than for default, because the government did not "want to cause any undue hardship" for Gulf Group. At trial, however, Col. Hess testified that he believed Gulf Group's latrine and dumpster contracts were terminated for security reasons by the contracting officer at Col. Miller's request. Col. Hess stated, "[w]e were ordered to get Gulf Group off the bases, the camps," and that "[m]y concern was to get the contractor off Brick Miller's installations…."

Col. Miller, however, denied directing the termination of the contracts and stated that he did not have the authority to order the terminations. Adding to the confusion surrounding the termination of the latrine and dumpster contracts, and, despite noting that his command was completely separate from contracting, Col. Miller, nonetheless, stated that the terminations were not related to the alleged security incident, suggesting that he had personal knowledge about the basis for the terminations, although he did not elaborate.

According to Maj. Petty's recollection, some or all of Gulf Group's contracts were terminated because of the alleged security incident. Capt. Novak testified that one of Gulf Group's contracts was terminated because of a security incident, but he did not know which one. Col. Portouw thought the cancellations were related to poor latrine performance. Mr. Cockerham testified that Col. Hess directed him to cancel Gulf Group's contracts for national security reasons. Col. Hess testified that Mr. Cockerham was following a command directive when he terminated the dumpster contract and was not exercising his own discretion. Mr. Cockerham confirmed that Col. Hess had directed him to cancel the dumpster contract. Mr. Cockerham also testified:

---

> reasons were not the basis for the termination. What did you have in mind in writing this third sentence as the circumstances that were in the best interest of the Army?

> A: I'm not sure what I meant by that sentence.

155

Q: Did I understand your testimony correctly that you supported Colonel Miller's and Colonel's Hess' decision to terminate Gulf Group's contracts in the name of national security, but not for any other reason?

A: Correct.

Q: So if the reason for terminating Gulf Group's contracts was not a national security, you would have not supported that decision, would you?

A: No.

Clea Efthimiadis, a civilian Army lawyer assigned to Camp Arifjan, testified that Col. Miller told her that plaintiff's latrine contract "was terminated because they couldn't do the job," and that the contract was terminated for default based on a "repeated failure to perform to the statement of work." Gulf Group's latrine contract, however, was not terminated for default, which conflicts with Ms. Efthimiadis' alleged conversation with Col. Miller.

Mr. Libbey, the contracting officer who supposedly reviewed all contract files before issuing his final decision, testified he thought the terminations were due to the overflowing latrine incident, dumpster diving, and security concerns. Mr. Libbey's contracting officer's final decision for the latrine contract stated:

The latrine inspection revealed that the vast majority of latrines were in a deplorable state of disrepair and the contractor was unsatisfactorily performing the terms and conditions of the contract. Gulf Group was advised of their poor performance and given an opportunity to remedy the situation,[147] but apparently their equipment capabilities (two waste tankers with two drivers) and staff were incapable of meeting the terms of the contract. At this same time, a substantial number of Gulf Group employees were being barred from the base for installation security infractions, which might have had a contributing affect [sic] on Gulf Group's inability to perform in an acceptable manner. Barely a week had passed from the first latrine inspection when the General again summoned Colonel Miller and LTC Hess to again observe the deplorable conditions of the latrines.

A report prepared by counterintelligence at Camp Arifjan detailed the alleged security incident, but at the end stated: "On 14 October, the Gulf Group General Enterprise [latrine] contract on Camp Arifjan was terminated by the Director of Contracting at the request of the ASG-KU Commander, for not meeting the contractual obligation to clean the port-a-johns on Camp Arifjan twice per day." As discussed below, however, the requirements of the latrine contract are conflicting with regard to the cleaning requirements.

---

[147] There is no indication in the record that plaintiff was given any cure notices.

Mr. Libbey's contracting officer's final decision for the dumpster contract stated: "On 9 October 2004, six Gulf Group employees were detained for security violations involving traveling on Camp Arifjan without their required escort, and rummaging through a dumpster. At least four of these individuals were barred from Camp Arifjan by Col. Miller on 16 and 18 October 2004." Plaintiff and its employees, however, were not barred from Camp Arifjan. It was employees of Gulf Company, not Gulf Group, who had been caught dumpster diving, and there was no relationship between these two distinct companies. In addition, it appears that Mr. Libbey was confused about which Gulf Group employees were issued letters of warning from the Army as a result of the alleged security incident involving Mohammed Al Tawash.

Mr. Peters, plaintiff's first attorney, testified at trial that, after the terminations, he met with Col. Hess, Col. Miller, Mr. Cockerham, and Tijani Saani in Kuwait and was given multiple reasons for the terminations. Mr. Peters testified that, after conversations with various individuals, "[i]t was apparent to me that there were different reasons being given in meetings and/or in discussions with various people, like Colonel Brick Miller." Attorney Peters further testified that Mr. Cockerham "told me a variety of things," including that a general, whose name Mr. Peters did not recall, "had used a satellite latrine portable, or attempted to use it, and it was not cleaned up. And for some reason, on a brand new contract that had been awarded, my client was blamed for it. That was one thing I was told. I was told other things, too." Mr. Peters also testified that during his meeting with Col. Miller, Col. Miller "mentioned" a latrine incident to Mr. Peters and made statements that the plaintiff may have been allied with anti-Americans. Reflecting on his meetings with the Army officials in Kuwait, Mr. Peters testified that:

I can only say that there were multiple reasons given [for the contract terminations]. I do remember that Colonel Hess wrote a letter to the Al Tawash family, not completely satisfactory, but saying that they were not a problem, but it was not clear exactly what he was saying in the letter. I remember that he was the contracting officer, and I wanted a General grade office to write a letter so that it would have more impact, and that was not forthcoming, and so I found that very questionable.

Saud Al Tawash stated he first learned about the impending terminations of the latrine and dumpster contracts from competitors, including Jasmine, which indicated to Saud Al Tawash that the contracts would be cancelled because Gulf Group was allegedly anti-American and had ties to terrorist groups. According to Saud Al Tawash, Capt. Trimble, Capt. Novak, Lt. Rivera, and Tijani Saani all told him that there was a security concern with Gulf Group. According to Mr. Wilson, Col. Hess told him that the cancellations had to do with security and counterintelligence and that the ASG commander made the decision to cancel. Mr. Wilson also testified that he tried to speak to Col. Hess over the phone, but Col. Hess did not want to talk to him and was "really nervous, talking in circles." Mr. Wilson further testified that Col. Hess stated during this phone call that Gulf Group's contracts were terminated due to "counterintelligence on the Al Tawash family, and they have ties [to] Al Qaeda and Saddam Hussein."

According to notes summarizing the cancellation of Gulf Group's contracts,[148] Mr. Wilson also heard someone comment that Gulf Group was "nothing but a bunch of kids and they [the Army] were going to get them out," although he could not remember if he heard this from an Army officer or from one of Gulf Group's competitors. Despite telling Mr. Wilson, plaintiff's Project Manager, that the Army was terminating Gulf Group's contracts for the alleged security risk, Tijani Saani, who worked in the contract office at Camp Arifjan, reportedly told Mr. Wilson that "we'll try to get you guys some work...." Mr. Wilson also stated that Col. Hess had said the Army was going to give plaintiff further work, and that either Mr. Cockerham or Capt. Novak said the same.[149]

It is odd that if the Army had truly considered Gulf Group a security threat, defendant would have terminated plaintiff's latrine and dumpster contracts for convenience, rather than for cause, thereby allowing Gulf Group potentially to obtain damages for the termination, and not barring Gulf Group from obtaining future contracts. Nor is it likely that senior Army officials like Col. Hess would write letters to members of the Al Tawash family stating, in part, "[p]lease rest assured that the Gulf Group's contract to service portable latrines at Army camps in Kuwait was not terminated because of security reasons," if security concerns remained or were the justification for the terminations.

Despite the varied reasons witnesses offered at trial for the terminations, defendant would have this court believe that the Army terminated Gulf Group's latrine and dumpster contracts due to the alleged security incident, which appears to have been innocent in origin, for which only a few Gulf Group employees received warning letters, and regarding which an investigation was never opened. Moreover, after the incident occurred, the Army continued to allow Gulf Group and its employees, including those involved in the incident, to carry out their operations in the camp. The employees who were detained for questioning were quickly released and no charges were filed against any individual or plaintiff. The individuals involved were not even asked to return for a hearing. Saud Al Tawash confirmed that neither Gulf Group nor any of Gulf Group's employees were barred from the camp because of the October 7, 2004 alleged security incident or any other security concerns, and Gulf Group continued to perform work for the United States government in the war theatre. The only consequence to plaintiff for the alleged security incident was that warning letters were sent to several Gulf Group personnel on October 21, 2004. As indicated by Saud Al Tawash in his trial

---

[148] At trial, Mr. Wilson indicated that he did not prepare the summary of the notes, included as a plaintiff's exhibit. When asked who prepared the summary he stated: "I'm assuming Mr. Peters."

[149] It is difficult to tell from Mr. Wilson's testimony which individual indicated the government would provide more work for the plaintiff. Mr. Wilson stated: "Major Cockerham was the same with me throughout the whole time. His basic stance was what happened and how this was handled was not right and that you know, they had – Captain Novak had done a very good report on the company. A very nice PowerPoint presentation, come out, put his hands on everything and he said, we're going to try to get you guys work."

testimony, moreover, only some of the recipients of the warning letters were even involved in the alleged security incident.

Col. Portouw testified that no case was opened on the incident because "there was no substance to it" and the questions of the Gulf Group employees were "innocent." Col. Portouw also testified that, while incidents like this were not frequent, they were not uncommon, and "invariably we found that they were curiosity-generated reports and simply required explaining to the employee why they shouldn't do that." Even Col. Hess and Maj. Petty testified that a map of the camp, as requested by Mohammed Al Tawash, had it been provided at the start of performance, would have been useful. As to the warning letters sent to Gulf Group and the employees involved in the incident, Col. Miller also indicated that "[t]housands" of such letters were sent out at that point in time in Kuwait and that the incident had "[n]othing to do with" the termination of plaintiff's contracts.

The incident involving Mohammed Al Tawash did not merit or receive great attention from the Army and was hardly substantial enough to warrant contract termination actions. Moreover, Mohammed Al Tawash's questions to determine locations for the latrines appear to have been innocent and in furtherance of a legitimate contract purpose. Indeed, on November 3, 2004, just sixteen days after terminating the contract and less than four weeks after the alleged security incident, the Army issued a letter of apology, stating that Gulf Group's latrine contract was not terminated for security concerns. The court finds that there is no evidence in the record that Gulf Group, Saud Al Tawash, or any member of the Al Tawash family had any terrorist ties or posed a security threat. Gulf Group has continued to do business with the United States government. The alleged security incident, therefore, was an insufficient and disingenuous basis for the terminations of plaintiff's latrine and dumpster contracts.

Evidence as to a legitimate basis for terminating the latrine and dumpster contracts, besides security reasons, also is lacking in the record. According to M. Sgt. Sivert, Gulf Group did not have enough dumpsters to replace its predecessor, Future Services, resulting in trash appearing on the ground. At trial, M. Sgt. Sivert testified that "Gulf Group did not have all their dumpsters to replace the ones that Future Services was taking away, and so there was a short time span that when the Future Service's [sic] contract ran out, they came and got their dumpsters, and then because there was no dumpsters to replace them with, Food Services [sic] was actually putting some of the trash and stuff on the ground, and we had to go back there and get it cleaned up after they had put it on the ground." After terminating Gulf Group's dumpster contract, the government awarded the services to another contractor, but required thirty-two more dumpsters than had been required from plaintiff. M. Sgt. Sivert explained that not all of the other dumpster contracts had run out by September 30, 2004, and that both Future Services and Gulf Group had dumpsters on the base at Camp Arifjan. M. Sgt. Sivert remembered Gulf Group's dumpsters being blue and Future Services' dumpsters being goldish brown. Saud Al Tawash, however, testified that Gulf Group's dumpsters were red. Therefore, there is an additional issue as to the color of Gulf Group's dumpsters, and there is testimony indicating that Gulf Group may not have been the lone contractor

with dumpsters in place at the time, calling into question whether Gulf Group's dumpsters or another contractor's dumpsters were overflowing. Saud Al Tawash also testified that the trash may have been caused by competitors flipping over their own dumpsters, although there is no independent evidence in the record of other contractors doing so. Megbel Al Tawash testified that, during the entire period of performance for the dumpster contract, there were no complaints regarding plaintiff's dumpster service at Camp Arifjan, nor did Gulf Group receive any nonconformance reports or any cure notices from the government. In sum, there is in the record before the court insufficient evidence to prove that the trash on the ground or any other deficiencies in performance prompted or offered support for the terminations.

As to the allegations regarding any dirty latrines, there is conflicting evidence in the record as to how many latrines were affected, the condition of the implicated latrines, how often they were to be maintained, which latrines were involved, and who was instructed by which employee of defendant to remedy the issue. Col. Miller testified that about twenty latrines were overflowing onto the floor. Col. Miller stated that either Col. Hess or Col. Fugate was with him when he viewed the latrines. Col. Hess did not remember any dirty latrine incident and did not recall seeing any overflowing, unplumbed latrines. Col. Hess testified that no one directed him to fix any dirty latrines. Col. Hess stated that Gulf Group was not terminated for poor performance under the latrine contract.

Mr. Cockerham stated that only one latrine was not cleaned. Maj. Petty testified that he inspected a group of eight to ten latrines which had "feces above the rim." He stated that only one was extremely bad and unusable; the others were merely unkept. In addition to Saud Al Tawash trying to explain that the latrines he provided were unplumbed and could not have overflowed, Megbel Al Tawash testified that Gulf Group's office received a phone call that one latrine had feces up to the brim, but it was cleaned that same day. Megbel Al Tawash also stated that Future Services had eight to ten latrines in the same area near the mess hall, and Mr. Wilson stated that latrines from various companies looked the same. Maj. Petty also testified that Future Services still had latrines in place when contractors Jasmine and Gulf Group first arrived.

Plaintiff argues that the contract only called for once-per-day cleaning of the latrines. Indeed, the statement of work for the latrine contract states:

4.2 *Cleaning.* The Contractor will empty and clean each latrine daily by wiping down interior walls and seat with mild disinfectant water or solution (that is nonharmful to the skin and eyes) and will provide steam cleaning reconditioning services once a month. The Contractor will provide all materials, equipment, personnel, chemicals, and cleaning supplies to include using an approved disinfectant. The Contractor will provide a Material Safe Data Sheet to the COR [contracting officer's representative] for any chemicals used in this contract. The cleaning services will include the following:

160

4.2.1 *Daily*.  The Contractor will vacuum sewage from the basin.  Debris such as cans, bottles, rags, sticks, etc. will be removed from the waste tank, collected and hauled away for proper disposal.  No debris will be allowed to contaminate the outside area around the chemical latrine.  The Contractor will be responsible for cleanup of any spills.  After all sewage and debris have been removed the Contractor will wash the toilet seat, urinal, and adjacent area around the toilet seat with the approved cleaning solution and remove all built up dirt and waste by scrubbing with a nylon hand brush.  The Contractor will fill the empty basin with a mixture of two (2) cups disinfectant solution and ten (10) gallons fresh water.  The Contractor will refill toilet paper dispensers and hand sanitation gel dispensers.  The Contractor will leave the area in and around the latrines in a sanitary state.

(emphasis in original).  At the end of the same section, however, the contract states, "[t]he vendor must use NEW Latrines and must take into consideration that they are bidding on the daily servicing of the latrines also latrines must be checked and cleaned twice a day." (emphasis in original).

According to Maj. Petty, servicing latrines once a day would have been sufficient. Col. Hess, however, stated that where latrines are located in high-traffic areas, like the mess hall or headquarters, a once-a-day service requirement may set a contractor up for failure as these latrines need to be serviced twice per day.  Steven Perry, a former Army Colonel, and plaintiff's expert on the issue of Army contracting and standard practices and procedures for Army contracting, testified that faulty specifications may have been the cause of unclean latrines if the government had not anticipated the extent of usage.  Mr. Perry also stated that, if bottles of water were found in a latrine, as suggested in some of the testimony to the court, it would be the end user's fault, not the contractor's.   Mr. Perry indicated that latrine contracts can be difficult to manage, although Col. Hess and Maj. Petty disagreed.

Therefore, if the latrine incident was the only basis for the termination of the latrine contract, especially without issuance of a cure notice, it appears to have been an insufficient basis for termination of the latrine contract.  There is conflicting evidence as to how many latrines were dirty, the extent of the uncleanliness, whether Gulf Group's latrines were the ones at issue, and whether Gulf Group was informed of any problems. Moreover, if, as suggested, plaintiff was responsive to a request to clean, there was an insufficient basis to terminate the plaintiff's latrine contract, particularly given that the specifications were conflicting.  Moreover, Col. Hess testified that a contractor missing a group of latrines during servicing was not uncommon and did not warrant termination for default.  Col. Hess further stated that his contracting office did not have performance problems with Gulf Group, and its latrine contract was not terminated for failure to meet its contractual obligations on the latrine contract.  At the time the government terminated the latrine contract, the Army continued to need the services and had the funds to pay. In fact, the joint stipulation of facts submitted to the court by both parties states that,"[a]ll or part of the services that were initially awarded to Gulf Group under [the latrine

161

contract] was awarded to another Government contractor, Jasmine International Trading & Service Company." Following termination of plaintiff's latrine contract, the government placed orders with Gulf Group for latrines at other locations, indicating that the Army believed in Gulf Group's ability to supply latrines and to service them.

In plaintiff's second amended complaint for the latrine case, plaintiff alleges:

As a result of the Government's arbitrary and wrongful termination of the contract, Gulf Group is entitled to damages in the form of preparatory expenses of KWD 25,757.137, equivalent to **$91,978.74** calculated at the exchange rate of 1 KWD @ U.S. $3.571, fees and costs incurred in the preparation and presentation of a termination claim and settlement proposal that was presented to the Contracting Officer in the sum of **$13,887.50**, in addition to lost profits of KWD 763,034.432 equivalent to **$2,724,795.96** calculated at the exchange rate of 1 KWD @ U.S. $3.571, for a grand total of **$2,830,662.20** in damages plus prejudgment interest under the Contract Dispute [sic] Act, 41 U.S.C. §611, the specific sum of which will be proven at the time of trial.[150]

(emphasis in original) (internal citations omitted). Plaintiff further alleges that "[o]n May 21, 2007 the Contracting Officer Joe L. Libbey of the U.S. Army Contracting Agency for Southwest Asia - Kuwait issued a final decision in which it granted in part and denied in part Gulf Group's claim for damages, awarding compensation in the amount of **$149,285.71** plus interest. Gulf Group disputes the computation of the award made by the Contracting Officer seeks additional compensation be awarded by this Court for its damages that were denied all as it will be shown at the time of trial." (emphasis in original) (internal citation omitted).

In plaintiff's second amended complaint for the dumpster case, plaintiff alleges that:

As a result of the Government's arbitrary and wrongful termination of the contract, Gulf Group is entitled to damages in the form of preparatory expenses of KWD 79,213.585,[151] equivalent to **$282,871.71** calculated at the exchange rate of 1 KWD @ U.S. $3.571, fees and costs incurred in the preparation and presentation of a termination claim and settlement proposal that was presented to the Contracting Officer in the sum of

---

[150] Plaintiff also alleges that, "[t]he Government's termination of this [latrine] contract was arbitrary, capricious and an abuse of discretion. Indeed, termination was in bad faith inasmuch as the purported basis for termination was a supposed security risk presented by Gulf Group that was not documented prior to, at the time of or any time subsequent to termination." As indicated above, plaintiff has abandoned any allegations of bad faith.

[151] Plaintiff's 2011 notice subsequently reduced the amount of costs plaintiff claimed to have incurred to 59,927.871 KD.

162

**$13,837.50,** in addition to lost profits of KWD 135,346.518 equivalent to **$483,322.42** calculated at the exchange rate of 1 KWD @ U.S. $3.571, for a grand total of **$780,131.63** in damages plus prejudgment interest under the Contract Dispute [sic] Act, 41 U.S.C. §611, the specific sum of which will be proven at the time of trial.[152]

(internal citations omitted; emphasis in original). Plaintiff further alleges that "[o]n May 21, 2007 the Contracting Officer Joe L. Libbey of the U.S. Army Contracting Agency for Southwest Asia – Kuwait, issued a final decision in which he granted in part and denied in part Gulf Group's claim for damages, awarding compensation in the amount of **$57,833.00** plus interest. Gulf Group seeks additional compensation be awarded by this Court for its damages that were denied all as it will be shown at the time of trial." (emphasis in original) (internal citation omitted).

Proof that a contract terminated for convenience was an abuse of discretion renders that contract breached. See Krygoski Constr. Co. v. United States, 94 F.3d at 1541; see also NCLN20, Inc. v. United States, 99 Fed. Cl. at 758. Therefore, the Army breached the latrine and dumpster contracts by improperly terminating them. The Restatement (Second) of Contracts provides, with respect to plaintiff's burden to prove damages:

> A party cannot recover damages for breach of a contract for loss beyond the amount that the evidence permits to be established with reasonable certainty.... Courts have traditionally required greater certainty in the proof of damages for a breach of a contract than in the proof of damages for a tort. The requirement does not mean, however, that the injured party is barred from recovery unless he establishes the total amount of his [or her] loss. It merely excludes those elements of loss that cannot be proved with reasonable certainty.

Restatement (Second) of Contracts § 352 cmt. a (1981). Although there may be uncertainty "'as to the extent of the damage,'" a court cannot avoid its obligation to provide relief when there is no uncertainty "'as to the fact of damage.'" See S.W. Elecs. & Mfg. Corp. v. United States, 228 Ct. Cl. 333, 351, 655 F.2d 1078, 1088 (1981) (quoting Joseph Pickard's Sons Co. v. United States, 209 Ct. Cl. 643, 650, 532 F.2d 739, 743 (1976)). "In cases where the responsibility for damage is clear…'it is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'" See Hughes Commc'ns Galaxy, Inc. v. United States, 47 Fed. Cl. 236, 239 (2000) (quoting S.W. Elecs. & Mfg. Corp. v. United States, 228 Ct. Cl. at 351, 655 F.2d at 1088 (citation omitted)); see also Bluebonnet Sav. Bank, F.S.B. v.

---

[152] Plaintiff also alleges that "[t]he Government's termination of this [dumpster] contract was arbitrary, capricious and an abuse of discretion. Indeed, termination was in bad faith inasmuch as the purported basis for termination was a supposed security risk presented by Gulf Group that was not documented prior to, at the time of or any time subsequent to termination." As indicated above, plaintiff has abandoned any allegations of bad faith.

163

United States, 266 F.3d 1348, 1355 (Fed. Cir.) ("The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: "'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'"" (quoting Elec. & Missile Facilities, Inc. v. United States, 189 Ct. Cl. 237, 257, 416 F.2d 1345, 1358 (1969) (quoting Specialty Assembling & Packing Co. v. United States, 174 Ct. Cl. 153, 183, 355 F.2d 554, 572 (1966)))), reh'g denied (Fed. Cir. 2001). In addition, "'[i]f a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery,' and the court's duty is to 'make a fair and reasonable approximation of the damages.'" Id. (quoting Ace–Federal Reporters, Inc. v. Barram, 226 F.3d 1329, 1333 (Fed. Cir. 2000) (citation omitted)); see also Marquardt Co. v. United States, 101 Fed. Cl. 265, 269 (2011). In situations in which the plaintiff seeks to recover costs that have been incurred, the plaintiff must demonstrate with reasonable certainty that the costs are recoverable. See Ariz. Pub. Serv. Co. v. United States, 93 Fed. Cl. 384, 390 (2010) ("Plaintiff alleges overhead of $577,934 in connection with its efforts to mitigate damages, and $357,013 for its cost of funds used…. These costs of funds and overhead are real, and we have no doubt that plaintiff spent the amounts claimed for the purposes stated. However, such costs must be established according to the standards and burdens described in this Opinion. Plaintiff did not show to a degree of reasonable certainty that those costs could be tied directly to its mitigation efforts.").

Plaintiff's citations to cases supporting that lost profits could have included the option periods rely on situations in which the wronged contractor can prove that the government chose, in bad faith, not to exercise the option periods. See Hi-Shear Tech. Corp. v. United States, 356 F.3d at 1374, 1375, 1380; Blackstone Consulting, Inc. v. Gen. Servs. Admin., CBCA 718, 08-1 BCA ¶ 33,770; Greenlee Constr., Inc. v. Gen. Servs. Admin., CBCA 416, 07-1 BCA ¶ 33,514. As the court determined above, however, there is no evidence that, had the latrine and dumpster contracts not been terminated, the government would have exercised the option periods, or would have not exercised them in bad faith or as a result of an abuse of discretion. Given that the latrine and dumpster contracts were terminated in the course of performance of the base period, and that the government is not obligated to exercise an option that is not otherwise restricted, plaintiff cannot claim entitlement to compensation for unexercised option periods. See Gov't Sys. Advisors, Inc. v. United States, 847 F.2d at 813 ("An option is normally an option, and nothing in [the provision at issue], or in any other contract clause, limited the circumstances under which the government could decline to exercise that bargained-for right in this case."). In Marketing & Management Information, Inc. v. United States, the plaintiff argued that it was entitled to damages relating to two, one-year option periods because, according to the plaintiff, it was foreseeable that the options would have been exercised had the underlying contract not been breached. See Mktg. & Mgmt. Info., Inc. v. United States, 62 Fed. Cl. 126, 130 (2004). Noting that, "where a contract is renewable solely at the option of the government, the government is under no obligation to exercise the option," the court concluded that "breach damages for the two option years would be inherently speculative." See id. (citing Gov't Sys. Advisors, Inc. v. United States, 847 F.2d at 813).

164

The court reasoned that an award of damages for lost profits relating to two option years that the government was free to exercise would put the plaintiff in a better position than had the breach never occurred. See Mktg. & Mgmt. Info., Inc. v. United States, 62 Fed. Cl. at 131. Although a claim that the government failed to exercise an option in bad faith, or as the result of an abuse of discretion, may entitle a plaintiff to relief, the abuse of discretion in the latrine and dumpster cases is linked to the underlying contracts at issue, not the government's option to extend those contracts. In circumstances where the government breaches an underlying contract, especially when the breach occurs early in the performance of the contract, an abuse of discretion giving rise to that breach generally only entitles a plaintiff to damages relating to the base year of the contract. See Sci. & Comm. Sys. Corp. v. Tessada Assocs., Inc., No. 1:11–cv–1278, 2012 WL 3866497, at *2 (E.D. Va. Aug. 30, 2012); E. Coast Res., LLC v. Town of Hempstead, 707 F. Supp. 2d 401, 409–10 (E.D.N.Y.), recons. denied (E.D.N.Y. 2010).

As with the camp package BPA claim, the task before the court of determining to what, if any, additional compensation plaintiff is entitled for the latrine and dumpster claims, lost profits notwithstanding, is made more difficult by the numerous and varying claim amounts submitted to Mr. Libbey in the form of certified claims, and to this court in the form of the complaints and the amended complaints. As noted above, plaintiff has sought various amounts for recovery on the latrine and dumpster contract claims. In its 2005 Claim and Settlement Offer to Mr. Cockerham for the latrine contract, plaintiff claimed entitlement to $5,058,428.59, and submitted a "settlement offer of $4,558,428.60." In its 2007 certified claim for the latrine contract, plaintiff claimed $6,000,000.00. Likewise in its original complaint in Case No. 06-858C, the latrine case, plaintiff sought $6,000,000.00. In its first amended complaint in the latrine case, plaintiff sought 1,572,967.611 KD.[153] In its second amended complaint in the latrine case, plaintiff now seeks $2,830,662.20.[154] In its 2005 Claim and Settlement Offer to Mr. Cockerham for the dumpster contract, plaintiff claimed entitlement to $1,110,621.72, and submitted a "settlement offer of $999,994.67." In its 2007 certified claim for the dumpster contract, plaintiff claimed $1,800,000.00. In its original complaint in Case No. 06-853C, the dumpster case, plaintiff also sought $1,800,000.00. In its first amended complaint in the dumpster case, plaintiff sought $1,946,721.78.[155] In its second amended complaint in the dumpster case, plaintiff now seeks $780,031.63.[156]

---

[153] Plaintiff sought 1,416,360.000 KD in lost profits, 156,607.611 KD in preparatory expenses, legal fees, costs incurred in preparing a settlement of plaintiff's claims, and interest. Plaintiff did not convert the amounts to USD.

[154] Plaintiff now seeks $2,724,795.96 in lost profits, $91,978.74 in preparatory expenses, $13,887.50 in fees and other costs, plus prejudgment interest, costs of litigation and attorneys' fees.

[155] Plaintiff sought $1,457,619.72 in lost profits, $489,102.06 in preparatory expenses, legal fees, costs incurred in preparing the settlement of the claims, and interest.

[156] Plaintiff asserts in its second amended complaint in the dumpster case that it seeks $780,131.63, but the total of the various amounts listed by plaintiff is only $780,031.63.

As indicated above, the majority of the testimony at trial addressed the award of the contracts, the alleged security incident, the hiring of Ms. Blake, Saud Al Tawash's relationship with Mr. Cockerham, and the inflated claims. Little testimony at trial specifically addressed the denied elements of Gulf Group's 2007 latrine contract and dumpster contract claims before Mr. Libbey. Moreover, plaintiff's exhibits at trial on the costs Gulf Group incurred in performing the latrine contract for a brief period of time included only a handful of unclear charts, spreadsheets, and a handful of invoices or records. In addition, only a small number of the joint exhibits offer any support for the specific claims after the contracting officer's final decision on the latrine contract claim. The most specific information is included in the 2011 notice for the latrine case, in which plaintiff indicates: "Pursuant to the Court's Order dated December 9, 2010, Gulf Group General Enterprises, Co. W.L.L. hereby submits its revised claim together with supporting documents and an explanation of the reasons for the revisions." The 2011 notice for the latrine claim, included as a joint exhibit at trial, included a chart similar to the one included for the 2011 notice for the camp package BPA claim. The chart for the latrine contract claim listed thirty-three individual claims, reducing the revised amount for thirteen claims, removing eight individual claims, listing no change for nine individual claims, and submitting three entirely new claims. Plaintiff included the identical forms, purchase orders, checks, and invoices included in the original 2005 Claim and Settlement Offer to Mr. Cockerham with the 2011 notice.

Plaintiff also did not identify the differences in its costs in the 2011 notice for the latrine claim and the second amended complaint on the latrine contract from the amounts awarded by Mr. Libbey in his May 21, 2007 contracting officer's final decision. In his contracting officer's final decision on the latrine contract claim, Mr. Libbey wrote:

> I determine Gulf Group is entitled to one month of contract performance. Actual performance was less than one month, but I believe Gulf Group incurred costs on at least a monthly basis; therefore, a full month of contract performance represents the percentage of the contract performed before contract termination. Gulf Group is entitled to $149,285.71, for one month's performance plus interest. I believe this [sic] a fair and reasonable settlement.

In a footnote, Mr. Libbey stated: "This amount is one month of service for 400 latrines as proposed by Gulf Group and is not the erroneous amount noted in footnote 1 above." Mr. Libbey appears to have misinterpreted the price of the contract by not relying on the price as it appears in the contract in reaching his decision on the latrine contract. Plaintiff did not make an effort to segregate what, according to Mr. Libbey, would have been covered by one month's worth of performance, $149,285.71, instead claiming

---

Plaintiff seeks $483,322.42 in lost profits, $282,871.71 for preparatory expenses, $13,837.50 for fees and other costs, prejudgment interest, costs of litigation and attorneys' fees.

$91,978.736.[157] Moreover, plaintiff did not draw a nexus between each of the revised claim amounts and the supporting documentation attached to the claim.

The testimony at trial by Saud Al Tawash also did not specifically link any of the claimed amounts to actual, documented expenditures by Gulf Group made in connection with preparing to perform the latrine contract. For example, on cross examination, regarding the purchase of latrines referred to in the 2011 second revised claim, and included as supporting documentation attached to that claim, Saud Al Tawash testified:

Q: This is the Joint Exhibit 85 which is the revised claim with regard to the latrines which was filed with the court in January of this year?

A: Yes. sir.

Q: This reduces the amount of latrines purchased?

A: Yes, fir [sic]. From 600 to 400 latrines.

Q: Reducing the amount from the initial claim column from 52,000 dinars to 37,000 dinars?

A: Reducing the preparatory expenses from the summary of the initial-claim to this revision.

Q: On the second page, page 1878, you also reduced the –

A: The adjustment like air freight, custom duty, freight forwarding charges. Based on a pro rata. They took the amount of the invoice of 600, they prorated it on 400 and they submitted those bills in here, sir.

Q: At the bottom of this the amount is reduced from – There's mitigation again?

A: Yes. We were able to sell a lot of these latrines, not all of them, we still have some stuck in Kuwait, but we sold a lot of them and we almost got the full value, remarkably, from the sale of them. And this, I think if I add it up I think we got close to 78,000 KD. That's quarter million dollars worth of mitigation efforts. We put ads in paper and sold them. These latrines are very hard to sell in Kuwait because they're spec'd out for military in that region of the world. We had issues trying to sell them, but we were lucky that we have been able to get this in the mitigation effort.

---

[157] Plaintiff's 2011 notice for the latrine claim rounded to three decimal places in converting between Kuwaiti dinars and United States dollars.

167

This testimony was representative of Saud Al Tawash's testimony on the specific claims on the latrine contract. As noted above, Saud Al Tawash was able to note the difference in the amount of certain items from the original claims and the 2011 notices, but was not able to offer support for the costs alleged. Instead, the testimony was often a recitation of the items listed in the 2011 notice for the latrine claim, rather than a substantiation of the supporting documents. Moreover, a large portion of Saud Al Tawash's testimony regarding the specific claims on the latrine and dumpster contracts was driven by explaining why Gulf Group, Saud Al Tawash as the General Manager of Gulf Group, and Gulf Group's attorneys submitted the particular claims filed and complaints filed.

Like the camp package BPA claim, however, defendant appears to have conceded that plaintiff incurred all of the costs that plaintiff identified in its 2011 notice in its performance for the latrine contract. Defendant stipulated that "Gulf Group purchased a total of 600 latrines, 400 of which were for use in the performance of Contract No. W912-D1-04-P-0932." Defendant also stated in post-trial brief that Gulf Group actually incurred costs in the amount of 94,047.000 KD in its performance of the latrine contract, which was well above the 25,757.137 KD that plaintiff claimed to have incurred in its 2011 notice. Defendant apparently treated the approximate costs that plaintiff deducted as a result of its mitigation efforts as costs that plaintiff incurred in its performance of the contract. Defendant also did not demonstrate that plaintiff failed to adequately mitigate its costs. See Koby v. United States, 53 Fed. Cl. 493, 497 (2002) (citations omitted). In fact, the record indicates that plaintiff made efforts to mitigate its costs. Defendant's failure to rebut plaintiff's claims with respect to the costs plaintiff incurred in its performance of the latrine contract is problematic.

Similarly, because little testimony at trial specifically addressed the denied elements of Gulf Group's 2007 dumpster claim, and because plaintiff's trial exhibits on the costs it incurred in performing the dumpster contract for a brief period of time included only a small number of unclear charts, spreadsheets, and a handful of invoices or records, and only one or two of the joint exhibits offer any support for the specific claims after the contracting officer's final decision on the dumpster contract claim, the most specific, relevant information may come from the 2011 notice on the dumpster claim. In the 2011 notice of filing of revised claims, plaintiff indicates: "Gulf Group General Enterprises, Co. W.L.L. hereby submits its revised claim together with supporting documents and an explanation of the reasons for the revisions." The 2011 notice for the dumpster contract, included as a joint exhibit at trial, contained a chart similar to the 2011 notices for the camp package BPA and latrine claims. The chart for the dumpster claim listed nineteen individual claims, removing one claim, reducing the revised amount for five claims, listing no change for four individual claims, and submitting nine entirely new individual claims. Plaintiff included the identical forms, purchase orders, checks, and invoices included in the original 2005 Claim and Settlement Offer to Mr. Cockerham with the 2011 notice.[158] Plaintiff also did not identify the differences in its costs in the 2011 notice and the second amended complaint for the

---

[158] Plaintiff's 2011 notice also included summaries of payments to various employees not included in the original claim.

dumpster contract from the amounts awarded by Mr. Libbey in its May 21, 2007 contracting officer's final decision.

In his contracting officer's final decision on the dumpster contract claims, Mr. Libbey wrote:

> I determine Gulf Group is entitled to one month of contract performance. Actual performance was less than one month, but I believe Gulf Group incurred costs on at least a monthly basis; therefore, a full month of contract performance represents the percentage of the contract performed before contract termination. Gulf Group is entitled to $57,833.00, for one month's performance plus interest. I believe this [sic] a fair and reasonable settlement.

Plaintiff did not make an effort to segregate what, according to Mr. Libbey, would have been covered by one month's worth of performance, the $57,833.00, instead claiming $214,002.427.[159] Moreover, as with the latrine contract claim, plaintiff was unable to draw a nexus between each of the revised claim amounts and the supporting documentation attached to the claim. Testimony at trial by Saud Al Tawash also did not specifically link any of the claimed amounts to actual, documented expenditures by Gulf Group. For example, on direct examination regarding the purchase of compactors referred to in the 2011 notice, and included as supporting documentation attached to that notice, Saud Al Tawash testified:

> Q: What is this document that we see on page 1116 [an exhibit attached to plaintiff's 2011 notice on the dumpster contract claim]?

> A: This is the company that does the steel fabrications called Malika Factory Steel Works. They manufacture dumpsters, and they're what we call in the industry body builder.

> Q: Okay. And are they invoicing you for any particular equipment, service? What is this for?

> A: Yeah, this is the garbage compactor maintenance. The referred the hydraulics, change hoses oil seals, jacks. This is just an invoice for the garbage compactor to be installed on the trucks.

> Q: And was this a used compactor or a new compactor? Why did it need service?

> A: Because we bought used compactors. They're international trucks, and they were the type of trucks that were approved to be used for this

---

[159] Plaintiff's 2011 notice for the dumpster contract claim rounded to three decimal places in converting between Kuwaiti dinars and United States dollars.

contract. They're American trucks, and they had American compactors manufactured by Hill Industries.

This was the sum-total of the testimony on the compactors by Saud Al Tawash, who offered the most in-depth testimony on the specific dumpster claims. For the next item on the 2011 notice, the red 20-cubic meter dumpsters, the entirety of Saud Al Tawash's testimony was:

> Q: All right, so turn to the next page 1118 [an exhibit attached to plaintiff's 2011 notice on the dumpster contract claim]. If you can tell us, what is this?
>
> A: This is an invoice for the 20-cubic meter dumpsters painted in red which is the Gulf Group identity. Every contractor had a different color like some of them are blue. Some of the other contractors have yellow. Our color was red for Gulf Group, and the Malika that has manufactured the dumpsters for us and painted them in the red color. And the first line item is for the dumpsters. The second line item is for six-cubic meter dumpsters, 230. And the third line item is the hooks for the trucks for roll on, roll off. These are the mechanical mechanism that we installed on the chassis truck to haul away the 20-cubic meter dumpster.
>
> Q: And is this an invoice for the purchase of these items that Gulf Group made?
>
> A: Yes ma'am.
>
> Q: All right.

As with the camp package BPA claim and the latrine claim, however, the government appears to have conceded that plaintiff incurred all of the costs that plaintiff identified in its 2011 notice regarding its performance of the dumpster contract. Defendant stipulated, for example, that "Gulf Group paid Abdul Hameed Salem ('AHS') 12,000 kd for the service to the 6cm dumpsters and 990 kd for the service to the 20 cm dumpsters by its subcontractor in the performance of Contract No. W912DI-04-P-0897." Defendant also stated in its post-trial brief that Gulf Group actually incurred costs in the amount of 80,467.871 KD in its performance of the dumpster contract, which was well above the 59,927.871 KD that plaintiff claimed to have incurred in its 2011 notice. Defendant apparently treated 68,910.000 KD of costs that plaintiff deducted as a result of its mitigation efforts as costs that plaintiff incurred in its performance of the contract. Defendant also did not demonstrate that plaintiff failed to adequately mitigate its costs. See Koby v. United States, 53 Fed. Cl. at 497 (citations omitted).

In contrast to Gulf Group's minimal effort to prove the amount of costs it incurred in performance of the latrine and dumpster contracts, Gulf Group has presented the court with a more understandable and complete explanation of its lost profits claims with

170

respect to the latrine and dumpster contracts. As noted above, it is the obligation of the court to find recovery for a party who has suffered a breach if the measure of damages can be reasonably certain. See AmBase Corp. v. United States, 100 Fed. Cl. 548, 572 (2011). When a plaintiff seeks expectancy damages, like lost profits, the plaintiff must present the court with sufficient "record evidence" to "perform the necessary comparison between the breach and non-breach worlds." See Yankee Atomic Elec. Co. v. United States, 536 F.3d 1268, 1273 (Fed. Cir. 2008); see also Stockton E. Water Dist. v. United States, 109 Fed. Cl. 760, 785 (2013); Stockton E. Water Dist. v. United States, 109 Fed. Cl. 460, 485 (2013). "To recover lost profits for breach of contract, the plaintiff must establish by a preponderance of the evidence that (1) the lost profits were reasonably foreseeable or actually foreseen by the breaching party at the time of contracting; (2) the loss of profits was caused by the breach; and (3) the amount of the lost profits has been established with reasonable certainty." Anchor Sav. Bank, FSB v. United States, 597 F.3d 1356, 1361 (Fed. Cir. 2010) (citations omitted).

> Lost profits are legally foreseeable only if, at the time that the contract was entered into, (1) the loss was natural and inevitable upon the breach so that the defaulting party may be presumed from all the circumstances to have foreseen it; or (2) if the breach resulted in lost profits because of some special circumstances, those circumstances must have been known to the defaulting party at the time the contract was entered into.

See Precision Pine & Timber, Inc. v. United States, 72 Fed. Cl. 460, 480 (2006) (citing Chain Belt Co. v. United States, 127 Ct. Cl. 38, 58, 115 F. Supp. 701, 714 (1953)), recons., 81 Fed. Cl. 235 (2007), and recons. in part, 81 Fed. Cl. 733 (2008), aff'd in part, rev'd in part, 596 F.3d 817 (Fed. Cir.), and reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 131 S. Ct. 997 (2011). The breaching party is not required to be absolutely certain that the non-breaching party would suffer the damages at issue as a result of the breach. See Restatement (Second) Contracts § 351 cmt. a ("It is enough, however, that the loss was foreseeable as a probable, as distinguished from a necessary, result of his [or her] breach."). In contrast, "the causal connection between the breach and the loss of profits must be 'definitely established.'" See Cal. Fed. Bank v. United States, 395 F.3d 1263, 1268 (Fed. Cir. 2005) (citations omitted). When analyzing anticipatory profit, however, "it must be 'definitely established' that without the government's breach there would have been a profit." See Hi-Shear Tech. Corp. v. United States, 356 F.3d at 1379 (quoting Cal. Fed. Bank, FSB v. United States, 245 F.3d 1342, 1349 (Fed. Cir. 2001), cert. denied, 534 U.S. 1113 (2002)). "'Certainty [of damages] is sufficient if the evidence adduced enables the court to make a fair and reasonable approximation of the damages,'" which permits the court to examine "'probable and inferential as well as direct and positive proof.'" Energy Capital Corp. v. United States, 302 F.3d 1314, 1329 (Fed. Cir. 2002) (quoting Locke v. United States, 141 Ct. Cl. 262, 267–68, 283 F.2d 521, 524 (1960)), reh'g denied (Fed. Cir. 2002) (alteration in original). If a plaintiff presents enough proof to allow a court to make a fair and reasonable approximation of damages, a defendant's reliance on cross-examination to attack the credibility of witnesses while offering "no evidence to counter Plaintiff's testimony and exhibits" may not be sufficient to rebut the plaintiff's

demonstration of an entitlement to expectancy damages.  See Richmond Am. Homes of Colo., Inc. v. United States, 80 Fed. Cl. 656, 662 (2008), appeal dismissed, 352 F. App'x 421 (Fed. Cir. 2009).  Expert testimony cannot demonstrate reasonable certainty of damages without "'an adequate foundation in the facts of the case.'"  See First Fed. Lincoln Bank v. United States, 518 F.3d 1308, 1320 (Fed. Cir.) (quoting Genmoora Corp. v. Moore Bus. Forms, Inc., 939 F.2d 1149, 1157 (5th Cir.), reh'g (5th Cir.), and mandate clarified (5th Cir. 1991)), reh'g and reh'g en banc denied (Fed. Cir. 2008).  Expert testimony, however, is a viable means of establishing lost profits with reasonable certainty if supported by the evidence.  See Energy Capital Corp. v. United States, 302 F.3d at 1327 (citations omitted) (citing decisions that affirmed the award of lost profits for new ventures based on expert testimony).  With respect to anticipatory lost profits, judges have "considerable leeway" in determining the reliability of an expert's testimony.  See Loeffel Steel Prods., Inc. v. Delta Brands, Inc., 387 F. Supp. 2d 794, 803 n.7 (N.D. Ill. 2005) (citation omitted).

Although a termination for convenience generally does not entitle a contractor to anticipatory profits, a termination for convenience "tainted by bad faith or an abuse of contracting discretion," Krygoski Constr. Co. v. United States, 94 F.3d at 1541, which amounts to a breach of contract, may entitle a plaintiff to expectancy damages.  Id. at 1545.  In support of its claims for lost profits, plaintiff offered the testimony of Terry Carlson, qualified as an expert in government contract accounting, with experience working for the Defense Contract Audit Agency, as well as for private companies.  Mr. Carlson testified that he had reviewed a spreadsheet prepared by Gulf Group's accounting department, which delineated the amount Gulf Group was to receive under the latrine and dumpster contracts, line items for each cost that Gulf Group expected to incur in performing the latrine and dumpster contracts, as well as Gulf Group's expected profit over the base periods and each option period for the latrine and dumpster contracts.  Mr. Carlson also reviewed the latrine and dumpster contracts, schedules prepared by Gulf Group, depositions that were taken in the above-captioned cases, Gulf Group's claims to the contracting officer, as well as its complaints, and the contracting officer's findings with respect to the termination of the latrine and dumpster contracts.  Plaintiff's expert testified that he suggested changes to Gulf Group's lost profits calculation, including the correction of errors in plaintiff's initial calculation of its expenses.  In helping plaintiff to revise its initial calculation of lost profits, plaintiff's expert testified that he also reviewed available documentation of projected expenses.  Mr. Carlson testified that he accounted for deficiencies in plaintiff's accounting system by individually reviewing invoices in support of each cost listed by plaintiff.  Plaintiff's expert also testified that plaintiff had properly calculated the depreciation of plaintiff's assets.  Although plaintiff's expert testified that business practices in Kuwait prevented him from calculating depreciation in a traditional manner, he counseled plaintiff and Saud Al Tawash on calculating depreciation of assets based on "a reasonable useful life" of the assets at issue.  After reviewing plaintiff's documentation, and accounting for deficiencies in plaintiff's accounting system, plaintiff's expert testified that he was reasonably certain that plaintiff's final lost profits calculation was accurate.  Plaintiff's expert ultimately concluded that the spreadsheet prepared by Gulf Group reflected "the difference between the revenue that they expected and the expected costs to perform,"

which amounted to "the profit that they would have incurred had they been allowed to perform the contract as they had planned."[160]

On cross-examination, defendant primarily highlighted that Mr. Carlson had relied on discussions with Saud Al Tawash and an individual from Gulf Group's accounting department to determine a reasonable approximation for the useful life of Gulf Group's assets, that plaintiff's expert mostly reviewed invoices, rather than cancelled checks to determine plaintiff's projected costs, and plaintiff's asserted entitlement to compensation relating to option periods not exercised by the government. Although defendant had indicated to the court that it intended to call a certified public accountant in response to plaintiff's expert, after hearing the testimony presented by plaintiff's expert, Mr. Carlson, defendant informed the court that it did not "need" to present expert testimony related to plaintiff's lost profits calculation.

As indicated above, the court disagrees with plaintiff's expert, Mr. Carlson, that plaintiff is entitled to lost profits for each unexercised option period, but plaintiff has established that defendant is liable for damages arising out of its breach of contract during the base period of the latrine and dumpster contracts. See Krygoski Constr. Co. v. United States, 94 F.3d at 1541, 1545. "In cases where the responsibility for damage is clear…'it is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'" See Hughes Commc'ns Galaxy, Inc. v. United States, 47 Fed. Cl. at 239 (quoting S.W. Elecs. & Mfg. Corp. v. United States, 228 Ct. Cl. at 351, 655 F.2d at 1088 (citation omitted)). Plaintiff calculated its lost profits directly from the subject matter of the contract, which plaintiff presumably entered into for the purpose of making a profit, establishing a link between plaintiff's losses and defendant's breach, and indicating that it was foreseeable that lost profits would be a probable result of defendant's breach. See Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1023 (Fed. Cir.), reh'g denied, in banc suggestion declined (Fed. Cir. 1996), cert. denied, 520 U.S. 1116 (1997). Moreover, the testimony of plaintiff's expert and his supporting documentation, as well as plaintiff's documentation of costs, indicate that the final calculation of lost profits that plaintiff presented to the court constitutes a projection of the "'fair and reasonable approximation of the damages'" plaintiff suffered, which satisfies the requirement that plaintiff prove its lost profits with reasonable certainty. See Energy Capital Corp. v. United States, 302 F.3d at 1329 (quoting Locke v. United States, 141 Ct. Cl. at 267–68, 283 F.2d at 524).

---

[160] The spreadsheet prepared by Gulf Group inaccurately indicates that the base period of the latrine contract was from September 2, 2004 to January 1, 2005. The base period of the latrine contract, which was awarded on September 28, 2004, actually was from September 28, 2004 to January 21, 2005. Mr. Carlson confirmed at trial that the lost profits associated with the inaccurate time period reflected in the spreadsheet prepared by Gulf Group correspond to the base period of the latrine contract. Defendant did not challenge the inaccurate time period listed in the spreadsheet and the time periods listed in plaintiff's calculation of lost profits for the latrine contract. The spreadsheet accurately reflects the base period of the dumpster contract and the period of performance for the camp package BPA call for Camp Buehring.

Although plaintiff claims lost profits for both the latrine and dumpster contracts, and the evidence plaintiff presented allows the court to make a fair and reasonable approximation of the plaintiff's profit and losses, the evidence before the court indicates that plaintiff would have made a profit on the dumpster contract only if defendant had exercised the option periods to the dumpster contract. The testimony of plaintiff's expert and supporting documentation indicate that plaintiff would have obtained profits during the base period of the latrine contract, but that plaintiff would have suffered a loss during the base period of the dumpster contract. Plaintiff, therefore, is entitled to lost profits as a result of defendant's termination of the latrine contract only in the amount of 92,443.724 KD, which is the amount endorsed by plaintiff's expert, Mr. Carlson, as well as interest on that amount.

That plaintiff would not have made a profit on the dumpster contract, however, does not preclude plaintiff from recovering the costs it incurred in preparing to perform the contract as a result of defendant's breach. A measure of damages that allows a non-breaching party to incur the full amount of costs incurred in preparing to perform a contract "'rests on the premise that the injured party's reliance interest is no greater than the party's expectation interest.'" See Bausch & Lomb Inc. v. Bressler, 977 F.2d 720, 729 (2d Cir. 1992) (quoting 3 Farnsworth, Farnsworth on Contracts § 12.16, at 265 (2d ed. 1990)) (applying New York law). It is "generally recognized that reliance damages should not exceed plaintiff's expectancy interest." See Citizens Fin. Servs., FSB v. United States, 57 Fed. Cl. 64, 70 n.5, clarified on denial of recons., 59 Fed. Cl. 27 (2003). When a non-breaching party seeks to recover costs incurred in preparing to perform a contract, and the non-breaching party would have ultimately incurred a loss in performing the contract, "it is open to the party in breach to prove the amount of the loss, to the extent that he [or she] can do so with reasonably certainty[,]…and have it subtracted from the injured party's damages." Restatement (Second) Contracts § 349 cmt. a. Accordingly, "[i]f the breaching party establishes that the plaintiff's losses upon full performance would have equaled or exceeded its reliance expenditures, the plaintiff will recover nothing under a reliance theory." See Bausch & Lomb Inc. v. Bressler, 977 F.2d at 729; see also Westfed Holdings, Inc. v. United States, 52 Fed. Cl. 135, 155 (2002) (noting that the Restatement (Second) of Contracts "permits a reliance recovery to be offset by losses that would have been sustained had the contract been fully performed…." (citing L. Albert & Son v. Armstrong Rubber Co., 178 F.2d 182, 189 (2d Cir. 1949) ("[O]n those occasions in which the performance would not have covered the promisee's outlay, such a result [the recovery of expenses] imposes the risk of the promisee's contract upon the promisor…. On principle therefore the proper solution would seem to be that the promise may recover his outlay in preparation for the performance, subject to the privilege of the promisor to reduce it by as much as he can show that the promise would have lost, if the contract had been performed."))); see generally Am. Capital Corp. v. United States, 63 Fed. Cl. 637 (taking into account the plaintiff's expected net losses in calculating the plaintiff's reliance interest), recons. in unrelated part, 65 Fed. Cl. 241 (2005).[161] Here, the record demonstrates that plaintiff

---

[161] The court notes that, although established by case law and recognized by the Restatement (Second) of Contracts, the principle that the court should deduct from reliance damages any loss that the non-breaching party would have incurred had the

expected to incur a loss in performing the dumpster contract. The court, therefore, applies the generally accepted principle of reducing plaintiff's reliance damages resulting from defendant's breach of contract by the value of the loss that plaintiff expected to incur in performing the contract, entitling plaintiff to 47,881.664 KD, plus interest.[162]

Although plaintiff seeks lost profits in addition to preparatory expenses, plaintiff has not demonstrated that it is entitled to costs in addition to lost profits on its latrine contract claims. Plaintiff cites United States v. Behan for the proposition that it can recover costs it incurred in performing the latrine and dumpster contracts, as well as lost profits. See United States v. Behan, 110 U.S. 338 (1884). In United States v. Behan, the United States Supreme Court stated while discussing lost profits that "it would seem to be quite clear that the claimant ought at least to be made whole for his [or her] losses and expenditures." See id. at 344. Even Gulf Group recognizes, however, the plaintiff in United States v. Behan failed to prove entitlement to lost profits, and therefore, pursued its costs as an alternative measure of damages. See id. at 342–43. The Supreme Court recognized that "losses...may consist of two heads of classes of damage—actual outlay and anticipated profits." Id. at 345. The Supreme Court also recognized, however, that these classes of damages are generally pursued in the alternative. See id. If a plaintiff chooses to pursue lost profits, then the ordinary rule of damages being measured by "'the difference between the cost of doing the work and what he has to receive for it'" applies. Id. The Supreme Court's holding in United States v. Behan, therefore, applied the established principle that recovery of a form of expectancy damages generally precludes recovery of reliance damages. See Restatement (Second) Contracts § 349 (noting that "[a]s an alternative" to expectation damages, "the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed."); see also Stovall v. United States, 94

---

contract been fully performed is "unrelated to putting the plaintiff back in the position he or she would have occupied if the contract had not been made." See Westfed Holdings, Inc. v. United States, 52 Fed. Cl. at 155 (citing L. Albert & Son v. Armstrong Rubber Co., 178 F.2d at 189); Christopher T. Wonnell, 38 San Diego L. Rev. 53, 114 (2001), Expectation, Reliance, and the Two Contractual Wrongs (noting that the reduction of a non-breaching party's expected loss in performing a contract from the expenditures that the non-breaching party made in preparing to perform the contract is a "hybrid remedy of 'reliance limited by expectation' which seems to be justifiable neither by reliance nor expectation theory.").

[162] The court would likely reach the same result if it were to determine Gulf Group's recovery arose from defendant's termination of the dumpster contract for convenience, rather than from defendant's breach of the dumpster contract. The FAR permits Gulf Group to recover expenses it incurred in preparing to perform the dumpster contract. See 48 C.F.R. § 52.249–2(g)(2)(i) (2005). The FAR also accounts for losses, see, e.g., 48 C.F.R. § 49.203 (2005), and recovery in such situations is a form of reliance damages. See Hi-Shear Tech. Corp. v. United States, 356 F.3d at 1383.

Fed. Cl. 336, 354 n.20 (2010) (noting that the recovery of both measures of damage is theoretically possible, but that the "plaintiff must demonstrate that there is no double-counting in his [or her] pursuit of expectation and reliance damages"); Dolmatch Grp., Ltd. v. United States, 40 Fed. Cl. 431, 440 (1998) ("Plaintiff cannot recover both expectancy and reliance damages on the same transaction." (citation omitted)). Plaintiff is precluded from recovering expenditures that would likely factor into the calculation of plaintiff's lost profits. In addition, as indicated above with respect to Gulf Group's claim for attorneys' fees in connection with defendant's termination of the camp package BPA, plaintiff is similarly precluded from recovering costs incurred in preparation of its 2005 Claim and Settlement Offers for the latrine and dumpster contracts because the 2005 submissions to the contracting officer were without factual or legal basis.

In sum, the court finds that defendant breached both plaintiff's latrine contract and dumpster contract in terminating both contracts without establishing a legitimate basis for doing so. The court finds that plaintiff is entitled to lost profits as a result of defendant's breach of the latrine contract, in the amount of 92,443.724 KD, plus interest. In addition, due to defendant's concession that plaintiff incurred costs in preparing to perform the dumpster contract, plaintiff is entitled to the amount claimed in its 2011 notice in the dumpster claim, less the loss that plaintiff expected to incur in performing the base period of the contract, or 47,881.664 KD, plus interest.

## IV.    The Bottled Water BPA Demurrage Claim

On September 28, 2004, Maj. Davis awarded the bottled water BPA to Gulf Group for the provision of bottled water to the Army. Although Mr. Cockerham was the contract specialist, he was not a warranted contracting officer at the time the bottled water BPA was awarded. He also was not a member of the Contract Review Board that reviewed the offers for the bottled water BPA. Nonetheless, Mr. Cockerham is listed as the contracting officer in the Contract Review Board Memorandum. The base period of performance for the bottled water BPA was September 28, 2004 through September 28, 2006. The bottled water BPA called for the supply and delivery of bottled water to locations in Kuwait and Iraq. The BPA master dollar limit on the contract was $10,000,000.00, and the BPA call limit was $7,000,000.00.

Modification P00001 to the bottled water BPA, signed on December 20, 2005 by Mr. Cockerham, deleted the original $10,000,000.00 BPA limit and extended the period of performance end date from September 28, 2006 to September 7, 2008. The final bottled water BPA call in the record is call No. 0011, dated July 31, 2005. The period of performance for call No. 0011 was July 31, 2005 to September 2005. The parties stipulated that the Army made nine payments to Gulf Group under nine different BPA calls, the final payment pursuant to call No. 0011. The parties also have stipulated that the nine payments totaled 2,762,543.767 KD, or $9,865,043.79, using a 1.000 KD to 3.571 USD conversion rate. Each BPA call and call modification included in the Joint Exhibits provides for a delivery time. For example, call No. 0002 had calls for "approximately 40,920 cases per week for 4 weeks," and call No. 00202 had calls for "approximately 18,750 cases per week for 4 weeks."

176

In its second amended complaint in the bottled water BPA case, plaintiff refers to the following language incorporated by reference into the bottled water BPA: "The Government shall not be liable for any delivery, storage, demurrage, accessorial, or other charges involved before the actual delivery (or 'constructive placement' as defined in carrier tariffs) of the supplies to the destination, unless such charges are caused by an act or order of the Government acting in its contractual capacity." Plaintiff claims that this language renders the "Government liable for reimbursement of extra expenses incurred for delays when the delay is attributable or caused by an act or order of the Government in its contractual capacity."

Plaintiff also alleges that, under § 205 of the Restatement (Second) of Contracts: "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Plaintiff continues:

> Accordingly, by virtue of its decision to delay the convoys and the return of Gulf Group's trucks, in accordance with the principle articulated in §205 of the Restatement (Second) of Contracts, the Government is required to compensate Gulf Group fully and place Gulf Group in the same position it would have been, had there been no delays by the convoys, including reimbursement for the demurrage incurred by Gulf Group which is the subject of this litigation, plus interest.

Plaintiff's second amended complaint in the bottled water BPA case, Case No. 07-82C, further alleges "[t]he delays experienced by the Army convoys for Gulf Group's trucks were not attributable to Gulf Group but were entirely attributable to the U.S. Government." In the joint stipulation of facts, however, the parties agree that some of the delays were caused by religious holidays and IEDs, in addition to those that may have been caused by the government. The parties, however, do not agree on the cause of all the delay claims filed by plaintiff or as to which delays should have been anticipated by plaintiff under the terms of the contract.

The parties stipulated that:

> The convoy requirement was necessary for security purposes, *i.e.*, to protect people and supplies because of hostilities in Iraq which resulted in people being killed or injured and supplies and equipment being lost. The convoy was also necessary to ensure the actual and prompt delivery of supplies by Government contractors. Delivery trucks traveling in military convoys were delayed at various times because of a variety of reasons including improvised explosive devices and observance of religious holidays by Iraqi nationals. Additionally, the delays occasionally were caused by the Government not having sufficient escorts. There was no agreement between Gulf Group and the Government to use some or all of Gulf Group's trucks that delivered bottled water to camps in Iraq, to transport military equipment back to Kuwait on their return trips from Iraq.

177

(emphasis in original; internal citations and stipulation numbers removed).

The bottled water BPA included the following "Special Instructions:"

Purchased For: US Army Various Locations in Kuwait and Iraq. Surface to some of the locations are unimproved which could cause delays in deliveries. Contractor shall do everything possible to ensure deliveries are made on time. The contractor is liable for all equipment and personnel necessary to deliver to the proper quantities. The US Military is not liable for damages caused to transportation assets or equipment necessary to deliver the items.

Personnel to contact for directions and access to various locations are as follows:

MAJ Banks:[163] 968-4819
CPT Sharp:[164] 970-5952

The bottled water BPA also incorporated by reference 48 C.F.R. § 52.247-34, "F.o.b. Destination," which states, in part:

(a) The term f.o.b. destination, as used in this clause, means--

(1) Free of expense to the Government, on board the carrier's conveyance, at a specified delivery point where the consignee's facility (plant, warehouse, store, lot, or other location to which shipment can be made) is located; and

(2) Supplies shall be delivered to the destination consignee's wharf (if destination is a port city and supplies are for export), warehouse unloading platform, or receiving dock, at the expense of the Contractor. The Government shall not be liable for any delivery, storage, demurrage, accessorial, or other charges involved before the actual delivery (or "constructive placement" as defined in carrier tariffs) or the supplies to the destination, unless such charges are caused by an act or order of the Government acting in its contractual capacity. If rail carrier is used, supplies shall be delivered to the specified unloading platform of the

---

[163] As noted above, according to the parties' joint stipulation of facts, "Major Banks was the chief of the bottled water branch until October 2004, when she was replaced by LTC Derrick Shoemake," who was the chief of the bottled water branch at Camp Arifjan during April 2005.  Mr. Shoemake pled guilty in June 2011 to two counts of bribery, and was subsequently sentenced to forty-one months in prison.

[164] As noted above, Capt. Sharp was Maj. Banks' deputy at the time the "Special Instructions" were issued.

consignee. If motor carrier (including "piggyback") is used, supplies shall be delivered to truck tailgate at the unloading platform of the consignee, except when the supplies delivered meet the requirements of Item 568 of the National Motor Freight Classification for "heavy or bulky freight." When supplies meeting the requirements of the referenced Item 568 are delivered, unloading (including movement to the tailgate) shall be performed by the consignee, with assistance from the truck driver, if requested. If the contractor uses rail carrier or freight forwarder for less than carload shipments, the contractor shall ensure that the carrier will furnish tailgate delivery, when required, if transfer to truck is required to complete delivery to consignee.

48 C.F.R. § 52.247-34(a) (1991).

Defendant contends that the military convoy requirement was not contractual because the clause merely provided contact information for Army officers as to "whom a contractor may contact for information." According to Saud Al Tawash, the Army officers Gulf Group contacted gave them convoy numbers, and he understood from the Army officers' direction that it was a requirement to travel in convoys.[165] Megbel Al Tawash also understood that there was a military convoy requirement and testified, in response to the question, "[a]nd how did you know that you [Gulf Group] were required to move in military convoys?" "Because I had spoken to Major, well he's Lieutenant Colonel now, Major Shoemake. He said it was the vitality of the water as a sent com[166] via item it had to be escorted in, so nobody should tamper with it or, God knows you shouldn't play with it, you know?" According to Megbel Al Tawash, Gulf Group obtained the convoy information from Mr. Shoemake, Sgt. Mentor, or Sgt. Brooks via email or, most often, by telephone. Megbel Al Tawash also stated that Gulf Group could not have moved without convoys.

When asked, "[c]ould Gulf Group have gone into Iraq with the bottled water trucks on its own without the military convoys?" Bobby Wilson, Gulf Group's Project Manager in Kuwait, similarly testified, "[n]o," and in response to the question "[a]nd why do you say that," Mr. Wilson replied "Because water is a sensitive item. It's a food item and that has to be under military control and at that time too, there were still a lot of the scare and whatnot over biological weapons, chemical warfare and whatnot and if you showed up at a front gate of an army base unescorted with truck loads of water, you're probably going to be shot." Mr. Wilson also stated that all of the bottled water

---

[165] Saud Al Tawash also testified, however, that he had traveled without a military escort for another company, which managed the United States Program for Iraqi Reconstruction in 2003-2004. It is not clear whether the alleged requirement to travel in convoys had been imposed at that time and there is no indication that the merchandise which was being transported was water or food, for which there were additional security concerns.

[166] The phrase "sent com" appears in the trial transcript, which is probably a reference to CENTCOM (United States Central Command).

contractors were told at a vendor meeting that they had to travel in military convoys. Mr. Wilson testified that, although Gulf Group could have used private security, he would not have done so without written approval from the Army. According to Mr. Wilson, regulations posted on the wall at NAVSTAR, a border crossing at the Kuwait-Iraq northern border, provided that "the trucks must stay in convoy, they must be escorted at all times and so on and so forth, I don't remember exactly how it was worded but those rules and regulations and requirements were posted there on the bulletin board inside the movement controls office." Mr. Wilson testified that the requirements and rules were posted so everyone could read them.

Plaintiff has not alleged improper termination of any calls issued under the bottled water BPA. The only time period at issue in plaintiff's bottled water BPA demurrage claim is between November 1, 2004 and March 31, 2005, as indicated in plaintiff's claim and second amended complaint. Defendant has not questioned the timeframe claimed by plaintiff. In the claim submitted to Mr. Cockerham on December 1, 2005, plaintiff stated: "This is an offer for settlement under FAR Part 49 with regard to contract #912D1-04-A-0052 which is between US Army Contracting Command SWA-Kuwait ('Arcent'), and Gulf Group General Enterprises Co. W.L.L., ('Gulf Enterprises') awarded in 2004, with the period of performance being November 01, 2004, and March 31, 2005."

Plaintiff argues that its bottled water trucks were required to travel in convoys pursuant to the bottled water BPA. The parties stipulated that "[b]etween November 1, 2004 and March 31, 2005, all of Gulf Group's deliveries of bottled water to camps in Iraq were made by trucks traveling to and from Iraq and Kuwait with Army Convoys." Plaintiff asserts that, as a result of the convoy requirement and insufficient military escorts, its bottled water trucks were delayed and, therefore, that the government should be held liable for delay damages. Plaintiff also asserts that the government-caused delays made its performance more onerous than it had expected, and that the delays frustrated its expectations under the bottled water BPA. Plaintiff, therefore, seeks demurrage for the delays caused by the government.

According to plaintiff, "Gulf Group and its transportation contractor Expeditor's tracked the delays of the trucks and determined that between November 2004 and March 2005 there were a total of 3511 days of delays,"[167] which is an average of 702.2 days of delay per month. (internal citation and footnote omitted). Plaintiff has submitted a Gantt chart,[168] detailing how many days of delay each of its trucks incurred. The chart assumes that the trips were anticipated to take five days and demonstrates that the

---

[167] In its post-trial briefing, the defendant calculated that there were 3,513 demurrage days.

[168] Saud Al Tawash described plaintiff's Gantt chart as "basically data derived from the operation. And what we do with this data, this is a document that we and Expeditors work on to make sure that there is no, that the actual data that's shared between the two offices are correct and accurate and we need to analyze them so that we can problem solve."

delay days were incurred in three hundred seventy-four trips, with an average of 9.387 days of delay per trip.[169] The chart was included in plaintiff's claim for demurrage submitted to Mr. Cockerham at Camp Arifjan as an appendix, and labeled: "Gant [sic] Chart with Tables." Plaintiff insists that the trial testimony offered by Megbel Al Tawash and Mr. Wilson establishes that there were delays attributable to delivering the bottled water and attributable to the return trips, as the result of transporting United States government property on return trips. Plaintiff indicates that five "free" days comprise the standard round-trip trucking distance pre-delays, and that these days are not included in the delay days shown on plaintiff's Gantt chart.

Defendant argues both that the bottled water BPA did not require contractors to travel in military convoys and that the requirement to travel in military convoys applied to all contractors, and even to the movement of military equipment on military trucks which transported food (which included water), fuel, ammunition, maintenance parts, and military equipment such as tents and generators. In a post-trial brief, defendant attempted to explain why Gulf Group only should be awarded demurrage, if at all, for delays on the return trips, and that the return trip delays estimated on plaintiff's Gantt chart should be reduced by the five "free" days allowed by Expeditors before demurrage was to be charged.

As noted above, the parties stipulated that the convoy requirement was issued for security purposes to protect people and secure the safety of supplies during hostilities in Iraq, and to ensure the prompt delivery of bottled water. The parties also stipulated that some delays were caused by IEDs, observance of religious holidays by Iraqi nationals, and by the government not having sufficient escorts. In a footnote to a post-trial brief, however, plaintiff argues that the stipulation merely refers to general convoy delays, not necessarily to delays relative to the bottled water convoys. Plaintiff argues that the government breached its duty of good faith and fair dealing in delaying plaintiff's delivery of bottled water, and that, because of the breach, the government is responsible for demurrage expenses.

In general, "[e]very contract, as an aspect of the duty of good faith and fair dealing, imposes an implied obligation 'that neither party will do anything that will hinder or delay the other party in performance of the contract.'" Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283, 1291 (Fed. Cir. 2000) (quoting Luria Bros. & Co. v. United States, 177 Ct. Cl. 676, 688, 369 F.2d 701, 708 (1966) (other citations omitted)); see also Metric Constr. Co. v. United States, 81 Fed. Cl. 804, 817 (2008). Moreover, the duty of good faith applies to the government just as it applies to private parties. See Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005) (citations omitted), reh'g and reh'g en banc denied (Fed. Cir. 2005); see also Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 828 (Fed. Cir.) ("The duty of good faith and fair dealing is inherent in every contract. Restatement (Second) of Contracts § 205. In essence,

---

[169] Saud Al Tawash testified that the round-trip travel time from Kuwait to Baghdad would take four days. Lt. Col. O'Connor, however, testified that the round-trip travel time from Kuwait to Taji, Iraq would take two days, although, as indicated above, her testimony is confused.

this duty requires a party to not interfere with another party's rights under the contract. Id. at cmt. d. The United States, no less than any other party, is subject to this covenant."), reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 131 S. Ct. 997 (2011); Bell/Heery v. United States, 106 Fed. Cl. 300, 312 (2012) ("Implied in every contract is a duty of good faith and fair dealing that requires a party to refrain from interfering with another party's performance or from acting to destroy another party's reasonable expectations regarding the fruits of the contract."). "When the government does delay a contractor's performance, however, liability attaches only when the actions causing the delay are unreasonable." Redland Co. v. United States, 97 Fed. Cl. 736, 754 (2011). "The government must avoid actions that unreasonably cause delay or hindrance to contract performance." C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1542 (Fed. Cir. 1993); see also Timber Prods. Co. v. United States, 103 Fed. Cl. 225, 244 (2011); Fireman's Fund Ins. Co. v. United States, 92 Fed. Cl. 598, 675-76 (2010).

One of the arguments defendant raises against plaintiff's demurrage claims is that defendant is not liable for delays caused by the requirement issued to plaintiff to travel in military convoys based on the Sovereign Acts Doctrine.[170] According to defendant, it is not liable for demurrage claims arising under the bottled water BPA because the order to travel in military convoys was a sovereign, public and general act, not a contractual action, and all trucks in the Iraq conflict zone carrying bottled water to camps in Iraq were required to travel in these convoys. Moreover, defendant argues, the requirement that trucks move in military protected convoys was imposed by Multi-National Force Iraq,[171] not by Army Contracting Command. Consequently, according to defendant, the convoy requirement was a sovereign act, and any effects upon Gulf Group from the convoy requirement do not give rise to government liability. Defendant points to the trial testimony of Lt. Col. Mary O'Connor, who, as noted above, was a battalion commander and chief of transportation at Balad Air Base in Iraq between October 2004 and November 2005. Lt. Col. O'Connor testified that she was responsible for setting up convoys in Iraq, and that the number of military escorts available was a decision made by the President of the United States. Defendant also argues that "any delays that follows [sic] from that, [the requirement to travel in convoys] that any delays that were experienced on the return trip also are precluded because, once the water is delivered in Iraq, performance is complete and there's no reason that the government should be responsible for any delays on the return." Therefore, defendant argues, "[t]he Government is not responsible for any costs arising from bottled water trucks being required to travel in military-protected convoys, because that requirement was a sovereign act."

---

[170] In the court's February 23, 2010 Order, the court denied defendant's motion for summary judgment on the issue of the Sovereign Acts Doctrine before trial for "failure of proof in the record."

[171] At the time of the convoys, Multi-National Force Iraq was the headquarters for all the Army units in Iraq.

Defendant claims that under the bottled water BPA, Gulf Group assumed responsibility for delivery of any merchandise.  As indicated above, 48 C.F.R. § 52.247-34, "F.o.b. Destination," was incorporated into Gulf Group's bottled water BPA, and states, "[t]he Government shall not be liable for any delivery, storage, demurrage, accessorial, or other charges involved before the actual delivery (or 'constructive placement' as defined in carrier tariffs) or the supplies to the destination, unless such charges are caused by an act or order of the Government acting in its contractual capacity."[172]  At the same time, defendant argues, perhaps in the alternative, that the contract clause, which plaintiff cites, titled "Special Instructions," simply provided contact information for Army officers for "directions and acess [sic] to various locations," and stated, "the contractor is liable for all equipment and personnel necessary to deliver the proper quantities."  Therefore, defendant states, "[a]ny effects upon contract rights were incidental to the achievement of the broader governmental objective, related to national security, of protecting convoy movements in Iraq."

Plaintiff insists that the Sovereign Acts Doctrine does not apply because the orders issued by the Army were not "public and general," but rather "limited and specific, and tailored especially to vital commodities like water, food and ammunition." Plaintiff argues that the specific FRAGO introduced into the record, and discussed below, is advisory in nature and did not require all contractors to travel in convoys. Specifically, plaintiff maintains that "[t]he Government...has not produced sufficient credible evidence in support [of the Sovereign Acts Doctrine], failing inclusive to produce the alleged written order that the Government claims was issued requiring that everything and everyone moving in Iraq must follow the military convoys."  Plaintiff views the convoy requirement as arising out of the "Special Instructions" provision of the bottled water BPA.  As a result, plaintiff argues that the convoy requirement cannot be considered a "sovereign act" because it had the substantial effect of hindering plaintiff's performance, which released the government from its obligation to follow the covenant of good faith and fair dealing implied in the parties' contract.  Plaintiff also highlights that the government obtained an economic advantage from the convoy requirement because defendant used plaintiff's bottled water trucks to transport military equipment on return trips for free.

According to the United States Court of Appeals for the Federal Circuit:

The sovereign acts defense was born of a trio of cases decided by the Court of Claims in the nineteenth century. See Conner Bros. Constr. Co. v. Geren, 550 F.3d 1368, 1372 (Fed. Cir. 2008) (discussing Deming v. United States, 1 Ct. Cl. 190 (1865), Jones v. United States, 1 Ct. Cl. 383 (1865), and Wilson v. United States, 11 Ct. Cl. 513 (1875)).  The definitive statement of the doctrine is credited to the Supreme Court's opinion in Horowitz v. United States, 267 U.S. 458, 461 [(1925)], in which the Court,

---

[172] Although 48 C.F.R. § 52.247-34 only refers to "charges involved before the actual delivery," neither party argues that the issue here applies solely to demurrage incurred for delivery trips, rather than also to the return trips, nor that the alleged contractual requirement via 48 C.F.R. § 52.247-34 concerns only the delivery trips.

citing those Court of Claims cases, said, "the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign."

Stockton E. Water Dist. v. United States, 583 F.3d 1344, 1365-66 (Fed. Cir. 2009), reh'g in part, 638 F.3d 781 (Fed. Cir. 2011); see also Horowitz v. United States, 267 U.S. 458, 461 (1925) (citing Deming v. United States, 1 Ct. Cl. at 191; Jones v. United States, 1 Ct. Cl. at 384; Wilson v. United States, 11 Ct. Cl. at 520) (finding the government not liable for the damages resulting from the delay of a silk shipment due to a government embargo on all silk shipments, despite the fact that the embargo caused a breach of the contract with plaintiff).

As explained by the Federal Circuit in Klamath Irrigation District v. United States, "[t]he sovereign acts doctrine is designed to balance 'the government's need for freedom to legislate [or in the instant case act through the Executive Branch] with its obligation to honor its contracts.'" Klamath Irrigation Dist. v. United States, 635 F.3d 505, 520–21 (Fed. Cir. 2011) (quoting United States v. Winstar Corp., 518 U.S. 839, 895–96 (1996)). The Federal Circuit in Klamath continued:

Under the doctrine, "the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." Yankee Atomic Elec. Co. v. United States, 112 F.3d 1569, 1574 (Fed. Cir. 1997) (quoting Horowitz v. United States, 267 U.S. 458, 461 (1925))[, reh'g denied, in banc suggestion declined (Fed. Cir. 1997), cert. denied, 524 U.S. 951 (1998)]. The government is not liable for breach of contract whenever it takes any generally applicable action in its sovereign capacity that incidentally frustrates performance of a contract to which it is a party. Horowitz [v. United States], 267 U.S. at 461. Discussing the sovereign acts doctrine in Winstar, Justice Souter, joined by Justices Stevens, O'Connor, and Breyer, stated:

As Horowitz makes clear, that defense simply relieves the Government as contractor from the traditional blanket rule that a contracting party may not obtain discharge if its own act rendered performance impossible. But even if the Government stands in the place of a private party with respect to "public and general" sovereign acts, it does not follow that discharge will always be available, for the common-law doctrine of impossibility imposes additional requirements before a party may avoid liability for breach. [United States v. Winstar Corp.,] 518 U.S. at 904.

We have stated that "[a]lthough the portion of the principal [Winstar] opinion addressed to the sovereign acts doctrine had the support of only

four (and as to some portions, only three) justices, this court has treated that opinion as setting forth the core principles underlying the sovereign acts doctrine." Conner Bros. Const. Co., Inc. v. Geren, 550 F.3d 1368, 1374 (Fed. Cir. 2008) (citing Carabetta [Enters., Inc. v. United States], 482 F.3d [1360,] 1365 [(Fed. Cir. 2007)]; Yankee Atomic, 112 F.3d at 1574–77). Relevant to this case, in Carabetta, we stated that even if the sovereign acts defense applies, "it does not follow that discharge will always be available, for the common-law doctrine of impossibility imposes additional requirements before a party may avoid liability for breach." 482 F.3d at 1365 (quoting Winstar, 518 U.S. at 904). See also, Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1294 (Fed. Cir. 2002) (stating that contract performance by the government is excused under the sovereign acts defense when "it is objectively impossible"). We reaffirmed this requirement in Casitas Municipal Water District v. United States, 543 F.3d 1276, 1287 (Fed. Cir. 2008)[, reh'g and reh'g en banc denied, 556 F.3d 1329 (Fed. Cir. 2009)], stating that "performance by the government is excused under the sovereign acts defense only when the sovereign act renders the government's performance impossible."

Klamath Irrigation Dist. v. United States, 635 F.3d at 520-21; see also Carabetta Enters., Inc. v. United States, 482 F.3d at 1365. "'In this court the United States appear simply as contractors; and they are to be held liable only within the same limits that any other defendant would be in any other court. Though their sovereign acts performed for the general good may work injury to some private contractors, such parties gain nothing by having the United States as their defendants.'" Horowitz v. United States, 267 U.S. at 461 (quoting Jones v. United States, 1 Ct. Cl. at 384); see also Yankee Atomic Electric Co. v. United States, 112 F.3d 1569, 1574 (quoting Horowitz v. United States, 267 U.S. at 461 (quoting Jones v. United States, 1 Ct. Cl. at 384)).

In Klamath Irrigation District, the United States Court of Appeals for the Federal Circuit set out a two part test for application of the Sovereign Acts defense:

[F]irst [we ask] whether the sovereign act is properly attributable to the Government as contractor. That is, is the act simply one designed to relieve the Government of its contract duties, or is it a genuinely public and general act that only incidentally falls upon the contract? If the answer is that the act is a genuine public and general act, the second part of the test asks whether that act would otherwise release the Government from liability under ordinary principles of contract law. This second question turns on what is known in contract law as the impossibility (sometimes impracticability) defense. Stockton East Water Dist. v. United States, 583 F.3d 1344, 1366 (Fed. Cir. 2009) (internal quotations and citations omitted).

Klamath Irrigation Dist. v. United States, 635 F.3d at 521.

In <u>Conner Brothers Construction Co. v. Geren</u>, the plaintiff had a contract with the Army to construct a facility on an Army base, but was denied access to the base following a September 11, 2001 terrorist act, when the base was placed at force protection Delta condition and closed to all but essential personnel, resulting in a halt to work and delay.  The court wrote "[t]he government will not be held liable…'so long as the action's impact upon public contracts is, as in <u>Horowitz</u>, merely incidental to the accomplishment of a broader governmental objective.'"  <u>Conner Bros. Constr. Co. v. Geren</u>, 550 F.3d 1368, 1373 (Fed. Cir. 2008) (quoting <u>United States v. Winstar Corp.</u>, 518 U.S. at 898).  "Courts should consider whether the governmental action is specifically directed at nullifying contract rights."  <u>Conner Bros. Constr. Co. v. Geren</u>, 550 F.3d at 1374.  Other relevant factors include whether the United States benefited economically from the act and whether the act applied to parties not in a contractual relationship with the government.  <u>Id.</u> at 1375.  "'The greater the Government's self-interest,...the more suspect becomes the claim that its private contracting partners ought to bear the financial burden of the Government's own improvidence....'"  <u>Id.</u> (quoting <u>United States v. Winstar Corp.</u>, 518 U.S. at 898).

In support of its position that the requirement to travel in military convoys was a public and general order that qualifies as a sovereign act, defendant points to a specific Army FRAGO and to the testimony of Lt. Col. Mary O'Connor.  According to the testimony of Lt. Col. O'Connor, the FRAGO required all vehicles used in support of the military to travel in convoys.  The FRAGO stated:

> The purpose of this FRAGO is to enhance and convoy [sic] security measures to protect the force by providing convoy commanders and unit commanders tools to ensure that all measures have been properly taken to safeguard personnel and equipment.  Unit/convoy commanders are personally responsible for the conduct and protection of convoy operations.  MNF-I units will monitor their convoys, and exercises control measures implemented by unit commanders.
>
> 3.C. (U) Tasks to Subordinate Unites. [sic]
>
> 3.C.1. MNC-I
>
> 3.C.1.A. Continue to produce internet status updates, and maintain the information on the MNCI webpage.  Convene emergency status board update when the situation warrants.
>
> 3.D. (U) Coordinating Instructions.
>
> 3.D.1.  There will be two vehicles minimum during daylight hours, and three vehicles minimum during the hours of darkness.  There will be at least two soldiers per vehicle and three in the trail vehicle to provide a turret or rear gunner for tactical vehicle movements.

186

3.D.2. **Non-tactical vehicle (NTV) movements used to transport military members, DOD civilians, and DOD contractors are cautioned not to move outside secure zones without security as set forth by MSC commanders**. As far as practical use armored/add on armored commercial vehicles to move off FOBS. The use and number of NTVS to support movement requirements is delegated to the MS[] commanders. However, the number of NTVs used should consider current AIF TTPS, emergency cross loading of personnel requirements and safety. NTVs will posses [sic] communication IAW Para 5.A.2. below, and have communication with the security escort.

3.D.3. Convoy commanders are responsible for the self-protection capability within their convoy. There will be at least one rifle in each vehicle for all movements. Tactical vehicle movements must have 360 degree security consisting of an M249 or above from the turret or out the back with the "canvas" removed. All military personnel will carry personal weapons, wear fragmentation protective vest, ballistic eye protection, and combat helmet. A minimum of one vehicle will maintain communications contact with coalition forces. Convoys will not have lights on during daylight operations. During night operations white lights will be used, and they will have NVDS in each vehicle.

3.D.4. Prior to all movements, convoy commanders will conduct coordination and include communications equipment sufficient to communicate with other MSCS when traveling through their AOR. Advanced notification to other MSCS will minimize potential fratricide of blue on blue forces. All vehicles must log out with parent unit and provide ETA to destination. All vehicles must report at destination to their parent unit.

3.D.5. Breakdown procedures, convoy commanders are responsible for self-recovery capability within each convoy. Recovery equipment will be available to each convoy. Commanders will take all reasonable measures to recover vehicles and will abandon vehicles as last resort only. They will recover the vehicle to the nearest CSO or LSA if possible. If not, leave appropriate security personnel and an operational vehicle with it until it can be recovered.

3.D.6. All MSCS will report deteriorating road conditions to MNCI, upon reporting to convoy support center operations cell(s), convoy commanders will report locations where maintenance is required and where engineer work could mitigate areas of vulnerability.

3.D.7. In the greater Baghdad area defined by the MND Baghdad area there will cautinue [sic] to be mission critical movements only. Units will verify route status with 1 CD website or Iraqna or prior to any movement.

3.D.8. There will be a minimum ratio of one tactical security vehicle for every ten military cargo vehicles, and a minimum ratio or [sic] one tactical security vehicle for every 5 KBR cargo vehicles. There will be no less than two security vehicles for every convoy (Para. 3.D.1.).

…

4.B. (U) All units will conduct risk assessments using mission, enemy, terrain, troops, time available, and civilian demonstrations (METT-TC) to identify and assess hazards. Ensure that seatbelts are properly used. Gunners in turrets and rear facing security will ensure other safety measures are used due to the inability to wear seat belts. All soldiers operating or riding in tactical and NTV vehicles must wear regulation gear as stated in paragraph 3.D.3. above.

(emphasis in original).

At trial Lt. Col. O'Connor testified that the Multi-National Force-Iraq order "provided the general orders for all operations and our order was to protect -- was to move sustainment and logistics and to protect that." She testified that her commander authorized more stringent measures than those provided in the order and increased the number of gun trucks to supply trucks in order to increase the "number of security elements that had to travel per truck." Lt. Col. O'Connor further stated that contractors would be made aware of the daily orders from Multi-National Force-Iraq prior to embarking on their trips. Lt. Col. O'Connor testified that the FRAGO was the order which provided for the convoy requirement, contrary to plaintiff's position that the "Special Instructions" provision of the bottled water BPA contained the convoy requirement. She also stated that the introductory phrase, "[t]he purposes of the FRAGO is to enhance convoy security measures to protect the force," required movement in convoys in "militarease." Regarding the language of the FRAGO, Lt. Col. O'Connor also indicated, "I guess it would be an [sic] assumed in the order that they [civilian contractors] would - that we would protect them. And further in the order, it does talk about - it talks about non-tactical vehicles, which would be contract trucks." She stated she was referring to the phrase in the FRAGO, "cautioned not to move outside secured zones without security as set forth by MSC commanders." (emphasis removed). Lt. Col. O'Connor continued that if a commander suggested that she do something she would consider it an order. Immediately thereafter, however, she responded on cross-examination that she would have discretion in implementing an order, and the ultimate decision would lie with her. The following exchange took place at trial:

Q: Would your discretion have any play into the determination of whether-

A: Yes

Q: - to follow –

188

A: Yes.

Q: - the commanders recommendations or suggestions?

A: Ethics and morales[173] [sic].

Q: So if you think it's ethical and morally advisable, the suggestion then by your commander, you followed?

A: Yes, ma'am.

Q: The ultimate decision is yours, not the commanders; correct?

A: Yes, ma'am.

Q: So, in the military world, when a commander gives you an order, you have no discretion?

A: I'll do that.

Q: You must comply?

A: I'll do that.

In response to the next question, with specific reference to the FRAGO, Lt. Col. O'Connor admitted that a suggestion is not an order. She testified:

Q: Now this language you just read at Section 3.D.2., I believe, says, "non-tactical vehicles movements used to transport military members, DOD civilians, and DOD contractors are cautioned not to move outside secured zones without security." The word "caution," isn't that a suggestion, a recommendation, an advice?

A: Yes.

Q: So that's not an order, is it?

A: No, at this point, I would say it's not.

As indicated above, Lt. Col. O'Connor's testimony was, at times, contradictory. She offered confusing testimony on whether the FRAGO was an order, or left discretion to officers to decide whether a convoy was required. She responded to a question on cross-examination as to whether the language of the FRAGO indicated "that there is an obligation to provide convoys for the military?" by stating, "[t]o us, yes, ma'am." Lt. Col.

---

[173] The word "morales" appears in the trial transcript.

O'Connor attempted to explain her vacillation, by stating that "more stringent restrictions" were placed on the FRAGO by lower-level commanding officers, who were apparently authorized to make the FRAGO "more stringent and more plain to the people that have to execute it." Although Lt. Col. O'Connor testified that she was aware that private security firms may have been moving without convoys, and although more stringent orders were not introduced into evidence, Lt. Col. O'Connor also stated that she knew "that every night a movement order was published and executed and no trucks moved in that country that supported the United States Army, Air Force, or Marine Corps without a military convoy that was protected and executed by [sic] section and the infantry brigade that protected my section."

Although defendant relies on Lt. Col. O'Connor's testimony, including her statement that the number of military escorts available was a decision made by the President of the United States, to support defendant's argument that the FRAGO was a requirement for Gulf Group to move in military convoys in support of the Army, and highlights that Lt. Col. O'Connor "was responsible for all the movement control teams at multiple convoy support centers throughout Iraq, as well as for setting up the convoys that moved support into Iraq," defendant also appears to attempt to distance itself from the inconsistencies in Lt. Col. O'Connor's testimony. According to defendant, "regardless of whether Lt. Col. O'Connor correctly interpreted whatever order she understood imposed the requirement that trucks move in military-protected convoys, her implementation of that requirement constitutes a sovereign act."

Plaintiff insists that the orders to travel in military convoys were contractual because the "Special Instructions" in the bottled water BPA instructed Gulf Group to contact two certain Army officers for "directions and access to various locations." Even if plaintiff was contractually bound to contact two particular Army officials, prior to moving merchandise, however, the requirement to travel in convoys was a sovereign act if Army personnel were generally directed to require contractors to travel in convoys. Plaintiff argues that the first sentence of ¶ 3.D.2 of the relevant FRAGO, which states that "**[n]on-tactical vehicle (NTV) movements used to transport military members, DOD civilians, and DOD contractors are cautioned not to move outside secure zones without security as set forth by MSC commanders**," uses discretionary, rather than mandatory language. (emphasis in original). Throughout the FRAGO, however, there are mandatory descriptions of how protective measures were to be implemented, such as "convoys <u>will not have</u> lights on," and "there <u>will be</u> two vehicles minimum during daylight hours." (emphasis added). In addition, although plaintiff identifies the term "cautioned" as a non-mandatory phrase, the word "cautioned" must be read in the context of the sentence in which it is contained: "[n]on-tactical vehicle (NTV) movements used to transport military members, DOD civilians, and DOD contractors are <u>cautioned not to move</u> outside secure zones without security as set forth by MSC commanders." (underlining added; bolding removed). The word "cautioned" is used in the sense of told, but the directive "not to move" is explicit. Moreover, the whole sentence leaves the discretion of how to move contractors in the military zone to "MSC commanders," which Lt. Col. O'Connor exercised by requiring military convoys.

Notwithstanding the government's position that the requirement to travel in convoys was a sovereign act, during performance of plaintiff's bottled water BPA, the government acknowledged some demurrage responsibility for delays caused by, among other reasons, insufficient number of military convoys. For example, on April 5, 2005, the government increased the price it was paying for bottled water in exchange for contractors not filing further demurrage claims. The following email was sent by Mr. Cockerham to bottled water contractors:

> Dear Vendors we have constantly been bombarded with Demurge [sic] charges and claims from trucks being tied up over 7 days or water held up at the border [sic] Vehicles shot up or vehicles having to bring equipment back on the return trip. Therefore to elimate [sic] all the paperwork and cliams [sic]. The C-4 and I have sit [sic] down and calculated the average claims and came up with an average number of 2.578 KWD to cover the case of water, the delivery plus the demurge [sic] charges. This will make business easier for us and it will get your money quicker rather than the claims process. All previous claims prior to APR 05 will continue to be processed. We hope that you will find our 1 [sic] offer more than accepted [sic] with the increase in your quote. Some will gain more other, sometimes this will be to the government [sic] economic advantage and other times it will be to the vendors advantage so it will balance out at the end. Thank you all.

The parties stipulated that, "[o]n April 6, 2005, Gulf Group confirmed to the current contracting officer, John Cockerham, that Gulf Group had received the proposed revised price of 2.578 KD per case of bottled water and had accepted the newly adjusted rate per case in exchange for not making any more demurrage claims past April 1, 2005."

On September 12, 2005, Derrick Shoemake and Mr. Cockerham jointly signed a Memorandum for Record containing information similar to Mr. Cockerham's earlier email. The September 12, 2005 Memorandum stated:

> The average price of a case of bottle water for delivery to Northern or Western Iraq is 2.0 KD/case. This price includes direct delivery of a case of water to Iraq under hostile conditions, however, this price does **not** include demurge [sic] charges, storage fees, a guaranteed **minimal** delivery, back-haul reinburstment [sic] in support of Heavy Lift VI or frivolous claims for trucks that are attacked or damaged due to an IED (unless completely destroyed). These claims were totaling in the millions.... This counter offer [of 2.578 KD/case] allows the vendor to have trucks delayed from returning indefinitely rather than paying delay charges after seven (7) days without demurge [sic] charges (the average delay is 19 days before all trucks are return [sic] from delivery). This system allows the vendor to store water for emergency pushes and timely pushes during normal request without storage fees.

(emphasis in original).

At trial, Mr. Cockerham offered further information about the price increases in the September 12, 2005 Memorandum. Mr. Cockerham explained that the purpose of the Memorandum was to reduce the costs to the government of processing the claims "because it was consuming the time of a couple officers constantly having to make adjustment payments and it was with finance and also having to request additional funds to cover the demurrage charges." Mr. Cockerham stated that the demurrage charges

> were encountered a couple ways, one being trucks held up for return, also trucks who had claims against the government that were either destroyed from IEDs or so forth, things of that nature.... And also for paying for storage, additional storage when the trucks couldn't move. Several of the companies had set up warehouses on the border to offload the trucks and then reload them because of the long delays.

With regard to including the storage expenses in the delay charges, Mr. Cockerham stated: "We just kind of put it all under that because any delays we were putting them basically under demurrage claims," and, "[w]e ended up with a small room full of boxes of claims of demurrage charges." When questioned, Mr. Cockerham agreed that there were hundreds of claims. As to how many demurrage claims the government received, Mr. Cockerham testified: "I can't say how many.... I'll say the average was about two a week."

The record reflects that the Army had entered into numerous agreements to deliver bottled water, including the bottled water BPA with Gulf Group. Mr. Cockerham did not remember all the companies specifically, but the parties stipulated that, for example, in 2004, StarCon, another contractor supplying bottled water to the government in Iraq, "submitted a claim for demurrage expenses incurred from delays of the convoys," and "[o]n December 4, 2004 StarCon's claim for demurrage expenses was approved by the issuance of a BPA Call." Mr. Cockerham also stated, although giving conflicting testimony, that he remembered a demurrage claim from IAP, a bottled water contractor, being paid. He also testified that, "[t]here was one in-house policy, and I forget the exact days on it, but I believe it was just standard if a truck was held seven days past the required time given for delivery they were paid."

Defendant notes with respect to the government's interaction with other contractors, "the sovereign acts inquiry does not rest upon a mechanical determination of how many contractors are affected, but rather focuses upon the nature and scope of the governmental action." Conner Bros. Constr. Co. v. Geren, 550 F.3d at 1378. The evidence in the record suggests that the Army may have required substantially all Army contractors, and of particular relevance here, all bottled water contractors, to travel in military convoys. Although she was, at times, nervous and slightly confused on how to interpret the precise language of the FRAGO, Lt. Col. O'Connor testified that she uniformly enforced the requirement to travel in military convoys, regardless of the

192

various interpretations of the FRAGO.  Moreover, the requirement for bottled water contractors in the war theatre, to carry an essential commodity for the troops in safety, in order to ensure uncontaminated arrival, combined with the desire to secure the safety of contractor and  military personnel in the war zone, leads the court to conclude that, when directing that the water had to be transported in military convoys, the government was acting in its sovereign capacity, rather than in its contracting capacity, even though the government appears to have paid a number of demurrage claims.  It would be unreasonable to conclude that any contractor could move freely without supervision or protection to deliver water to the troops in the war zone.  The water and the personnel had to be secured and delivered safely with no possibility of harm or contamination.

As argued by defendant, "[t]he requirement that trucks move in military-protected convoys was not directed at nullifying contractor rights or relieving the Government of its contract obligations; rather, the purpose of that requirement was to protect convoy movements, both 'unit moves' of soldiers and equipment, and 'logistics sustainment' moves that included contractors," and to keep safe the essential commodity transported. The effect of the requirement to travel in military convoys on Gulf Group's "contract rights was incidental to the achievement of a broader governmental objective relating to national security and therefore did not give rise to governmental liability." Conner Bros. Constr. Co. v. Geren, 550 F.3d at 1379.   As the Federal Circuit noted in Conner Brothers, "[t]he key issue here—as in all sovereign act cases—is not whether the government had the authority to exclude Conner for national security purposes, but rather who should bear the cost of an action that was admittedly in the public interest: a single contractor or the taxpayers at large. The answer to that question turns on whether the governmental action was public and general, not whether it served the public interest." Id. at 1378 n.1.

In an order issued by the court prior to trial, the court denied the defendant's motion for summary judgment to invoke the Sovereign Acts Doctrine "based on a failure of proof in the record before the court" at that time before trial.  This current opinion is issued following a lengthy trial, after review of all the information now in the record regarding the period during which Gulf Group was performing under the bottled water BPA, including the testimony of numerous witnesses and the documentation introduced into the record.  Based on the record before the court, and particularly in the bottled water BPA case, Case No. 07-82C, the court finds that under the facts presented, the requirement for Gulf Group to travel in convoys was a sovereign act.

Even if the requirement to travel in convoys was a sovereign act, "'it does not follow that discharge will always be available, for the common-law doctrine of impossibility imposes additional requirements before a party may avoid liability for breach.'" Carabetta Enters., Inc. v. United States, 482 F.3d at 1365.  Thus, under "the second part of the sovereign acts doctrine analysis, which addresses whether the sovereign act would otherwise release the Government from liability under ordinary principles of contract law," Klamath Irrigation Dist. v. United States, 635 F.3d at 522 (citing Stockton E. Water Dist. v. United States, 583 F.3d at 1366), the issue is whether the government has shown that, "'the...actions made it impossible for'" the Army to fulfill

its obligations under the bottled water BPA. Id. (quoting Stockton E. Water Dist. v. United States, 583 F.3d at 1367). "[T]he doctrine of impossibility of performance 'excuses delay or non-performance of a contract where the agreed upon performance has been rendered 'commercially impracticable' by an unforeseen supervening event not within the contemplation of the parties at the time the contract was formed.'" Seaboard Lumber Co. v. United States, 308 F.3d at 1294 (quoting Hercules Inc. v. United States, 24 F.3d 188, 204 (Fed. Cir. 1994), cert. granted, 514 U.S. 1049 (1995), and aff'd, 516 U.S. 417 (1996)). "'[T]he doctrine of impossibility does not require a showing of actual or literal impossibility of performance but only a showing of commercial impracticability.'" Klamath Irrigation Dist. v. United States, 635 F.3d at 522 (quoting Seaboard Lumber Co. v. United States, 308 F.3d at 1294). "[T]he nonoccurrence of the act in question must have been a basic assumption of the contract, and the government must not have assumed the risk that such an act would occur." Conner Bros. Constr. Co. v. Geren, 550 F.3d at 1379 (citing United States v. Winstar Corp., 518 U.S. at 905; Seaboard Lumber Co. v. United States, 308 F.3d at 1294).

The court concludes that the agreed-upon performance of timely deliveries was made impossible by the necessity of traveling in convoys and unforeseen delays in a war zone. Moreover, regarding the second prong of the Sovereign Acts Doctrine test, the "Special Instructions" as part of the bottled water BPA, quoted above, demonstrates that the government did not assume the risk of delays in getting the bottled water into Iraq. The second prong of the Sovereign Acts Doctrine test, is therefore, satisfied. There is no allegation here that the Army refused to pay Gulf Group for the deliveries of bottled water.

Left unresolved, however, is whether the government should be held liable for plaintiff's transporting government equipment on return trips, including for delays caused by the convoy escort requirement, although plaintiff had no obligation to do so under the bottled water BPA. Both the trial testimony and the post-trial briefings did not fully address the return trips. With regard to the hauling of equipment, Mr. Cockerham explained that the government had a Heavy Lift contract in place at a cost of $37 billion for the purpose of returning equipment from Iraq to Kuwait, which was not being used because the government, instead, was loading the equipment on incoming bottled water trucks for the return trip. The Army benefited economically from the convoy requirement applied to Gulf Group's bottled water trucks by having the military equipment transported on the return trips for free and by not having to use and pay other contractors to transport the equipment. According to Mr. Cockerham, the government also benefited because the bottled water trucks were used to store the equipment to be transported back to Kuwait "until such time as the government can make arrangement to get it back or get it to the right unit." Because of the convoy escort requirement, the Army was able to more closely control the departure time of Gulf Group's trucks from Iraq. Saud Al Tawash testified that insufficient military convoys on the return trips to Kuwait caused further delays for Gulf Group.

Defendant makes two arguments against defendant's obligation to pay plaintiff for any return trips. Defendant argues that plaintiff's allegedly inflated claim and violation of the False Claims Act with regard to the bottled water BPA claims, precludes any award to Gulf Group. The court has concluded, however, that there was no violation of the False Claims Act regarding the bottled water BPA. Defendant further argues that, if there were an insufficient number of convoys on the return trips, that too was a sovereign act. Defendant argues: "The number of military escorts for convoys was a function of the decision making of the President of the United States. That too was a sovereign act; it was not directed at nullifying contractor rights or relieving the Government of its contractual obligations, but directed at the broader governmental objective of national security." Defendant, however, fails to address the fact that some of the delays were also caused by the hauling of equipment on the return trips.

Defendant's second argument takes the Sovereign Acts Doctrine to the extreme. Under defendant's interpretation, any decision made by Army personnel in the war theatre ultimately would have been a function of the decision making of the President of the United States in furtherance of national security, and potentially could render any claims by a contractor null. Unlike the trips to Iraq, the claims for return trips are not covered by the Sovereign Acts Doctrine. It does not appear that the government generally ordered Gulf Group or any other contractor to transport equipment back from Iraq.

But, regardless of whether the decision to use bottled water trucks to carry other equipment was a sovereign act, and regardless of whether any delays caused by the convoy requirement are excused by the doctrine of impossibility, plaintiff has not met its burden of proof with respect to its claims for demurrage monies owed for the return trips.[174] As noted above, neither the trial testimony nor the post-trial briefings fully addressed the return trips and whether the government had an obligation to compensate Gulf Group for these trips. In a supplemental brief, defendant notes plaintiff stated that, "there is not actual evidence in the record of this case regarding the exact number of days the roads were closed due to religious holidays or road side bombing," to which defendant does not disagree. Defendant also takes issue with the chart prepared by plaintiff in response to the court's order, arguing the Gantt chart does not identify the days of delay that, allegedly, were government-caused, versus which days were caused by factors outside the government's control. Unfortunately for plaintiff, the evidence in the record currently before the court does not segregate return-trip delay days that were caused by the government from return-trip delay days that were caused by factors outside the government's control. Although plaintiff alleged that, between November 2004 and March 2005, there were a total of 3,511 days of delay, compared to defendant's calculation of 3,513 days of delay, Gulf Group fails to account separately for delays that were caused by the convoy requirement or the hauling of equipment. Defendant notes, "[d]elivery trucks traveling in military convoys were

---

[174] Similar to the camp package BPA, latrine, and dumper claims, defendant concedes that Gulf Group incurred demurrage expenses. Unlike the camp package BPA, latrine, and dumpster claims, however, it is not clear that defendant is responsible for the expenses that plaintiff incurred.

delayed at various times because of IEDs and observance of religious holidays by Iraqi nationals." Saud Al Tawash testified generally, but without specifics:

> Because the operation didn't become efficient, we didn't have the trucks back from Iraq, we had to store the water and we had to incur expenses both local transportation and the warehousing. We warehoused, we couldn't warehouse this water anywhere. Because of the issues with the climate and the issues of security. This bottled water is again going for the troops. We had to put this in a climate controlled warehouse and secured. So we chose the warehouse in the Free Trade Zone because it's inside a militarized, it's operated by the military of Kuwait. And this particular facility was Gulf Telecom's facility. So Gulf Telecom leased it to Gulf Group during this time.

As noted by defendant, "Gulf Group provides no objective evidence, such as a pick-up schedule from the factory [sic] or testimony from factory personnel, that demonstrates the existence of a pick-up schedule or a requirement to pick up water according to a particular schedule." Without more than Saud Al Tawash's general testimony, the plaintiff has not demonstrated the specific return trip delay days that were government-caused. Plaintiff, thus, has failed to meet its burden to prove the costs associated with the government-caused delays resulting from return trips.[175] Due to the

---

[175] Gulf Group argues that it requested that the government produce data from "the Combat Logistics Patrols (CLP) Tracker," to allow plaintiff to differentiate between government-caused delays and non-government-caused delays, but that the government was not able to locate the requested data. According to plaintiff, the government's failure to provide this data "should be grounds for the formulation of an adverse inference preventing the Government from arguing as it does here, that Gulf Group cannot carry its burden of proof, and that the documents in question would show that the delays were all related to the convoy requirement." The Federal Circuit has recognized:

> The general rules of evidence law create an adverse inference when evidence has been destroyed and "(1)...the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2)...the records were destroyed with a culpable state of mind; and (3)...the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."

See Jandreau v. Nicholson, 492 F.3d 1372, 1375 (Fed. Cir. 2007) (alterations in original) (quoting Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002)). Although a finding of spoliation would permit the court to assume that the records at issue were favorable to Gulf Group's position, see Lab. Corp. of Am. v. United States, 108 Fed. Cl. 549, 557 (2012), Gulf Group has the burden of proving the necessary elements for the court to find that the application of an adverse inference is warranted. See Jandreau v. Nicholson, 492 F.3d at 1375; K-Con Bldg. Sys., Inc. v.

196

application of the Sovereign Acts Doctrine and plaintiff's unfortunate failure to carry its burden for proving responsibility for the costs of the return trips, plaintiff is not entitled to recover for its bottled water BPA demurrage claims.

## CONCLUSION

The court's conclusion in the above-captioned cases is based on an unusual set of circumstances. Although Gulf Group and Saud Al Tawash relied on their advisors as to how to submit claims to the United States government and how to file complaints in this court, the failure of those advisors to provide competent advice and Gulf Group's and Saud Al Tawash's reckless disregard for the accuracy of Gulf Group's camp package BPA, latrine contract, and dumpster contract claims leads the court to conclude that Gulf Group violated the False Claims Act when it submitted inflated and baseless claims to the contracting officer in 2005 and 2007. Because defendant has not demonstrated that it suffered damages as a result of plaintiff's submission of its claims, plaintiff is liable only for the maximum statutory penalty of $11,000.00 per claim, for a total amount of $66,000.00 for six violations of the False Claims Act. Although Gulf Group's failure to understand the basic requirements for submitting a claim to the government leads the court to conclude that Gulf Group violated the False Claims Act, the deficiencies in Gulf Group's camp package BPA, latrine contract, and dumpster contract claims also lead the court to conclude that Gulf Group did not intend to deceive the government, which is required to establish liability under the Contract Disputes Act or to warrant forfeiture under the Special Plea in Fraud statute. In addition, defendant's failure to establish that plaintiff intended to deceive the government or that plaintiff's contracts were tainted by a conflict of interest leads the court to conclude that the rescission or disgorgement of the camp package or bottled water BPA calls is not warranted.

Although the court does not condone the manner in which Gulf Group submitted its claims to the contracting officer, defendant's behavior in this case was equally problematic with regard to its termination of the latrine and dumpster contracts. Although the record reflects a number of purported, and shifting, justifications offered by defendant's personnel for terminating Gulf Group's latrine and dumpster contracts for convenience, none of the justifications presented to the court were reasonable or consistent with the government's obligation to act in good faith. The government's

United States, 106 Fed. Cl. 652, 664 (2012) (citation omitted); Morse Diesel Int'l, Inc. v. United States, 81 Fed. Cl. 220, 222 (2008) (citation omitted). Gulf Group did not move for a finding of spoliation and did not attempt to prove the elements of spoliation that would justify an application of an adverse inference in the bottled water BPA case. Gulf Group has, therefore, failed to meet its burden of proof with respect to the bottled water BPA claims in a variety of ways. See Precision Pine & Timber, Inc. v. United States, 596 F.3d at 833 ("[T]he party seeking damages has the burden of proving them with 'reasonable certainty.'"); see also Ariz. Pub. Serv. Co. v. United States, 93 Fed. Cl. at 390 (noting that, although there was "no doubt" that the plaintiff incurred costs, the plaintiff "did not show to a degree of reasonable certainty that the costs could be tied directly to its mitigation efforts").

allegations with respect to the alleged security incident and Gulf Group's performance under the latrine and dumpster contracts were without basis. The record before the court indicates that government personnel were simply motivated, as Col. Hess described, "to get Gulf Group off the bases," while at the same time contracting with Gulf Group for other services, including continuation of calls under the bottled water BPA.

The court concludes, therefore, that the government abused its discretion in terminating Gulf Group's latrine and dumpster contracts, thereby entitling Gulf Group to lost profits for the base period of the latrine contract in the amount of 92,443.724 KD, plus interest. The record establishes that plaintiff would not have made a profit during the base period of the dumpster contract. Given defendant's concession of the costs plaintiff incurred in preparing to perform the dumpster contract, therefore, Gulf Group is entitled to 47,881.664 KD, plus interest, which amounts to the costs Gulf Group incurred in preparing to perform the dumpster contract, less the value of the loss Gulf Group would have incurred in performing during the base period of the dumpster contract.

In contrast to the latrine and dumpster contracts, Gulf Group did not establish that defendant abused its discretion in terminating the camp package BPA call for Camp Buehring. Defendant has advanced a good faith, reasonable explanation for its termination of the call for Camp Buehring. The record before the court indicates that defendant terminated the call for Camp Buehring for reasons primarily unrelated to its termination of the latrine and dumpster contracts. Although Saud Al Tawash and Gulf Group may have anticipated receiving an award of a call for Camp Virginia, defendant was not contractually obligated to make such an award. Gulf Group is, therefore, only entitled to recover the costs it incurred in preparing to perform the call for Camp Buehring, which amounts to 19,323.000 KD, plus interest, as a result of the government's termination for convenience.

Gulf Group advanced a consistent and understandable claim under the bottled water BPA for demurrage costs associated with what plaintiff alleges were government-caused delays. To the extent that any delays were caused by the government's requirement that Gulf Group deliver bottled water into Iraq in military convoys, the court concludes that Gulf Group may not recover for the additional costs it incurred by these delays because the requirement to travel in military convoys was a sovereign act. Moreover, the court concludes that it would have been commercially and otherwise impossible for the government to have avoided causing delays by not requiring Gulf Group to deliver bottled water in military convoys, that the parties did not foresee that the requirement to travel in military convoys would cause delays, and that the government did not assume the risk of any delays caused in the delivery of bottled water into Iraq. The Sovereign Acts Doctrine, therefore, precludes Gulf Group from recovering for the delays caused by the requirement to travel in military convoys when delivering bottled water into Iraq. With respect to the return-trip delays, although plaintiff clearly provided a service to the defendant, the court concludes that, given the nature of transportation conditions in the theatre at the time, including numerous possible delay

factors, Gulf Group did not present the court with sufficient evidence to determine that the government is responsible for any return-trip delays.

       **IT IS SO ORDERED.**

                                        <u>s/Marian Blank Horn</u>
                                     **MARIAN BLANK HORN**
                                        **Judge**